**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

SEAGATE TECHNOLOGY LLC,

      Plaintiff,

v.

Civil Action No. 04-418-SLR

CORNICE, INC.

      Defendant.

**CORPORATE DEPOSITION NOTICE OF DEFENDANT CORNICE, INC.**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 27, 2005 at 9:00 a.m., Plaintiff Seagate

Technology, LLC, pursuant to Fed. R. Civ. P. 30, will take the deposition of Defendant

Cornice, Inc.

The deposition will take place at the offices of Fish & Richardson P.C., 1425 K

Street, N.W., Washington, D.C. 20005, or at such other location as the parties shall agree.

The deposition shall be taken upon oral examination before an officer authorized to

administer oaths and take testimony. The oral examination will be recorded

stenographically, including the use of use of instantaneous transcription and/or videotape,

and will continue day to day until completed.

The deposition will be taken for the purpose of discovery, for use at the hearings

and trial in this matter, and for any other purpose permitted under the Federal Rules of

Civil Procedure. Pursuant to the Federal Rules of Civil Procedure, Cornice shall

designate a witness or witnesses on each of the topics set forth in Exhibit A attached

hereto. You are invited to attend and examine.

Dated: May 13, 2005

FISH & RICHARDSON P.C.

By: _____
    William J. Marsden (#2247)
    Timothy Devlin (#4241)
    919 N. Market Street, Suite 1100
    Wilmington, DE 19899-1114

    Roger S. Borovoy
    David M. Barkan
    D. Austin Horowitz
    500 Arguello Street
    Redwood City, CA 94063-1526

    Ruffin B. Cordell
    Brian R. Nester
    Timothy W. Riffe
    1425 K Street NW, Suite 1100
    Washington, D.C. 20005

    Edmond Bannon
    Lewis E. Hudnell, III
    Citigroup Center - 52nd Floor
    153 East 53rd Street
    New York, NY 10022-4611

Attorneys for Plaintiff
SEAGATE TECHNOLOGY LLC

2

## EXHIBIT A

## DEFINITIONS

1.    "Plaintiff" or "Seagate" means Seagate Technology LLC, individually and collectively, including without limitation all of its corporate locations, and all predecessors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with Seagate and others acting on behalf of Seagate.

2.    "Defendant," "Cornice," "you" or "your" means Cornice, Inc., including without limitation all of your corporate locations, and all predecessors (including Convergent Systems Solutions), subsidiaries, parents, and affiliates and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with Cornice and others acting on behalf of Cornice.

3.    The "'159 patent" means U.S. Patent No. 5,452,159.

4.    The "'461 patent" means U.S. Patent No. 5,596,461.

5.    The "'506 patent" means U.S. Patent No. 5,600,506.

6.    The "'754 patent" means U.S. Patent No. 6,146,754.

7.    The "'054 patent" means U.S. Patent No. 6,324,054.

8.    The "'845 patent" means U.S. Patent No. 6,545,845.

9.    The "'606 patent" means U.S. Patent No. 6,744,606.

10.    The "Seagate patents" means, individually and collectively, the '159 patent, the '461 patent, the '506 patent, the '754 patent, the '054 patent, the '845 patent, and the '606 patent.

11.    "Document" is defined broadly to be given the full scope of that term contemplated in Federal Rule of Civil Procedure 34, and includes all tangible things, all

3

originals (or, if originals are not available, identical copies thereof), all non-identical copies of a document, all drafts of final documents, all other written, printed, or recorded matter of any kind, and all other data compilations from which information can be obtained and translated if necessary, that are or have been in your actual or constructive possession or control, regardless of the medium on which they are produced, reproduced, or stored (including without limitation computer programs and files containing any requested information), and any recording or writing, as these terms are defined in Rule 1001, Federal Rules of Evidence. Any document bearing marks, including without limitation, initials, stamped initials, comments, or notations not a part of the original text or photographic reproduction thereof, is a separate document.

12.    "Person" means any individual or firm, association, organization, joint venture, trust, partnership, corporation, or other collective organization or entity.

13.    "Entity" means any person.

14.    "Product" means a machine, manufacture, apparatus, device, instrument, mechanism, appliance, or assemblage of components/parts (either individually or collectively), which are designed to function together electrically, mechanically, chemically, or otherwise, to achieve a particular function or purpose, including those offered for sale, sold, or under development.

15.    "Accused Product" or "Accused Products" means and includes all of Cornice's disc drives, components thereof, and products containing such components and/or disc drives. Cornice's disc drives include all of Cornice's "Storage Element" disc drive products, including, but not limited to, Cornice's 1.0 GB Storage Element, 1.5 GB Storage Element, 2.0 GB Storage Element, 3.0 GB Storage Element, 4.0 GB Storage Element, and any other disc drive that Cornice may market by the close of fact discovery, including but not limited to the "higher capacity 1in hard drives as well as smaller form – factor products" that "Cornice told its customer it will launch" this month at Computex in Taipei, Taiwan , components thereof, and products containing the same, whether

4

manufactured or sold by Cornice or others. See "Cornice to Stop making 1-2GB 1in HDDs" The Register, http://www.theregister.co.uk/2005/05/03/seagate_vs_cornice/; May 3, 2005.

16.    "Components" means and includes any and all constituent parts or elements included in Cornice's disc drives or products containing the same.

17.    "Products containing the same" means and includes all products that contain any Cornice disc drive or components thereof.

18.    To "relate to" means to describe, discuss, constitute, comprise, or evidence.

19.    The term "identify" or "identity," when used with respect to any natural person, means that the following information shall be provided: the person's full name; last known home address; present and last known business address and telephone number; present and last known title or occupation; and present and last known employer.

