IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SEAGATE TECHNOLOGY LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>CORNICE, INC.,<br><br>            Defendant. | Civil Action No. 04-418-SLR |

## CORPORATE DEPOSITION NOTICE OF PLAINTIFF SEAGATE TECHNOLOGY LLC

PLEASE TAKE NOTICE that on June 14, 2005 at 9:00 a.m., Defendant Cornice, Inc., pursuant to Fed. R. Civ. P. 30, will take the deposition of Seagate Technology LLC ("Seagate"), at the offices of Defendant's counsel, Morris, Nichols, Arsht & Tunnell, 1201 N. Market Street, P.O. Box 1347, Wilmington, Delaware 19899, or at such other time and place as the parties mutually agree. The deposition will continue from day to day until completed.

The deposition will be taken before a court reporter or other person authorized by law to administer oaths, and it will be recorded by stenographic means and/or videotape. The deposition will be taken for the purpose of discovery, for use at the trial in this matter, and for any other purpose permitted under the Federal Rules of Civil Procedure.

Pursuant to the Federal Rules of Civil Procedure, Seagate shall designate a witness or witnesses on each of the topics set forth in Exhibit A attached hereto. You are invited to attend and examine.

          MORRIS, NICHOLS, ARSHT & TUNNELL

          /s/ *Julia Heaney*
          Jack B. Blumenfeld (#1014)
          Julia Heaney (#3052)
          1201 N. Market Street
          P.O. Box 1347
          Wilmington, DE  19899
          (302) 658-9200
          jheaney@mnat.com
              *Attorneys for Defendant and Counterclaim Plaintiff Cornice, Inc.*

OF COUNSEL:
Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153
(212) 310-8000

May 27, 2005

# EXHIBIT A

# DEFINITIONS

A.     "**Seagate**" and "**Plaintiff**" shall each mean and refer to plaintiff Seagate Technology LLC, individually and collectively, including without limitation all of its corporate locations, and all predecessors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with Seagate and others acting on behalf of Seagate, including without limitation, Seagate Technology, Seagate Technology (US) Holdings, Inc., Quinta Corporation, and Conner Peripherals, Inc. ("**Conner**").

B.     "**Western Digital**" and **"WD"** shall each mean and refer to Western Digital Technologies, Inc., individually and collectively, including without limitation all of its corporate locations, and all predecessors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with WD and others acting on behalf of WD.

C.     "**Hitachi**" shall mean and refer to Hitachi, Ltd., including without limitation all of its corporate locations, and all predecessors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with Hitachi and others acting on behalf of Hitachi.

D.     "**Cornice**" and "**Defendant**" shall each mean and refer to Cornice, Inc.

E.     "**Product**" means a machine, manufacture, apparatus, device, instrument, mechanism, appliance, or assemblage of components/parts (either individually or collectively), which are designed to function together electrically, mechanically, chemically, or otherwise, to achieve a particular function or purpose, including those offered for sale, sold, or under development.

F.     "**Patents-in-Suit**" shall mean and refer to U.S. Patent Nos. 5,452,159; 5,596,461; 5,600,506; 6,146,754; 6,324,054; 6,545,845; and 6,744,606, individually and collectively.

G.     The "**'159 patent**" shall mean U.S. Patent No. 5,452,159.

H.     The "**'461 patent**" shall mean U.S. Patent No. 5,596,461.

I.     The "**'506 patent**" shall mean U.S. Patent No. 5,600,506.

J.     The "**'754 patent**" shall mean U.S. Patent No. 6,146,754.

K.     The "**'054 patent**" shall mean U.S. Patent No. 6,324,054.

L.     The "**'845 patent**" shall mean U.S. Patent No. 6,545,845.

M.     The "**'606 patent**" shall mean U.S. Patent No. 6,744,606.

N.  "**Relevant products**" shall mean (i) any product or process that is or was at any time alleged to practice one or more of the patents-in-suit, including at least the products identified in Seagate's Complaint in the ITC action (¶¶ 14.1 through 14.8) and Seagate's Response to Interrogatory No. 11 served in the ITC action, and (ii) any other product or process upon which a lost-profits analysis is or could be asserted, including without limitation the ST1.

