IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SEAGATE TECHNOLOGY LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>CORNICE, INC.<br><br>  Defendant. | C.A. No. 04-418 (SLR)<br><br>REDACTED |

**PLAINTIFF SEAGATE TECHNOLOGY LLC'S MOTION FOR SUMMARY
JUDGMENT ON DEFENDANT CORNICE, INC.'S THIRD, FIFTH, AND
SEVENTH AFFIRMATIVE DEFENSES**

Date: November 18, 2005

FISH & RICHARDSON P.C.
Timothy Devlin (#4241)
919 N. Market Street, Suite 1100
Wilmington, DE  19899-1114
Tel: (302) 652-5070

Roger S. Borovoy
David M. Barkan
500 Arguello Street, Suite 500
Redwood City, CA 94063-1526
Tel: (650) 839-5070

Ruffin B. Cordell
Brian R. Nester
Timothy W. Riffe
Christian A. Chu
1425 K Street NW, Suite 1100
Washington, D.C.  20005
Tel: (202) 783-5070

Edmond R. Bannon
Lewis E. Hudnell, III
Citigroup Center
153 East 53rd Street, 52nd Floor
New York, NY 10022-4611
Tel: (212) 765-5070

Attorneys for Plaintiff
SEAGATE TECHNOLOGY LLC

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ..................................................1

II.   SUMMARY OF ARGUMENT ........................................................................1

III.  FACTUAL BACKGROUND...........................................................................2

     A.    In the Disc Drive Industry, Companies Must Invest Significant
          Resources in Research and Development ................................................2

     B.    Cornice Ignored and Appropriated Other Companies'
          Intellectual Property....................................................................................3

IV.   LEGAL STANDARDS FOR SUMMARY JUDGMENT ....................................5

V.    ARGUMENT...................................................................................................7

     A.    Summary Judgment is Appropriate on Cornice's Third
          Affirmative Defense of Laches ..................................................................7

          1.    Legal standards for the doctrine of laches ......................................7

          2.    Cornice has failed to present any evidence supporting a
               prima facie case of laches ...............................................................7

          3.    There is no evidence that Seagate unreasonably or
               inexcusably delayed in bringing suit...............................................9

          4.    There is no evidence that Cornice suffered any material
               prejudice as a result of any alleged delay ....................................11

     B.    Summary Judgment is Appropriate on Cornice's Fifth
          Affirmative Defense: Unclean Hands/Patent Misuse ..............................13

          1.    Legal standards for unclean hands/patent misuse.......................13

          2.    Cornice has not presented any evidence that Seagate's
               practices anti-competitively broadened the scope of its
               asserted patents ............................................................................13

               a.    Section 271(d) precludes a finding of patent
                    misuse based on Seagate's filing and
                    enforcement of its infringement actions ...........................14

                b.    Precedent precludes a finding of misuse based on
                    Seagate's infringement warnings to Cornice ...................17

          3.    Under the rule of reason and settled precedent, there is
                no patent misuse............................................................................19

i

## TABLE OF CONTENTS (cont'd)

Page

C.  Summary Judgment is Appropriate on Cornice's Seventh
    Affirmative Defense of Equitable Estoppel ............................................20

    1.  Legal standards for equitable estoppel.........................................20

    2.  Cornice has failed to present any evidence supporting a
        prima facie case of equitable estoppel .........................................21

    3.  There is no evidence that Seagate, through misconduct
        or otherwise, led Cornice to reasonably believe there
        would be no infringement suit .......................................................21

    4.  There is no evidence of reliance to support an equitable
        estoppel defense..........................................................................22

    5.  There is no evidence of material prejudice to support an
        equitable estoppel defense ..........................................................23

VI.  CONCLUSION...............................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,
960 F.2d 1020 (Fed. Cir. 1992) (en banc) ............................. 7, 9, 11, 12, 20, 22, 23

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ................................................................................... 6

B. Braun Medical, Inc. v. Abbott Laboratories,
124 F.3d 1419 (Fed. Cir. 1997) ................................................................ 13

Bio-Tech. Gen. Corp. v. Genentech, Inc.,
80 F.3d 1553 (Fed. Cir. 1996) ................................................................. 16

C.R. Bard, Inc. v. M3 Systems, Inc.,
157 F.3d 1340 (Fed. Cir. 1998) ................................................................ 13

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ............................................................................... 5, 6

Depuy Inc. v. Zimmer Holdings, Inc.,
343 F.Supp.2d 675 (N.D. Ill. 2004) ........................................................ 15

Ecolab, Inc. v. Envirochem, Inc.,
264 F.3d 1358 (Fed. Cir. 2001) ............................................................ 7, 21

Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.,
60 F.3d 770 (Fed. Cir. 1995) .............................................................. 7, 9, 21

Globetrotter Software, Inc. v. Elan Computer Group, Inc.,
362 F.3d 1367 (Fed. Cir. 2004) ................................................................ 18

Hemstreet v. Computer Entry Sys. Corp.,
972 F.2d 1290 (Fed. Cir. 1992) ............................................................... 12

Int'l Union of Heat & Frost Insulators Local 42 v. Absolute Envtl.
Servs., Inc.,
814 F. Supp. 392 (D. Del. 1993) ............................................................... 6

Mallinckrodt, Inc. v. Medipart, Inc.,
976 F.2d 700 (Fed. Cir. 1992) ........................................................... 17, 19

Meyers v. Asics Corp.,
974 F.2d 1304 (Fed. Cir. 1992) ............................................................... 23

Mikohn Gaming Corp. v. Acres Gaming, Inc.,
165 F.3d 891 (Fed. Cir. 1998) ........................................................... 17, 19

iii

Odetics, Inc. v. Storage Tech. Corp.,
    185 F.3d 1259 (Fed. Cir. 1999)................................................................7

Penn. Coal Ass'n v. Babbitt,
    63 F.3d 231 (3d Cir. 1995)..................................................................6

Tex. Instruments, Inc. v. United States Int'l Trade Comm'n,
    851 F.2d 342 (Fed. Cir. 1988).............................................................16

U.S. Philips Corp. v. Int'l Trade Comm'n,
    424 F.3d 1179 (Fed. Cir. 2005)...........................................................20

Vaupel Textilmaschinen KG v. Meccanica Euro Italia s.p.a.,
    944 F.2d 870 (Fed. Cir. 1991).........................................................9, 10

Virginia Panel Corp. v. MAC Panel Co.,
    133 F.3d 860 (Fed. Cir. 1997)...................................................17, 19, 20

Virtue v. Creamery Package Mfg. Co.,
    227 U.S. 8 (1913)..............................................................................17

**Statutes**

35 U.S.C. § 271(d) (2000) ........................................................................14

**Rules**

Fed. R. Civ. P. 56(c) ..................................................................................5

Fed. R. Civ. P. 56(c) & (e)..........................................................................6

## I.   NATURE AND STAGE OF PROCEEDINGS

In this patent infringement case filed on June 22, 2004 [D.I. 1], Plaintiff Seagate

Technology LLC ("Seagate") asserts seven patents against Defendant Cornice, Inc. ("Cornice").

