IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SEAGATE TECHNOLOGY LLC, <br><br> Plaintiff, <br><br> v. <br><br> CORNICE, INC. <br><br> Defendant. | C.A. No. 04-418 (SLR) <br><br> **REDACTED** |

**PLAINTIFF SEAGATE TECHNOLOGY LLC'S CLAIM CONSTRUCTION
BRIEF REGARDING U.S. PATENT NO. 6,146,754**

Date: November 18, 2005

FISH & RICHARDSON P.C.
Timothy Devlin (#4241)
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114
Tel: (302) 652-5070

Roger S. Borovoy
David M. Barkan
500 Arguello Street, Suite 500
Redwood City, CA 94063-1526
Tel: (650) 839-5070

Ruffin B. Cordell
Brian R. Nester
Timothy W. Riffe
Christian A. Chu
1425 K Street NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 783-5070

Edmond R. Bannon
Lewis E. Hudnell, III
Citigroup Center
153 East 53rd Street, 52nd Floor
New York, NY 10022-4611
Tel: (212) 765-5070

Attorneys for Plaintiff
SEAGATE TECHNOLOGY LLC

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDING.............................................1

II.   SUMMARY OF THE ARGUMENT ..................................................1

III.  BACKGROUND .........................................................................2

      A.    The magnetic recording medium ...............................................2

      B.    The challenges of creating a functional thin-film
           magnetic recording medium with the desired magnetic
           properties.................................................................................5

      C.    The innovations of the '754 patent .............................................8

IV.   ARGUMENTS...........................................................................10

      A.    Legal standards regarding claim construction ..........................10

      B.    Independent Claims 1 and 13: A "seedlayer" is defined
           by the thin-film layer's position <u>and</u> function in the
           magnetic medium..................................................................10

           1.    The term's ordinary meaning in this field
                 includes both position and function ...........................11

           2.    The patent specification supports Seagate's
                 construction of "seedlayer".........................................11

           3.    The prosecution history of the patent reinforces
                 Seagate's construction of "seedlayer" ........................13

      C.    Independent Claims 1 and 13: A "chromium alloy"
           refers to a single-phase solid solution of chromium and
           other element(s) (usually metals)...........................................14

           1.    The term's proper construction must consider the
                 term's use and context in the claims and the
                 specification .............................................................16

           2.    The prior art considered during prosecution
                 supports Seagate's construction...................................17

      D.    Independent Claims 1 and 13: "Substantially Directional
           Magnetic Isotropy" should be construed according to
           precedent and the technological context...............................18

## TABLE OF CONTENTS (cont'd)

|  | | | Page |
|---|---|---|---|

1. "Substantially" does not have a strict numerical ceiling ................................................................18

2. "Substantially directional magnetic isotropy" permits consideration of one or more orientation ratios ........................................................................20

3. "Substantially directional magnetic isotropy" does not require a lack of dominant crystallographic orientation ............................................23

E. Dependent Claim 12: "Having magnetic properties with an orientation ratio of about 1.0" ............................................26

1. "Having magnetic properties with an orientation ratio" allows "one or more" orientation ratios ...........................26

2. "About 1.0" does not involve any rounding ................................27

F. Dependent claim 10 and Independent Claim 13: "randomly oriented grains" and "grains [lying in a plane] are randomly oriented" ............................................28

1. "Randomly oriented" qualifies two different types of grains and requires independent consideration ........................................................................29

2. Cornice's construction cannot scientifically or legally apply to claim 13 ..................................................29

3. Cornice's improper construction does not apply claim 10 ..................................................................31

G. Independent Claims 1 and 13: "Substrate" ............................................31

1. The ordinary meaning of "substrate" should control ..................................................................32

2. The specification supports the inclusion of coatings in the substrate ...........................................32

3. The prosecution history supports the inclusion of coatings such as NiP ...........................................34

4. The extrinsic evidence from the inventors' own work supports the adoption of the term's ordinary meaning .........................................................34

V. CONCLUSION ..................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Arthur A. Collins, Inc. v. N. Telecom Ltd.,
    216 F.3d 1042 (Fed. Cir. 2000)..................................................................... 14

Cordis Corp. v. Medtronic AVE, Inc.,
    339 F.3d 1352 (Fed. Cir. 2003)..................................................................... 20

Ecolab, Inc. v. Envirochem, Inc.,
    264 F.3d 1358 (Fed. Cir. 2001)..................................................................... 27

Gentry Gallery, Inc. v. Berkline Corp.,
    134 F.3d 1473 (Fed. Cir. 1998)..................................................................... 28

Karsten Mfg. Co. v. Cleveland Golf Co.,
    242 F.3d 1376 (Fed. Cir. 2001)..................................................................... 19

KCJ Corp. v. Kinetic Concepts, Inc.,
    223 F.3d 1351 (Fed. Cir. 2000)..................................................................... 21

Kumar v. Ovonic Battery Co.,
    351 F.3d 1364 (Fed. Cir. 2003)..................................................................... 13

Liebel-Flarsheim Co. v. Medrad, Inc.,
    358 F.3d 898 (Fed. Cir. 2004)....................................................................... 19

Liquid Dynamics Corp. v. Vaughan Co., Inc.,
    355 F.3d 1361 (Fed. Cir. 2004)..................................................................... 20

Mars, Inc. v. H.J. Heinz Co.,
    377 F.3d 1369 (Fed. Cir. 2004)..................................................................... 16

Merck & Co., Inc. v. Teva Pharmas. USA, Inc.,
    395 F.3d 1364 (Fed. Cir. 2005)..................................................................... 27

Modine Mfg. Co. v. United States Int'l Trade Comm'n,
    75 F.3d 1545 (Fed. Cir. 1996)....................................................................... 19

Omega Eng'g, Inc. v. Raytek Corp.,
    334 F.3d 1314 (Fed. Cir. 2003)..................................................................... 25

Phillips v AWH Corp.,
    415 F.3d. 1303 (Fed. Cir. 2005) (en banc)................................ 11, 17, 21, 28, 33

Playtex Prods., Inc. v. Procter & Gamble Co.,
    400 F.3d 901 (Fed. Cir. 2005)....................................................................... 20

V-Formation, Inc. v. Benetton Group SpA,
    401 F.3d 1307 (Fed. Cir. 2005)..................................................................... 14

Wright Med. Tech., Inc. v. Osteonics Corp.,
   122 F.3d 1440 (Fed. Cir. 1997)..........................................................................20, 30

## I.   NATURE AND STAGE OF THE PROCEEDING

In this patent infringement case, Plaintiff Seagate Technology LLC ("Seagate") asserts seven patents against Defendant Cornice, Inc. ("Cornice"). Fact and expert discovery is nearly complete, and the parties have exchanged expert reports. Pursuant to the Court's Scheduling Order [D.I. 36-1], Seagate files this brief regarding claim construction of one of the patents in suit, U.S. Patent No. 6,146,754 (the "'754 patent").

## II.   SUMMARY OF THE ARGUMENT

This case concerns hard disc drives for consumer electronics, and particularly one-inch disc drives used in MP3 players, PDAs, and other handheld devices. A few decades ago, a mere 5 MB of memory required an armoire-size cabinet to hold the hard drive. Today, small palm-size devices like iPod® digital players can store 60 GB of data. To make this technological revolution possible, the storage capacity of disc drives had to increase while the drives' physical size had to decrease. But accomplishing such a feat was far from simple, even for an industry leader like Seagate.

Since its founding, Seagate has invested billions of dollars in research and development, resulting in over 2,700 U.S. patents to date and earning an industry-wide recognition that Seagate's drives often set the industry benchmark. It is through this significant R&D investment that Seagate has been able to bring to consumers the disc drive innovations that fuel today's revolution in consumer electronics and portable devices.

In contrast, Cornice makes no attempt to truly innovate; it relies on the intellectual property of others to make the disc drives it calls "Storage Elements" ("Cornice SE"). As a recent entrant into this industry, Cornice opted not to innovate, choosing instead to rely on the patented technology developed by others. As a result, Cornice's SE incorporates at least seven technologies developed and patented by Seagate.

When called to account for its infringement in this action and the related U.S. International Trade Commission ("ITC") investigation, Cornice sought to evade responsibility through various tactics, including asserting baseless tort and contract counterclaims, agreeing to

1

discontinue selling certain types of Cornice SEs in exchange for a settlement of the ITC dispute, and attempting to design around the asserted patents. But its repeated attempts to design around the '754 patent's innovative magnetic recording media have failed. Although the Cornice SEs are now on their fourth generation of magnetic media since this action started, they still literally infringe the '754 patent's asserted claims.

