IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEAGATE TECHNOLOGY LLC,

        Plaintiff,

   v.

CORNICE, INC.

        Defendant.

C.A. No. 04-418 (SLR)

**REDACTED**

**PLAINTIFF SEAGATE TECHNOLOGY LLC'S OPENING BRIEF
REGARDING CONSTRUCTION OF CERTAIN DISPUTED CLAIM TERMS
OF U.S. PATENT NOS. 6,324,054, 6,545,845, AND 5,596,461**

Date: November 18, 2005

FISH & RICHARDSON P.C.
Timothy Devlin (#4241)
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114
Tel: (302) 652-5070

Roger S. Borovoy
David M. Barkan
500 Arguello Street, Suite 500
Redwood City, CA 94063-1526
Tel: (650) 839-5070

Brian R. Nester
Timothy W. Riffe
Christian A. Chu
1425 K Street NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 783-5070

Edmond R. Bannon
Lewis E. Hudnell, III
Citigroup Center
153 East 53rd Street, 52nd Floor
New York, NY 10022-4611
Tel: (212) 765-5070

Attorneys for Plaintiff
SEAGATE TECHNOLOGY LLC

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ...........................................1

II.   SUMMARY OF THE ARGUMENT ..................................................................1

III.  LEGAL STANDARDS OF CLAIM INTERPRETATION ................................3

IV.   BACKGROUND OF GENERAL DISC DRIVE
      TECHNOLOGY .................................................................................................3

V.    The '461 patent ..................................................................................................3

      A.    Technology Overview of the '461 Patent ................................................3

            1.    Conventional Housings ................................................................4

      B.    Construction of Disputed Terms in U.S. Patent No.
            5,596,461 ("the '461 patent") ...............................................................7

            1.    "cover element" and "base member" ...........................................7

            2.    Head Stack Assembly ................................................................10

            3.    "continuous, single PCB support surface" ..................................11

VI.   The '054 Patent ...............................................................................................17

      A.    Technology Overview of the '054 Patent ..............................................17

      B.    Construction of Disputed Terms in U.S. Patent No.
            6,324,054 ("the '054 patent") .............................................................22

            1.    "critical region" ..........................................................................22

            2.    "non-critical region" ...................................................................24

            3.    "enclosure sized to receive a disc drive therein" ........................25

            4.    "shock absorbing material" .........................................................26

            5.    "flexible shock absorbing material" ............................................29

            6.    "corner of the disc drive" ...........................................................30

VII.  The '845 Patent ...............................................................................................32

      A.    Technology Overview of the '845 Patent ..............................................32

i

## TABLE OF CONTENTS (cont'd)

| | | **Page** |
|---|---|---|
| B. | Construction of Disputed Terms in U.S. Patent No. 6,545,845 ("the '845 patent") | 34 |
| | 1.  "retaining clip" | 34 |
| | 2.  "bearing cartridge" | 37 |
| VIII. | CONCLUSION | 37 |

# TABLE OF AUTHORITIES

**Page(s)**

 **Cases**

Free Motion Fitness, Inc. v. Cybex Int'l, Inc.
   423 F.3d 1343 (Fed. Cir. 2005) ..................................................................... 27, 28

KCJ Corp. v. Kinetic Concepts, Inc.
   223 F.3d 1351 (Fed. Cir. 2000) ............................................................................ 27

Liebel-Flarsheim Co. v. Medrad, Inc.
   358 F.3d 898 (Fed. Cir. 2004) .............................................................................. 29

Moba, B.V. v. Diamond Automation, Inc.
   325 F.3d 1306 (Fed. Cir. 2003) ............................................................................ 13

Omega Eng'g v. Raytek
   334 F.3d 1314 (Fed. Cir. 2003) ............................................................................ 17

Phillips v. AWH Corp.
   415 F.3d.1303 (Fed. Cir. 2005) ............................................................................ 35

RF Del., Inc. v. Pac. Keystone Techs., Inc.
   326 F.3d 1255 (Fed. Cir. 2003) ............................................................................ 28

Wright Med. Tech., Inc. v. Osteonics Corp.
   122 F.3d 1440 (Fed. Cir. 1997) ....................................................................... 23, 24

## Other Authorities

Compact Oxford English Dictionary ............................................................................ 22

The American Heritage Dictionary (2nd Coll. Ed. 1985) ...................................... 26, 29

## I.     NATURE AND STAGE OF THE PROCEEDINGS

In this patent infringement case, Plaintiff Seagate Technology LLC ("Seagate") asserts seven patents against Defendant Cornice, Inc. ("Cornice").  Discovery is nearly complete, and the parties have exchanged expert reports.  Pursuant to the Court's Scheduling Order [D.I. 36-1], Seagate files this brief regarding claim construction of three of the seven patents in suit, U.S. Patent No. 6,324,054 ("the '054 patent," Ex. 1[1]); U.S. Patent No. 6,545,845 ("the '845 patent," Ex. 2); and U.S. Patent No. 5,596,461 ("the '461 patent," Ex. 3).

## II.     SUMMARY OF THE ARGUMENT

Cornice attempts to construe the '845, '054, and '461 patents inconsistently with their claim terms, specifications, and prosecution history striving to create non-infringement or invalidity contentions.  With respect to the '461 patent, which is directed to a space-efficient disc drive housing, having completed expert discovery, Seagate adopts the claim construction for the terms "cover element" and "base member" as construed by the Administrative Law Judge in the parties' I.T.C. investigation.  Cornice, apparently not satisfied with the ALJ's constructions and Seagate's adoption of those constructions, seeks to impose that the "cover element" must always be the "top" portion of the housing and the "base member" must always be the "bottom" portion of the housing.  These additional limitations were rejected by the ALJ and should also be rejected here.  Cornice's remaining proposed constructions for (1) "head stack assembly" (HSA) and (2) "continuous, single PCB support surface," are likewise devoid of any support in the intrinsic record, and are merely a reflection of Cornice's desperate attempts to avoid infringement.

---

[1] Unless otherwise noted, Exhibits in this Brief refer to the co-filed Declaration of Timothy Devlin in Support of Plaintiff Seagate Technology LLC's Opening Brief Regarding Construction of Certain Disputed Claim Terms of U.S. Patent Nos. 6,324,054, 6,545,845, and 5,596,461.

Cornice's entire non-infringement defense to the '845 patent, which covers a retaining clip used to secure an actuator arm to a bearing cartridge, boils down to the construction of the term "retaining clip." Seagate construes this term to mean "a mechanical device for holding or gripping the bearing cartridge to the actuator by engaging a groove(s) on the exterior of the bearing cartridge." Cornice, in direct contrast to the intrinsic evidence, limits "retaining clip" to the preferred "clip ring" embodiment described in the written description. As detailed below, neither the claims, specification, nor the prosecution history serve to limit the claimed "retaining clip" to the preferred embodiment. Instead, when viewed in light of the intrinsic, and conforming extrinsic evidence, the only construction of "retaining clip" that is consistent with the evidence is Seagate's proposed construction.

The '054 patent relates to a novel shock absorbing enclosure designed to protect "critical" and "non-critical" regions of a disc drive. Cornice asserts a number of contorted constructions of various '054 patent claim terms in an attempt to either avoid infringement or shoehorn the claim limitations to meet the disclosures of disparate prior art references. For example, Cornice offers a construction of "critical region" that plainly contradicts the evidence of record, and renders additional claims superfluous. Similarly, Cornice goes outside the context of the claimed invention and attempts to apply a generalized definition of "corner" devoid of any meaning within the disc drive arts. Finally, continuing its practice of limiting the claimed invention to the preferred embodiment, Cornice attempts to limit the "enclosure" limitation in such a way that plainly contradicts the evidence of record, including concessions made by its own expert.