20.    The term "identify" or "identity," when used with respect to any legal entity, such as a corporation, company, or person other than a natural person, means that the following information shall be provided: the entity's name; the place of incorporation or organization; the principal place of business; and the nature of the business conducted by that legal entity.

21.    The term "identify" or "identity," when used with respect to a document, means to provide information sufficient to locate that document, including but not limited to the following: the Bates range, the date appearing on such document or, if no date appears thereon, the approximate date the document was prepared; the identifying code number, file number, title, or label of such document; a general description of such document (e.g., letter, memorandum, drawing); the title or heading; the number of pages of which such document consists; the name of each person who signed or authorized the document; the name of each addressee; the name of each person having possession, custody, or control of such document; if the document existed at one time but does not

5

presently exist, the reason(s) why it no longer exists and the identity of the last person having custody of it; and, if the document is in a foreign language, whether an English translation of the document exists, whether partial or complete.

22.    When used with reference to a communication, "identify" means to identify the sender(s), recipient(s), and/or participant(s) of the communication and to state the date, subject matter, and nature (e.g., telephone call, meeting, letter, etc.) of the communication.  If the communication was in person, also state the location.

23.    The term "communication" or any variant thereof means any contact between two or more persons and shall include, without limitation, written contact by means such as letters, memoranda, telegrams, telecopies, telexes, e-mail, or any other document, the transmittal of information by any means, and any oral contact such as face-to-face meetings or telephone conversations.

24.    The term "concerning" includes, but is not limited to, the following meanings: relating to; referring to; pertaining to; discussing; mentioning; containing; reflecting; evidencing; constituting; describing; displaying; showing; identifying; proving; disproving; consisting of; supporting; contradicting; in any way legally, logically, or factually connected with the matters referenced; or having a tendency to prove or disprove any matter referenced.

25.    The term "all" includes and encompasses "any."

26.    The term "and" as well as "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of these requests all facts, documents, things, or communications that might otherwise construed as outside the scope of these requests.

27.    "TDK" means TDK Corporation Group, individually and collectively, including without limitation all of its corporate locations, and all predecessors, subsidiaries (including SAE Magnetics [H.K.] Ltd.), parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys,

6

entities acting in joint-venture or partnership relationships with TDK and others acting on behalf of TDK.

28.    "SAE" means SAE Magnetics [H.K.] Ltd., individually and collectively, including without limitation all of its corporate locations, and all predecessors, subsidiaries, parents (including TDK Corporation Group), and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with SAE and others acting on behalf of SAE.

29.    "Agere" means Agere Systems Inc., individually and collectively, including without limitation all of its corporate locations, and all predecessors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with Agere and others acting on behalf of Agere.

30.    "Hoya" means Hoya Corporation and Hoya Holdings, Inc., individually and collectively, including without limitation all of its corporate locations, and all predecessors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with Hoya and others acting on behalf of Hoya.

31.    The term "3:2 servo pattern" means and includes any servo pattern that has 3 servo tracks for every 2 data tracks.

32.    The term "5:4 servo pattern" means and includes any servo pattern that has 5 servo tracks for every 4 data tracks.

33.    "Phillips" means Royal Philips Electronics NV, individually and collectively, including without limitation all of its corporate locations, and all predecessors, subsidiaries (including Philips Consumer Electronics), parents, and affiliates, and all past or present directors, officers, agents, representatives, employees,

consultants, attorneys, entities acting in joint-venture or partnership relationships with Phillips and others acting on behalf of Phillips.

## **TOPICS**

1. The identification of each and every Accused Product designed by or for Cornice.

2. The identity of each and every marketing name, internal name, part number, and all other unique designations, for each product identified in response to Topic 1.

3. The design, research, and development of the Accused Products, including documents relating to or describing the design, research, and development of the Accused Products, including but not limited to data sheets, circuit diagrams, specifications, schematics, block diagrams, engineering notebooks, and engineering drawings and/or CAD files.

4. The functionality, operation, structure, and architecture of the Accused Products, including documents relating to or describing the functionality, operation, structure, and architecture of the Accused Products, including but not limited to data sheets, circuit diagrams, specifications, schematics, block diagrams, engineering notebooks, and engineering drawings and/or CAD files.

5. The manufacture of the Accused Products including, but not limited to, their fabrication, packaging, and testing.

6. The process(es) that Cornice uses or has used to research, design, layout, develop and test each Accused Product.

7. The properties (including the isotropic magnetic properties, presence of superlinear noise behavior at different recording densities, coercive squareness ($S^*$), and coercivity (Hc)), composition, components, substrate, compounds, elements, layers (including the substrate, seedlayer, underlayer and magnetic layer), the hexagonal close

8

packed crystal structure of the magnetic layer, and the random oriented grains of each disc of each Accused Product.

8.      The structure, composition, and non-magnetic properties of the substrate of each disc of each Accused Product.

9.      The structure, composition, thickness, and properties of the seedlayer on the substrate of each disc of each Accused Product, and whether, and to what extent, it is oxidized.

10.     The structure, composition and properties of the underlayer on the seedlayer of each disc of each Accused Product.

11.     The structure, composition and properties of the magnetic layer on the underlayer of each disc of each Accused Product.

12.     The isotropy of the magnetic layer of each disc of each Accused Product.

13.     The orientation ratio of each disc of each Accused Product.

14.     The crystal structure of the magnetic layer of each disc of each Accused Product.

15.     Whether the magnetic layer of the disc of each Accused Product exhibits a hexagonal close packed crystal structure with randomly oriented grains.

16.     The superlinear noise behavior of the disc of each Accused Product at a recording density of about 220 KFCI to about 280 KFCI.