O.  "**ITC action**" shall mean United States International Trade Commission Investigation No. 337-TA-516.

P.  "**Named Inventor(s)**" shall mean Frederick Mark Stefansky, Michael Baum, James Touchton, Xing Song, Qixu Chen, Charles Leu, Rajiv Yadav Ranjan, Wai Onn Chee, Joseph Cheng-Tsu Liu, Niroot Jierapipapatanakul, Choon Kiat Lim, Michael Joo-Chiang Toh, Pow-Hing Yong, Wallis A. Dague, Joseph HengTung Lau, Terang KongBeng Thia, PhyLye Lim, ChorShan Cheng, Andre YewLoon Liem, and SiewMing Ng.

Q.  "**Person**" shall mean any natural person or any business, proprietorship, firm, partnership, corporation, association, organization or other legal entity.  The acts of a Person shall include the acts of directors, officers, owners, members, employees, agents, attorneys or other representatives acting on the Person's behalf.

R.  "**Document**" means any physical medium or media in which information is stored or expressed.  A draft or non-identical copy is a separate Document within the meaning of this term.

S.  "**Thing**" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure.

T.  "**Communication**" shall mean any transmission of information in any context or situation by or between two or more persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically or digitally, or on tape, either orally or in writing, including without limitation but not limited to conversations, correspondence, electronic mails, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

U.  "**Date**" shall mean the exact date, if known, or the closest approximation to the exact date as can be specified, including without limitation, the year, month, week in a month, or part of a month.

V.  "**Relate to**," "**Related to**," or "**Relating to**" shall mean in whole or in part constituting, containing, embodying, reflecting, describing, analyzing, identifying, mentioning, stating, referring directly or indirectly to, dealing with, or in any way pertaining to.

W.  The term "**identify**" or "**identification**" when used with respect to any natural person, means that the following information shall be provided: the person's full name; last known home address; last known business address and telephone number; last known title or occupation; and last known employer.

X.  The term "**identify**" or "**identification**" when used with respect to any legal entity, such as a corporation, company, or person other than a natural person, means that the following information shall be provided: the entity's name; the place of incorporation or organization; the principal place of business; and the nature of the business conducted by that legal entity.

Y.  The term "**identify**" or "**identification**" when used with respect to a document, subject to the option to produce records under 19 C.F.R. § 210.29(c), means to provide information sufficient to locate that document, including but not limited to the following: the Bates range; the date appearing on such document (e.g., letter, memorandum, drawing); the title or heading; the number of pages of which such document consists; the name of each person who signed or authorized the document; the name of each addressee; the name of each person having possession, custody, or control of such document; if the document existed at one time but does not presently exist, the reason(s) why it no longer exists and the identity of the last person having custody of it; and, if the document is in a foreign language, whether an English translation of the document exists, whether partial or complete.

Z.  The term "**3/2 Quad Servo Pattern**" means the servo burst pattern described in, e.g., STX098441-098476, and particularly, STX098461-098463.

AA.  The term "**2/3 Gray Code Servo Pattern**" means a servo pattern where a new gray code occurs every 2/3 of a data track.

BB.  As used herein, the singular form of a term shall be interpreted to include the plural and vice versa.

CC.  As used herein, the masculine form of a term shall be interpreted to include the feminine and vice versa.

DD.  Except where the context does not permit, the term "**including**" shall be without limitation.

EE.  Except where the context does not permit, the terms "**and**" and "**or**" shall be both conjunctive and disjunctive.

FF.  Except where the context does not permit, the terms "**each**" and "**any**" shall mean any and all.

## **TOPICS**

1.      Seagate's responses to Cornice's interrogatories served in this action (not including contention interrogatories).