Fact and expert discovery is nearly complete, and the parties have exchanged expert reports.

Pursuant to the Court's Scheduling Order [D.I. 36-1], Seagate files this brief in support of its

motion for summary judgment on Cornice's affirmative defenses of laches, unclean hands/patent

misuse, and equitable estoppel.

## II.   SUMMARY OF ARGUMENT

Seagate is recognized as one of the world's leading designers, manufacturers and

marketers of disc drives. Seagate's continued success through four decades of industry change is

a testament to the billions of dollars it has invested in research and development. As a result,

Seagate's drives are often the industry benchmark and its 2,700 U.S. patents bear witness to the

wisdom of this significant investment in innovation.

In contrast, defendant Cornice makes no attempt to truly innovate; it relies on the

intellectual properties of others to make the disc drives it calls "Storage Element" ("Cornice

SE"). As a recent entrant into this industry, Cornice opted not to innovate, choosing instead to

rely on the patented technology developed by others. Cornice had the option of licensing these

innovations from their rightful owners, as Seagate has done through its industry-wide cross-

licenses. But Cornice chose to play by other rules. It hired engineers from Seagate and other

disc drive companies, acquiring in the process professionals steeped in their former employers'

technology. As a result, Cornice stands as a conglomerate of engineers, well-versed in other

companies' technologies, who are bringing to market products built on the innovations and

intellectual investments of Seagate and other disc drive pioneers. In short, Cornice is a company

born from, and built on, the efforts and investments of others. While Cornice is certainly free to

compete in the disc drive industry, neither patent law nor fair play allows Cornice to get a free

pass and sell products that infringe the valid U.S. patents of others.

1

When Seagate sought to defend its intellectual property rights in the ITC and this Court, Cornice raised a number of affirmative defenses, including three equitable defenses: laches, patent misuse and unclean hands, and equitable estoppel. Yet, despite extensive discovery in the ITC investigation and this action, Cornice has not provided sufficient evidence to support its burden of proof on these three affirmative defenses. All that Cornice has offered to date in its written discovery responses are mere innuendos that fall far short of satisfying the requisite evidentiary burden. Because there is no evidence on which Cornice can convince a fact finder that it could prevail on its equitable defenses, Seagate is entitled to summary judgment on these defenses.

## III.    FACTUAL BACKGROUND

### A.    In the Disc Drive Industry, Companies Must Invest Significant Resources in Research and Development

The technologies in suit relate to hard disc drives, which are today's primary medium for storing electronic information. Disc drive technologies now stand at the heart of the information economy, having become central and indispensable components of desktop and laptop computers, network servers, and consumer electronics such as Tivo® digital video recorders and iPod® digital players.

Despite this ever growing demand for disc drives, the industry is fiercely competitive, with manufacturers competing for a limited number of major customers. [Ex. 1 (2005 Annual Rep.) at 10.][1] This intense competition and market forces, such as customers' ever changing needs and preferences, have resulted in significant industry consolidation over the past decade, as disc drive companies and drive component suppliers merged or exited the industry. [Id. at 4 & 10-11.] To survive and thrive, disc drive companies must do more than meet current demands; they must innovate by developing critical component technologies and making significant commitments to advanced research. [Id. at 9-11.]

---

[1] "Ex." refers to the exhibits attached to the declaration of Timothy Devlin in support of Seagate's Motion for Summary Judgment on Defendant Cornice, Inc.'s Third, Fifth, and Seventh Affirmative Defenses, filed concurrently.

Innovations in this field do not, however, come easily or inexpensively. Developing, designing, and producing innovative disc drives and drive components are inherently challenging, requiring expertise in physics, tribology, aerodynamics, fluid mechanics, information theory, magnetics, process technology, and numerous other technical disciplines. [See id. at 4-6.] But expertise alone is not enough. The process of bringing innovation to fruition also demands significant financial and capital investments. For example, during fiscal year 2005 alone, Seagate spent approximately $645 million in R&D and product development. [Id. at 11.] Thanks to its significant investment in innovations, Seagate owns substantial intellectual property, including approximately 2,700 U.S. patents and about 1,000 pending U.S. applications. [Id. at 11.]

This sizable patent portfolio does not, however, necessarily translate into immunity from patent litigation. In this intensely competitive industry which is characterized by heavy investment in R&D, most large disc drive companies have accumulated substantial patent portfolios capable of covering most, if not all, drives developed and sold by their competitors. [See id. at 52-53.] Given the expensive, uncertain, and time-consuming nature of patent litigation, most disc drive companies (including Seagate) have chosen to compete in the marketplace instead of the courtroom, by taking licenses or entering into cross-licenses with other companies. For instance, Seagate is a party to

**REDACTED**

. By avoiding the dangerous minefield of disc drive-related patents while respecting other companies' intellectual property, disc drive companies can compete in the marketplace based on the quality, innovation, and timeliness of their products and the strength of their development and support services without fear of infringement.

**B.     Cornice Ignored and Appropriated Other Companies' Intellectual Property**

But not all disc drive companies choose to abide by the same rules of fair play. Rather than investing in their own R&D or seeking licenses, these companies leverage proprietary

3

technologies developed by their competitors, and incorporate into their products the innovations developed by others. Cornice is one such company.