To avoid infringement and concoct an invalidity story based on murky evidence, Cornice offers untenable claim constructions detached from the terms' ordinary meanings and divorced from the teachings of the intrinsic evidence. For instance, Cornice offers a construction of "substrate" that plainly contradicts the evidence of record, including concessions made by its own expert. Similarly, Cornice attempts to rewrite the invention from a two-dimensional longitudinal recording medium into a three-dimensional medium. It even goes so far as to devise a whole new construction dispute at the eleventh hour, even though the issue never surfaced in the ITC litigation or in its July 2005 List of Claim Terms for Construction.

Cornice's actions evince a lack of confidence that comes from distorted claim interpretations ungrounded in the intrinsic record. In contrast, Seagate's proposed constructions are in harmony with the intrinsic evidence, and should therefore be adopted in their entirety.

## III.   BACKGROUND

### A.   The magnetic recording medium

Every hard disc drive contains one or more magnetic recording media, usually in the form of a disc, on which the data is recorded. The '754 patent discloses such a magnetic recording medium, and particularly one that has a data recording layer that is substantially magnetically unoriented with respect to the radial and circumferential direction on the disc surface (referred to as "isotropic") and comprises a seedlayer within its structure to promote isotropic orientation of the data layer. [Ex. 1 ('754 patent).] [1]

---

[1] "Ex." refers to the exhibits attached to the declaration of Timothy Devlin in support of Seagate's Claim Construction Brief Regarding U.S. Patent No. 6,146,754, filed concurrently.

2



Magnetic recording
medium

Internal view of a Cornice disc drive

The magnetic recording media used in disc drives consist of "thin films" of magnetic and related materials that are deposited as layers, one layer over another, onto a substrate. An illustration of a disc drive annotated with Figure 1 of the '754 patent, shown below, describes prior art media and provides a schematic depiction of these thin-film layers:



Schematic illustration of a cross section
of magnetic media.

This thin-film structure is analogous to a house: the substrate is comparable to the foundation of a house, the "underlayer" is akin to the walls, the magnetic layer (the data storage film layer) is like the roof, and the overcoat and lubricant are analogous to the roof's coating. The substrate supports the media layers, forming a sturdy and rigid base on which the film layers are deposited. For a hard disc, the substrate is usually made of a coated aluminum alloy, glass, or glass-ceramic materials. On top of the substrate, a number of film layers – such as the underlayer and

3

magnetic layer schematically shown above – are deposited.   The underlayer supports and affects
the characteristics of the magnetic layer, in the same way as the shape and composition of the
supporting walls would dictate the shape and structure of the roof.

Because these film layers are often less than a millionth of an inch thick, they are
deposited by a process called "sputtering," involving the use of a vacuum-deposition process to
deposit extremely thin layers of material on a particular surface (see illustration, below left).

 

Schematic illustration of sputtering        Schematic illustration of recording process
process

To store data in a recording medium, the recording head writes digital information (in the form
of "0's" and "1's") by magnetizing tiny regions -- called "bits" – in the medium's magnetic layer.
Once written, each bit is magnetically oriented in one direction (digital 0) or the opposite
direction (digital 1).  The figure above, right, schematically depicts two distinct bits in the
magnetic layer, with white arrows representing opposite magnetization orientations.

It is not by accident that the figure depicts the white arrows – the magnetization
orientations – horizontally.  The diagram is faithful to the conventional method of recording that
has dominated the industry over the past forty years and even today.  This conventional
technology, called "longitudinal recording," requires that the bits' magnetization be oriented
parallel the plane of the film.  But it was not easy achieving this "two-dimensional" orientation.

4

To do so, skilled artisans had to find ways of manipulating the building blocks of the thin-film layers – the microscopic crystals called "grains."[2]

**B.    The challenges of creating a functional thin-film magnetic recording medium with the desired magnetic properties**

However, manipulating those grains and formulating a functional thin-film magnetic recording medium with the desired magnetic properties is not easy. [See '754 patent at 1:25-30.] The first challenge is reconciling the demands of the market with the laws of physics. To satisfy the industry's demand for greater storage capability within smaller and smaller space, the industry had to increase the medium's available recording density and therefore the medium's grain density. [See id.] But physics imposes on the grain density inherent limits which cannot be easily overcome. For example, when oppositely magnetized regions get too close to one another, the recording "noise" – the unwanted electromagnetic interference from adjacent grains that degrades the quality of signals and data – increases substantially, creating an inherent limit to how close the grains can get to one another. [See id. at 1:31-42.]

As the skilled artisan attempts to avoid such problems, he must also address a second challenge: he must preserve – and is often expected to improve – relevant magnetic properties of the medium, "such as coercivity (Hc), magnetic remanence (Mr) and coercive squareness (S*), which are critical to the performance of a Co [cobalt] base alloy magnetic thin film." [Id. at 1:54-57.] Each of these three magnetic properties is important in making a good recording medium, in the same way as sturdiness and water-proofing are important qualities of a good roof. The magnetic remanence (Mr) corresponds to the amount of magnetization that remains in the medium after the applied magnetic field is removed, and is thus the magnetization that a recording head reads. Equally useful is the coercive squareness (S*), which determines the abruptness of transition from one bit to another. A greater S* value means a smaller transition and thus a better signal. The third magnetic property is the medium's coercivity (Hc or Hr),

---

[2]  A grain is not necessarily magnetic. Chromium and chromium alloy grains are, for example, non-magnetic and do not have a magnetization orientation. The grains of the data storage layer are generally composed of cobalt alloy, which impart magnetic properties on the grains.

which represents the magnetic field necessary to remove the induced magnetization of a material. [See id. at 1:24-27.] Although increasing coercivity may facilitate higher recording density, there are drawbacks; as coercivity increases, the medium noise may also increase due to inhomogeneous grain size and microstructural interactions between nearby magnetic grains. [Id. at 1:32-40.] To minimize the medium noise, the skilled artisan had to experiment and find ways of controlling the medium's microstructure. [Id. at 1:40-42.]

This leads to the third and most difficult challenge: creating a magnetic thin-film medium, with the desired magnetic properties and microstructures, that can meet the market and industry's needs. Such a creation required significant experimenting and research. Indeed, when cobalt alloy grains are directly sputtered on a substrate, the cobalt grains "grow" perpendicular to the plane of the film, leading to the magnetization being also perpendicular to the film. To use longitudinal media technology, the magnetization orientation of the cobalt grains – called the grains' "c-axis" (shown as a red arrow in the figure below) – had to lie parallel to the plane of the film. This problem is analogous to building a flat roof in which the architect needs the roof to be parallel to the ground, but the contractor can only fit the roof's beams perpendicular to the ground. The industry therefore needed to change the "crystallographic orientation" of the cobalt grains, shifting it from a "(0001)" orientation perpendicular to the plane of the film (below, left), to either a "(1120)" or "(1010)" orientation in the plane of the film (below, right):[3]



---

[3] The denotations, such as (1120) or (200), are based on a system called the "Miller index" and are commonly used in this field to designate the orientation and position of the face of a crystal.

6

Shifting the crystallographic orientation of microscopic grains was a significant challenge. In the 1980's, skilled artisans discovered that, through epitaxial[4] interactions, an "underlayer" of chromium ("Cr") or Cr alloy could cause the cobalt grains in the magnetic layer to acquire a "(10$\bar{1}$1) orientation" and grow at about 29 degree angle to the plane of the film (second figure from the left, above). [Id. at 1:43-53.] This gave rise to the conventional media structure shown in Figure 1 of the '754 patent (reproduced below on the left). [Id. at 1:43-53.] But the resulting magnetic medium was still not good enough for high density longitudinal recording, because the out-of-plane orientation diminished the magnetization read by the head and the Cr underlayer gave rise to larger grains in the magnetic layer.



FIG. 1
PRIOR ART

FIG. 2
PRIOR ART

To find a better medium with the desired magnetic properties for high density recording and magnetization parallel to the plane of the film for longitudinal recording, skilled artisans, such as Professor Laughlin and his colleagues, experimented with new types of media. First, they tried using a nickel-aluminum ("NiAl") underlayer, and discovered that films with a NiAl underlayer had smaller grain size and exhibited the desired magnetization orientation parallel to the film's plane. [Id. at 1:65-2:5 (citing work by Professor Laughlin's research group); id. at Fig. 2 (reproduced above on the right).] But this medium's magnetic properties (such as Hc) were

---

[4] "Epitaxy" refers to the growth of the crystals of one film on the crystal face of another film, such that the crystals of both films have a related structural orientation.