For the following reasons, Seagate respectfully requests that the Court adopt Seagate's proposed constructions in their entirety.

2

### III.    LEGAL STANDARDS OF CLAIM INTERPRETATION

Seagate incorporates by reference the legal standards section set forth in its claim construction brief regarding the construction of U.S. Patents Nos. 5,452,159 and 6,744,606, filed concurrently.

### IV.    BACKGROUND OF GENERAL DISC DRIVE TECHNOLOGY

Seagate incorporates by reference the background of general disc drive technology set forth in Plaintiff Seagate Technology LLC's Technology Overview filed concurrently.

### V.    THE '461 PATENT

#### A.    Technology Overview of the '461 Patent

The '461 patent relates to disc drives, and more specifically, a space efficient housing architecture for disc drives.  [Ex. 3 at 1:6-8.]  The housing of a disc drive protects the components of the drive, such as the spindle motor, head stack assembly ("HSA") and disc(s).  [Id. at 2:4-6.]

As an illustration, Figure 1 of the '461 patent, reproduced below, identifies two housing elements (cover element 24 and base plate 26), the spindle motor (34), the HSA (36), discs (22a,b,c), and the printed circuit board ("PCB") (52) of the patent's preferred embodiment.



3

[Ex. 3, Fig. 1.]

The '461 patent teaches a housing configuration that decreases the overall dimensions of the drive, while accommodating the mechanical and electronic components required for drive operations. [Id. at 1:9-13.] More specifically, the patent teaches that the cover element should have a first raised portion with a height sufficient to accommodate the height extremities of the spindle motor and head stack assembly. The '461 patent further teaches that the cover element has remaining portions, which are lower in height than the first raised portion. The remaining portions provide a support surface for a single, continuous PCB. [Id. at 2:10-23.] In addition, the '461 patent teaches that the PCB should be a single, non-segmented PCB, and that it can fit within the height differential between the first raised portion and remaining portions of the configured housing element. [Id. at 3:25-27; 5:37-44.]

### 1.    Conventional Housings

In conventional disc drive housings, the height of the housing elements is maintained at a dimension sufficient to fit the HSA and spindle motor over substantially the entire width and length of the disc drive housing. [Ex. 3 at 2:24-28.] For example, a conventional Seagate drive below shows that the cover element has a single height (Fig. 1), generally uniform along the length and width, that is sufficient to house the extremities of the spindle motor and HSA (Fig. 2).





Fig 1: Exterior of a Seagate hard-disc drive          Fig 2: Interior of a hard-disc drive

4

Having a single height for the cover element, such as the prior art, increases the overall volume and space requirements of the drive.

As the '461 patent explains, conventional disc drives had at least two different PCB architectures that increased drive volume, or space requirements. First, prior art drives included a PCB generally rectangular in shape, that had width and length dimensions approximately equal to the width and length dimension of the disc drive. [Id. at 2:44-48.] Because the PCB was approximately equal to the length and width of one of the housing elements, it had to be placed over the entire surface of that housing element, thus adding to the overall height dimensions of the disc drive. [Id. at. 2:52-57; 3:39-40.] Second, some conventional drives included multiple, segmented PCBs, which consumed much more power while wasting significant space. [Id. at 2:62-3:4.] In this industry, a drive with smaller overall dimensions is desirable because it requires less space inside its host device, such as a computer. [Id. at. 2:54-57.] As the industry started designing in recent years compact disc drive products to minimize the space requirement imposed on computer systems, [id. at 2:57-61], solving these problems became critical.

Recognizing the drawback of high-volume conventional drives and the demand for reduced volume drives, the '461 patent teaches a number of innovations that result in space efficient disc drive housings. Particularly, the '461 patent teaches and claims a cover element with at least two heights, and a single PCB that goes over the lower height portions of the cover element.

With respect to housing elements with at least two levels, the patentee observes that at least one of the housing elements should have a "first raised portion." [Id. at 3:17-18.] The first raised portion of the "housing element" is shown in figure 1 (highlighted in blue) of the '461 patent and labeled 48 (also highlighted in blue):



[Ex. 3, Fig. 1; id. at 4:56-58.]  As the figure above shows, the first raised portion is at a

height designed to accommodate the "extremities of the spindle motor and head stack

assembly."  [Id. at. 22-23.]  Because the drive can include one or more than one disc, id.

at 2:14, this innovation can accommodate a multi-armed or single-armed HSA.  In

addition to "first raised portion," this housing element also includes a second height or

heights - what the '461 patent refers to as the "remaining portions."  [Id. at Abstract.]

The "remaining portions" of the housing element, i.e., portions 50, 56 and 60, are lower

in height and reduce the volume of the drive.  [Id. at claim 1; 3:22-25.]  The "remaining

portions" provide a surface for the PCB and can also include mounting elements (60)

(shown in red highlights in figure 1 of the '461 patent reproduced above).

    In addition to having a housing element with two heights, the '461 patent teaches

that the PCB, 52, is to be continuous and single.  The '461 patent discloses that the PCB

is configured to "generally coincide" with the surface of the "remaining portions" of the

6

housing element. [Id. at 3:25-27; 5:37-44.] By having the PCB coincide with the "remaining portions," the height of the drive can be reduced because the height of the PCB is dimensioned to fit above the lowered remaining portions of the housing. [Id.] This allows for a space efficient, low profile drive. [Id.] Additionally, by using a single, continuous PCB, as opposed to the prior art's multiple and segmented PCBs, the '461 patent teaches that additional space savings are achieved. [Id. at 2:62-3:4 (commenting that multiple/segmented PCB architecture "does not fully realize economic use of space").] The '461 patent also teaches that a single, continuous PCB, as opposed to multiple, segmented PCBs, reduces energy consumption.

### B. Construction of Disputed Terms in U.S. Patent No. 5,596,461 ("the '461 patent")

#### 1. "cover element" and "base member"

The Court should construe "cover element" as "the portion of the housing opposite the base member, which is received over the spindle motor and head stack assembly." The Court should construe "base member" as a "portion of the housing for mounting the components of the drive, e.g., the spindle motor and head stack assembly." Having completed expert discovery, Seagate now adopts the ITC's construction of cover and base. (Initial Determination, Inv. No. 337-TA-516 (March 7, 2005) (Ex. 4).

Cornice attempts to further narrow "cover element" and "base member" by asserting that the "cover element" must be the "top" and the "base member" must be the "bottom" of the drive. [See, e.g., Ex. 5, August 22, 2005 Expert Report of Dr. James Morehouse Regarding Invalidity of U.S. Patent No. 5,596,461 at ¶¶ 39-54.]

Not only is Cornice's legal construct in direct contrast to the intrinsic evidence, it was rejected by the Administrative Law Judge in the parties' I.T.C. investigation. The ITC correctly held,

> the 'cover element' need not in every instance be uppermost, or on the top side, of the claimed housing . . . .

[Ex. 4 at 14.]

7

Cornice makes a number of meritless arguments in support of its strained construction that Seagate addresses *seriatim*. First, Cornice asserts that cover means the top portion of the housing because the cover is "'received over the spindle motor and head stack assembly.'" [E.g., Ex. 5 at ¶ 46.] Nevertheless, the claims nowhere recite the limitation that the cover be "received over the spindle motor and head stack assembly." Moreover, being "received over," as Cornice puts it, is irrelevant as both the cover and base, under Cornice's construction, are designed to go over the HSA and spindle. In fact, both the cover element and base member go over the HSA and spindle as their function is to protect these components. [Ex. 3 at 1:66-2:5.]