17.     The coercive squareness (S*) and coercivity (Hc) of the disc of each Accused Product.

18.     Whether the underlayer of the disc of each Accused Product exhibits a (200)-dominant crystallographic orientation.

19.     Whether the magnetic layer of the disc of each Accused Product exhibits a (11$\underline{2}$0)-dominant crystallographic orientation.

20.     The method of manufacturing the disc of each Accused Product.

21.     The method of depositing a seedlayer on a substrate of the disc of each Accused Product.

22.     Whether in depositing the seedlayer of the disc of each Accused Product, the grains lying in a plane are randomly oriented.

23.     The method of depositing an underlayer on a seedlayer of the disc of each Accused Product.

24.     The method of depositing a magnetic layer on an underlayer of the disc of each Accused Product.

25.     The meaning of all charts, graphs, schematics, engineering notebooks, specifications, and associated files, in both hardcopy and electronic format, relating to the properties, (including the isotropic magnetic properties and presence of superlinear noise behavior at different recording densities, coercive squareness (S*), and coercivity (Hc)), composition, components, substrate, compounds, elements, layers (including the seedlayer, underlayer and magnetic layer), the hexagonal close packed crystal structure of the magnetic layer, and the random oriented grains of the magnetic layer of each disc of each Accused Product.

26.     The process(es) for generating magnetic reference patterns, including, but not limited to, servo and gray scale bands, on the surface of the magnetic recording media incorporated into the Accused Products, the identity of the entity or entities responsible for generating such patterns on the media, and documents that refer or relate to generation of such patterns.

27.     The design, fabrication, assembly, and functionality of the system for measuring the distance of a transducer from a reference point on a disc in each Accused Product.

28.     The design, fabrication, assembly and functionality of any system or process for dividing a disc surface of a disc in each Accused Product into sectors comprising one or more of a data track, a servo band and a gray scale band.

29.    The design, fabrication, assembly, and functionality of any servo band recorded on each disc of each Accused Product including any quadrature servo pattern repeated 0.75*Z times, where Z is the number of data tracks recorded in each sector on the disc of each Accused Product.

30.    The design, fabrication, assembly, and functionality of any gray scale band recorded on each disc of each Accused Product including any 1.5*Z consecutively addressed gray scale areas, where Z is the number of data tracks recorded in each sector on the disc of each Accused Product.

31.    Any relationship, co-activity, or cooperation between any servo band and any gray scale band recorded on each disc of each Accused Product including any relationship, coactivity or cooperation to define radial positions on the disc from a fixed reference point in the gray scale band.

32.    The design, fabrication, assembly, and functionality of the position generator of the system for measuring the distance of a transducer from a reference point on a disc in each Accused Product.

33.    Any process by which the position generator in each Accused Product generates, from the quadrature servo pattern and an address of a gray scale area read by a transducer, a signal indicating a position of the transducer relative to a fixed reference point in the gray scale band on the disk of each Accused Product.

34.    Any system or process by which the position generator in each Accused Product segments each gray scale area into two zones, including any system or process by which a gray scale area having an even address is divided into zone 1 and zone 0, and a gray scale area having an odd address is divided into zone 2 and zone 3, and including any system or process where a center in each of said zones 0, 1, 2 and 3 is located at a boundary between two of said four bursts in said quadrature servo pattern.

35.    Any relationship co-activity or cooperation between the data tracks and the gray scale of each Accused Product including whether each of the data tracks on each

11

disc of each Accused Product has a track address TA whose center TAC, expressed in gray scale units, is located from said fixed reference point in the gray scale band by the relationship $TAC=(1.5*TA)+0.25$.

36.     Any relationship, co-activity or cooperation between the position generator and the gray scale of each Accused Product, including whether the position generator in each Accused Product segments each gray scale area into four zones where a gray scale area having an even address is divided into zones 1, 2, 3 and 4 and a gray scale area having an odd address is divided into zones 5, 6, 7 and 8 and where each zone has a border on a boundary between two of the four servo bursts in the quadrature servo pattern.

37.     The addressing of any gray scale band of each Accused Product including whether the gray scale areas of the gray scale band recorded on each disc of each Accused Product are consecutively addressed starting with address zero and the fixed reference point is located at a center of a gray scale area having an address of zero; and including whether the gray scale areas of the gray scale band recorded on each disc of each Accused Product are consecutively addressed starting with address zero and a fixed reference point is located at a center of a gray scale area having an address of zero.

38.     The size and shape of any servo burst of each Accused Product including whether the first, second, third, and fourth servo burst each have a width of $2/3*W$, and whether each gray scale area has a width of $2/3*W$, assuming each data track on each disc of each Accused Product has a width of W.

39.     The initiation of any gray scale area, including whether the gray scale area of the gray scale band recorded on each disc of each Accused Product having an address zero is initiated at a point of initiation of the gray scale band and a data track having a data track address of zero, and including whether the gray scale area of the gray scale band recorded on each disc of each Accused Product having an address zero is initiated at

12

a point 1/6*W from the initiation of the gray scale band and a data track having a data track address of zero.

40.    The method or process of determining the position of a transducer from a fixed reference point located on the surface of a disc in each Accused Product.

41.    The method or process of generating a radial position signal that is indicative of the position of a transducer from a fixed reference point located on the surface of a disc in each Accused Product.

42.    The design, fabrication, assembly, and functionality of the actuator assembly, actuator arm and bearing cartridge of each Accused Product.

43.    The design, fabrication, assembly, and functionality of each structure used to fasten, secure, or otherwise couple the actuator to the bearing cartridge in each Accused Product.