2.      The identity, location, and contents of documents relating to the topics in this notice, the steps taken by Seagate to preserve evidence for this action and the timing of those steps, as well as the location and identity of the documents and things searched in response to Cornice's discovery requests in this action and the ITC action, and the files and locations from which documents and things were produced.

3.      Identification and description of all relevant products (Seagate's, its licensees', or otherwise), the time frame when such products are/were manufactured, and the patent numbers now or previously marked on all such products, including the time period during which such marks were present.

4.      Seagate's policies regarding patent marking, including the process used to select patents to mark on a given product, the manner in which the products are marked, and any other notice provided by Seagate regarding its alleged proprietary rights.

5.      For each relevant product, the total sales by month, the average selling price by month, the cost of goods sold, and all variable and fixed costs associated with the manufacture and sale of each relevant product.

6.      The capacity of Seagate to manufacture the relevant products from 1980 to the present, the actual production volumes for those products over the same time frame, and an explanation for the difference (if any) between production capacity and actual production.

7.      Seagate's business plans for the relevant products, including actual and estimated demand, distribution channels, projected sales prices, projected sales and income, pro forma financial statements, product timelines, production plans, actual and estimated market penetration, cost analyses and manufacturing budgets.

8.      Actual and projected profitability of the relevant products, and of those products versus Seagate's other products.

9.      Seagate's sales strategies and forecasts for the relevant products, including warranty policies, sales training materials, sales budget, and salespeople's reports.

10.     The identity and location of Seagate (or its licensees') customers for the relevant products from 1980 to present, including the identity of products into which the relevant products are or were incorporated.

11.     The cost of sales on a yearly basis for the relevant products, including the sales on a yearly basis of all consumables associated with the relevant products as well as the cost of sales on a yearly basis for all consumables associated with the relevant products from 1980 to present.

12.     Seagate's marketing strategy for the relevant products, including the marketing, solicitation efforts, sales, offers of sale, trade shows, distribution, promotion, market research, selection of features and designs to be employed in the relevant products, including all product demonstrations, samples, price quotations, information or materials provided by Seagate in connection with such efforts.

13.     The marketing forecasts, business plans, business projections, market research/analysis, customer surveys and sales budgets for the relevant products from 1980 to the present.

14.     Competitive analyses performed by Seagate or on its behalf with regard to the relevant products, the accused products, or other companies' products in the same field.

15.     Identification of the competitors and competitive products in the market in which the relevant products were/are sold from 1980 to present, including the market share held by each of the relevant products and the competing products during that time frame.

16.     Seagate's research and development activities, budget and plans for each of the relevant products, including the summary(ies) of Seagate's investments or cost of developing the relevant products or the patents-in-suit.

17.     The technological manner in which any or all relevant products could have been substituted for each accused products in a host device, including compatibility and performance characteristics.

18.     The existence, identity, and details regarding noninfringing alternatives for the products alleged to practice the patents-in-suit.

19.     All facts and information Seagate believes is relevant to determine the profits lost by Seagate, if any, due to Cornice's alleged infringement of the patents-in-suit.

20.     Valuation or estimates of the value of Seagate, its relevant products, and its patents, including but not limited to the patents-in-suit.

21.     Communications with third parties, including but not limited to government entities such as the IRS, regarding any valuation attributed to Seagate's intellectual property in general, and its patent(s) in particular, including any evidence presented by either Seagate or the third party in support or opposition of a proposed valuation.

22.     Seagate's current and historical technology and patent licensing practices, policies and strategies.

23.     Seagate's current and historical efforts to license its patents, and any license agreements that have resulted from these efforts.

24.     The negotiation for and terms of all patent licenses between Seagate and other parties, including without limitation the royalty rates paid or received by Seagate under those licenses (or any other consideration given or received), the nature and scope of the license granted, the

duration of the patent for which the license was granted, the term of the license granted and the commercial relationship between Seagate and the other party to each license.