Founded in August of 2000 and formally incorporated in August 2002, Cornice claims to be a "leading innovator in compact, low-cost, high-capacity storage that enables a new generation of pocket-able consumer electronic devices for the world's foremost brand-name manufacturers." [Ex. 2 (Cornice's website); Ex. 3 (Aug. 1, 2002 State of Colorado Business Application).] It even touts that "[t]he core Cornice engineering team collectively holds well in excess of 100 patents.…" [Ex. 2 (Cornice's website).]

But there is little substance to such claims. As Cornice's CEO readily admitted,

**REDACTED**
[Ex. 4 (Apr. 22, 2005 Tr. of K. Magenis depo.) at 30:15-19.] In other words, the know-how on which Cornice was built came from the skills, training, and innovations developed at other disc drive companies such as Seagate. Cornice not only readily admits this fact publicly, it boasts that its team "consists of world-class innovative engineers who had worked together at such HDD [hard disc drive] leaders as Maxtor, Quantum, Seagate, and Connor Peripherals". [Ex. 2 (emphasis added).] Not surprisingly, the innovations developed by these same HDD leaders found their way into, and became integral features of, Cornice's own disc drives.

As these questionable practices came to light, Seagate cautioned Cornice – more than once – about possible infringement. During ongoing dialogue in 2002 between the parties regarding Seagate's possible investment in Cornice, Seagate first flagged the significant risks posed by disc drive companies' sizable patent portfolios in an aptly named presentation entitled "The Patent Minefield." [Ex. 5 (Patent Minefield presentation).] In the presentation, Seagate cautioned Cornice that the hard disc drive industry was riddled with thousands of patents owned by various companies, and that it would be both difficult and expensive for any new entrant to perform the necessary due diligence to avoid infringing any patents owned by the large disc drive companies, such as IBM, Hitachi and Seagate. [Id.] Cornice ignored this warning.

4

Then, a few months later, well before Cornice finalized and launched its first commercial disc drives, Seagate again expressed its concerns in a letter from its General Counsel to Cornice's CEO. [Ex. 6 (Apr. 10, 2003 Ltr. from Mr. Hudson to Mr. Magenis).] The letter reminded Cornice that, given the nature of the disc drive industry, it was likely that Cornice's products would infringe one of Seagate's "6,000 issued and pending patents worldwide." [Id. at 2.]

Cornice ignored these cautionary notes. Charging ahead despite the risks, Cornice launched its 1.5 Gigabyte ("GB") Storage Element disc drives in the summer of 2003 and its 2.0 GB drives in January of 2004. [Ex. 7 (Cornice Timeline).]

Companies in the disc drive industry quickly took notice of Cornice's disregard for their intellectual property. In the past 18 months, three district court patent infringement actions have named Cornice as a defendant. One of these lawsuits was brought by Western Digital in June of 2004. As the disc drive company explained in its press release,

> Western Digital has made significant investments in research and development over its 34-year history, including the last 16 years as a leading hard drive company. We have invested hundreds of millions of dollars to develop our hard drive products. The technical sophistication and outstanding quality of our products is the result of these investments and the hard work of our talented and dedicated team of employees. We will not allow Cornice to unfairly exploit our patents, which are the product of the efforts of our team and the investments by our shareholders. We intend to vigorously protect our valuable intellectual property and keep our rights from being violated.

[Ex. 8 (Western Digital Press Release).] Another lawsuit, initiated on September 26, 2005 by Papst Licensing, accuses Cornice and its China-based disc drive assembler of infringing seven disc drive-related patents. [Ex. 9 (Papst Licensing complaint).] But the first infringement lawsuit filed is the present one pending in this Court.

## IV.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is

appropriate when there is no genuine issue of material fact or when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (stating that the purpose of summary judgment is to avoid an unnecessary trial for which there can be only one outcome). Specifically, the Supreme Court ruled that Rule 56 mandates entry of summary judgment against a party which fails to demonstrate the existence of an element essential to its case on which it will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

Although it must initially demonstrate the absence of a genuine issue, the moving party is under no obligation to support its motion with affidavits or other evidence negating the claim or defense of its opponent where the moving party does not bear the burden of proof at trial. Id. at 323. Instead, "the moving party need only establish that there exists no genuine issue of material fact as to any essential element of the nonmovant's claim or defense." Int'l Union of Heat & Frost Insulators Local 42 v. Absolute Envtl. Servs., Inc., 814 F. Supp. 392, 401 (D. Del. 1993).

The party opposing the motion must then go beyond the pleadings by presenting evidence, such as "depositions, answers to interrogatories, and admissions on file," that establishes a genuine material issue for trial. Fed. R. Civ. P. 56(c) & (e); Celotex, 477 U.S. 324 (citations omitted). Courts deem an issue "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. "Material" facts are those which might affect the outcome of the litigation under the applicable law. Id.

Although courts must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," Penn. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995), the mere existence of some evidence in support of the nonmoving party is not sufficient to deny a motion for summary judgment; there must be enough evidence to enable a reasonable jury to find for the nonmoving party on that issue. Anderson, 477 U.S. at 249. Hence, the moving party is entitled to judgment as a matter of law where the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. See Celotex, 477 U.S. at 322.

6

## V.    ARGUMENT

### A.    Summary Judgment is Appropriate on Cornice's Third Affirmative Defense of Laches

#### 1.    Legal standards for the doctrine of laches

Laches is an equitable defense, committed to the trial court's discretion.  See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1273 (Fed. Cir. 1999).  A presumption of laches applies if the patentee delays bringing suit for more than six years after actual or constructive knowledge of the infringing activity.  Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1371 (Fed. Cir. 2001).  To invoke the affirmative defense of laches, Cornice must show that Seagate (1) delayed filing suit for an unreasonable and inexcusable length of time from the time it knew or reasonably should have known of its claim, and (2) that delay caused prejudice to Cornice. Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 773 (Fed. Cir. 1995); A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc). However, the court must also consider the reasons for any delay in filing suit.  For example, a delay can be justified if the plaintiff had been engaged in negotiations with the accused infringer prior to commencing legal action.  Id. at 1033.