7

still too low for a useful high-density magnetic recording medium. [Id. at 2:6-16.] Professor Laughlin tried adding a Cr sub-underlayer on the substrate and an intermediate layer above the underlayer, but observed that the noise increased and the grains' magnetization skewed outside of the film's plane. [Id. at 2:17-39 (citing additional work by Professor Laughlin)] Only the deleterious use of high heat on this new medium could induce the conventional "(200)" crystal structure in the underlayer, so that the cobalt crystals would acquire a "(1120)" crystallographic orientation and finally lie in the plane of the film. [Id. at 2:40-55.] They also tried using a magnesium-oxide ("MgO") "seedlayer" before depositing a NiAl underlayer. [Id. at 2:56-3:14 (citing additional publication by Professor Laughlin's research group).] Although this medium produced an underlayer with the desired "(200)" crystal structure, the magnetic layer did not exhibit the expected "(1120)" orientation parallel to the film's plane.

Other researchers also attempted – with varied degrees of success – to create a medium capable of high recording density, with the desired magnetic properties, and with its cobalt grains oriented in the plane of the film. [Id. at 3:40-59.] Dr. Lal and his colleagues experimented with a Cr "sublayer" sputtered on a substrate, followed by a Cr underlayer and the magnetic layer. [Id. at 3:40-44.] Other groups also tried depositing a Cr underlayer on a partially oxidized nickel-phosphorous ("NiP") layer, or using a seedlayer comprising partially oxidized NiP surface in combination with a Cr sub-underlayer, NiAl underlayer, and/or Cr intermediate layer. [Id. at 3:45-59.] But none achieved the results obtained by the inventors of the '754 patent.

C.    The innovations of the '754 patent

Surprisingly, Dr. Song, Mr. Chen, Mr. Leu, and Dr. Ranjan discovered that sputtering a chromium or chromium alloy seedlayer onto a non-magnetic substrate, with an underlayer on top of the seedlayer, resulted – under the preferred conditions disclosed in the patent – in a magnetic recording medium with high recording density capabilities and desirable magnetic properties for longitudinal recording. [Id. at 4:1-53.] Contrary to the pervading belief at the time, the preferred embodiment of the patented medium achieved those desirable magnetic properties without

8

necessarily achieving a "(200)" dominant crystallographic orientation in the underlayer or a "(11$\overline{2}$0)" dominant orientation for the magnetic layer crystals. [Id. at 5:40-53.]

As a result, the patented medium advantageously exhibits "substantially directional magnetic isotropy." This property made possible even higher density longitudinal recording by improving overwrite[5] characteristics, significantly reducing fluctuations in certain magnetic properties (including Hc), and avoiding an undesirable increase in noise (e.g., no substantial superlinear noise behavior[6]), even at high recording density. [Id. at 5:62-6:5.] And in addition to reducing media noise at high recording density, this substantially isotropic medium exhibits superior magnetic properties compared to media known at the time. [See id. at 4:2-6.]

To determine whether a medium exhibits this advantageous characteristic, the inventors and other skilled artisans consider a dimension-less parameter called an "orientation ratio," which is calculated as the ratio of a medium's magnetic property (such as Hc, Mr or S*) measured in the circumferential direction over the measurement in the radial direction:



The closer the orientation ratio is to 1.00, the more isotropic the magnetic medium. By using a chromium or chromium alloy seedlayer and controlling various deposition conditions, the

---

[5] Overwrite refers to the recording or copying of new data over existing data, such as when a file or directory is updated.

inventors induced substantial magnetic isotropy in their media, resulting in an orientation ratio as low as 1.06 compared to an orientation ratio as high as 1.62 in a medium without a Cr seedlayer.

To share their discovery, the inventors of the patent submitted a provisional patent application on September 8, 1997. [Ex. 2 (Sept. 8, 1997 provisional appl.).] On September 2, 1998, the inventors submitted an application, which claimed priority from the provisional application and which issued as the '754 patent on November 14, 2000. [Ex. 1.]

The '754 patent contains 19 claims, two of which (a composition claim and a method claim) are independent:

| 1. A magnetic recording medium comprising: | 13. A method of manufacturing a magnetic recording medium, which method comprises: |
|---|---|
| a non-magnetic **substrate**; | depositing **a chromium or chromium alloy seedlayer** on a non-magnetic **substrate**, wherein the grains lying in a plane are randomly oriented; |
| a **chromium or chromium alloy seedlayer** on the non-magnetic substrate; | |
| an **underlayer** on the seedlayer; and | depositing an **underlayer** on the seedlayer; and |
| a magnetic layer on the underlayer; wherein the magnetic layer exhibits **substantially directional magnetic isotropy**. | depositing a magnetic layer on the underlayer; wherein the magnetic layer exhibits **substantially directional magnetic isotropy**. |

Of these 19 claims, seven claims are at issue in this action: claims 1, 6, 7, 10, 11, 12, and 13.

## IV.     ARGUMENTS

### A.     Legal standards regarding claim construction

Seagate incorporates by reference the legal section set forth in its claim construction brief regarding U.S. Patents Nos. 5,452,159 and 6,744,606, filed concurrently.

### B.     Independent Claims 1 and 13: A "seedlayer" is defined by the thin-film layer's position <u>and</u> function in the magnetic medium

Seagate and Cornice agree that the "seedlayer" is a film layer between the substrate and the underlayer. Cornice would, however, define a "seedlayer" based solely on the film layer's

---

[6] Superlinear noise behavior refers to an exponential increase in media noise, as shown in Figure 9 of the '754 patent.

position in the media, requiring that this layer be in direct contact with the substrate. Seagate, in contrast, offers a construction that acknowledges both the position of the seedlayer and the importance of its function in the recording medium.

A simple analogy illustrates this claim construction dispute. Cornice is essentially arguing that anything directly in contact with the floor (the substrate) must be a carpet (seedlayer), even if it is a tarp, a bedsheet, or a piece of paper. Seagate proposes that a carpet is more than what is on the floor; it must also perform some of the functions of a carpet, such as softening footsteps or insulating bare feet from otherwise cold floors.

> 1.  **The term's ordinary meaning in this field includes both position and function**

The goal of claim construction is to give claim terms their ordinary meaning in the art. See Phillips v AWH Corp., 415 F.3d. 1303, 1315 (Fed. Cir. 2005) (en banc). There is no dispute here that, as used in this field of technology and its scientific literature, the term "seedlayer" ordinarily encompasses both structure and function. In fact, Cornice's own expert admits it. Referring to an article cited on the face of the patent, Cornice's expert acknowledges that:

**REDACTED**

[Ex. 3 (Aug. 22, 2005 Coffey Rep.) at 36 (emphasis in original) (citing and quoting 1996 article by Prof. Laughlin et al. in IEEE Trans. Mag.).] Although Cornice's expert characterizes this definition as "narrower," it is still the ordinary meaning as confirmed by the intrinsic evidence.

> 2.  **The patent specification supports Seagate's construction of "seedlayer"**

The intrinsic evidence fully supports that the term's ordinary meaning encompasses function. In the Description of the Invention section, the patent repeatedly indicates that a seedlayer performs a specific function in the magnetic medium. For instance, the patent states:

> In accordance with embodiments of the present invention, a desirably high SNR is achieved by the strategic formation of a seedlayer on the substrate prior to

11

> deposition of the underlayer and magnetic layer. After considerable
> experimentation and investigation, it was found that the nucleation, growth and
> crystallographic orientation of the magnetic layer can be suitably **controlled by**
> the proper selection of seedlayer and underlayer materials and, significantly, by
> suitable methodology.

['754 patent at 6:05-14 (emphases added).] As this passage indicates, the seedlayer is not just a

thin-film layer passively sitting on the substrate, as Cornice suggests. To the contrary, the

"seedlayer" is a functional cornerstone of the invention, affecting and "suitably control[ling]"

"the nucleation, growth and crystallographic orientation of the magnetic layer." [Id.]

The seedlayer's function focuses on achieving a primary goal: promoting a specific

crystallographic orientation in the magnetic layer to achieve "substantial directional magnetic

isotropy." The seedlayer achieves this function by affecting the underlayer's grains and thus

inducing (or precluding) particular crystallographic orientations in the magnetic layer's grains:

> It was found that the seedlayer can be treated, after deposition, to adjust its
> crystalline orientation and surface morphology to induce the nucleation and
> growth of the underlayer and the magnetic layer such that the magnetic layer
> exhibits substantial directional magnetic isotropy.