Second, Cornice argues that because the cover element includes a "top surface" it must be the top housing element. [E.g., Ex. 5 at ¶¶ 51-53.] Nevertheless, regardless of whether the cover constitutes the top or bottom, it will have a top surface. Indeed, the claim also recites that the base member has a "top," but Cornice asserts that it is the bottom. [Ex. 3, claim 1.] Top surface, when referring to the claim elements, simply distinguishes one surface of the cover from the other opposing surface, such as the side or the bottom surfaces, and orients the cover in relation to other components.

Cornice's reliance on the "top surface" and "topmost" language is misplaced. Indeed, the patentee uses these terms to orient one component in relation to another claimed component. They simply do not require that one component be on the top from one perspective, i.e., the ground, or that one housing element mount the spindle and HSA. For instance, the word "top surface" orients the "PCB" with other components such as the "first raised portion." Since both are on the top surface of the cover, they are on the same side of the cover. "Topmost" with respect to the spindle motor denotes that the topmost portion of the spindle faces the same direction as the top surface of the cover element. "Topmost" also indicates that the first raised portion accommodates the height extremities rather than width.

Finally, Cornice's own products reveal that limiting cover element to top and base member to bottom is an erroneous, overly-simplistic, legal construct with no technological basis. The portion of the accused products that Cornice insists is the "cover" and the "top" is actually on the bottom of the iRiver product depicted below. The first photograph shows the "top" of the iRiver product, STX099866, and the second photograph shows the "bottom" of (the side opposite) of the "top" in which the "cover" of Cornice's drive is actually on the "bottom."





**"Top" View Of iRiver Device**     **"Bottom" View of iRiver Device**

Disc drives have no top or bottom, just different sides, because in different applications drives are oriented differently. The claims do use the terms "top" to describe surfaces (not to define cover) so as to indicate how one claimed component is oriented with respect to other claimed components, however, there is no restriction that the cover element must be the top or the base member must be the bottom.

Accordingly, the Court should construe "cover element" as "the portion of the housing opposite the base member, which is received over the spindle motor and head stack assembly." The Court should construe "base member" as a "portion of the housing for mounting the components of the drive, e.g., the spindle motor and head stack assembly." Such constructions are consistent with the plain and ordinary meaning of the terms and the intrinsic evidence.

9

2.    **Head Stack Assembly**

The Court should construe head stack assembly (HSA) to mean an "assembly including an actuator, its arm, recording head, and an electric coil. The HSA can include one or more actuator arms." The Court should not require the HSA to include multiple (i.e., two or more) actuator arms as Cornice contends, and as the ITC required.

Although the '461 patent's preferred embodiment includes multiple arms, the patent defines HSA as the "stack" including an actuator, its arm, a head mounted to the arm, and its electric coil. [See Ex. 3 at 4:20-22 ("The principal components of the head stack assembly 36 comprise a stack of actuator arms 36a-d, spacers 38a,b and an electric coil element 40."); id. 1:44-49 (explaining that the arm mounts a head or pair of heads).] In other words, the patent does refer to the arms in the HSA in the plural, but only to describe the preferred embodiment, and the stack is comprised of components such as the arm, spacer and coil element. . [See Ex. 3 at 4:20-22.] Seizing on the preferred embodiment, Cornice insists that HSA requires multiple arms. [E.g., Ex. 5 at ¶¶ 55-59.]

The plain and ordinary meaning of HSA does not require multiple arms. For instance, prior to this litigation, Cornice described its single-armed, single-head disc drive as including a head stack assembly. For example, Cornice produced several documents that were used by its customers entitled "Document for Defining the Storage Element Assembly and Test Flow," which defines head stack assembly as follows:

**REDACTED**

[Ex. 6, COR-ITC044837.] Further, Cornice devotes entire specifications to its HSA, which again relate to a single-armed application, for example:

**REDACTED**

Still further, in other prior statements,



REDACTED

[E.g., Ex. 6 at COR-ITC044837.]

Despite Cornice's litigation positions that these documents use HSA "in an instance of 'poor use of English,'"

REDACTED

[E.g., Ex. 9 at 236:5-239:9.]

Moreover, the ITC's and Cornice's apparent basis for asserting that "head stack assembly for a disk stack" is based on the term "disk stack" as contemplated by the '461 patent, one of ordinary skill in the art would understand that the HSA could include a single arm which reads from one surface of the disc (i.e., two arms are not required). [E.g., Ex. 10 at 18; Ex. 3 at 2:13-17.]

REDACTED

[E.g., Ex. 14 at 37:25-38:9.]

Indeed, the specification refers to a single disk application, "disk or disks." [Ex. 3 at 2:13-17.] In such a single disk "disk stack assembly," as contemplated by the '461 patent, one of ordinary skill in the art would understand that the HSA could include a single arm which reads from one surface of the disc (i.e., two arms are not required). [E.g., Ex. 10 at 18; Ex. 3 at 2:13-17.]

Accordingly, the Court should define HSA as an assembly, including an actuator, its arm, recording head, and an electric coil, whether including one or more arms.

### 3.    "continuous, single PCB support surface"

Each of the asserted claims of the '461 patent requires that the top surface of the cover element provides a "continuous, single PCB support surface." In the context of the claims, and when read in light of the intrinsic evidence, this limitation should be construed as requiring a surface that provides support for one and only one, non-segmented printed circuit board. Cornice, disputes that single and continuous modifies PCB and argues that it modifies the "remaining portions" to require, "[a] single,

uninterrupted surface for mounting a PCB, and not discrete mounting locations for a PCB."

For purposes of context, the following claim language is at issue:

> Remaining portions of the top surface of the cover element . . . providing a continuous, single PCB support surface.

[Ex. 3, claims 1, 6.] So that perspective is not lost (as Cornice desires), "surface" of the "continuous, single PCB support <u>surface</u>" refers to the preceding surface "remaining portions of the top surface." [<u>Id.</u>]

Cornice proposes that "continuous, single PCB support surface" should be construed to mean "a single, uninterrupted surface for mounting a PCB, and not discrete mounting locations for a PCB." [<u>E.g.</u>, Ex. 5 at ¶ 60.] Specifically, Cornice seeks to add the following extraneous limitations: (1) using discrete locations for mounting the PCB does not satisfy the "continuous, single PCB support surface" and (2) a multi-level "remaining portion of the top surface" cannot be a single, uninterrupted surface. [<u>E.g.</u>, Ex. 5 at ¶ 64.]. That is erroneous, because Cornice's claim constructions run afoul of claim language, read out the preferred embodiment, and contradict the teachings of the specification.

The plain and ordinary meaning of "continuous, single PCB support surface" is that the surface (of the remaining portions of the top surface of the cover element) provides support for one and only one, non-segmented printed circuit board. The adjectives "continuous, single" precede PCB, not "surface." Therefore, what is continuous and single is the PCB. Warriner's Eng. Grammar And Composition, 5th Course (1982) ("Usually an adjective precedes the noun it modifies. Sometimes, for emphasis a writer may place it after the noun.") Claim 1 reads "continuous, single PCB support surface," not "a continuous, single surface for mounting a PCB."