44.    The design, fabrication, assembly, and functionality of the retaining clip used to fasten the bearing cartridge to the actuator arm of each Accused Product.

45.    The design, fabrication, assembly, and functionality of the data storage medium, transducer, and actuator of each Accused Product.

46.    The design, fabrication, assembly, and functionality of each and every structure used to capture and park the transducer in each Accused Product.

47.    The design, fabrication, assembly, and functionality of the magnetic parking device used to capture and park the transducer in each Accused Product.

48.    The design, fabrication, assembly, and functionality of the magnetically permeable capture member provided on the actuator of each Accused Product.

49.    The design, fabrication, assembly, and functionality of the magnetic parking means provided adjacent to the actuator for capturing and magnetically retaining the capture member to park the transducer in each Accused Product.

50.    The design, fabrication, assembly, and functionality of the magnetic field containing member and magnet of the magnetic parking means in each Accused Product.

13

51.    Whether the capture member provided on the actuator of each Accused Product is in a non-permeated state over a first portion of the path of the actuator, and whether the capture member switches to a permeated state over a second portion of the actuator path such that the capture member is positioned proximate to the magnetic parking means and in the magnetic field.

52.    The design and functionality of the magnetic flux provided by the magnet in the magnetic parking means in each Accused Product.

53.    Whether the magnetic parking means of each Accused Product captures the magnetically permeable capture member only when the capture member enters an air gap in the magnetic field containing member.

54.    Whether there is substantially no magnetic flux leakage outside the air gap in the magnetic field containing member of each Accused Product.

55.    The design, fabrication, assembly, and functionality of any structure used in each Accused Product to reduce vibrations and shock that may be caused by packaging, transporting, assembling, and handling each Accused Product.

56.    The design, fabrication, assembly, and functionality of all material, including plastic and rubber, on the exterior of each Accused Product.

57.    The design, fabrication, assembly, and functionality of the disc drive housing of each Accused Product.

58.    The design, fabrication, assembly, and functionality of the actuator in each Accused Product.

59.    The design, fabrication, assembly, and functionality of the coil support portion of the actuator in each Accused Product.

60.    The design, fabrication, assembly, and functionality of the arm portion of the actuator in each Accused Product.


61.    Whether the coil support portion of the actuator in each Accused Product defines a first plane and the arm portion of the actuator in each Accused Product defines a second plane, and whether the first plane is distinct from the second plane.

62.    Any third party involvement in the design, development, manufacture, marketing, sale, and/or distribution of the Accused Products, and all agreements relating to this involvement, including but not limited to SAE, TDK, Agere and Hoya.

63.    Cornice's involvement in the research, development, design, engineering, manufacture, offer for sale, or sale of products sold by Cornice's customers, whether past, present, or future, that contain any of the Accused Products.

64.    Any modification, improvement, change, or any proposed modification, improvement, or change, in any Accused Product, in light of the present litigation.

65.    Cornice's efforts to determine the state of intellectual property rights in the area of technologies covered by the '159, '461, '506, '754, '054, '845, and '606 patents.

66.    Cornice's efforts to determine the scope, validity, infringement, and/or enforceability of the '159, '461, '506, '754, '054, '845, and '606 patents.

67.    All studies, analyses, or reports, written or oral, prepared, reviewed, or considered by or for Cornice referring or relating to the infringement or non-infringement, validity or invalidity, enforceability or unenforceability, or interpretation of the scope of the claims of the '159, '461, '506, '754, '054, '845, and '606 patents and any related United States or foreign applications and/or patents.

68.    Investments in capital equipment used in the manufacture/assembly of the Accused Products, the entities responsible for such investments, and where such equipment is located.

69.    Cornice's commercial exploitation of the Accused Products including marketing, manufacturing, sampling, efforts to sell, offers for sale, actual sales, and licensing.

15

70. The identity of all customers, past or present, or potential customers that have purchased or may purchase any Accused Product, whether based in the U.S. or abroad.

71. The identity of all customers that incorporate the Accused Products into downstream products, and the identity of such downstream products, and all communications and Cornice's involvement in such incorporation.

72. Communications with Cornice's distributors, AV Concept Limited, Kaga Electronics Co. Ltd. (Japan), Holy Stone Enterprise Co., Ltd. (Taiwan), and Uniquest Corporation (Korea), including but not limited to reports or summaries concerning sales, shipment, and importation into the United States of the Accused Products or products containing same.

73. The sale and importation, sale for importation, or sale in the United States after importation of any Accused Products and other products containing any Accused Products.

74. The actual and expected sales volume of each of the Accused Products.

75. The sale price of any Accused Product and products containing any Accused Product, both inside and outside the United States.

76. The identity and relationship to Cornice of each person or entity involved in the sale and importation, sale for importation, or sale in the United States after importation of any Accused Products and other products containing any Accused Products.

77. The location and volume of inventories and sales of the Accused Products and products containing any Accused Products, both inside and outside the United States.

78. Cornice's shipment and storage of the Accused Products into the United States for any purpose, including but not limited to testing and demonstrations to customers or potential customers.

16

79.    All communications between Cornice and SAE concerning engineering, manufacture, assembly, testing, distribution, or sale of the Accused Products, and any products containing any Accused Products.

80.    All communications between Cornice and Hoya concerning engineering, manufacture, assembly, testing, distribution, or sale of the Accused Products, and any products containing any Accused Products.

81.    All communications between Cornice and Agere concerning engineering, manufacture, assembly, testing, distribution, or sale of the Accused Products, and any products containing any Accused Products.

82.    The location of all design, engineering (including customer support), research and development, manufacture, testing, simulation, fabrication, or sales and marketing activities for the Accused Products or any products containing any Accused Products.