25. Patents that Seagate believes are "comparable" to the patents-in-suit within the meaning of *Georgia Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

26. The licensing of any patents at any time of which Seagate is aware or believes are "comparable" to the patents-in-suit within the meaning of *Georgia Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

27. The rate and/or amount that Cornice and Seagate would have agreed upon as a result of a hypothetical negotiation to license the patents-in-suit at any time after 2000, including without limitation internal analyses and discussions at Seagate regarding the proposed terms of license agreements for the patents-in-suit and negotiations between Seagate and third-parties that did or did not result in a consummated license agreement.

28. The existence and extent of any derivative or convoyed sales resulting from the sale of products which practice one or more of the patents-in-suit.

29. The profitability and commercial success, or lack thereof, of products or processes that practice one or more of the patents-in-suit, including without limitation the unit sales, revenues, costs, profits and allocation of costs and profits of such products, and the portion of the profit attributable to each patent practiced.

30. The extent to which Seagate believes the inventions of the patents-in-suit provide utility and advantage over the previously existing modes or devices in the fields of the patents.

31. The extent to which Seagate believes Cornice has made use of the patents-in-suit, and the evidence probative of the value of that use.

32. The nature of the subject matter of the patents-in-suit, the character of the commercial embodiment of it as owned and produced by Seagate, and the benefits to those who have used the invention.

33. The customary portion of the profit or selling price to allow for the use of the subject matter of the patents-in-suit or analogous subject matter.

34. All facts and information Seagate believes is relevant to the calculation of a reasonable royalty.

35. Any asset or corporate acquisitions for technology similar to the patented technology, including all book entries and valuations related to the transactions, business plans, business proposals, and communications related to the acquisition.

36. The relationship between Seagate and TDK, including Seagate's intentions and understandings regarding the cross-license(s) between Seagate and TDK/SAE, including identification of the intended third-party beneficiaries, licensed products, licensed combinations, sublicenses, as well as all communications relating to said cross-license(s) and sublicense(s).

37.    All communications between Seagate and any third party (including actual or potential customers, competitors, suppliers, analysts, media, Cornice investors/potential investors, Cornice customers/potential customers and business partners) regarding the patents-in-suit, Cornice, Cornice's products, this action and/or the ITC action, and the motivation and intent for all of the foregoing communications.

38.    All communications between Seagate and Hitachi and/or Western Digital regarding Cornice, the patents-in-suit, Cornice's products, this action, and/or the ITC action.

39.    Seagate's consideration(s) to invest in, purchase, or collaborate with Cornice, the negotiations associated with such discussions, the terms discussed/offered/agreed upon, communications regarding the issue, the ultimate outcome and reasons therefor.

40.    The non-disclosure agreements between Seagate and Cornice, the materials provided to Seagate under the terms of those agreements, Seagate's use of those materials, and the ultimate disposition of those materials.

41.    Seagate's attempts to obtain samples of Cornice's products, its examination and evaluation of Cornice's products and/or technology, communications regarding such evaluation(s), and the results of those investigations.

42.    Evaluation of Cornice by Seagate or on its behalf, communications regarding such evaluations, and the results thereof.

43.    The presentation titled "The Patent Minefield" (see, *e.g.*, COR-ITC021316 *et seq.*), the creation of that presentation, the people involved with its creation including identification of all individuals who commented on or contributed to it, drafts or changes made to the presentation, the purpose of the presentation, the delivery of the presentation, and communications regarding it.

44.    Seagate's policies regarding "defensive investigations" when introducing a disk drive product, including patents compared to each Seagate product, patents "examined closely," formal non-infringement opinions prepared, and the time and money spent on each such investigations individually and all such investigations collectively.

45.    Communications with Cornice regarding proprietary or intellectual property issues, including any actual or constructive notice of Seagate's patents and/or of alleged infringement.

46.    Seagate's evaluation of Cornice's products for possible infringement, the timing of such evaluation, the impetus for such evaluation, the patents that were considered in connection with this evaluation, the results of this evaluation, and all communications relating to this evaluation.