#### 2.    Cornice has failed to present any evidence supporting a prima facie case of laches

Without providing any other fact, Cornice pled as an affirmative defense that "[t]he relief sought by Seagate is barred in whole or in part by the doctrine of laches."  [D.I. 52 Att. 1 at 8.] In response to Seagate's interrogatory requesting all evidentiary bases supporting this affirmative defense, Cornice merely restated its affirmative defense:


**REDACTED**


7

[Ex. 10 (June 13, 2005 Cornice's Interrog. Resp.) at 32-33 (emphasis added).]  Even its reference, in the above paragraph, to its response to Interrogatory No. 1 is devoid of evidence to support an affirmative defense of laches.  [Ex. 11 (June 10, 2005 Cornice's Interrog. Resp.) at 5-8.]  Stripped of rhetoric and unfounded innuendos, the only facts Cornice provides regarding the parties' pre-suit course of dealing are:

- **REDACTED**                                    ;
- **REDACTED**

                                                                                    ;

- **REDACTED**

            ;
- **REDACTED**

                                                                        ;
- **REDACTED**

                                                .''

[Id.]  Despite this more detailed recitation of facts, none of them relate to unreasonable or inexcusable delay.  In fact, Mr. Magenis, Cornice's co-founder and CEO during the relevant timeframe before the filing of this action, admitted that                **REDACTED**

                        :


                                **REDACTED**

[Ex. 12 (Nov. 11, 2005 Tr. of K. Magenis Depo.) at 35:24-36:8.] At bottom, there is no evidence showing – or even implying – that Seagate unreasonably delayed the filing of its lawsuits or that Cornice suffered any actual prejudice from this alleged delay.

### 3. There is no evidence that Seagate unreasonably or inexcusably delayed in bringing suit

The first laches factor – the length of time that is unreasonable or inexcusable delay in filing suit – depends on the facts and circumstances of each case, focusing primarily on the reasonableness of the delay. Aukerman, 960 F.2d at 1032-34. "In making this determination, a court must consider any excuse for the delay offered by the plaintiff" Gasser., 60 F.3d at 773.

In this case, any alleged delay could not conceivably be more than twenty-three months. It is undisputed that Seagate filed this action in June of 2004. [D.I. 1]. It is also undisputable that Cornice did not assume corporate existence until August 1, 2002. [Ex. 3 at 1.] As its corporate documents show, Cornice's founders incorporated the company on July 29, 2002 as "Convergent Systems Solutions, Inc."[2] and commenced operations on the same day the incorporation papers were filed – August 1, 2002. [Id.] Until then, Cornice did not exist and Seagate could not have brought suit against a non-existent infringer.

Moreover, Seagate could not have initiated this action until the first Cornice accused disc drives became publicly available just a year before the filing of this action. Until June of 2003 when Cornice launched the 1.5 GB Cornice SE (its first commercial product) [Ex. 7 (Cornice timeline)], Cornice did not even have a finished product and did not disclose any technical information about its products publicly. Thus, until Cornice openly and notoriously infringed by selling its products in the marketplace, a reasonable patentee in Seagate's position did not have the knowledge necessary to trigger a duty to enforce its patent rights. See Vaupel Textilmaschinen KG v. Meccanica Euro Italia s.p.a., 944 F.2d 870, 878-79 (Fed. Cir. 1991) (reversing finding of laches because patentee was justified in not filing suit until defendant made actual sales of the infringing device, and ruling that mere display of the infringing device at a

trade show in the U.S. without resulting sales was not enough to constitute knowledge for purposes of laches inquiry).

Once Cornice's infringing product became available in the marketplace, Seagate diligently investigated the possible infringement and took reasonable steps to enforce its patent rights. Indeed, during the twelve months between Cornice's product launch and the filing of this action, Seagate performed extensive analyses of the drives to determine which patents, if any, were infringed. Such a determination required extensive and time-consuming examination and reverse-engineering, as evidenced by the infringement claim charts that Seagate attached to its July 2, 2004 ITC Complaint. For instance, the infringement chart for the '754 patent attached to Seagate's ITC Complaint shows that, to determine structure and composition of Cornice's magnetic media, Seagate had to perform at least two different, complex testing procedures: Electron Spectroscopy for Chemical Analysis, and Time-of-Flight Secondary Ion Mass Spectroscopy Analysis. [Ex. 14 (ITC Complaint Ex. 27).] And to evaluate the magnetic properties of the media, Seagate also made measurements on an Orientation Ratio Magnetometer. [Id.] Similarly, the ITC Complaint's infringement chart for the '506 patent shows that Seagate scrutinized Cornice's servo pattern using at least three different imaging techniques: a Candela Optical Surface Analyzer; a Magnetic Force Microscope; and a spin stand tester to generate a transducer readback signal. [Ex.15 (ITC Complaint Ex. 30.] Thus, Seagate did not sit on its rights during the twelve months between Cornice's product launch and the filing of this lawsuit; Seagate was performing its pre-suit due diligence to determine whether Cornice infringed, and if so, which patents were infringed. Hence, no reasonable jury could conclude that, under these facts, one year would constitute an "unreasonable delay." See Vaupel, 944 F.2d at 878-79 (holding, based on similar facts and a delay of three and a half years, that "it would have been an abuse of discretion for the district court to have held that these circumstances resulted in laches").

---

[2] Cornice adopted its current name on January 23, 2003. [Ex. 13 (Jan. 23, 2003 State of Colorado filing).]

Given these facts, it is not surprising that Cornice abandoned its laches affirmative defense before the ITC trial, as shown by ITC prehearing statement. To streamline trial, ALJ Harris had ordered the parties to provide in their respective prehearing briefs and statements:

> A statement of the issues to be considered at the hearing that set forth *with particularity* a party's contentions on each of the proposed issues, including citations to legal authorities in support thereof. Any contentions not set forth in detail as required herein shall be deemed abandoned or withdrawn, except for contentions of which a party is not aware and could not be aware in the exercise of reasonable diligence at the time of filing the prehearing statement.

[Ex. 16 (Aug. 26, 2004 ALJ Harris's Order No. 2, Ground Rules) § 4(d) at 7 (italics in original, underlining added).] Cornice was well aware of the doctrine of laches, having pled the defense in this action and in the ITC proceeding. Yet, Cornice never briefed with particularity this defense in its ITC prehearing submission. [Ex. 17 (Table of contents of Cornice's ITC prehearing brief/ statement).] Despite hundreds of pages of prehearing briefing and extensive discovery, Cornice said nary a word about its laches defense. This silence and resulting waiver is clear proof that Cornice's laches defense is without merit and without evidentiary support.