[Id. at 6:14-19 (emphases added).] In a preferred embodiment of the patent, the seedlayer

performs its function by precluding the formation of a (110) or (200) dominant orientation in the

underlayer, and thus preventing the development of a (1120) orientation in the magnetic layer:

> However, in accordance with embodiments of the present invention, a seedlayer is
> employed, and the materials are selected and the deposition conditions controlled
> so that the subsequently deposited underlayer and magnetic layer do not exhibit
> any dominant crystallographic orientation. Thus, in accordance with embodiments
> of the present invention, the underlayer does not exhibit a (110)- or (200)-
> dominant crystallographic orientation and the magnetic layer does not exhibit a
> (1120)-dominant crystallographic orientation. Rather, the seedlayer is formed
> such that it contains grains lying in a plane which are randomly orientated. As a
> result, the magnetic layer exhibits substantial directional magnetic isotropy.

[Id. at 5:45-57 (emphases added).] Hence, the seedlayer imprints its own random in-plane

crystallographic orientation on the underlayer's grains as they nucleate and grow, ultimately

influencing the crystallographic orientation of the magnetic layer's grains which nucleate and

grow on the underlayer's randomly oriented grains. [Id.] Through this process, the seedlayer

12

overcomes the natural orientation of the grains of the underlayer and magnetic layer, imposes a random in-plane orientation in both layers, and generates "substantial directional magnetic isotropy" in the magnetic layer.

In sum, the patent confirms that the seedlayer is not an inert thin-film characterized solely by its position as Cornice would have the Court believe. According to the patent, the seedlayer performs a crucial function by inducing (or preventing) certain crystallographic orientations in the underlayer and ultimately in the magnetic layer.

### 3. The prosecution history of the patent reinforces Seagate's construction of "seedlayer"

The references specifically cited on the face of the patent, in the patent's Background section, and expressly considered during prosecution, reinforce the propriety of Seagate's definition. Kumar v. Ovonic Battery Co., 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("Our cases also establish that prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.").

Indeed, two of the papers cited on the face of the patent define "seedlayer" based on the layer's position and function. The first paper defines "seedlayer" in the same way as Seagate:

> A seed layer (sometimes called a precoating) is a thin-film layer that is deposited between the substrate and the underlayer. Seed layers are used for (1) the facilitation of infrared heating of glass substrates, (2) the modification of the topography of the disk substrates for tribological purpose, and (3) inducing preferred crystallographic texture to underlayers.

[Ex. 4 (1996 article by L-L Lee et al., in J. Appl. Phys.) at 4902 (cited in '754 patent at cover and 2:62-65) (emphases added).] As this intrinsic evidence shows, the technical context in which the inventors were working contemplates that a "seedlayer" has at least two features: (1) its position in the thin-film medium, between the substrate and the underlayer, and (2) the function it performs, including as discussed in the specification, the inducement of certain crystallographic orientations in the layers above. Similarly, the second prior art paper cited on the face of the patent unambiguously links a "seedlayer" with the function it performs:

13

> Our terminology for the different layers is shown in Fig. 1. We have named the layers in reference either to their positions with respect to the magnetic layer (the underlayer lies *under* the magnetic layer and the intermediate layer lies *between* the underlayer and the magnetic layer) or with a name that describes its function (the seedlayer *seeds* the nucleation of a particular crystallographic texture of the underlayer).

[Ex. 5 (1996 article by Laughlin et al. in IEEE Trans. Mags.) at 3632 (cited in '754 patent at front page and 2:65-3:2) (underlines added; italics in original).] Rather than mere citations made during prosecution, these two papers provide the scientific context in which the inventors developed the patented invention, and are integral to understanding the innovative approach taught by the patent. Not surprisingly, the patent extensively discusses and cites these two papers in its Background section. ['754 patent at 2:56-3:40.]

This is a clear instance where, "[w]hen prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1045 (Fed. Cir. 2000). To construe "seedlayer" without considering the positional and functional definition reflected in these two references, as Cornice does, would be legally erroneous. See V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1309 (Fed. Cir. 2005) (disapproving failure to consider prosecution history prior art in construing claims).

Accordingly, whether a layer is a "seedlayer" as used in the '754 patent does not depend merely on the position of the layer in the medium; it also depends on the function it performs.

**C.    Independent Claims 1 and 13: A "chromium alloy" refers to a single-phase solid solution of chromium and other element(s) (usually metals)**

Seagate and Cornice agree that the term "alloy" in the phrase "chromium alloy" refers to a mixture of two or more components (one of which is chromium in the case of a "chromium alloy").[7] The dispute turns on the type of mixture composing the "chromium alloy" in this field.

_____

[7] The parties do not dispute that an "alloy" cannot be a "compound" (i.e., a distinct substance formed by a chemical union or bond of two or more element), because in a compound, the atoms

14

As taught by the intrinsic evidence and the understanding of skilled artisans, Seagate submits that the term refers to a "single-phase" mixture, i.e., a homogenous mixture or solid solutions of two or more elements (usually metals) in which the atoms of one replace or occupy interstitial positions between the atoms of another. As shown by the diagram below on the left, in a single-phase mixture, the atoms of one element randomly <u>substitute</u> (replace or occupy interstitial positions) for the atoms of the other element(s):



Schematic of single-phase alloy, in which the red atoms randomly substitute for the blue atoms



Example of two-phase mixture: Oil droplets floating on water

Cornice, in contrast, argues for an unduly broad construction designed to capture prior art. Specifically, it argues that an "alloy" is any metal mixture composed of two or more elements. Cornice's construction thus encompasses not only single-phase mixtures, but also "multi-phase" elemental mixtures. [Ex. 3 at 39 ("

REDACTED

").]

A common example of a multi-phase mixture is the "two-phase" water-oil emulsion system. As shown in the picture above right, the oil (labeled 2) is a phase, separate and distinct from the water phase (labeled 1). Both phases are internally homogeneous, physically distinct from the other phase, and physically separable by mechanical means (in the case of oil and water, by letting the emulsion sit still until, under gravity, the phases separate).

---

are arrayed in an orderly fashion and chemically bonded, rather than being merely mixed as they are in an alloy.

The claim construction dispute here turns on how many "phases" the term "chromium alloy" encompasses. Cornice argues that an alloy must encompass two-phase mixtures, adopting a construction so broad ("a metal mixture composed of two or more elements") that it encompasses non-alloys such as a bag of copper marbles mixed with iron nuggets. As supported by the intrinsic evidence, Seagate submits that an alloy – especially one used in a commercial recording medium – cannot include a "two-phase mixture."

1.     **The term's proper construction must consider the term's use and context in the claims and the specification**

In the context of the asserted claims, "alloy" always appears as part of the claim phrase "chromium alloy," rather than as any type of "alloy." Indeed, independent claims 1 and 13 call for a magnetic recording medium comprising "a chromium or <u>chromium alloy</u> seedlayer on the non-magnetic substrate[.]" ['754 patent at 11:10-11.] Similarly, claim 6 recites "[t]he magnetic recording medium according to claim 1, wherein the underlayer comprises chromium or a <u>chromium-alloy</u>." [<u>Id.</u> at 11:31-33.] It is in this framework that the claim must be considered and construed. <u>Mars, Inc. v. H.J. Heinz Co.</u>, 377 F.3d 1369, 1374 (Fed. Cir. 2004) (construing claim term "ingredients" in light of the term "mixture" used in the same claim phrase).

In this framework, a review of the specification indicates that the patent only uses "alloy" and "chromium alloy" to refer to single-phase mixtures in which atoms of one element substitutes for atoms of another. The background section of the patent makes this point clear:

> The Co alloy magnetic layer normally comprises polycrystallites <u>epitaxially grown on the polycrystal Cr or Cr-alloy underlayer</u>, . . .
> Conventional underlayers include Cr, molybdenum (Mo), tungsten (W), titanium (Ti), chromium-vanadium (CrV) as well as <u>Cr alloyed with various substitutional elements</u>.

['754 patent at 1:51-62 (emphases added).] By using the term "substitutional" concurrently with the verb "to alloy," the patent unambiguously indicates that the claimed "chromium alloy" does not involve an uncommon mixture of two phases, but rather a single-phase solution in which the atoms of one component substitute for those of another component. [<u>See id.</u>] If the underlayer

16

were made of a multi-phase mixture, the underlayer would lose its ability to affect the properties

and characteristics of the magnetic layer.