Furthermore, the '461 patent specifies that continuous and single modify PCB, not surface, and that "continuous, single" means one (not several), non-segmented printed circuit board. The specification teaches the benefit of a single, non-segmented PCB:

12

> In one recent proposal, the overall dimensions of the disk drive are reduced by providing several PCB segments and mounting the PCB segments within cutout portions formed in the disk drive housing. The PCB segment approach takes advantage of miniaturization of integrated circuits to implement PCB structures in less than the full length and width of the dimensions of the disk drive. However, this arrangement incurs added power requirements for transmission of signals between PCB boundaries and does not fully realize economic use of available space.

[Ex. 3 at 2:62-3:4 (emphasis added).]  The term "continuous, single PCB" distinguishes the claimed invention over the prior art's multiple, segmented PCB approach. The specification provides additional instances making clear that single modifies PCB,

> A single PCB is arranged and configured to generally coincide with the surface area defined by the second raised portion. The PCB is mounted to the second raised portion, surrounds the first raised portion and has a height dimension that fits within the difference in height dimensions between the first and second raised portions.

[Id. at 3:25-27 (emphasis added).]

Moreover, Cornice's proposed construction reads the preferred embodiment out of all claims. A construction that reads the preferred embodiment out of the claims is incorrect. Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1316 (Fed. Cir. 2003) (holding erroneous a claim construction that did not read on the disclosed preferred embodiment). Below, is the relevant portion of Figure 1 of the '461 patent.

13



In this figure PCB 52 (highlighted in yellow) is "supported on the surface" of the

second raised portion 50. [Id. at 5:37-44.][2]  The specification then explains that

openings 62 (highlighted in blue), which are through the pin connector 54, align with

corresponding openings 60 (highlighted in red) and thread posts 30 (highlighted in green)

of cover element 20. [Id. at 5:65-6:9.][3]  As the specification explains, "The openings 62

─────────────────

[2] This portion of the '461 patent specification provides:

> The PCB 52 is shaped to <u>generally coincide with the shape of the second raised portion 50</u> such that the PCB 52 <u>can be supported on the surface of the second raised portion 50</u> and surround the first raised portion when the PCB 52 is mounted to the disk drive housing 20.  Moreover, the overall height of the PCB 52 is dimensioned to fit within the height difference between the first and second raised portions 48, 50.

[Id. at 5:37-44 (emphasis added).]

[3] This portion of the specification reads:

> In accordance with another feature of the present invention, openings 62 are formed in the pin connector 54.  The openings 62 are arranged to align with corresponding openings 60 and internally threaded posts 30 of the cover element 24 and base plate 26,

14

permit the pin connector 54, and <u>the attached PCB to be secured to the disk drive housing</u> <u>20 via screws received through the openings 62 and the corresponding openings 60</u> and threaded into the corresponding posts 30." [<u>Id.</u> at 5:2-7 (emphasis added).]

In other words, there are two discrete mounting locations for attaching the PCB to the housing in the preferred embodiment. These discrete mounting locations are the raised portions 60, highlighted in red in Figure 1 of the patent above. [<u>Id.</u>] Notably, the PCB of Figure 1 is not attached directly to the surface of the housing, but is instead attached to pin connector 54, which attaches to discrete mounting points 60 (highlighted in red). [<u>Id.</u>] Cornice's construction precluding "discrete locations" cannot stand.

In the face of this evidence, Cornice argues incorrectly that the prosecution history precludes attaching the PCB to "discrete locations on the housing." [<u>E.g.</u>, Ex. 5 at ¶ 64.] As distinguished by the applicant, the '335 prior art mounts the PCB to mounting brackets on the side <u>opposite</u> the side PTO identified to the <u>top surface</u>—thus failing to satisfy claim 1's requirement that the PCB be mounted to the top surface. In discussing the four "mounting brackets" of Stefansky '335 patent, the patentee observes that the mounting brackets on this prior art are not part of the claimed "top surface of the cover element," but instead are discrete from this top surface:

> Additionally, Claim 1 requires that the <u>top surface</u> include a "continuous, single PCB support surface."

[Ex. 11 at 10.] The patentee then observed that the Stefansky '335 mounting brackets are "discrete," and not part of the top surface of the mounting locations claimed by the '461 patent. In other words, the term "continuous, single PCB support surface" refers to the

---

respectively, as shown in FIG. 1. The openings 62 permit the pin connector 54, and the attached PCB to be secured to the disk drive housing 20 via screws received through the openings 62 and the corresponding openings 60 and threaded into the corresponding posts 30. In conventional disk drives, the connectors are typically mounted to the PCB, and do not have a secure mounting directly to the housing as provided by this feature of the present invention.

[<u>Id.</u> at 5:65-6:9.]

claimed "top surface," and the Stefansky '335 mounting brackets are discrete from, not part of, that top surface.  Simply put, the PCB in Stefansky '335 does not coincide the remaining portions of the top surface.  Indeed, as Figure 1 of Stefansky '335, as annotated by the Examiner, shows, the mounting brackets (32) are discrete from the remaining portion's top surface (as labeled by the examiner) in that they face the bottom, not the top, and mount the PCB 36) on the bottom, not the top.



Still further, the prosecution history also indicates that the PCB can be mounted to mounting brackets.  It states that "claim 1 requires _more than_ merely a cover which includes _mounting brackets_" which indicates that mounting brackets are sufficient if the other limitations of claim 1 are met.[4]  [Ex. 11 at 9-10.]

---

[4] In addition, the prosecution history discusses "mounting brackets" not "discrete
  locations," the claim construction proffered by Cornice.  Moreover, the prosecution

16

Fourth, Cornice's assertion that this limitation does not allow "multiple uninterrupted surfaces at different levels" also contradicts all intrinsic evidence. Indeed, the claim language requires "remaining portions" thus indicating that the remaining portions, can have multiple, not a single and uninterrupted portion. The remaining portions of the preferred embodiment also have multiple levels, such as 60, 24, and 56, and these are the portions that "generally coincide with" the PCB. Moreover, claim 2 specifically requires that the claimed remaining portion have multiple levels. It requires:

> The disk drive housing of claim 1 wherein the remaining portion of the top surface include a second raised portion to provide a height dimension...

If there is a first raised portion (claim 1), and a second raised portion in the remaining portions (claim 2), there must be a third portion that is part of the remaining portion from which the "second raised portion" is raised—as shown in the preferred embodiment that Cornice attempts to read out of the claims.

Perhaps most telling, Cornice nowhere cites the specification for its claim construction. Indeed, the specification makes no mention of the limitations Cornice seeks to impose. Accordingly, the Court should construe "continuous, single PCB support surface" to require a surface for a single, non-segmented printed circuit board.

## VI.    THE '054 PATENT

### A.    Technology Overview of the '054 Patent

The '054 patent relates to an approach for increasing a disc drive's shock robustness. As its preferred embodiments illustrate, the '054 patent discloses a shock

---

history that Cornice relies on simply stands for the proposition that having four "mounting brackets" that are not part of, "discrete" from, the "top surface" do not meet the claim limitation that "the remaining portions of the cover element ... providing a continuous, single PCB support surface." [Ex. 3, claims 1, 6.] Simply put, the parts of the prosecution history Cornice relies on falls well short of the required "clear and unmistakable" standard for narrowing claims based on prosecution history. See Omega Eng'g v. Raytek, 334 F.3d 1314, 1327 (Fed. Cir. 2003) (requiring that a prosecution disclaimer must be "clear and unmistakable" before it may be used to narrow the literal scope of patent claims).