83.    The existence, location, and extent of all technical or engineering documents relating to the Accused Products or any products containing any Accused Products.

84.    The existence, location, contents, and extent of all demonstration kits and reference designs relating to the Accused Products or any products containing any Accused Products.

85.    The corporate structure and organization of Cornice, including the structure and organization of the portion or portions, and employees of Cornice responsible for the design, development, manufacture, marketing, and sale of the Accused Products and any products containing any Accused Products.

86.    Cornice's business plans, including, but not limited to, strategic plans, operating plans, marketing plans, financial plans, production plans, sales plans and capital or investment plans relating to the Accused Products.

17

87.     The identity and involvement of all persons or entities involved in the conception, design, development, manufacture, assembly, offer for sale, sale, distribution, importation, and inventorying of the Accused Products.

88.     The identification of all patents and patent applications (and related prosecution histories) owned, licensed, or controlled by Cornice, foreign or domestic, that refer or relate to the Accused Products and any products containing any Accused Products.

89.     Any licenses entered into, proposed, or identified by Cornice that would allow Cornice and/or a third party to obtain rights to make, use, or sell the Accused Products and any products containing any Accused Products.

90.     Any communications between Cornice and any other person regarding the ' 159, '461, '506, '754, '054, '845, and '606 patents or this litigation, including without limitation any reports, statements or analysis by third parties.

91.     All advice of counsel regarding the '159, '461, '506, '754, '054, '845, and '606 patents upon which Cornice may rely for any purpose of this action.

92.     The date(s) on which and the circumstances under which Cornice first became aware of the '159, '461, '506, '754, '054, '845, and '606 patents.

93.     Cornice's full factual and legal bases for asserting that it does not infringe the ' 159, '461, '506, '754, '054, '845, and '606 patents.

94.     Cornice's full factual and legal bases for asserting that Cornice, SAE, and/or TDK are licensed under one or more of the '159, '461, '506, '754, '054, '845, and '606 patents.

95.     Cornice's full factual and legal bases for asserting that the ' 159, '461, '506, '754, '054, '845, and '606 patents are invalid.

96.     Cornice's full factual and legal bases for asserting that the ' 159, '461, '506, '754, '054, '845, and '606 patents are unenforceable.

18

97.    Cornice's full factual and legal bases for asserting that Cornice has committed no unfair acts.

98.    All prior art that Cornice believes relates to the '159, '461, '506, '754, '054, '845, and '606 patents, including, but not limited to, any prior art relating to any defense Cornice intends on asserting.

99.    Cornice's full factual and legal bases regarding the level of knowledge, schooling, experience, expertise or relevant technical information of a person having ordinary skill in the art to which any invention disclosed, described or claimed in the '159, '461, '506, '754, '054, '845, and '606 patents pertains.

100.    Cornice's full factual and legal bases for asserting that the relief sought by Seagate is barred in whole or in part by the doctrines of laches, patent exhaustion, and/or the first sale doctrine, implied license, prosecution history laches, and the equitable doctrines of estoppel and acquiescence.

101.    Cornice's full factual and legal bases for asserting that by reason of the prosecution before the United States Patent and Trademark Office ("USPTO") and by reason of admissions made by or on behalf of the applicant for these patents, Seagate is estopped from claiming infringement by Cornice of one or more of the claims of the '159, '461, '506, '754, '054, '845, and '606 patents.

102.    Cornice's full factual and legal bases for asserting that the '159, '461, '506, '754, '054, '845, and '606 patents are unenforceable under the doctrine of inequitable conduct due to breaches of the duty of candor by either the named inventors on such patents and/or substantively involved in the prosecution of the applications that resulted in such patents.

103.    Cornice's full factual and legal bases for asserting that each of the ' 159, '461, '506, '754, '054, '845, and '606 patents is void and unenforceable by reason of the equitable doctrine of unclean hands.

19

104.   Cornice's full factual and legal bases for asserting that (1) Seagate's infringement claims are objectively baseless, and that (2) Seagate has through this and other proceedings interfered with Cornice's existing and future business relationships and opportunities, including an identity of any alleged interference, and an identity of each existing and future business relationship and opportunity.

105.   Cornice's full factual and legal bases for asserting that Seagate has taken part in wrongful conduct and led a false and negative campaign: to advertise and publicize this proceeding in bad faith to third parties with whom Cornice has actual or potential business relationships; to improperly and illegally disrupt these business relationships of Cornice; to disparage the Accused Products to manufacturers overseas; to induce or cause third parties to decline to enter into, or continue, contractual or business relations with Cornice which would otherwise have been continued or consummated; and to falsely represent to Cornice customers and potential customers that Cornice will be prevented from supplying them with products and that supply contracts should not be entered into with Cornice.

106.   Cornice's full factual and legal bases for asserting that Seagate is publicizing this (and other) infringement proceedings by improperly enlisting the support of Western Digital Technologies, Inc. ("Western Digital"), and perhaps other manufacturers, to conjure up infringement claims of their own against Cornice to further weaken and distract Cornice from its ability to meet the existing demands of its customers, and further to discourage customers from dealing with Cornice.

107.   Cornice's full factual and legal bases for asserting that Seagate is barred from asserting the Patents-in-Suit by the equitable doctrine of patent misuse.

108.   Cornice's full factual and legal bases for asserting that the relief sought by Seagate does not and would not further the public interest and there are strong public policy reasons for denying Seagate the relief sought.

20

109.   The identity, including the definition, of the "market" referred to in your contention that "Seagate is currently one of the largest manufacturers of disk drives in the world, and its disk drive account for a significant market share," and that "[t]he storage elements manufactured . . . for Respondent represent a future competitive threat to Seagate's dominant market position."