47.    Seagate's practices and procedures regarding enforcement of its intellectual property rights.

48.    Seagate's motivations for and its decisions to file this action and the ITC action, the factors considered in making those decisions, communications regarding those decisions,

analysis of the merits of Seagate's allegations, allegations considered but not asserted, and the timing of the action.

49.     Seagate's motivations for and its decision to withdraw its infringement allegations with respect to the '845 and '054 patents in the ITC action, and its decision to continue to pursue those claims in this action, including all communications regarding those decisions.

50.     Seagate's motivations for and its decision not to appeal the Initial Determination of noninfringement of the '461 patent in the ITC action, and its decision to continue to pursue that claim in this action, including all communications regarding those decisions.

51.     Seagate's procedure for and considerations in making materiality determinations for statements and disclosures in its governmental filings, including SEC filings, including the analysis, selection, and disclosure of competitors, litigations, etc., as well as the information and materials not disclosed in those filings and the reasons therefor.

52.     Seagate's design, development, evaluation, analysis and testing of a servo system, or any portion thereof, for a disk drive utilizing an MR head, prior to 1996, regardless of whether such servo system was commercialized. This topic covers work performed by or for Seagate and/or Conner, both before and after Seagate's acquisition of Conner.

53.     Seagate's disclosure to any third party prior to 1996 of a 3/2 Quad Servo Pattern or 2/3 Gray Code Servo Pattern, or any disk drive, magnetic disk, servo system or prototype containing either or both. This topic covers disclosures by or for Seagate and/or Conner, both before and after Seagate's acquisition of Conner.

54.     Seagate's demonstration or disclosure of products and/or prototypes of disk drives utilizing an MR head at COMDEX and/or any other trade show or conference prior to 1996. This topic covers demonstrations and disclosures by or for Seagate and/or Conner, both before and after Seagate's acquisition of Conner.

55.     Seagate's design, development, evaluation, analysis, and testing of a servo system, or any portion thereof, utilizing a 3/2 Quad Servo Pattern and/or a 2/3 Gray Code Servo Pattern prior to 1996, regardless of whether such servo system was commercialized. This topic covers work performed by or for Seagate and/or Conner, both before and after Seagate's acquisition of Conner.

56.     The design, development, evaluation, analysis, and testing of the position generator logic described in the '506 patent.

57.     Seagate's reverse engineering, analysis, or investigation of the servo system in any IBM or other third party disk drive product or portion thereof utilizing an MR head prior to 1996. This topic covers work performed by or for Seagate and/or Conner, both before and after Seagate's acquisition of Conner.

58.     The servo pattern and position generator logic used in each product manufactured and/or sold by or for Seagate that Seagate contends practices any claim of the '506 patent.

59. The function and operation of the code produced by Seagate at STX 173223-174503.

60. Seagate's use of alternatives to the servo pattern and/or position generator logic described in the '506 patent.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on May 27, 2005, I electronically filed Corporate Deposition Notice of Plaintiff Seagate Technology LL with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

**BY HAND**
William J. Marsden, Jr., Esquire
Fish & Richardson, P.C.
919 N. Market Street
Suite 1100
Wilmington, DE  19801

and I, the undersigned, also hereby certify that on May 27, 2005, I sent by Federal Express, the above-stated document to:

**BY FEDERAL EXPRESS**
Roger S. Borovoy, Esquire
Fish & Richardson, P.C.
500 Arguello Street
Redwood City, CA  94063-1526

Ruffin B. Cordell, Esquire
Fish & Richardson, P.C.
1425 K Street, NW
Suite 1100
Washington, DC  20005

Edmond Bannon
Fish & Richardson
Citigroup Center
153 East 53rd St.
New York, NY  10022

MORRIS, NICHOLS, ARSHT & TUNNELL
/s/ *Julia Heaney*
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 North Market Street
Wilmington, Delaware 19899
 (302) 658-9200
 jheaney@mnat.com
 *Attorneys for Defendant and Counterclaim Plaintiff Cornice, Inc.*