### 4. There is no evidence that Cornice suffered any material prejudice as a result of any alleged delay

To establish its affirmative defense of laches, Cornice must also demonstrate that it suffered a material prejudice resulting from the plaintiff's delay. Aukerman, 960 F.2d at 1033. This material prejudice may be either evidentiary or economic, but it must have an actual nexus with the alleged unreasonable delay. Id.

Here, Cornice has not – and cannot – assert any evidentiary prejudice that "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." Id. To the contrary, Seagate cautioned Cornice in April of 2003, well before Cornice launched its products, that the Cornice SE drives may potentially infringe Seagate's extensive patent portfolio. [Ex. 6.] And Seagate's prompt

11

enforcement of its patent rights within one year of Cornice's product launch dispels any possibility of evidentiary prejudice.

Similarly, there is no evidence of economic prejudice in this case. To meet its burden of proof, Cornice must show that it "suffer[ed] the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." Id. at 1033. But such a loss, alone, is insufficient; Cornice must also prove a "nexus to the patentee's delay in filing suit, as Aukerman requires for a finding of prejudice" Hemstreet v. Computer Entry Sys. Corp., 972 F.2d 1290, 1294 (Fed. Cir. 1992) (ruling that a spending of "over $23 million on research and development, $6.5 million on direct marketing costs, and $20 million to expand or consolidate manufacturing facilities" did not constitute economic prejudice because of the lack of proven nexus). "It is not enough that the alleged infringer changed his position--i.e., invested in production of the allegedly infringing device. The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity." Id. Despite this clear requirement and extensive discovery in the ITC investigation and this action, Cornice has failed to even identify an economic injury resulting from any alleged delay in filing this action. Its interrogatory responses on this issue are utterly silent on this point, providing neither evidence of economic injury, actual damages amount, nor the requisite causal connection. [Ex. 10 (June 13, 2005 Cornice's Interrog. Resp.) at 32-33; Ex. 11 (June 10, 2005 Cornice's Interrog. Resp.) at 5-8.] In fact, Cornice has not submitted any expert damages report for any affirmative defense or counterclaim; it has only offered a damages expert report to rebut Seagate's claims for damages resulting from Cornice's infringement. [Ex. 18 (Hoffman Exp. Report).] By itself, the dearth of evidence on the material prejudice element justifies summary judgment for Seagate.

Based on these undisputed facts, no reasonable fact finder can find in Cornice's favor on this affirmative defense, since Cornice does not have any evidence to support its burden of proof. Therefore, summary judgment dismissing Cornice's affirmative defense of laches is appropriate.

12

### B.  Summary Judgment is Appropriate on Cornice's Fifth Affirmative Defense: Unclean Hands/Patent Misuse

#### 1.  Legal standards for unclean hands/patent misuse

"The defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage.  Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant."  C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1372 (Fed. Cir. 1998).  Of primary importance in identifying patent misuse is whether "the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect."  B. Braun Medical, Inc. v. Abbott Laboratories, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (citations omitted).

#### 2.  Cornice has not presented any evidence that Seagate's practices anti-competitively broadened the scope of its asserted patents

As with its laches defense, Cornice only stated in its pleading that "[t]he relief sought by Seagate is barred in whole or in part by the doctrine of unclean hands and/or patent misuse."  [D.I. 52 Att. 1 at 8.]  Like its response on laches, Cornice's interrogatory response on this issue primarily repeats the wording of its pleadings and again refers to its response to Interrogatory No. 1.  [Ex. 10 (June 13, 2005 Cornice's Interrog. Resp.) at 33.]  Even Cornice's witness most knowledgeable about the litigation and the parties' pre-suit interactions only pointed to

                    **REDACTED**                  .  [Ex. 12 (Nov. 11, 2005 K. Magenis Depo. Tr.) at 10:22-12:9.]

At bottom, the only evidence related to misuse or unclean hands that Cornice has identified is: (i) Seagate had cautioned Cornice during a presentation in 2002 about the risks of infringing the significant patents in the disc drive industry, and sent a letter to Cornice in the Spring of 2003 warning about infringement of Seagate's patents, (ii) Seagate filed suit against Cornice in this Court and the ITC; and (iii) Seagate continues to assert in this action patents that were either "dropped" about three months before the ITC trial or the subject of summary

judgment in the ITC proceeding. None of these bases can, however, establish patent misuse or unclean hands.

> **a.**    **Section 271(d) precludes a finding of patent misuse based on Seagate's filing and enforcement of its infringement actions**

Seagate's filing and prosecution of its infringement actions in this Court and ITC cannot provide the grounds for a finding of misuse. In § 271(d), Congress broadly excluded a number of activities from the scope of patent misuse, including some of the bases for Cornice's misuse allegations:

> (d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following:
>
> \* \* \*
>
> (3) sought to enforce his patent rights against infringement or contributory infringement;

35 U.S.C. § 271(d) (2000) (emphasis added).

The law thus entitles patent holders, like Seagate, to seek redress for the infringement of its patents and to assert its patents against infringers such as Cornice, without fearing an accusation of patent misuse. Coupled with the fact that Cornice does not have a scintilla of evidence to show that Seagate's lawsuits aimed to improperly broaden or extend its patent rights, Seagate's filing of the ITC and the district court actions cannot give rise to misuse. See id.

Moreover, § 271(d) precludes the use of the ITC proceeding's litigation history and events as the basis for a finding of misuse. The statute is clear that a patentee cannot be "deemed guilty of misuse" merely because it "sought to enforce his patent rights against infringement...." Id. (emphasis added). There is no question here that Seagate's litigation of its patent suit in the ITC, until Cornice settled the ITC dispute on the eve of trial, constitutes "enforce[ment] of his patent rights against infringement." Accordingly, the procedural history and events from the ITC proceeding and this action cannot be, as a matter of law, evidence of misuse or unclean hands. See id.; Depuy Inc. v. Zimmer Holdings, Inc., 343 F.Supp.2d 675, 684-85 (N.D. Ill. 2004)

14

(granting summary judgment for patentee on misuse issue, because in light of § 271(d)(3), "I decline to infer any patent misuse from DePuy's litigation history").