Confirming that the chromium alloy involves a substitutional single-phase mixture, the

patent emphasizes that the various chromium alloys are sputter deposited:

> The seedlayer employed in the present invention can be sputter-deposited and can
> comprise various materials, such as Cr, a Cr alloy, e.g., CrV, CrTi or CrTiB. . . .
> The underlayer employed in the present invention can be sputter deposited at a
> thickness of about 300 .ANG. to about 1500 .ANG. and can comprise Cr, a Cr
> alloy, such as CrV, CrTi, CrTiB or Cr-Ta$_2$O$_5$.

['754 patent at 6:47-56 (emphases added).]  As Cornice's expert concedes,

**REDACTED**

. [Ex. 7 (Apr. 4, 2005 Coffey Depo. Tr.) at 212:9-19.]  Simply

put, the specification fully supports the single-phase meaning that the skilled artisan would give

to the term "chromium alloy."

> **2.    The prior art considered during prosecution supports Seagate's
> construction**

The prosecution history, which "includes the prior art cited during the examination of the

patent," "provides evidence of how the PTO and the inventor understood the patent." Phillips,

415 F.3d at 1317.  These references teach two important points.

First, the prior art considered by the Examiner during prosecution echoes the teaching of

the '754 patent and is consistent with Seagate's construction.  Co-authored by Prof. Laughlin's

group and cited on the face of the '754 patent, this paper indicates that a "chromium alloy" in a

magnetic thin-film involves the substitution of one atom for another in the single-phase mixture:

> Many different underlayer materials for longitudinal media, such as Cr, Mo, W,
> Ti, NiP, CrV and Cr alloyed with other substitutional elements, have been
> reported in the literature.  Only a few of these, however, actually perform well.
> Among them, the most often used and the most successful underlayer is pure Cr.
> It has been shown that BCC Cr underlayers promote grain-to-grain epitaxial
> growth of HCP Co alloy thin films deposited on these underlayers.

17

[Ex. 8 (1994 article by L.L. Lee et al. in IEEE Trans. Mag.) at 3953 (emphasis added and footnotes omitted).]

Second, none of the references considered during prosecution – either the four patents or the five papers from Prof. Laughlin's research group – use any "chromium alloy" other than a single-phase substitutional mixture. In other words, none of these references can support the breadth of Cornice's proposed construction, failing to use any "chromium alloy" that involves a two-phase or a multi-phase mixture. [Id.]

**D.     Independent Claims 1 and 13: "Substantially Directional Magnetic Isotropy" should be construed according to precedent and the technological context**

In the patent, a substantially isotropic medium has a data recording layer (the magnetic layer) that is substantially magnetically unoriented with respect to the radial and circumferential direction on the disc surface. The parties agree that a perfectly isotropic medium would exhibit an orientation ratio equal to 1.00.

However, the parties disagree on three major points: (1) since the patent does not call for a perfectly isotropic medium, but a "substantially" isotropic medium, how close to 1.00 must the orientation ratio be and whether, as Cornice's expert asserts, there is a numerical ceiling on the orientation ratio based on the preferred embodiment; (2) whether one or more types of orientation ratios must be considered to determine substantial isotropy; and (3) whether this claim term requires, as Cornice argues, that the magnetic layer has no dominant crystallographic orientation and thus be three-dimensional rather than two-dimensional.

**1.     "Substantially" does not have a strict numerical ceiling**

According to Cornice and its expert, the term "substantially" imposes certain numerical values on "substantially directional magnetic isotropy." For instance, at his deposition,

**REDACTED**

[Ex. 7 at 214:4-215:10.]

Based on this view, Cornice's expert imposes arbitrary numerical cut-offs in his rebuttal report in this action, arguing for example,                    **REDACTED**

18

REDACTED

[Ex. 6 (Oct. 10, 2005 Coffey Rebut. Rep.) at 30.] This approach violates three basic rules of claim construction.

First, Cornice and its expert are rewriting the claim term to impose an upper numerical value on the orientation ratio(s) that a person skilled in this art would not consider. Under their construction, a magnetic medium that exhibits any orientation ratio above those of Sample B (as shown below in the reproduction of Table II of the patent) falls outside of the claim scope.

TABLE II

| Sample | Hr(cir) | Hr(rad) | OR(Hr) | mr(cir) | mr(rad) | OR(mr) | S*(cir) | S*(rad) | OR(S*) |
|--------|---------|---------|--------|---------|---------|--------|---------|---------|--------|
| A | 3233 | 2744 | 1.18 | 5.80 | 3.58 | 1.62 | 0.80 | 0.72 | 1.22 |
| B | 2965 | 2801 | 1.06 | 4.96 | 4.26 | 1.16 | 0.80 | 0.75 | 1.07 |

It is, however, well settled that numerical ranges or values in the specification cannot be imported into the claims as limitations. E.g., Modine Mfg. Co. v. United States Int'l Trade Comm'n, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("Ordinarily a claim element that is claimed in general descriptive words, when a numerical range appears in the specification and in other claims, is not limited to the numbers in the specification or the other claims.").

Furthermore, under Cornice's interpretation, the alleged numerical ceiling for coercivity orientation ratio (1.06) and S* orientation ratio (1.07) would render claim 4 – which depends on claim 1 and adds a 1.1 orientation ratio – meaningless and indefinite. Precedent does not condone such nonsensical interpretation. See Karsten Mfg. Co. v. Cleveland Golf Co., 242 F.3d 1376, 1384 (Fed. Cir. 2001) (ruling that whenever possible, claims should be construed to preserve their validity).

Second, Cornice's numerical restrictions tied to Sample B ignores that "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 913 (Fed. Cir. 2004). Here, Cornice has not provided any support to justify its construction.

19

Finally, Cornice's position disregards the adverb "substantially" in the claim term "substantially directional magnetic isotropy." This disregard results in a construction that improperly renders an express claim limitation superfluous. See Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1444 (Fed. Cir. 1997) (rejecting claim construction that would make other terms in disputed claims mere "surplusage"). It also ignores Federal Circuit precedent stating that "[t]he term 'substantial' is a meaningful modifier implying 'approximate,' rather than 'perfect.'" Liquid Dynamics Corp. v. Vaughan Co., Inc., 355 F.3d 1361, 1368 (Fed. Cir. 2004) (reversing district court's construction that required perfection). In a recent case, the Federal Circuit reversed a construction similar to the one offered by Cornice. Playtex Prods., Inc. v. Procter & Gamble Co., 400 F.3d 901, 906-09 (Fed. Cir. 2005). The Federal Circuit disagreed that "substantially flattened surfaces" requires a numerical limit and manufacturing standard, and ruled that the term "substantial" and "substantially" denotes a matter of degrees:

> The disputed claim term is clearly a comparative term. Comparison requires a reference point. Therefore, to flatten something, one must flatten it with respect to either itself or some other object. In the context of the claim, the term "flattened" requires a comparison between the diametrically opposed surfaces and something else. The only antecedent basis in the claim is the tubular barrel. '178 patent, col. 6, II. 3-9. Playtex, therefore, claimed something flatter than a tubular barrel, but not necessarily something flat.

Id. at 908 (emphasis added). See also Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352, 1361 (Fed. Cir. 2003) (refusing to impose a precise numeric constraint on the term "substantially uniform thickness," noting that the proper interpretation of this term was "of largely or approximately uniform thickness"). Based on this clear precedent, the term "substantially directional magnetic isotropy" is not restricted to any specific numerical value.

### 2.    "Substantially directional magnetic isotropy" permits consideration of one or more orientation ratios

Cornice's proposed construction of this term calls for the plural term "magnetic properties" while Seagate's interpretation proposes one or more magnetic properties. At the heart of this dispute is how many orientation ratios the person skilled in this art needs in order to determine whether a magnetic medium exhibits "substantially directional magnetic isotropy."

20

Although the parties generally agree that the skilled artisan may consider more than one orientation ratio of a medium's magnetic properties (such as coercivity Hc, remanence Mr, and coercive squareness S*) to make this determination, Cornice believes that the skilled artisan needs at least two orientation ratios (i.e., ORs of Hc, Mr, and S*) consistent with isotropy, while Seagate submits that one or more orientation ratios would suffice (i.e., OR of Hc, Mr, or S*).