17

absorber apparatus and a process for increasing a disc drive's shock robustness by providing a shock absorbing material around certain portions of the disc drive.



**FIG.4**

[Ex. 1, Fig. 4.]

The '054 patent offered a solution to problems related to external vibrations and shocks such as during packaging, transporting, assembling into computers or other consumer devices, and handling of the disc drive and consumer devices, which can negatively impact the drives, and possibly lead to internal damages and drive failure. [Ex. 1 at 1:31-48.]

Until the '054 patent, the two main types of prior art shock absorbers were designed primarily "to reduce the damaging effects of the customer defined specifications loads." [Id. at 1:41-48.] The first type of prior art shock absorber involved shock absorbing "mounts." As depicted in Figure 1 of the '054 patent (reproduced below), the shock mounts (110) isolate the disc drive (100) from vibration and shock by attaching a bracket (112) to the disc drive (100).

18



**PRIOR ART**

**FIG.1**

These shock mounts were designed to absorb pre-defined shock loads [Ex. 1 at 1:49-62.]

The second type of prior art shock absorber involves "shock absorbent jackets" made of a shock absorbent material to enclose the disc drive. [Id. at 2:7-14.] As with the shock mounts, the shock absorbent jacket could only protect and isolate the disc drive from vibrations and shock loads pre-defined by a customer's specifications. [Id. at 2:22-25; 2:28-37.]

Overcoming the prior art's narrow focus, the '054 patent discloses a disc drive enclosure made of a shock absorbing material, such as plastic or rubber, that better protects the disc drive from vibrations and shocks, which are not necessarily pre-defined by customers' specifications. [Id. at 5:6-10.] The patent achieved that goal by increasing the protection of a drive's "critical region(s)" through the use of thicker shock absorbing material." [See id. at 2:35-38; 2:44-52; 4:45-55; 5:8-61.]

To properly protect the drive's critical regions, one must first know where those critical regions are. However, not all drives have the same critical regions, because of differences in architecture, design, and engineering:

19

other form factors and shapes of disc drives may be accommodated by the shock absorber apparatus of the present invention.  In these instances, <u>the location of critical regions and non-critical regions may vary and therefore the location of thickened portions may change accordingly.</u>

[<u>Id.</u> at 8:66-9:4 (emphasis added); <u>see also id.</u> at 7:29 (identifying the preferred embodiment as having a 3-1/2 inch form factor).]  Since one could not always assume that certain parts of a drive (such as the corners) were critical regions, proper implementation of this invention requires some testing.

> In particular, the shock absorbing material 300 is designed to pass rigorous shock testing methods, such as the tilt drop test and the table top test. <u>These shock testing methods assist in producing a shock absorbing material 300 that can protect disc drives in unstable environments, such as automobiles and household appliances.</u>

[<u>Id.</u> at 5:8-14 (emphasis added).]  Thus, the inventors of the '054 patent performed a number of tests, including, for example, tilt drop tests and table drop tests, to determine the critical regions of the specific disc drives used with a preferred embodiment of the claimed shock absorber.  For instance, as shown in Figures 6 and 7 of the patent, the inventors measured shocks received by various drives, comparing the magnitude of shocks on the tested disc drives with and without the invention:



FIG. 6            FIG. 7

As Figures 6 and 7 show, a drive with properly protected critical regions received a shock pulse of no more than 22 Gs compared to 110 Gs for an unprotected drive.  [<u>Id.</u> at 5:39-61.]  Thanks to those tests, the inventors determined that, in the particular drives

that used the invention's preferred embodiment, the corners were the "critical regions" because shock delivered to those regions of the drive caused more damage or drive failure. [See id. at 4:51-51 ("The critical regions 304 are more susceptible to being damaged by external vibrations or shocks."); id. 5:8-61 (explaining testing of critical regions).] In contrast, the side walls and end walls of the disc drives tested in the patent were non-critical regions, because they were less sensitive (e.g., experienced less damage or failure) to shock loading during such events as table drops, corner drops, and other handling mistakes, and therefore were considered non-critical regions. [See id. at 6:41-54.]

Once the critical regions are identified, the '054 patent taught the use of a shock absorbing material with two thicknesses: one thickness would cover the non-critical region(s) of the disc drive, while a greater thickness would be adapted to cover the drives' critical region(s). [See id. at 2:52-57.]

Figure 4 of the '054 patent (reproduced below) demonstrates the results derived from the testing and experimentation: the shock absorber 300 that surrounds the disc drive 200. As provided by the '054 patent, the thicker regions of the shock absorber 300 cover the "critical regions," such as 304, while the thinner portions of the shock absorber cover the "non-critical regions," such as 306.



FIG.4

21

**B.    Construction of Disputed Terms in U.S. Patent No. 6,324,054 ("the '054 patent")**

      1.      **"critical region"**

Each of the asserted claims of the '054 patent requires a disc drive with one or more "critical region(s)." The plain and ordinary meaning of the term "critical" is: "having a decisive importance in the success or failure of something; crucial." Compact Oxford English Dictionary [Ex. 12.] This denotation is consistent with the specification, which states that "[t]he critical regions 304 are more susceptible to being damaged by external vibrations or shocks." [Ex. 1 at 4:51.] Dr. Morehouse, Cornice's expert, agrees that the '054 patent describes a "critical region" as that region of the drive that is more susceptible to being damaged by external vibrations or shocks. [See, e.g., Ex. 14 at 99:14-23.]

As the '054 patent further explains, different drives can have different critical regions:

> other form factors and shapes of disc drives may be accommodated by the shock absorber apparatus of the present invention. In these instances, the location of critical regions and non-critical regions may vary and therefore the location of thickened portions may change accordingly.

[Ex. 1 at 8:66-9:4 (emphasis added); see also 7:29 (identifying the preferred embodiment as having a 3-1/2 inch form factor).] The '054 patent further explains that the applicants performed different tests to identify which regions were critical, more likely to cause damage to the drive after being subjected to shock and/or vibration caused by various rigorous shock testing methods. [See, e.g., id. at 5:6-14; 5:6-61.]

Therefore, the meaning of "critical region" that is consistent with the intrinsic record and the common understood meaning of this term in the disc drive arts is a region of the disc drive that is relatively sensitive to vibration and shock accelerations. The region is critical based on whether external vibrations or shock delivered to that region are more likely to result in drive failure or damage, than in a non-critical region.

22

Cornice, however, ignores the evidence and attempts to limit the interpretation of the "critical region" to a "region of the disk drive that is relatively sensitive to vibration and shock accelerations <u>because most shock loadings during handling and transport are focused there.</u>" [E.g., Ex. 13 at ¶ 70.] In other words, Cornice asserts that instead of being more susceptible to damage (i.e., a critical region), these regions have a "greater *probability* of receiving an impact during handling or transport." [Id. at ¶ 71 (emphasis in original).]

Neither the concept of a "greater probability of receiving an impact" or a limitation that such critical regions are only present "during handling or transport" appear anywhere in the claims of the '054 patent. Likewise, Cornice cannot identify any portion of the asserted claims that limit the claimed critical regions as only being present during handling or transport. [See, e.g., Ex. 14 at 113:17-122:15.]

REDACTED

[Ex. 15 at 446:2-447:14.]