110.   Cornice's answers to Seagate's First and Second Sets of Interrogatories in the above captioned matter, and any supplemental answers Cornice may provide to these Interrogatory, and all documents and things connected with the formulation of answers to these interrogatories.

111.   The identity of all persons involved in, and each such person's role in, the design, development, manufacture, assembly, shipment, marketing, sale, importation, and transfer of Accused Products.

112.   The identity of all persons that supply or provide Accused Products, or components thereof, the identity of the item supplied or provided, specifications used to design and manufacture such item, and the supplier(s) of such specification.

113.   The identity of the person supplying the disc included with, or comprising, the Accused Product, and all communications with, including any specifications provided to or received from, any such person.

114.   The sale, importation, provision, supply, shipment or any form of transfer of Accused Products, and documents reflecting the same.

115.   The identity and function of all materials and equipment used in the manufacture, assembly, and design of Accused Products located in SAE/TDK facilities and which of such materials are, were or will be, at least in part, purchased by or otherwise financed by Cornice.

116.   The identity of each and every person or entity holding title to the Accused Products prior to, during, and after assembly, manufacture, sale, importation, shipment, or any other transfer.

21

117.    All communications between Cornice and any other party regarding the Accused Products.

118.    All agreements between Cornice and SAE/TDK, or any third party and SAE/TDK, concerning or relating to the Accused Products.

119.    Cornice's document retention policies.

120.    The structure of Cornice's computer records and archives, including without limitation, what records are stored in a computerized form, whether information is stored in a single central database or in separate databases for each department or division, whether such information can be searched by user constructed parameters or if only certain pre-constructed reports can be generated, and the applications in use.

121.    The scope, extent, and method of Cornice's search efforts for documents in response to the various requests for production, interrogatories, and deposition notice topics, including but not limited to the steps taken to search for potentially responsive documents, the personnel involved in the search for potentially responsive documents, and the files within Cornice and entities under its control which were searched.

122.    The investments in Cornice and/or its products, including but not limited to any investments made by Cornice's founders (Kevin Magenis and Curt Bruner), its management team (Magenis, Mike Wingert, Bruner, Jeff Elberson, and Scott Holt), Texas Instruments, CIBC Capital Partners, Nokia Venture Partners, VantagePoint Venture Partners, BA Venture Partners, and GIC Special Investments Pte. Ltd.

123.    Cornice's actual and expected sales volume of each of the Accused Products in terms of units and dollar amount, including without limitation Cornice's actual and expected gross revenues, net profits, and gross profits derived from these sales.

124.    The quantity, by month or quarter and in total, the sales prices, and the returns of each of the Accused Products made, sold or offered for sale by or for Cornice.

125.    Cornice's modification, improvement, change, or any proposed modification, improvement, or change, in any Accused Product, including attempts to

design or re-design products to avoid infringement of the '159, '461, '506, '754, '054, '845, and '606 patents.

126.    Cornice's forecasts or projections concerning the marketing, importing, exporting, offering for sale, and sale of the Accused Products.

127.    The identity of all persons or entities, and the facts and circumstances, involved in the conception, design, and development of the servo pattern, position generating logic, the servo track writer specifications, the servo track writer code, used in the Accused Products.

128.    The identity of all persons or entities, and the facts and circumstances, relating to Cornice's assertion of a joint defense agreement, "joint defense, common interest" agreement, or other similar contractual arrangement or agreement between Cornice and either Hoya Corporation, SAE, TDK, and/or Agere.

129.    Cornice's full factual and legal bases for asserting a joint defense agreement, "joint defense, common interest" agreement, or other similar contractual arrangement or agreement between Cornice and either Hoya Corporation, SAE, TDK, and/or Agere.

130.    Any communications related to any assistance, advice, consultations, funding, equipment, tests, test results, personnel, or other support between Cornice and Hoya Corporation related to this litigation.

131.    Any communications related to any assistance, advice, consultations, funding, equipment, tests, test results, personnel, or other support between Cornice and SAE/TDK related to this litigation.

132.    Any communications related to any assistance, advice, consultations, funding, equipment, tests, test results, personnel, or other support between Cornice and Agere related to this litigation.

23

133.    Cornice's product programs designated as "Fire," "Dragon," or "Earth" including but not limited to every derivative product under each such name and/or product line.

134.    All communications, including any agreement and invoices, between Cornice and Samsung Electronics, relating to the incorporation of the Accused Products into any products made, produced, marketed, sold, or offered for sale by Samsung Electronics.

135.    All communications, including any agreement and invoices, between Cornice and Sony, relating to the incorporation of the Accused Products into any products made, produced, marketed, sold, or offered for sale by Sony.

136.    All communications, including any agreement and invoices, between Cornice and Phillips, relating to the incorporation of the Accused Products into any products made, produced, marketed, sold, or offered for sale by Phillips.

137.    All communications, including any agreement and invoices, between Cornice and NHJ Ltd., relating to the incorporation of the Accused Products into any products made, produced, marketed, sold, or offered for sale by NHJ Ltd.

138.    Any investigation, research, experiment, assessment, analysis, study or due diligence investigation done by or on behalf of Cornice concerning the Accused Products.

139.    Any investigation, research, experiment, assessment, analysis, study or due diligence investigation done by, or on behalf of, Cornice concerning or relating to the Seagate Patents, including all documents relating to any determination that any Accused Product does not infringe any of the Seagate Patents.

140.    Any advertising, marketing, promotional and sales literature, sales presentation material, sales brochures, technical presentation materials, trade show presentations, or technical paper presentations, including overhead transparencies or slides, which relate to any of the Accused Products.