But even if the statutory command were ignored and the procedural history of these related actions were considered, no reasonable fact finder would find misuse on Cornice's sole two pieces of litigation-related evidence – assertion in this action of three patents "dropped" three months before the ITC trial, and enforcement of two patents that were subject to summary judgment in the ITC.

First, Seagate's streamlining of its ITC case does not establish bad faith or misuse. Indeed, three months before the ITC trial and after considering both sides' initial expert reports, it became clear that the two weeks scheduled by the ALJ for trial would not afford enough time to fully and fairly try the infringement, invalidity and unenforceability issues for all seven patents-in-suit. As a result, Seagate had to choose between superficially litigating all seven patents or trying a subset of its asserted patents during the allotted two weeks. Far from basing its decision on the patents' alleged lack of merits, as Cornice characterized it, Seagate chose to streamline the ITC trial by focusing on four patents it could reasonably try in the allotted two weeks. This choice does not contradict Seagate's current plans to try all seven asserted patents given the additional time available in the currently schedule four-week trial. Seagate's choices are not unusual in patent litigation, much less evidence of predatory, anticompetitive intent. To hold otherwise would create a disincentive for patentees to streamline their cases, even where circumstances outside of its control (such as court-imposed time limits on trial) require such choices. The decision to maintain all seven asserted patents in this action does not contradict the decision to focus its limited trial time in the ITC on only four patents. It certainly does not support Cornice's misuse allegations.

Second, Seagate has not "impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect" by continuing to assert in this action the two patents which were subject to summary judgment in the ITC. To the contrary, one of the rulings cited by Cornice was reversed by the Commission and the other has no preclusive effect in this Court.

15

Indeed, although the ALJ adopted a claim construction that neither party advanced and granted summary judgment of anticipation on the '606 patent, the ITC commissioners reviewed and quickly reversed the ALJ's erroneous ruling. [Ex. 19 (Jan. 28, 2005 ITC Notice).] As the Commission explained in its Notice of Decision,

> The Commission determined to review and reverse the ALJ's ID [initial determination] granting summary determination on the ground that, assuming arguendo that the ALJ's claim construction is correct, summary determination is inappropriate because there are genuine issues of material fact as to what is disclosed in the two prior art references. See Commission rule 210.18(b) (19 C.F.R. 210.18(b)).

[Id. at 2.] Hence, as a null-and-void decision, the ALJ's ruling on the '606 patent cannot buttress Cornice's weak misuse allegations. As to the second ruling regarding the '461 patent, the ALJ granted summary judgment of noninfringement despite disputed claim construction issues, factual questions on the doctrine of equivalents, and expert declaration pointing to the existence of disputed issues of facts. The ALJ's 30-page order (issued in March 2005, less than two months before trial) underscores the difficulty he had in reaching his decision. With trial just two months away and even though it disagreed with the ruling, Seagate chose to defer further litigation of the '461 patent issues to this action, since ITC rulings on patent issue have no preclusive effect on subsequent district court litigation. Bio-Tech. Gen. Corp. v. Genentech, Inc., 80 F.3d 1553, 1564 (Fed. Cir. 1996) ("Thus, in view of the jurisdictional limitations on the relief available in the ITC, we hold that the ITC's prior decision cannot have claim preclusive effect in the district court."); Tex. Instruments, Inc. v. United States Int'l Trade Comm'n, 851 F.2d 342, 344 (Fed. Cir. 1988) ("[T]his court has stated that the ITC's determinations regarding patent issues should be given no res judicata or collateral estoppel effect."). By making this choice, Seagate was able to focus its resources in the remaining two months on the four patents it could fairly try in the two-week ITC trial, and as a result was able to compel Cornice to settle the ITC dispute. [Ex. 20 (May 2, 2005 Press Release).] Hence, far from supporting Cornice's misuse allegations, the procedural history of the ITC litigation merely reflects reasonable choices patentees in Seagate's position would make. The ITC proceeding certainly does not provide any

16

evidence that Seagate's enforcement of its patent rights in court "has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect."

Accordingly, because of the statutory provision in § 271(d)(3) and the undisputed facts, Seagate's enforcement of its patent rights cannot constitute patent misuse.

> **b.    Precedent precludes a finding of misuse based on Seagate's infringement warnings to Cornice**

Likewise, Seagate's cautionary warnings to Cornice about possible infringement cannot be evidence of misuse or unclean hands. Under settled precedent, merely sending infringing notices to a believed infringer, or threatening a lawsuit, does not reach the level of patent misuse as long as the infringement notices or threats were made based on a good faith belief that a patentee's patents are being infringed. Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860, 868 (Fed. Cir. 1997) ("That VP [the patentee] sent infringement notices to various government contractors, even notices that threatened suit and injunctions, did not indicate that VP attempted to broaden its patent monopoly."). As the Federal Circuit noted, there is nothing improper about a patentee's attempt to enforce its rights under the patent by advising potential infringers of its good faith belief that a particular product infringes or will likely infringe. See Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700, 709 (Fed. Cir. 1992) (ruling that a patentee "that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers"). Otherwise, "[p]atents would be of little value if infringers of them could not be notified of the consequences of infringement or proceeded against in the courts. Such action considered by itself cannot be said to be illegal." Virtue v. Creamery Package Mfg. Co., 227 U.S. 8, 37-38 (1913).

For this reason, the Federal Circuit requires that, "[i]n general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights." Mikohn Gaming Corp. v. Acres Gaming, Inc., 165 F.3d 891, 897 (Fed. Cir. 1998). This "bad faith" requirement extends to pre-litigation communications with potential infringers. Globetrotter

17

Software, Inc. v. Elan Computer Group, Inc., 362 F.3d 1367, 1377 (Fed. Cir. 2004). Here, neither the "Patent Minefield" presentation nor the letter meets this threshold.