Although the term "substantially directional magnetic isotropy" does not specify the number of orientation ratios, additional limitations in the dependent claims shed light on this issue. See Phillips, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms."). Claims 4 and 10, which ultimately depend from claim 1, require a magnetic medium "having magnetic properties with an orientation ratio less than about" 1.1 and 1.0, respectively. ['754 patent at 11:25, 12:14-15 (emphasis added).] Claim 19, which ultimately depends from claim 13, contains language identical to claim 10. [Id. at 12:45-46.] Based on their plain language, the dependent claims therefore require one or more orientation ratios, because they each use the indefinite article "an" to qualify "orientation ratio." See KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'). And since the dependent claims call for "one or more" orientation ratios, independent claim 1 must be as broad as – if not broader than – its dependent claims by requiring "one or more" orientation ratios as well. Otherwise, if "substantially directional magnetic isotropy" required "two or more" orientation ratios as Cornice argues, claim 1 would be improperly and illogically narrower than its dependent claims.

Cornice's focus on the plural term "magnetic properties" is not to the contrary, because the defendant fails to acknowledge that the patent uses the term "magnetic properties" in two different ways: The term may either refer to a magnetic property of the media (such as Hc or S*), or indicate a property measurement made in a certain direction (such as Hc measurement in the circumferential direction). The context in which the patent uses the term resolves any ambiguity,

21

indicating whether it is focusing on the property of the media ['754 patent at 1:54-56 ("It is recognized that the relevant magnetic properties, such as coercivity (Hc), magnetic remanence (Mr) and coercive squareness (S*) ....")], or the property measurement in a certain direction. [Id. at 5:59-61 ("a magnetic layer having magnetic properties with an orientation ratio (circumferential direction: radial direction) of less than about 1.1 even about 1.0."); 5:64-6:2 (stating that the preferred embodiment exhibits "significantly reduced magnetic property modulation, particularly significantly reduced Hc modulation in the circumferential direction.").] Given the similarity of the dependent claim's language with the appropriate instance in the specification, it is logical to conclude that "magnetic properties" in the dependent claims refers to property measurements in a certain direction, rather than to the media's magnetic properties. [Compare id. at 5:59-61 and claims 4, 10 and 19.] Accordingly, the number of orientation ratios to consider remains, as claimed, one or more.

     An examination of the specification reinforces this point. Indeed, the patent consistently pairs the plural "magnetic properties" with the singular "an orientation ratio," using language parallel to the dependent claims and never using the term "orientation ratio" in the plural. [Id. at 5:57-61, 7:3-6, and 10:9-16 ("magnetic properties with an orientation ratio").] If Cornice were correct that "magnetic properties" always refer to the media's properties, the specification would become internally inconsistent, with certain portions of the written description precluding the preferred embodiment from having orientation ratios greater than "about 1.1 even 1.0" while empirical testing of the embodiment indicates that its remanence orientation ratio is 1.16. [Compare id. at 5:57:61 and Table II.]

     As a practical matter,                             **REDACTED**

                                                                    . [Ex. 9
(Apr. 1, 2005 Laughlin Depo. Tr.) at 223:5-20.]              **REDACTED**
                    **REDACTED**
                                               . [Ex. 10 (June 23, 2005 McNeil Depo.
Tr.) at 492:9-24 (
                                        **REDACTED**

                                            22

REDACTED

.").]

### 3.    "Substantially directional magnetic isotropy" does not require a lack of dominant crystallographic orientation

To avoid infringement, Cornice attempts to rewrite the patent to cover a completely different invention, by arguing that "substantially directional magnetic isotropy" requires a complete lack of dominant crystallographic orientation in the magnetic layer. Instead of a medium optimized for longitudinal recording by having the cobalt grains' magnetization parallel to the plane of the film (see figure for 2-D isotropy, below left, with arrows showing possible magnetization directions and the green circle showing the plane of the film), Cornice is transforming the invention into a non-working medium in which the cobalt grains' magnetic orientations are pointed in all directions in space, including outside of the film's plane (see figure for 3-D isotropy, below right).

    

**2-D isotropy**                          **3-D isotropy**

A simple analogy to the roof of a house illustrates the problem in Cornice's construction. Even though the blueprints call for the roof's beams and timbers to be parallel to the ground in order to construct a flat roof, Cornice is arguing that the beams must be pointed or angled in every possible direction including up and down or at angle to the plane of the designed roof.

23

Such a roof with beams pointed in every direction in space would no longer be a flat roof, and in fact it would be impossible to build anything resembling a roof in this way. For this reason and as indicated by the intrinsic evidence discussed below, Cornice's argument must be rejected.

As a preliminary point,

**REDACTED**

[Ex. 3 (Aug. 22, 2005 Coffey Rep.) at 45.] This contingency is not surprising, since there is no intrinsic evidence to justify this additional limitation.

First, the claims do not support this novel limitation. The claim term "substantially directional magnetic isotropy" focuses on "magnetic," not "crystallographic," isotropy. There is nothing in the term or the language of claim 1 on which Cornice can base its new limitation.

More importantly, Cornice's limitation contradicts and renders dependent claim 11 superfluous. To illustrate, the two claims are reproduced below, with the novel limitation added in brackets:

| | |
|---|---|
| 1. A magnetic recording medium comprising: a non-magnetic substrate; a chromium or chromium alloy seedlayer on the non-magnetic substrate; an underlayer on the seedlayer; and a magnetic layer on the underlayer; wherein the magnetic layer exhibits substantially directional magnetic isotropy [, and has no dominant crystallographic orientation.] | 11. The magnetic recording medium according to claim 1 [where the magnetic layer has no dominant crystallographic orientation.], wherein: the underlayer does not exhibit a (200)-dominant crystallographic orientation; and the magnetic layer does not exhibit a (1120)-dominant crystallographic orientation. |

As this comparison shows, Cornice's novel limitation renders superfluous claim 11's requirement that the "magnetic layer does not exhibit a (1120)-dominant crystallographic orientation." After all, there is no reason to insist on this lack of (1120)-dominant orientation if claim 1 already negates all dominant crystallographic orientations. In fact, when confronted with this fact,

**REDACTED**

[Ex. 7 at 130:23-132:18.]

24

Likewise, the specification does not support this preclusion of all dominant crystallographic orientations. Even the two snippets from the specification on which Cornice relies offer it no comfort. ['754 patent at 5:45-49 and 10:19-22.] In context, these two passages only show that the preferred embodiment departed from the conventional media-making practices, which induced a (200)-dominant orientation in the underlayer to obtain a (1120)-dominant orientation in the magnetic layer. The first sentence's context shows this:

> Conventional practices seek to control material selection and deposition conditions to obtain an underlayer exhibiting a (200)-dominant crystallographic orientation to induce a (1120)-dominant crystallographic orientation in the magnetic layer deposited and epitaxially grown thereon. However, in accordance with embodiments of the present invention, a seedlayer is employed, and the materials are selected and the deposition conditions controlled so that the subsequently deposited underlayer and magnetic layer do not exhibit any dominant crystallographic orientation. Thus, in accordance with embodiments of the present invention, the underlayer does not exhibit a (110)- or (200)-dominant crystallographic orientation and the magnetic layer does not exhibit a (1120)-dominant crystallographic orientation.

[Id. at 5:40-53 (emphasis added).] The context of the second sentence echoes this point:

> The underlayer formed in accordance with the present invention does not exhibit any dominant crystallographic orientations, e.g., a (110)- or (200)-dominant crystallographic orientation, and the magnetic layer, similarly, does not exhibit any dominant crystallographic orientations, e.g., a (1120) dominant crystallographic orientation.

[Id. at 10:16-22.] Simply put, the specification does not support Cornice's argument.

Like the specification, the prosecution history provides no solace to Cornice's contention, because there is no disclaimer and certainly no "clear and unmistakable disclaimer" as required by precedent to add a new limitation. See Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325 (Fed. Cir. 2003). Even the co-pending application identified in the patent's Related Application section, which Cornice cites as support for its argument, undermines its argument. ['754 patent at 1:5-14 (citing application no. 60/058-240, issued as U.S. Patent No. 6,110,582); Ex. 11 ('582 patent).] Pointing to the fact that the '582 patent uses the phrase "two-dimensional" to characterize its substantial isotropy, Cornice and its expert argue that the '754 patent's failure

25

to specify the kind of isotropy must mean that it is three-dimensionally isotropic and thus without any dominant crystallographic orientation. [Ex. 3 at 44.] Contrary to this assertion, the '582 patent uses throughout its specification the term "substantially <u>two dimensional</u> directional magnetic isotropy" interchangeably with the disputed claim phrase "substantially directional magnetic isotropy." [<u>E.g.,</u> Ex. 11 ('582 patent) at 6:20-30; <u>see also</u> <u>id.</u> at 3:61-64; 4:7-12; 9:39-41; 10:37-39; 12:3-4.] This interchangeable use of the two phrases is strong evidence that these phrases in the '582 and '754 patent are synonymous, and that the '754 patent's medium is a longitudinal recording medium with the cobalt grains' magnetization oriented parallel to the plane of the film.