Cornice's proposed construction (i.e., that the critical regions are those regions that are more probable to hit) cannot stand for the additional reason that such a construction would render at least asserted dependent claim 2 superfluous. See Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1444 (Fed. Cir. 1997) (rejecting claim construction that would make other terms in disputed claims mere "surplusage"). Indeed, according to Cornice's expert, Dr. Morehouse, the corners of the disc drive are more "liable to hit than the sides" of the drive, and therefore, the corners of the disc drive must be critical regions. [Ex. 14 at 97:7-15.] Dependent claim 2, however, specifically recites that the "critical region . . . comprises a corner of the disc drive." [Ex. 1, claim 2.]

If Cornice's proposed construction is adopted (i.e., that the corners are always critical regions because they are more probable to hit than the other portions of the disc drive), then claim 2's requirement that the corner of the disc drive is the critical region becomes mere surplusage. Wright Med. Tech., 122 F.3d at 1444. Thus, not only is Cornice's proposed construction legally incorrect, it directly contradicts the specification, which clearly states that the "location of critical regions and non-critical regions may vary." [Ex. 1 at 9:1-4.]

Thus, Cornice's effort to import the "handling and transport" limitations should be rejected, as should its "greater probability" limitation which contradicts the meaning set forth in the intrinsic evidence.

### 2.    "non-critical region"

Similar to the claim term "critical region," the term "non-critical region" should be construed in accordance with its plain and ordinary meaning, and in light of the intrinsic evidence, to mean "a region of the disc drive that is relatively insensitive to vibration and shock."

As Cornice did with the term "critical region," Cornice attempts to limit the interpretation of "non-critical region" to a "region that is relatively insensitive to vibration and shock accelerations because it receives less shock loading during handling and mishaps." [E.g., Ex. 13 at ¶ 76.] While Cornice's proposed construction of "non-critical region" is close to Seagate's, Cornice attempts to improperly inject the unclaimed concept of "handling" of the disc drive into the claim term. Again, the claims say nothing about non-critical regions only being present "during handling mishaps," and Cornice cannot identify any portion of the claims that require that non-critical regions are only present during the handling of the drive. [See, e.g., Ex. 14 at 113:17-122:15.] Thus, Cornice's effort to import the "handling and transport" limitations should be rejected, and "non-critical region" should be properly interpreted to mean a region of the disc drive that is relatively insensitive to vibration and shock.

3.     **"enclosure sized to receive a disc drive therein"**

This is a claim limitation that Cornice seeks to narrowly construe in order to avoid infringement. Seagate, on the other hand, asserts that the claim limitation needs no construction because one of ordinary skill in the art reading the limitation in view of the intrinsic evidence would understand the limitation to simply mean an "enclosure that is sized to receive a disc drive therein."

Despite the plain and ordinary meaning of the term, Cornice seeks to escape liability for its infringement by attempting to limit the interpretation of "enclosure" to "something that encloses, meaning to shut in all around or to surround." Cornice further asserts that the associated phrase "sized to receive a disc drive therein" requires that the enclosure surround or contain all surfaces of the disc drive. [See, e.g., Ex. 13 at ¶¶ 55-61.] Cornice bases its construction on the flawed premise that the claim language requires an enclosure "for encapsulating" the disc drive, when in fact the claims simply require an enclosure sized to receive a disc drive therein. Just because the enclosure is sized to receive the disc drive does not require that all surfaces of the disc drive be "encapsulated" by the enclosure. It simply means that the enclosure is sized to conform to the outer dimensions of the drive. Further, Cornice's own expert, Dr. Morehouse testified, in distinct contradiction to his expert report, that under his interpretation of the term, the enclosure is not required to "shut in all around or to surround." [Ex. 14 at 125:17-24.]

In addition, the '054 patent itself does not require the enclosure "surround or contain all surfaces of the disc drive." For example, when describing a preferred embodiment illustrated in Figure 4 (reproduced below), the patent explains that the shock absorbing material 300, which is used for "encapsulating" the disc drive 200 has several openings 302 used for inserting and removing the disc drive. [Ex. 1 at 4:45-49.] As is evident from Figure 4 below, while the shock absorbing material provides an enclosure for the disc drive and it is sized to receive the disc drive, it is undeniable that the

25

enclosure does not surround or contain each and every surface of the disc drive as Cornice requires.



FIG.4

[Ex. 1, Fig. 4; see also alternative embodiment illustrated in Figs. 14 and 15.]

Cornice is once again improperly seeking to import limitations into the claim based on the preferred embodiment set forth in the written description. But Cornice cannot establish that the patent's description of the best mode for practicing the invention in any way contradicts the plain and ordinary meaning of the terms chosen for the claims. Cornice's effort to import limitations from the specification must be rejected.

### 4.    "shock absorbing material"

This is yet another claim limitation that Cornice seeks to narrow in an attempt to avoid infringement. Asserted claim 1 requires that the enclosure be made of a "shock absorbing material." The plain and ordinary meaning of this term as gleaned from the claims and written description is simply a "shock absorbing material" or a material used to absorb shocks. The claim language is consistent with the commonly understood meaning of "shock absorber," which is understood to mean "a material used to absorb mechanical shocks." [See, e.g., The American Heritage Dictionary (2nd Coll. Ed. 1985)

26

at 1132 (providing definition of related term "shock absorber".]  The specification of the '054 patent, consistent with the understanding of a shock absorbing material as being a material used to absorb mechanical shocks notes that the material may be made of natural or synthetic rubber (or its compounds) or plastic.  [Ex. 1 at 4:65-66.]  The specification further recognizes that several plastics could be employed in the invention, and provides specific examples, but explicitly does not limit the invention to one particular type of plastic.  [Ex. 1 at 2-5 ("Possible plastic candidates are: acrylonitrile-butadiene-styrene copolymer, polypropylene, polyethylene, etc. [and] [o]ther plastic alternatives may also be used.").]

Once again to avoid liability for its infringement, Cornice seeks to read the description of the preferred embodiments into the claims, and more specifically, the specific testing examples set forth in the specification, to assert that "shock absorbing material" be construed to mean "a material that is suited for widening a shock pulse and reducing its maximum amplitude."  [See, e.g., Ex. 13 at ¶¶ 63-65.]  Cornice goes one step further to assert that the material cannot consist of a combination of different materials to arrive at a shock absorbing material, as Cornice does in its accused products.  [Id.]

Taking first Cornice's assertion that because the claim recites "a shock absorbing material," the material cannot consist of a combination of materials, Cornice provides no support whatsoever for such a construct.  Indeed, it is settled that the use of the term "a" or "an" in patent parlance carries the meaning of one or more.  Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1350 (Fed. Cir. 2005) (citing KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000)).  This convention is overcome only when "the claim is specific as to the number of elements" or "when the patentee evinces a clear intent to . . . limit the article."  Id.

Cornice argues that the '054 patent consistently uses the phrase "a shock absorbing material" in the singular, and does not disclose or suggest combining different materials to arrive at a shock absorber apparatus.  [See, e.g., Ex. 13 at ¶ 65.]

27

Nevertheless, the references to alternative materials in the specification are set forth to teach one of ordinary skill in the art examples of materials that can be used as the shock absorbing material in the preferred embodiments of the claimed enclosure. Indeed, by use of the term "a shock absorbing material" as opposed to "a [single] shock absorbing material," the '054 patent does indeed make clear that various materials can be combined, and is contrary to Cornice's argument.

Nothing in the specification evinces any intent by the patentees to limit the article "a" to the singular, and Cornice has not provided evidence of such clear intent. Free Motion Fitness, 423 F.3d at 1350 (citing RF Del., Inc. v. Pac. Keystone Techs., Inc., 326 F.3d 1255, 1263 (Fed. Cir. 2003) ("[W]hen a claim term is expressed in general descriptive words, it typically will not be limited to a numerical range that may appear in the written description as referring to a preferred embodiment or in other, narrower claims.")