141.    Cornice's full factual and legal bases for making the allegations of the First Affirmative Defense of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the Seagate Patents "are invalid because they fail to comply with the requirements of 35 U.S.C. § 101 et seq., including, without limitation §§ 102, 103 and/or 112."

142.    Cornice's full factual and legal bases for making the allegations of the Second Affirmative Defense of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that "Cornice has not directly infringed, indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the Seagate Patents-in-Suit, and has not otherwise committed any acts in violation of 35 U.S.C. § 271."

143.    Cornice's full factual and legal bases for making the allegations of the Third Affirmative Defense of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the "relief sought by Seagate is barred in whole or in part by the doctrine of laches."

144.    Cornice's full factual and legal bases for making the allegations of the Fourth Affirmative Defense of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the "claims brought by Seagate are barred in whole or in part by delay in prosecuting the patent applications resulting in the Seagate Patents-in-Suit."

145.    Cornice's full factual and legal bases for making the allegations of the Fifth Affirmative Defense of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the "relief sought by Seagate is barred in whole or in part by the doctrine of unclean hands and/or patent misuse."

146.    Cornice's full factual and legal bases for making the allegations of the Sixth Affirmative Defense of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that "[b]y reason of the prosecution before the United States Patent and Trademark Office ('USPTO') leading to the Seagate Patents-in-Suit, and by reason of

admissions made by or on behalf of the applicant for these patents, Seagate is estopped from claiming infringement by Cornice of one or more of the claims of such patents."

147.    Cornice's full factual and legal bases for making the allegations of the Seventh Affirmative Defense of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that "Seagate is equitably estopped from pursuing claims under the Seagate Patents-in- Suit."

148.    Cornice's full factual and legal bases for making the allegations of the Eighth Affirmative Defense of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that "the Seagate Patents-in-Suit are unenforceable under the doctrine of inequitable conduct due to repeated breaches of the duty of candor by either the named inventors on such patents and/or others substantively involved in the prosecution of the applications that resulted in such patents."

149.    Cornice's full factual and legal bases for making the allegations set forth in paragraph 71 of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that "[t]he storage elements manufactured and sold by Cornice represent a future competitive threat to Seagate's dominant market position."

150.    Cornice's full factual and legal bases for making the allegations set forth in paragraph 72 of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that "Seagate's response to the presence in the marketplace of the storage elements sold by Cornice was not to compete on the merits with those products, but to attempt to preempt by unfair means the competition represented by Cornice and to eliminate Cornice's storage elements as a choice for consumers."

151.    Cornice's full factual and legal bases for making the allegations set forth in paragraph 73 of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that "[t]he unfair means undertaken by Seagate include (i) the bringing of claims of patent infringement against Cornice that are objectively baseless because no reasonable litigant could believe it could prevail in that the patents asserted are invalid

and/or not infringed by the products made and sold by Cornice, (ii) seeking and obtaining publicity for its baseless litigation against Cornice, casting doubt on the legitimacy of the products sold by Cornice, and falsely asserting that Cornice would be prevented from selling its products, (iii) using the pendency of this litigation to falsely represent to customers and potential customers that Cornice will be prevented from supplying them with products and that supply contracts should not be entered into with Cornice, (iv) repeating and reasserting its objectively baseless claims against Cornice in proceedings in the U.S. International Trade-Commission ('USITC'), (v) using the pendency of proceedings in the USITC to falsely represent to customers and potential customers that Cornice would be prevented from selling its products and supply contracts should not be entered into with Cornice; and (vi) enlisting the support of Western Digital and perhaps other existing manufacturers of disk drives to conjure up infringement claims of their own to further burden Cornice and enhance Seagate's smear campaign against Cornice."

152.    Cornice's full factual and legal bases for making the allegations set forth in paragraph 74 of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that "Seagate has engaged in these acts for the purpose of injuring or destroying Cornice and therefore preventing the competitive threat represented by Cornice from ever emerging to threaten it."

153.    Cornice's full factual and legal bases for making the allegations of the First Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the '754 patent is allegedly not infringed, invalid, and/or unenforceable.

154.    Cornice's full factual and legal bases for making the allegations of the Second Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the '054 patent is allegedly not infringed, invalid, and/or unenforceable.

155. Cornice's full factual and legal bases for making the allegations of the Third Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the '461 patent is allegedly not infringed, invalid, and/or unenforceable.

156. Cornice's full factual and legal bases for making the allegations of the Fourth Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the '606 patent is allegedly not infringed, invalid, and/or unenforceable.

157. Cornice's full factual and legal bases for making the allegations of the Fifth Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the '845 patent is allegedly not infringed, invalid, and/or unenforceable.

158. Cornice's full factual and legal bases for making the allegations of the Sixth Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the '159 patent is allegedly not infringed, invalid, and/or unenforceable.

159. Cornice's full factual and legal bases for making the allegations of the Seventh Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that the '506 patent is allegedly not infringed, invalid, and/or unenforceable.

160. Cornice's full factual and legal bases for making the allegations of the Eighth Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, based on tortious interference with prospective business relations under Colorado law.

161. Cornice's full factual and legal bases for making the allegations of the Eighth Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, that assertion of the Seagate Patents is objectively baseless.

28

162.    Cornice's full factual and legal bases for making the allegations set forth in paragraphs 121-130 inclusive of Defendant's Answer, filed on August 11, 2004 in the above captioned matter.

163.    Cornice's full factual and legal bases for making the allegations of the Ninth Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, based on unfair competition under Colorado common law.

164.    Cornice's full factual and legal bases for making the allegations set forth in paragraphs 131-136 inclusive of Defendant's Answer, filed on August 11, 2004 in the above captioned matter.