Seagate exercised its rights to inform Cornice, through the "Patent Minefield" presentation, of the significant risks an unlicensed company takes in venturing into such patent-laden industry. There is certainly nothing false or deceiving in informing a potential defendant that there were over 10,000 relevant patents in the disc drive industry in 2003, and that the cost of a reasonable defensive investigation – including sorting, reviewing, and obtaining noninfringement opinions – with regards to these patents would likely exceed $14 million in attorneys fees. [Ex. 5 (Patent Minefield presentation) at 3-4.] Nor is there any bad faith in noting that failure to properly perform due diligence may result in infringement litigation – regardless of whether the suits are significant or mere nuisance. [Id. at 5.] Hence, regardless of any other purpose behind the presentation, the lack of deception or falsehood in the presentation precludes the requisite finding of bad faith that would allow the defense of misuse and unclean hands to proceed. Id. ("[A] competitive commercial purpose is not of itself improper, and bad faith is not supported when the information is objectively accurate.").

In the same vein, there is no evidence of bad faith in Mr. Hudson's April 2003 letter. Contrary to Cornice's mischaracterization, the correspondence plainly stated that, given the large size of Seagate's worldwide patent portfolio, any unlicensed and unwary disc drive manufacturer would likely infringe these patents. After all, "Seagate has more than six thousand issued and pending patents worldwide," and "[t]he scope of this patent portfolio is all encompassing in the field of hard disc drives." [Ex. 6 (Apr. 10, 2003 Ltr fr. Mr. Hudson to Mr. Magenis) at 1.] Given this extensive patent portfolio, the letter justifiably concluded that "[i]t is very clear that any company that makes or sells any form of hard disc drive regardless of size or capacity, including any component or assembly used in a hard disc drive, would be using inventions found in Seagate patents." [Id. at 2.] This large portfolio led many other companies to seek licenses or enter into cross-licenses with Seagate, so that

18

all parties may freely compete in the marketplace. That Cornice chose to infringe with impunity despite the letter's warnings does not infuse the correspondence with incorrectness, falsehood, or bad faith. Mr. Hudson's letter is a simple statement of facts, the truth of which Cornice has not denied. There is therefore nothing incorrect or false in these statements, and thus nothing on which Cornice could rely to meet the threshold requirement of bad faith. See Mikohn, 165 F.3d at 897 (reversing grant of preliminary injunction blocking communications regarding patent rights, because there was no showing of falsehood or incorrectness in the letters and press release, even though patentee had not verified infringement).

Accordingly, because Cornice cannot overcome the threshold showing of bad faith, Cornice cannot rely on its pre-suit communications with Seagate to buttress its unclean hands and patent misuse defense.

### 3.    Under the rule of reason and settled precedent, there is no patent misuse

Regardless of whatever inferences Cornice draws from these facts or however it spins the record, Cornice cannot prevail as a matter of law. Indeed, unless the patentee practices per se misuse in the form of tying arrangements or by demanding royalties beyond a patent's expiration, a court must determine if the accused practice is "reasonably within the patent grant, i.e., that it relates to subject matter within the scope of the patent claims." Virginia Panel, 133 F.3d at 868 (quoting Mallinckrodt, 976 F.2d at 708). If so, the practice does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse. Id. at 869. "If, on the other hand, the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accordance with the 'rule of reason.'" Id. at 869. "Under the rule of reason, 'the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and

19

effect." Id. (citations omitted).  The Federal Circuit recently reaffirmed this analysis.  U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1197 (Fed. Cir. 2005).

All of the practices that Cornice alleges to be improper – warning about patent infringement, filing infringement suits, and pursuing certain patents in parallel proceedings – are "reasonably within the patent grant, i.e., that it relates to subject matter within the scope of the patent claims." Virginia Panel, 133 F.3d at 868; see also Philips, 424 F.3d at 1197.  In other words, these activities stem from the basic property rights granted by the Patent Statute, and are consistent with an innovator's right to protect its investment from those who wish to unfairly benefit from the inventions.  See Virginia Panel, 133 F.3d at 868-71 (rejecting allegations of misuse, even though patentee threatened to seek injunctions against defendants' customers and to limit warranties, because the allegedly improper practices "did not extend VP [the patentee]'s patent rights nor were they unreasonable competitive practices.  Accordingly, such practices were legally insufficient to render the [patent-in-suit] unenforceable. The jury verdict that VP misused the '005 patent is therefore reversed and the district court is instructed to award damages to VP based on the adjudicated acts of infringement.").

Therefore, summary judgment dismissing Cornice's affirmative defense of unclean hands/patent misuse should be granted.

### C.     Summary Judgment is Appropriate on Cornice's Seventh Affirmative Defense of Equitable Estoppel

#### 1.     Legal standards for equitable estoppel

As an equitable defense to patent infringement, equitable estoppel requires that the infringer prove that it was led to believe that the patentee would not assert its patents, either by the actions or inactions of the patentee.  A.C. Aukerman, 960 F.2d at 1042-43.  Specifically, Federal Circuit law requires the accused infringer to prove three elements: (1) that Seagate, through misleading conduct, lead Cornice to reasonably infer that Seagate did not intend to enforce its patents against Cornice; (2) Cornice relies on that conduct; and (3) due to its reliance,

Cornice is materially prejudiced if Seagate is allowed to proceed with its claim. Ecolab, 264

F.3d at 1371; Gasser Chair, 60 F.3d at 776.

### 2. Cornice has failed to present any evidence supporting a prima facie case of equitable estoppel

As with the other defenses, Cornice only provided a cursory statement in its pleading that

"Seagate is equitably estopped from pursuing claims under the Patents-In-Suit." [D.I. 52 Att. 1

at 8.] Like the other defenses, Cornice's interrogatory responses on this issue are simply a

restatement of the legal requirements to establish equitable estoppel. [Ex. 10 (June 13, 2005

Cornice's Interrog. Resp.) at 32-33 (emphasis added).] And like the two other defenses above,

the reference to Interrogatory No. 1 response is devoid of any evidence on which any fact finder

can rule in Cornice's favor. Simply put, Cornice has failed to put forward evidence based on

which it can show at trial either the alleged misconduct that led Cornice to believe it would not

be sued, the basis for Cornice's reliance, or the material prejudice that arose from this reliance.

[See id.; Ex. 11 (June 10, 2005 Cornice's Interrog. Resp.) at 5-8.]

### 3. There is no evidence that Seagate, through misconduct or otherwise, led Cornice to reasonably believe there would be no infringement suit

The undisputed facts are clear: there is no statement or conduct which reasonably led

Cornice to believe it would not be sued. The record establishes instead that Seagate repeatedly

warned Cornice that it could be sued for patent infringement.