In sum, the Court should reject Cornice's attempt to (1) impose a numerical ceiling on "substantially directional magnetic isotropy" by narrowing the scope of the term "substantially," (2) require consideration of multiple orientation ratios to determine substantial isotropy, and (3) add the new limitation "no dominant crystallographic orientation" when two-dimensional magnetic orientation is the subject of the invention.

### E.     Dependent Claim 12: "Having magnetic properties with an orientation ratio of about 1.0"

Seagate disagrees with Cornice's construction requiring (1) that one skilled in this art must consider at least two orientation ratios of a media's magnetic properties, and (2) an orientation ratio number that would round to 1.0. Seagate addresses these arguments in turn.

#### 1.     "Having magnetic properties with an orientation ratio" allows "one or more" orientation ratios

Cornice's argument here echoes the contention presented with regard to "substantially directional magnetic isotropy," by insisting that one needs <u>at least two</u> orientation ratios (i.e., ORs of Hc, Mr, <u>and</u> S*) to determine whether a medium meets this requirement. Although Seagate agrees that more than one magnetic property of the media (e.g., Hc, Mr, or S*) <u>may</u> be considered in determining "substantially directional magnetic isotropy," there is no reason to impose a requirement that one <u>must</u> consider the orientation ratios of at least two such properties in making this determination. Since it has briefed this issue for the construction of the term

26

"substantially directional magnetic isotropy" and discussed why its proposed construction is the most consistent with the intrinsic evidence, Seagate respectfully refers the Court to that section above. See, supra, Part IV.D.2.

### 2.    "About 1.0" does not involve any rounding

In yet another attempt to avoid infringement, Cornice attempts to rewrite claim 12 to require mathematical rounding to the first decimal place. Cornice's expert provides the best illustration of what this requirement entails:

### REDACTED

[Ex. 3 (Aug. 22, 2005 Coffey Rep.) at 47.] There is no support in the intrinsic evidence.

Settled precedent and the claim language contradict Cornice's interpretation. Because
### REDACTED
Cornice's construction must require that the term "about" be restricted to a numerical value of 0.04. Otherwise, 1.05 could round down to 1.0. That is legally erroneous, because it deprives the term "about" of its ordinary meaning of "approximately." See Merck & Co., Inc. v. Teva Pharmas. USA, Inc., 395 F.3d 1364, 1369 (Fed. Cir. 2005) ("We reverse the district court's construction of 'about' and hold that such term should be given its ordinary meaning of 'approximately.'"). And it is even more erroneous because this construction further imposes an improper numerical value on a descriptive term, the use of which aims to avoid such stricture. See Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("We note that like the term 'about,' the term 'substantially' is a descriptive term commonly used in patent claims to 'avoid a strict numerical boundary to the specified parameter.'" (citations omitted)).

The specification similarly conflicts with Cornice's proposed construction. Indeed, the orientation ratios reported in Table II, including those of preferred embodiment Sample B, are not rounded to the first decimal place:

27

TABLE II

| Sample | Hr(cir.) | Hr(rad.) | OR(Hr) | mr(cir.) | mr(rad.) | OR(mr) | S*(cir.) | S*(rad.) | OR(S*) |
|--------|----------|----------|--------|----------|----------|--------|----------|----------|--------|
| A      | 3233     | 2744     | 1.18   | 5.80     | 3.58     | 1.62   | 0.80     | 0.72     | 1.22   |
| B      | 2968     | 2801     | 1.06   | 4.96     | 4.26     | 1.16   | 0.80     | 0.75     | 1.07   |

The three ratios in Table II (1.06, 1.16, and 1.07) ratios are left unrounded at two decimal places, while Cornice's interpretation would require rounding the Hr and S* orientation ratios to 1.1 and the Mr ratio to 1.2. In other words, Cornice's interpretation does not even read onto the preferred embodiment, indicating that it cannot be right. See Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1477 (Fed. Cir. 1998) (holding that "a claim interpretation that excludes the preferred embodiment is rarely, if ever, correct").

Against the weight of the intrinsic evidence, Cornice only offers the uncorroborated view of its expert. [Ex. 3 at 47.] Such a use of extrinsic evidence to contradict the objective evidence should be disregarded. Phillips, 415 F.3d at 1318 ("[A] court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." (internal quotation marks omitted)). Accordingly, the Court should reject Cornice's attempt to impose improper additional limitations, such as two or more orientation ratios and the concept of rounding.

**F.    Dependent claim 10 and Independent Claim 13: "randomly oriented grains" and "grains [lying in a plane] are randomly oriented"**

Cornice is also asking this Court to add an extraneous limitation to claims 10 and 13, by construing "randomly oriented" to mean that the "magnetic c-axis of the grains is randomly oriented in all three dimensions." This proposed construction is of recent vintage, since Cornice never disputed the construction of these claim phrases during the ITC litigation or even raised the issue in its List of Claim Terms for Construction served on July 22, 2005. [D.I. 116; Ex. 12 (July 22, 2005 Cornice's List of Claim Terms for Construction) at 6.] This is again nothing more than an improper rewriting of the claims to suit Cornice's litigation needs.

1.    **"Randomly oriented" qualifies two different types of grains and requires independent consideration**

The proposed construction offers yet another example of Cornice's disregard for the intrinsic evidence. To illustrate, claims 10 and 13 are reproduced below, with the claim language at issue underlined:

| | |
|---|---|
| 10. The magnetic recording medium according to claim 1, wherein the **magnetic layer** exhibits a hexagonal close packed crystal structure with <u>randomly oriented grains</u>, and the magnetic recording medium is characterized by the absence of any substantial superlinear noise behavior at a recording density of about 220 KFCI to about 280 KFCI and exhibits an S* of about 0.70 to about 0.90, an Hc greater than about 3,000 Oe. | 13. A method of manufacturing a magnetic recording medium, which method comprises:<br>    depositing a **chromium or chromium alloy seedlayer** on a non-magnetic substrate, wherein the <u>grains lying in a plane are randomly oriented</u>;<br>    depositing an underlayer on the seedlayer; and<br>    depositing a magnetic layer on the underlayer; wherein the magnetic layer exhibits substantially directional magnetic isotropy. |

As the claim language shows, the term "randomly oriented" qualifies two very different types of grains. In claim 10, the "randomly oriented grains" relate to the magnetic layer's hexagonal close packed (HCP) grains composed of <u>cobalt</u> alloys. [Ex. 3 at 11-13 (stating that only HCP cobalt alloy grains were useful in longitudinal magnetic recording media).] In contrast, the "grains lying in a plane are randomly oriented" phrase of claim 13 describes the grains of the <u>chromium or chromium alloy</u> seedlayer. As Cornice's expert acknowledges, cobalt and chromium grains have different crystal structures and different properties. [<u>See id.</u> at 11-18.]

2.    **Cornice's construction cannot scientifically or legally apply to claim 13**

Cornice argues that grains of the seedlayer should have their "magnetic c-axis" "randomly oriented in all three dimensions." There are, however, two major obstacles to this argument: scientific truth and legal precedent.

Scientifically, this construction cannot apply to the chromium or chromium alloy grains of the seedlayer because chromium-based crystals do <u>not</u> have a magnetic c-axis (a point Cornice's expert does not dispute). If the grains in claim 13 were magnetic cobalt alloy crystals,

29

as in claim 10, there would be no dispute that each cobalt alloy grain of the magnetic layer has a c-axis – i.e., an "easy axis" – along which the grains are magnetized. [Id. at 14-15, 20.] In fact, with regards to the cobalt alloy grains of claim 10, the only dispute regarding "randomly oriented grains" is whether the grains' c-axis should be pointed in all three dimensions.