As for Cornice's further assertion that the shock absorbing material must be suited for "widening a shock pulse and reducing its maximum amplitude," such an overly technical legal construct contradicts the plain and ordinary meaning of the term. As it is inclined to do, Cornice once again attempts to read limitations from specific examples set forth in the specification into the claims. [See, e.g., Ex. 1 at 5:6-11; 5:39-61.] While the '054 patent, in the examples of the tests carried out with the shock absorbing materials, did describe the shock pulse widening and amplitude reducing characteristics of the materials, the claims do not recite such strict requirements.

Cornice's strained construction is simply an attempt to remove its infringing plastic shock absorbing corners from the limits of the claims. Despite Cornice's attempts, the claims of the '054 patent simply do not require a particular type of plastic or shock absorbing material. Indeed, the claims, and specifically dependent claim 4 that recites use of "plastic" does not limit the type of plastic to be used, nor does it specifically require the plastic to have any certain mechanical or material properties. [Ex.

28

1, claims 1 and 4.]   In addition, as set forth in detail in the written description, the shock absorbing material can comprise any number of materials, ranging from, for example, natural or synthetic rubber (or its compounds) or plastic. [Id. at 4:65-5:5.]  While the inventors provided numerous examples of such rubber and plastic materials, they explicitly noted that "other plastic alternatives may also be used." [Id. at 5:4-5.]

Accordingly, it is improper for Cornice to attempt to narrow the plain and ordinary meaning of the claim terms, when it has failed to show that the specification or the prosecution history evidences a clear and unmistakable intent to redefine the plain meaning of the claims. Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906-908 (Fed. Cir. 2004).

## 5.   "flexible shock absorbing material"

Asserted claims 15 and 19 add the requirement that the "shock absorbing material" of the enclosure be "flexible."  Such a commonly understood term requires no construction.  Indeed, the plain and ordinary meaning of flexible is "capable of being bent or flexed." [See, e.g., The American Heritage Dictionary (2nd Coll. Ed. 1985) at 513 (Ex. 22).] The specification of the '054 patent, consistent with the understanding of a flexible shock absorbing material as being a material that is capable of being bent or flexed and that is used to absorb mechanical shocks, notes that the material may be made of natural or synthetic rubber (or its compounds) or plastic. [Ex. 1 at 4:65-66.] The specification further recognizes that several plastics could be employed in the invention, and provides specific examples, but explicitly does not limit the invention to one particular type of plastic. [Id. at 2-5 ("Possible plastic candidates are: acrylonitrile-butadiene-styrene copolymer, polypropylene, polyethylene, etc. [and] [o]ther plastic alternatives may also be used.").] Moreover, nowhere in the specification does the patentee define the degree of flexibility that must be exhibited by the shock absorbing material.

29

Despite the plain and unambiguous meaning of the term "flexible" when read in light of the intrinsic evidence, Cornice attempts to narrow the term to a material that is "able to bend without breaking."   [See, e.g., Ex. 13 at ¶¶ 67-68.]  Again, there is nothing in the claims themselves or the specification that requires the material have a degree of flexibility that it will never break under any circumstances.  Moreover, the '054 patent explicitly disclosed that a number of various plastics could be employed as the flexible shock absorbing material, and whether or not those plastics are "able to bend without breaking" is simply not a requirement.  Cornice's attempt to read extraneous limitations into the claims to avoid infringement cannot be accepted when viewed in light of the plain and ordinary meaning of the term and the intrinsic evidence.

### 6.    "corner of the disc drive"

Despite the widely accepted and understood meaning of this term to one of ordinary skill in the art in the disc drive industry, Cornice attempts to contort the meaning in order to bolster its reliance on various prior art references.  Asserted dependent claims 2 and 20 recite that the critical region(s) of a disc drive comprises a "corner of the disc drive."  The plain and ordinary meaning of the term "corner of the disc drive" is simply one corner of the disc drive.  No further construction is required.

The specification of the '054 patent, which describes the best mode developed by the patentees for practicing the claimed invention, supports the plain meaning of the claim term.  For example, in referring to the embodiment shown in Figures 9-13 (reproduced below), the patentees described the corners in the following manner:

> These corner portions 646, 64[4], 650, and 652 are thicker than the side walls and the top and bottom portions so as to absorb larger shock loads, since most shock loadings that occur during transport and handling of the system are focused on the corner portions of the body 606.  These are the typical critical regions in a disc drive such as drive 200.

[Ex. 1 at 6:41-47.], and

> The shock absorber (such as 606) has first portions (such as 644, 646, 650, and 652) of a shock absorbing material having a first thickness adapted to cover each critical region (such as the corners) of the disc drive (such as 200).

[Id. at 8:16-20; see also 4:49-51; 6:28-32; 7:6-8; 8:16-20; 8:46-51.]



**FIG.9**

**FIG.11**    **FIG.12**    **FIG.13**

**FIG.10**

Thus, the specification explicitly supports the plain and ordinary meaning of the term, and clearly does not provide sufficient evidence to compel the Court to interpret "corner of the disc drive" in a manner contrary to the plain meaning of the claim language.

Despite the straight-forward ordinary meaning of "corner of the disc drive" compelled by the claim language and the intrinsic evidence, Cornice has advanced a contrived definition of "corner," alone, removed from the disc drive context of the claim language, in a transparent attempt to read various prior art references onto the claims. [Ex. 13 at ¶¶ 79-80.] At bottom, Cornice asks this Court to construe an edge of the disc drive as a corner. According to Cornice, the Court need only construe the term "corner," removed from the context of the disc drive limitations of the claim, to mean "[t]he point

31

or place where lines or surfaces join and form an angle." [Id.] The hidden meaning in Cornice's construction, however, is that Cornice construes this term in the two-dimensional realm and obviously disc drives are three-dimensional objects. Cornice really contorts its dictionary-based definition of corner as follows "the point or place where [two] lines or surfaces join and form an angle." Under Cornice's construction, not only would the commonly-understood four corners of the disc drive identified throughout the intrinsic evidence (e.g., represented by corner portions 644, 644, 650, and 652 in Figures 9-13 of the '054 patent) suffice as the claimed "corners of the disc drive," but so would the edges where the top surface and bottom surfaces meet the sides of the disc drive. As discussed above, the '054 patent directly refutes Cornice's out-of-context construction. [See, e.g., Ex. 1 at 6:41-47; 8:16-20; see also 4:49-51; 6:28-32; 7:6-8; 8:16-20; 8:46-51.]

## VII.   THE '845 PATENT

### A.     Technology Overview of the '845 Patent

The '845 patent is directed to an apparatus employed in a disc drive to secure an actuator arm assembly to an actuator pivot. The '845 patent discloses and claims a "retaining clip" (and discloses one type of retaining clip, "clip ring 63" in Figure 4, reproduced below) used to fasten an actuator arm to a bearing cartridge, by engaging groove(s) on the exterior of the bearing cartridge.



FIG.4

In the prior art, the '845 patent explains that various alternatives, such as adhesives, were used to secure the actuator arm to the bearing cartridge. [Ex. 2 at 8:28-31.] While adhesives served the purpose of fixing the actuator arm structure to the bearing cartridge or pivot assembly, they presented a variety of issues that are critical to the performance and cost of manufacturing disc drives. [Ex. 16 at 8.] For example, attaching the pivot to the actuator arm with an adhesive approved for use in one disc drive can, depending on the curing technique, take a long time to cure. [Id.] This process typically requires expensive ovens and tooling and tends to be labor intensive. [Id.]