165.    Cornice's full factual and legal bases for making the allegations of the Tenth Counterclaim of Defendant's Answer, filed on August 11, 2004 in the above captioned matter, based on Unfair Competition under Colorado Rev. Stat. § 6-1-105.

166.    Cornice's full factual and legal bases for making the allegations set forth in paragraphs 137-142 inclusive of Defendant's Answer, filed on August 11, 2004 in the above captioned matter.

167.    Cornice's full factual and legal bases for making the allegations set forth in paragraphs 137-142 inclusive of Defendant's Answer, filed on August 11, 2004 in the above captioned matter.

168.    The testing, design verification, evaluation, offer for sale, or sale by Phillips or any other third-parties concerning or relating to Cornice's 4.0GB Storage Element.

169.    The dates when each of the Accused Products have or will begin the Engineering Lab Unit, Design Verification Testing, and Mass Production stages, as identified by Mr. Scott Holt.

170.    All information and communications related to the "mailing sent to Cornice's Asian customers, and seen by The Register" and all information disclosed with

29

that mailing. See "Cornice to Stop making 1-2GB 1in HDDs" The Register,
http://www.theregister.co.uk/2005/05/03/seagate_vs_cornice ; May 3, 2005.

171.    Cornice's preparation for the Computex Show in Taipei, Taiwan for May
and June 2005.

172.    The fact and circumstances concerning the conception, design, research,
and development of any servo pattern, including the 3:2 servo pattern and 5:4 servo
pattern, used in the Accused Products including the documents concerning the same.

173.    The fact and circumstances concerning the conception, design, research,
and development of the position generating logic used in the Accused Products including
the documents concerning the same.

174.    The facts and circumstances concerning the conception, design, research,
and development of the servo pattern specifications used in the development and
manufacture/assembly of the Accused Products including the documents concerning the
same.

175.    The fact and circumstances concerning the conception, design, research,
and development of the servo track writer code used in the development and
manufacture/assembly of the Accused Products including the documents concerning the
same.

176.    The fact and circumstances concerning the conception, design, research,
and development of any servo code used in the development and manufacture/assembly
of the Accused Products including the documents concerning the same.

177.    The design, fabrication, assembly, and functionality of any ramp on each
disc of each Accused Product.

178.    The design, fabrication, assembly, and functionality of any inner crash
stop on each disc of each of the Accused Products.

179.    The location of any gray scale area having an address of zero on each disc
of each of the Accused Products.

180.    The number and/or percentage of units of the Accused Products in which any gray scale area having an address of zero is not written on a disc of an Accused Product.

181.    The facts and circumstances concerning the decision to use a 3:2 servo pattern in any of the Accused Products.

182.    The facts and circumstances concerning the decision to use a 5:4 servo pattern in any of the Accused Products.

183.    The design, fabrication, implementation, and functionality of the 5:4 servo pattern in any of the Accused Products.

184.    The design, fabrication, implementation, and functionality of the position generating logic in any of the Accused Products that uses a 5:4 servo pattern.

185.    Any modification, improvement, change, or any proposed modification, improvement, or change in any Accused Product, including attempts to design or re-design products to avoid infringement of the '506 patent, including any modifications to any documents reflecting the same.

186.    The facts and circumstance concerning the recording of the servo pattern on any disk of any Accused Product during manufacture.

187.    The fact and circumstances concerning the process by which the transducer or head reads the recorded servo information and uses it to generate a position signal when the product is in use.

188.    Cornice's full factual and legal bases for its theory of damages and the method used to calculate each category of damages (including, without limitation, whether the calculation is based on lost profits, reasonable royalty, or some other measure or patent damages; and identify each fact that supports that allegation, and each person with knowledge of that fact (listed in order from most knowledgeable to least knowledgeable)).

31

189.    Cornice's full factual and legal bases for any remedy or relief it seeks either through any of its affirmative defenses or counterclaims.

190.    Any design, manufacturing, or engineering changes you made to the 2.0 GB Storage Element to obtain the 3.0 GB Storage Element.

191.    Any design, manufacturing, or engineering changes you made to the 2.0 GB Storage Element to obtain the 3.0 GB Storage Element.

192.    The results and effects of any design, manufacturing, or engineering you made to the 2.0 GB Storage Element to obtain the 3.0 GB Storage Element, including without limitations any effects on the operations and yield of the 3.0 GB Storage Element and the costs associated with such changes.

193.    Cornice's full factual and legal bases for any design, manufacturing, or engineering you made to the 2.0 GB Storage Element to obtain the 3.0 GB Storage Element.

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2005, I electronically filed a **CORPORATE**

**DEPOSITION NOTICE OF DEFENDANT CORNICE, INC.** with the Clerk of Court

using CM/ECF which will send notification of such filing(s) to the following:

Jack B. Blumenfeld, Esquire　　　　　Attorneys for Defendant
MORRIS NICHOLS ARSHT &　　　　　Cornice, Inc.
TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347

I hereby certify that on May 13, 2005, I have mailed by United States Postal

Service, the document(s) to the following non-registered participants:

Mathew D. Powers　　　　　　　　　Attorneys for Defendant
Jason D. Kipnis　　　　　　　　　　Cornice, Inc.
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065

Russell Wheatley　　　　　　　　　　Attorneys for Defendant
WEIL, GOTSHAL & MANGES LLP　　　Cornice, Inc.
700 Louisiana, Suite 1600
Houston, TX  77002

Alan J. Weinschel　　　　　　　　　　Attorneys for Defendant
David C. Radulescu　　　　　　　　　Cornice, Inc.
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153

Timothy Devlin