Since Cornice's incorporation, Seagate has cautioned the company about the risks of

patent infringement. And it did so twice. The first time in mid 2002 occurred during the parties'

negotiations to determine whether a business relationship was appropriate. During one of these

discussions, Seagate informed Cornice, through a presentation, that the disc drive industry was a

virtual patent minefield. [Ex. 5 (Patent Minefield presentation).] As the presentation cautioned,

large disc drive companies – including IBM, Seagate, Western Digital, and Hitachi – held

significant patent portfolios covering all discrete disc drive technologies, making any attempt to

enter the industry and to design a non-infringing product challenging, if not impossible. [Id. at

4.] Performing defensive patent due diligence – a step Cornice chose to skip – would be very

expensive, and the feasibility of avoiding infringement suits was low.  [Id.]  For that reason, Seagate suggested that Cornice either seek licenses from each patent holder or ally itself with an established disc drive company to benefit from an existing cross-license.  [Id. at 4-5.]  Rather than heeding this warning, Cornice chose to enter the industry without due diligence and without respecting others' intellectual property.

The second warning came in the Spring of 2003, when Seagate reiterated its warnings about patent infringement in a letter from its General Counsel to Cornice's CEO.  [Ex. 6 (Apr. 10, 2003 Ltr fr. Mr. Hudson to Mr. Magenis).]  The letter was clear in describing Seagate's large patent portfolio, comprising over 6,000 issued and pending patents worldwide.  [Id. at 1.]  It also underscored the significant risks Cornice took in disregarding its duty of due care, given the broad scope of the patent portfolio.  [Id.]  In unequivocal terms, Seagate even stated that it "takes the protection of its intellectual property very seriously and does not and will not permit any company to freely use its intellectual property."  [Id. at 2.]

Seagate then followed through with these warnings, by filing this action just a year after Cornice launched its first infringing product and about fifteen months after it sent the warning letter to Cornice's CEO.  [D.I. 1.; Ex. 7 (Cornice timeline).]

Thus, throughout the parties' pre-suit course of dealing, Seagate unambiguously informed Cornice about the significant risks of patent litigation.  The record is clear that Seagate at all times intended to protect its patented innovations.

### 4.    There is no evidence of reliance to support an equitable estoppel defense

Like the element of misrepresentation, Cornice cannot prove that there was reliance. Precedent is clear that reliance "is essential to equitable estoppel." Aukerman, 960 F.2d at 1042. To establish reliance, "[t]he accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action." Id. at 1042-43. Beyond showing an actual nexus between the action taken and the alleged misrepresentation, the infringer must also establish how it would alter its behavior otherwise. Meyers v. Asics Corp.,

974 F.2d 1304, 1306, 1309 (Fed. Cir. 1992). ("Defendants make numerous conclusory assertions that they relied on Meyers conduct, but they have not presented undisputed facts to show that they did.... Furthermore, defendants have not shown that they would have altered their conduct if Meyers had sued earlier.").

In this case, Cornice has offered no evidence that it took any action based on its supposed reliance. Its interrogatory responses fail to identify any such action, and the evidence produced during discovery is equally silent. Simply put, there is no evidence of reliance to establish equitable estoppel.

### 5. There is no evidence of material prejudice to support an equitable estoppel defense

In addition, Cornice has failed to provide any evidence that it was prejudiced as a result of Seagate's alleged misrepresentation. See Aukerman, 960 F.2d at 1043 ("Finally, the accused infringer must establish that it would be materially prejudiced if the patentee is now permitted to proceed. As with laches, the prejudice may be a change of economic position or loss of evidence.").

As with its laches defense, Cornice cannot assert any evidentiary prejudice given Seagate's prompt enforcement of its patent rights within one year of Cornice's product launch. Nor can Cornice show any economic prejudice, since it has yet to identify any economic injury resulting from the alleged, but non-existent, misrepresentation. Its interrogatory responses on this issue do not identify any evidence of economic injury, actual damages amount, or the requisite causal connection. [Ex. 10 at 30-33; Ex. 11 at 5-8.] And Cornice has not submitted any expert damages reports to establish the economic injury it allegedly suffered. In sum, Cornice has failed to put forward a single piece of evidence demonstrating any sort of prejudice.

In light of this lack of evidence, it is not surprising that, like its laches defense, Cornice abandoned its equitable estoppel defense before the ITC trial. Despite the ALJ's order warning about abandonment of any issue not briefed with particularity [Ex. 16 § 4(d) at 7], Cornice never briefed or even addressed its equitable estoppel defense in its ITC prehearing brief/statement.

23

[Ex. 17 (Table of contents of Cornice's ITC prehearing brief/statement).] This silence and resulting waiver is clear proof that Cornice's equitable estoppel defense has no evidentiary support.

Therefore, summary judgment dismissing Cornice's affirmative defense of equitable estoppel should be granted.

## VI.    CONCLUSION

For the reasons stated above, Seagate's motion for summary judgment as to Cornice's Third, Fifth, and Seventh Affirmative Defenses should be granted.

Dated: November 18, 2005                    FISH & RICHARDSON P.C.


                                By:  /s/ Timothy Devlin
                                     Timothy Devlin (#4241)
                                     919 N. Market Street, Suite 1100
                                     Wilmington, DE  19899-1114
                                     Tel: (302) 652-5070

                                     Attorney for Plaintiff
                                     SEAGATE TECHNOLOGY LLC

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2005, I electronically filed the attached

document with the Clerk of Court using CM/ECF which will send notification of such

filing(s) to the following:

Jack B. Blumenfeld, Esquire      Attorneys for Defendant
MORRIS NICHOLS ARSHT &     Cornice, Inc.
TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

I hereby certify that on November 23, 2005, I have mailed by Federal Express

Service, the document(s) to the following non-registered participants:

Matthew D. Powers        Attorneys for Defendant
Jason D. Kipnis         Cornice, Inc.
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

Russell Wheatley         Attorneys for Defendant
WEIL, GOTSHAL & MANGES LLP    Cornice, Inc.
700 Louisiana, Suite 1600
Houston, TX 77002

Alan J. Weinschel        Attorneys for Defendant
David C. Radulescu       Cornice, Inc.
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

          /s/ Timothy Devlin
          Timothy Devlin