But it is a different story for chromium-based crystals found in the seedlayer and underlayer. These crystals have a cubic crystal structure called "body centered cubic" (BCC) [See id. at 15-16.] The differences are illustrated below, with the red arrow showing the direction of the c-axis in the cobalt HCP crystal:



Cobalt
Hexagonal Close Packed (HCP)
Crystal Structure
(Co)

Chromium BCC
Body-Centered Cubic (BCC)
Crystal Structure
(Cr)

In contrast to a HCP cobalt crystal which has a magnetic c-axis, chromium and chromium alloy crystals are non-magnetic and thus do not have a magnetic c-axis. For that reason, Cornice's expert only discusses the c-axis of a HCP cobalt crystal in his report. [Id. at 11-21.] In light of this scientific fact, it is impossible to apply Cornice's construction of "randomly oriented" – that "the magnetic c-axis of the grains [be] randomly oriented in all three directions" – to chromium grains that do not have any magnetic c-axis. It is impossible because it is scientifically wrong.

Second, Cornice's construction would negate the limitation "lying in a plane," by requiring that the grains be oriented in all three dimensions – both in the plane and out of the plane of the film. Such a construction cannot be legally correct. See Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1444 (Fed. Cir. 1997) (rejecting claim construction that would make other terms in disputed claims mere "surplusage").

Finally, based on expert discovery, Seagate understands that Cornice bases its "randomly oriented in all three directions" on the erroneous belief that a "substantially directional magnetic isotrop[ic]" medium must not have any dominant crystallographic orientation. [Ex. 3 (Aug. 22, 2005 Coffey Rep.) at 48-49.]  Since the reasons why Cornice's premise is incorrect have been fully discussed above, Seagate respectfully refers the Court to that section of the brief.  See, supra, Part IV.D.3.

3.     **Cornice's improper construction does not apply claim 10**

As it attempted to do with the term "substantially directional magnetic isotropy," Cornice seeks to convert a two-dimensionally isotropic longitudinal medium (in which the cobalt grains have their magnetization orientations parallel to the plane of the film) into a three-dimensionally isotropic medium (in which the cobalt grains can be oriented in and out of the plane).  According to its expert, the only justification for this transformation is the erroneous belief that a "substantially directional magnetic isotrop[ic]" medium must not have any dominant crystallographic orientation:

**REDACTED**

[Ex. 3 (Aug. 22, 2005 Coffey Rep.) at 48-49.]  As discussed above, Cornice is incorrect in equating "substantially directional magnetic isotropy" with a complete lack of dominant crystallographic orientation.  See, supra, Part IV.D.3.  Since this issue has been fully discussed above, Seagate respectfully refers the Court to that section of the brief.  See id.

G.     **Independent Claims 1 and 13:  "Substrate"**

Although the parties agree that "substrate" refers to "the supporting material on which the thin films are deposited," expert discovery has made clear that Seagate and Cornice have a differing understanding of this term.  Specifically, Cornice insists that the term should preclude any coating, such as the common nickel phosphorous (NiP) coating, on the supporting material.

31

To illustrate, Cornice's argument boils down to this: the waterproof coating on a wooden deck not part of the deck because the coating does not "support" the chairs on the deck. This should be rejected.

### 1.    The ordinary meaning of "substrate" should control

The ordinary meaning of "substrate" in this art encompasses supporting material bases (such as aluminum or glass) with coatings such as NiP. In fact, Cornice's expert expressly acknowledges in his report that the ordinary meaning of "substrate" encompasses base materials manufactured and sold with certain coatings. He indeed states that media substrates – especially aluminum-based substrates –                              **REDACTED**

[Ex. 3 (Aug. 22, 2005 Coffey Rep.) at 33-34.] But for purpose of this lawsuit, Cornice and its expert asks this Court to change the ordinary meaning and exclude coatings like NiP layers from the "substrate."

### 2.    The specification supports the inclusion of coatings in the substrate

The '754 patent uses the term "substrate" to cover coatings such as NiP, consistent with the term's ordinary meaning. For instance, the patent's Description of the Invention section expressly states that its preferred "substrates" include NiP-coated aluminum:

> The magnetic recording media in accordance with embodiments of the present invention additionally advantageously exhibit substantial directional magnetic isotropy. Advantageously, a magnetic recording media in accordance with the present invention can be provided on any of various conventional substrates, such as glass, glass-ceramic, ceramic and NiP-coated Al substrates.

['754 patent at 5:20-27 (emphasis added).] Rather than departing from the accepted conventional use of the term "substrate," the patent embraces this ordinary meaning by emphasizing its reliance on "various conventional substrates" and then reciting "NiP-coated Al substrates" as an example of such supporting materials. A later section of the specification echoes this point:

> The substrates employed in the present invention can advantageously comprise any of various substrates conventionally employed in the manufacture of magnetic recording media, including Al alloy substrates with NiP coatings, various glass, ceramic or glass ceramic materials.

32

['754 patent at 10:23-27.] The specification thus emphasizes that the substrates used in the patent are those "conventionally employed in the manufacture of magnetic recording media," such as NiP-coated aluminum alloy substrates (as Cornice's expert expressly acknowledged). Given this evidence, Cornice's construction cannot be correct, because it excludes NiP coated aluminum substrates from being a preferred embodiment. See Gentry Gallery, 134 F.3d at 1477 ("[A] claim interpretation that excludes the preferred embodiment is rarely, if ever, correct.").

The patent's figures, such as Figure 5, are also consistent with the ordinary meaning of the term "substrate:"



FIG. 5

Under Cornice's construction, Figure 5 would have separated the NiP coating from the aluminum base. But Figure 5, which Dr. Coffey concedes as

**REDACTED**                    [Ex. 7 (Apr. 4, 2005

Coffey Depo. Tr.) at 143:21-23], does not do so because a person skilled in this art understands that the NiP coating is a part of the substrate on which the invention's chromium seedlayer is deposited. In sum, "substrate" should receive its ordinary meaning, and encompass a NiP coating. See Phillips, 415 F.3d at 1312 ("We have frequently stated that the words of a claim "are generally given their ordinary and customary meaning." (citation omitted)).

### 3.     The prosecution history supports the inclusion of coatings such as NiP

The Doerner patent, one of the prior art references asserted by the Examiner during prosecution, also confirms that NiP coatings are part of the "substrate." [Ex. 13 (U.S. Patent no. 5,302,434 issued to Doerner et al.).] This prior art reference describes a magnetic medium in which the substrate's NiP coating was transformed into a seedlayer through a special heating and oxidation process. In particular and as illustrated below by Figure 5 of the prior art, the Doener patent states that "disk <u>substrate 60 comprises</u> a an [sic] AlMg base 61 with a NiP surface coating 62." [<u>Id.</u> at 4:4-6 (emphasis added).]



According to the Doerner patent, the special high heat and oxidation treatment on the top part of its substrate's NiP coating produced a thin crystalline nickel oxide (NiO) film at the top of the NiP coating. [<u>Id.</u> at 4:40-64.] This newly created crystalline NiO film was then able to act as seedlayer by controlling other layers' crystallographic orientations: "The formation of the NiO film on the NiP coating significantly reduces the modulation <u>by altering the crystallographic orientation of the underlayer and magnetic layer</u>." [<u>Id.</u> at 5:28-31 (emphasis added).]

Hence, in the medium taught by Doerner and her colleagues, the oxidized crystalline NiP film acts as a seedlayer. In contrast, in the '754 patent, the NiP remains a coating on the substrate's base, leaving the seedlayer function to the chromium or chromium alloy layer.

### 4.     The extrinsic evidence from the inventors' own work supports the adoption of the term's ordinary meaning

Finally, not only does Cornice's construction disagree with the intrinsic evidence, it also contradicts the inventors' contemporaneous understanding of their invention, as evidenced by a presentation prepared by Dr. Song in 1997:

REDACTED

[Ex. 14 (1997 Presentation by Dr. Song) at 3.]  As this diagram shows, the inventors had an understanding consistent with the teachings of the patent – that the NiP layer in that context was a base coating of the substrate and not the alleged seedlayer Cornice needs to avoid infringement. For all of these reasons, Dr. Coffey and Cornice's extraneous limitation should be rejected.

## V.    CONCLUSION

For the reasons provided above, Seagate respectfully requests that the Court adopts its proposed constructions in their entirety.

Dated: November 18, 2005                    FISH & RICHARDSON P.C.


By:  /s/ Timothy Devlin
     Timothy Devlin (#4241)
     919 N. Market Street, Suite 1100
     Wilmington, DE  19899-1114
     Tel: (302) 652-5070

     Attorney for Plaintiff
     SEAGATE TECHNOLOGY LLC

35