Moreover, the use of adhesives in the manufacturing process can lead to contaminants in the sealed disc drive, which can affect the drive's performance or damage the data on the disc. [Id.] In particular, the adhesives can outgas after the actuator and bearing cartridge are placed in the disc drive, for example, at elevated temperatures. [Id.] If the adhesive continues to cure when the drive has been sealed then particles or vapors of the adhesive will be released inside the drive housing and can cause

33

premature failures of a head-disc interface. [Id.] In addition, using adhesives to fasten the bearing cartridge to the actuator assembly prohibited the bearing cartridge from being tested prior to assembly and cleaned independently of the actuator arm. [Ex. 2 at 8:28-31.]

The "retaining clip" of the '845 patent overcame a number of the disadvantages of the prior art. First, it eliminates the out-gassing problem because its use allows the pivot assembly or bearing cartridge to be put together independently. [Ex. 2 at 8:28-31.] In addition, the bearing cartridge can be tested prior to assembly with the actuator assembly and may be cleaned independently of the actuator. [Id.] This is important because if the bearing cartridge is attached to the actuator and the actuator is cleaned, the cleaning agent could wash out the grease inside the bearing cartridge and fatally damage the bearings.

**B.    Construction of Disputed Terms in U.S. Patent No. 6,545,845 ("the '845 patent")**

**1.    "retaining clip"**

When viewed in light of the intrinsic and extrinsic evidence, the term "retaining clip" should be construed to mean "a mechanical device for holding or gripping the bearing cartridge to the actuator by engaging a groove(s) on the exterior of the bearing cartridge." [See, e.g., Ex. 2 at 8:28-31; Figs. 4 and 14.]

The claims of the '845 patent recite a "retaining clip" used to secure (i.e., hold or grip) the bearing cartridge to the actuator. As described in the written description, the retaining clip secures the actuator to the bearing cartridge by engaging a groove on the exterior of the bearing cartridge. [Id. at 8:28-31; Fig. 4.] Indeed, in the preferred embodiment, which Cornice improperly uses to limit this limitation, the retaining clip is referred to as a "clip ring." The clip ring engages a peripheral groove formed on the exterior of the bearing cartridge in order to secure the bearing cartridge to the actuator, or vice versa. [Id. at 8:28-31; Fig. 4.] As discussed above, the '845 patent's use of a mechanical device, such as the retaining clip, in lieu of prior art methods such as

34

adhesives, provided numerous benefits to disc drive manufacturers, including elimination of contamination and ease of manufacture.

The extrinsic evidence further supports Seagate's proposed construction and is consistent with the specification and claims of the '845 patent. For example, the commonly understood meaning of the term "retaining" is "to keep or hold in a particular place, condition, or position." [The American Heritage Dictionary (2nd Coll. Ed. 1985) at 1054.] In addition, the plain and ordinary meaning of the term "clip" is "a device for gripping; clasp; fastener." [Id. at 282.] Accordingly, not only are the generally accepted dictionary definitions consistent with the description of the claimed "retaining clip," they advise one of ordinary skill in the art as to the proper scope of the claims when read in light of the patent. See Phillips v. AWH Corp., 415 F.3d.1303, 1319 (Fed. Cir. 2005) (en banc).

In an attempt to avoid infringement, Cornice improperly limits the term retaining clip to "a device such as a snap ring, retaining ring, or clip ring." [E.g., Ex. 17 at ¶ 39.] Cornice's construction is overly narrow, and improperly limited to the preferred embodiment—a clip ring. [Ex. 2 at 8:28-31.] Cornice's additional assertions concerning the prosecution history are also without merit.

As discussed in more detail below, the Wright '055 patent, which the Patent Examiner asserted against the pending claims of the '845 patent application, fails to disclose a device for holding or gripping the bearing cartridge to the actuator by engaging a groove(s) on the exterior of the bearing cartridge, and specifically fails to disclose a device that fastened the bearing cartridge to the actuator arm in the central pivot portion of the actuator. [E.g., Ex. 18 at 25-27.]

The Examiner initially rejected the pending claims in view of Figure 2 of the Wright patent (reproduced below):



**Fig. 2**

[Ex. 19, Figure 2.]  According to the Examiner, the Wright '055 patent disclosed a "retaining clip (64)" that engaged a portion of the bearing cartridge to fasten the bearing cartridge to the actuator arm.  [Ex. 20 at 3 (STX000765).]  In response to the Examiner's objection, the applicants explained that the asserted "retaining clip (64)" of the Wright '055 patent "does not engage 'a portion of the bearing cartridge to fasten the actuator arm 56 to the bearing cartridge."  [Ex. 21 at 3.]  Instead, the actuator arms in the Wright '055 patent are captured on the "bearing cartridge" by bolts which thread into the bottom flange of the cylinder 66.  [Id.]

Contrary to Cornice's assertions, instead of arguing that the claimed "retaining clip" does not cover threaded fasteners, such as the bolt in the Wright '055 patent or the threaded nut in the accused Cornice devices, the applicants were merely explaining to the Examiner that the alleged "retaining clip (64)" was only used to fasten the alleged bearing cartridge to the separate post, not to fasten the bearing cartridge to the actuator arms.  [Id.]  As is apparent from Figure 2 of the Wright '055 patent, the threaded bolts used to fasten the actuator arms to the alleged bearing cartridge do not engage grooves on the exterior of the bearing cartridge, nor do they fasten the alleged cartridge to the

36

actuator arms in the central pivot portion of the actuator.  [E.g., Ex. 18 at 25-27.]
Accordingly, when read in the context of the applicants' statements during prosecution of
the '845 patent, it is clear that Cornice's assertions that the applicants' in any way
disclaimed coverage of a threaded retaining clip are unfounded.

Thus, in view of the claim language and intrinsic evidence, the Court should
adopt Seagate's proposed construction of "retaining clip" to mean a mechanical device
for holding or gripping the bearing cartridge to the actuator by engaging a groove(s) on
the exterior of the bearing cartridge."

### 2.    "bearing cartridge"

While Seagate does not agree with Cornice's multiple definitions for this claim
limitation, at this juncture, Seagate sees no reason to further clarify the plain meaning of
this term, but will await Cornice's interpretations and argument therefor, while reserving
the right to object to or modify as appropriate those interpretations.

### VIII.   CONCLUSION

For the foregoing reasons, Seagate respectfully requests that the Court adopt its
proposed constructions of the disputed claim terms as set forth herein and collected in the
addendum to this brief.

Date:  November 18, 2005                FISH & RICHARDSON P.C.


By:  */s/ Timothy Devlin*
    Timothy Devlin (#4241)
    919 N. Market Street, Suite 1100
    Wilmington, DE  19899-1114

    Roger S. Borovoy
    David M. Barkan
    D. Austin Horowitz
    Desa L. Burton
    500 Arguello Street
    Redwood City, CA 94063-1526

    Brian R. Nester
    Timothy W. Riffe
    Christian A. Chu
    1425 K Street NW, Suite 1100
    Washington, D.C.  20005

    Edmond Bannon
    Lewis E. Hudnell, III
    Citigroup Center – 52nd Floor
    153 East 53rd Street
    New York, NY 10022-4611

    Attorneys for Plaintiff
    SEAGATE TECHNOLOGY LLC