IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEAGATE TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-418 (SLR) |
| | ) | |
| v. | ) | **REDACTED VERSION** |
| | ) | |
| CORNICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CORNICE, INC.'S OPENING CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NO. 5,452,159

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Defendant and Counterclaim
Plaintiff Cornice, Inc.*

OF COUNSEL:

Vernon Winters
Steven Carlson
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

Russell Wheatley
Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, TX  77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153
(212) 310-8000

Original Filing Date:  November 18, 2005

Redacted Filing Date:  November 28, 2005

# TABLE OF CONTENTS

Page

TABLE OF CITATIONS ........................................................................................... iii

NATURE AND STAGE OF THE PROCEEDING............................................................. 1

SUMMARY OF ARGUMENT ...................................................................................... 1

    Claim Language ................................................................................................. 1

    Cornice's Proposed Construction ......................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2

I.      TECHNICAL BACKGROUND............................................................................ 2

    A.    Problem Facing the Industry:  Where to Position the Head During Periods of
          Inactivity ................................................................................................. 2

    B.    Contact Start-Stop Technology.................................................................... 3

    C.    Dynamic Head Loading Technology ............................................................ 4

II.     THE '159 PATENT ........................................................................................ 6

ARGUMENT............................................................................................................ 6

I.      "PARK" AND "PARKING" ............................................................................... 6

    A.    Cornice's Proposed Construction Is Taken Directly From The Patent Itself And
          Is Supported By The Intrinsic Evidence ....................................................... 7

    B.    Seagate Improperly Attempts to Supplant The Patent's Definition Using
          Extrinsic Evidence .................................................................................... 8

    C.    Cornice's Constructions are Consistent with the Understanding of One of
          Ordinary Skill in the Art ............................................................................ 9

II.     "A MAGNETIC FIELD CONTAINING MEMBER" ................................................. 10

    A.    The Specification Supports Cornice's Construction......................................... 10

    B.    During Prosecution of the '159 Patent, Seagate Made It Clear That Containment
          Of The Magnetic Field Was "Crucial" To Its Invention.................................... 11

    C.    "A Member" Should Be Construed To Mean A Single Structure, Not Multiple
          Discrete Pieces ......................................................................................... 12

    D.    Seagate's Construction Is Contradicted By The Intrinsic Record ...................... 13

    E.    Cornice's Construction is Consistent with the Understanding of One of Ordinary
          Skill in the Art.......................................................................................... 14

III.    "THE CAPTURE MEMBER IS IN A NON-PERMEATED STATE ... AND THE CAPTURE
      MEMBER SWITCHES TO A PERMEATED STATE"................................................. 15

    A.    The Intrinsic Evidence Supports Cornice's Construction.................................. 15

    B.    Seagate's Construction Is Flawed ................................................................ 16

    C.    Cornice's Construction is Consistent with the Understanding of One of Ordinary
          Skill in the Art.......................................................................................... 17

ii.

Table of Contents (cont'd.)

Page

IV.    "AN ACTUATOR FOR SELECTIVELY POSITIONING THE TRANSDUCER OVER A
       PATH BETWEEN A FIRST POSITION AND A SECOND POSITION" .................................. 17

CONCLUSION ........................................................................................................................ 19

**TABLE OF CITATIONS**

<u>**Cases**</u>                                                                                 <u>**Page(s)**</u>

**Cases**

*3M Innovative Properties Company v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003),
    *cert. denied* 124 S.Ct. 2877 (2004) ............................................................. 9

*Bristol-Myers Squibb Co. v. Ben Venue Labs, Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) ..................................................................... 13

*Cultor Corp. v. AE Staley Mfg. Co.*,
    224 F.3d 1328 (Fed. Cir. 2000) ....................................................................... 9

*Desper Products, Inc. v. QSound Labs, Inc.*,
    157 F.3d 1325 (Fed. Cir. 1998) ..................................................................... 14

*KCJ Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000) ..................................................................... 18

*Kwik Products, Inc. v. National Express, Inc.*,
    356 F.Supp.2d 303 (S.D.N.Y. 2005) ............................................................. 13

*Laitram Corp. v. Morehouse Indus., Inc.*,
    143 F.3d 1456 (Fed. Cir. 1998) ..................................................................... 12

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc),
    *aff'd*, 517 U.S. 370 (1996) ............................................................................... 7

*Mercexchange, L.L.C. v. eBay, Inc.*,
    401 F.3d 1323 (Fed. Cir. 2005) ..................................................................... 12

*Omega Engineering, Inc. v. Raytek Corporation*,
    334 F.3d 1314 (Fed. Cir. 2003) ..................................................................... 12

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ........................................................... 7, 12, 15

*Texas Instruments Inc. v. U.S. Intern. Trade Com'n*,
    988 F.2d 1165 (Fed. Cir. 1993) ........................................................... 13, 16, 18

*Toro Co. v. White Consolidated Indus., Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999) ..................................................................... 14

## NATURE AND STAGE OF THE PROCEEDING

Seagate Technology LLC ("Seagate") brought this action against Cornice, Inc. ("Cornice") for infringement of seven patents on June 22, 2004. In accordance with the Scheduling Order, the parties are filing a Joint Claim Construction Statement on the seven patents-in-suit today. Cornice is submitting this Opening Claim Construction Brief in support of its constructions of certain claim terms in U.S. Patent No. 5,452,159 ("the '159 patent"), and separate claim construction briefs addressing each of the other six patents-in-suit.

The parties dispute four claim terms in the '159 patent. Cornice is also filing today a motion for summary judgment of noninfringement of the '159 patent. That motion is being filed because there is at least one disputed claim term that, if construed as explicitly defined in the specification of the '159 patent, is dispositive of Seagate's claim of infringement as a matter of law.

## SUMMARY OF ARGUMENT

The parties have proposed competing constructions for four terms from the '159 patent: (1) "park" and "parking," (2) "an actuator for selectively positioning the transducer over a path between a first position and a second position with respect to the data storage medium," (3) "a magnetic field containing member," and (4) "the capture member is in a non-permeated state ... and the capture member switches to a permeated state." Cornice proposes the following constructions for the claim terms at issue:

| Claim Language | Cornice's Proposed Construction |
|---|---|
| "parking device" [cls. 1-6]<br><br>"parking means" [cls. 1, 3, 5]<br><br>"to park" [cls. 1, 5] | The terms "park" and "parking," as used in the phrases "parking device," "parking means," and "to park," mean "[m]aintain[ing] the position of the head(s) over a selected portion of the disk." |
| "an actuator for selectively positioning the transducer over a path between a first position and a second position with respect to the data storage medium"<br><br>[cl. 1] | The phrase "an actuator for selectively positioning the transducer over a path between a first position and a second position with respect to the data storage medium" means "an actuator for controllably positioning the transducer at any specific location between the first position and the second position." |

| Claim Language | Cornice's Proposed Construction |
|---|---|
| "a magnetic field containing member" [cls. 1, 5] | The phrase "a magnetic field containing member" means "a single structure that prevents magnetic fringing (*i.e.*, contains the magnetic field)." |
| "the capture member is in a non-permeated state … and the capture member switches to a permeated state" [cls. 1, 5] | The phrase "the capture member is in a non-permeated state … and the capture member switches to a permeated state" means "a rapid change (like a switch) of the capture member from a non-permeated to a permeated state." |

## STATEMENT OF FACTS

I.    **TECHNICAL BACKGROUND**

    A.    **Problem Facing the Industry: Where to Position the Head During Periods of Inactivity**

Disk drives are a type of data storage device used in computers and an increasing variety of other applications. Exh. A, Expert Report of James H. Morehouse, Ph.D. Regarding Invalidity of U.S. Patent No. 5,452,159 ("Morehouse '159 Invalidity Report"[1]) at ¶ 12. Normally, a disk drive is not constantly reading or writing data. *Id.* at ¶ 16. Rather, there are non-operative periods during which the drive is inactive. *Id.* During these inactive periods, it is advantageous not to leave the read/write head over a data portion of the disk since any jolt or shock to the system could cause the read/write head to impact the disk. *Id.* Such an impact could damage both the disk (causing loss of data) as well as the read/write head (rendering the drive nonfunctional). *Id.* Therefore, during periods of inactivity, it is advantageous to position the heads somewhere other than over a data region of the magnetic recording media. *Id.* Two basic techniques were developed to address this concern, and each is discussed below.

---

[1]    The original Morehouse '159 Invalidity Report is        Redacted      A copy of that report is being filed as "Exh. A" to the Appendix To Cornice's Opening Claim Construction Brief For U.S. Patent No. 5,452,159, with unnecessary Exhibits thereto removed as not being relevant to the claim construction issues herein. Exhibits to the Morehouse '159 Invalidity Report are cited herein as "Exh. A-__". For example, the '159 patent is attached as Exhibit 4 to the Morehouse '159 Invalidity Report and cited herein as "Exh. A-4".

### B.    Contact Start-Stop Technology

One method of addressing this concern is called "Contact Start-Stop" (CSS) or "Winchester" technology. *Id.* at ¶ 17. In a CSS system, the disk itself has two general areas – data regions and non-data regions. *Id.* When the drive is inactive, the heads in a CSS system are placed over the non-data region of the disk, called a "landing zone." *Id.* In this way, an impulse sustained by the system will typically not result in the loss of any data, because the head does not collide with a data region of the disk. *Id.* However, CSS does not solve the problem of damage to the head itself resulting from such an impact, and damage (even in the landing zone) can propagate to catastrophic drive failure. *Id.* Below is a picture of a CSS type system, taken from the '159 patent itself, showing the read/write head parked in the "landing zone" 61.



**FIG.—4**

Another disadvantage of the CSS technology is that any area on the disk dedicated to a "landing zone" is necessarily space that cannot be used to store data. *Id.* at ¶ 18. Therefore, a disk that includes a landing zone has less memory capacity than an otherwise identical disk without a landing zone. *Id.* In systems using CSS, it is therefore desirable to minimize the size of these landing zones in order to maximize the area of the surface of the disk that is available for data storage. *Id.*

Manufacturers of CSS systems quickly realized that in addition to having a landing zone, it was also desirable to include some means to keep the read/write head in the landing zone during periods of inactivity. *Id.* at ¶ 19. Otherwise, a physical shock to the system could move the read/write head from the non-data region to the data region of the disk, thus defeating the purpose of the landing zone. *Id.* CSS systems have therefore used a variety of methods to keep the read/write heads in the "parked" position, including solenoids, air vanes, electromechanical braces, and magnetic latches. *Id.* at ¶ 20. In general, when the actuator assembly of a CSS system is captured ("latched"), only the least amount of movement possible should be allowed. *Id.* The more movement, or "play," that is allowed, the larger the landing zone and hence, the less space available for data storage. *Id.* In addition, because the landing zone is typically adjacent to the data regions of the disk, it is also desirable for the latching system to only affect the actuator when it is in the parked position. *Id.* Otherwise, the movement of the actuator over the data regions may be influenced and/or compromised. *Id.*

## C.     **Dynamic Head Loading Technology**

An alternative to CSS is called "Dynamic Head Loading" (DHL). *Id.* at ¶ 21. Unlike CSS, where the head is "parked" over a non-data region of the disk, in a DHL system, the head is completely removed from the surface of the disk and typically placed on a ramp beyond the outside diameter of the disk. *Id.* As discussed in the Morehouse '159 Invalidity Report,          Redacted
                        Redacted                        as exemplified in U.S. Patent No. 4,933,785 (Exhibit A-5) and others on which he is a named inventor. *Id.* DHL has two primary advantages over CSS. *Id.* First, because the head is unloaded completely off of the disk rather than parked on the disk itself, there is no need for a "landing zone," which increases the available data storage area and hence capacity of the disk. *Id.* Second, because the head is not in direct contact with the disk (or anything else) and is instead suspended off of a ramp, a shock to the system will generally not result in a collision between the read/write head and another structure of the drive, including the disk. *Id.* Thus, DHL provides greater protection for the heads themselves. *Id.* Below is an illustration of a DHL system, showing the read/write head positioned on the ramp $16_1$:



DHL systems maintain the read/write head on the ramp (in the "home" position) using a variety of techniques, although the considerations are somewhat different. *Id.* One way to maintain the read/write head on the ramp is simply to include a "detent" (valley) in the ramp itself, such that the read/write head must overcome the physical barrier on the ramp itself before it can reach the disk surface. *Id.* An example of this is illustrated below (showing the detent of the ramp in red):



DHL can also use supplemental latching systems such as magnets, although the considerations for such systems can be somewhat different. *Id.* at ¶ 23. Specifically, whereas in CSS the influence of the latch should be over as small a range as possible, the latch in a DHL system need not be so confined. *Id.* In fact, it is often desirable to design the magnetic latch such that it acts over a wider

stroke of the actuator assembly, since that increases the effectiveness of the latch (*i.e.*, so that a small movement does not disengage the latch completely) without impacting on the data capacity of the disk. *Id.*

## II.    THE '159 PATENT

The '159 patent issued on September 19, 1995, and is entitled "Magnetic Parking Device for Disk Drive." Exh. A-4, '159 Patent, Cover. According to the Field of Invention, the '159 patent relates "to devices which position and retain the head(s) of a disk drive over a selected portion of a hard (or fixed) disk when the disk drive is not in use." Exh. A-4, '159 Patent, col. 1, lns 38-41. The specification goes on to state that "[p]arking the head(s) is particularly important in portable computers, in which the disk drive may be continually subject to large physical shocks during transportation." *Id.*, col. 2, lns. 3-6.

## ARGUMENT

For a discussion of the legal standards for claim construction, please refer to Cornice's Opening Claim Construction Brief for U.S. Patent No. 6,146,754.

## I.    "PARK" AND "PARKING"

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "parking device" [cls. 1-6]<br><br>"parking means" [cls. 1, 3, 5]<br><br>"to park" [cls. 1, 5] | The terms "park" and "parking," as used in the phrases "parking device," "parking means," and "to park," mean "[m]aintain[ing] the position of the head(s) over a selected portion of the disk." | "to park" means "fix the position of the actuator which supports the head(s)." |

As discussed above, the '159 patent discloses and claims a CSS (Contact Start Stop) style disk drive, while the accused products utilize DHL (Dynamic Head Loading). For purposes of these limitations, this distinction is significant because when the drive is not operating, a CSS system will land the read/write head directly into the "landing zone" on the disk, whereas a DHL system unloads the head onto a ramp that is completely off of the disk. Cornice's proposed construction is taken directly from the

specification of the patent, while Seagate wishes to avoid that definition and more broadly construe the terms such that the head(s) can be positioned anywhere, not just over the disk.

>    **A.    Cornice's Proposed Construction Is Taken Directly From The Patent Itself And Is Supported By The Intrinsic Evidence**

When construing claims, the process is straightforward if the patentee has chosen in the specification to define claim terms. This is often known as the "own lexicographer" rule. "[A] patentee is free to be his own lexicographer. The caveat is that any special definition given to a word must be clearly defined in the specification." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). When "a patent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term," as Seagate did here, "the definition selected by the patent applicant controls." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

The '159 patent is for a "magnetic parking device for a disk drive." According to the Field of the Invention, "[t]he present invention relates to parking devices for disk drives; more particularly, to devices which position and retain the head(s) of a disk drive over a selected portion of a hard (or fixed) disk when the disk drive is not in use." Exh. A-4, '159 patent, col. 1, lns. 36-41. The patent clearly and specifically defines "park" and "parking" as follows:

>    *As used in this patent, the terms 'park' and 'parking' refer to the maintaining the position of the head(s) over a selected portion* (usually a "landing zone" at the inside or outside diameter) *of the disk* (or disks).

*Id.* at col. 1, lns. 55-60 (emphasis supplied). Cornice's proposed construction is thus the patentee's own definition as explicitly disclosed in the patent. The inquiry into what "park" and "parking" mean in the '159 patent need and, under *Renishaw* and similar cases, must proceed no further. Seagate chose specifically to define the term, which settles the matter.

Were one to look further nonetheless, Cornice's construction is completely consistent with the remaining disclosure of the '159 patent. For example, the patent further states:

>    The present invention relates to parking devices for disk drives; more particularly, to devices which position and retain the head(s) of a disk drive *over a selected portion of a*

8.

*hard (or fixed) disk* when the disk drive is not in use. *Id.*, col. 1, lns. 37-41 (emphasis added).

\* \* \*

*Parking the head assures that the head will land on a landing zone – i.e., a non-data storage portion of the disk* – and will be held in a position over the landing zone during the power-down period. *Id.*, col. 2, lns. 11-15 (emphasis added).

\* \* \*

The elimination of fringing allows more of surface of disk 34 to be utilized for data storage. *Id.*, col. 8, lns. 43-44.[2]

In addition, all of the figures in the patent also reflect Cornice's proposed construction of "park" and "parking." Figure 4 is representative, showing the head (38) maintained over a selected portion of the disk, *i.e.*, the landing zone (61):



FIG.—4

**B.** **Seagate Improperly Attempts to Supplant The Patent's Definition Using Extrinsic Evidence**

Confronted with its own explicit definition (that would lead to the conclusion that the Cornice DHL system does not infringe), Seagate looks beyond that definition, and beyond the patent, to

---

2   This statement only makes sense in the context of a CSS system, where the head lands directly on the disk. In such a system, the elimination of fringing would allow for a smaller landing zone, and thus a greater portion of the disk surface available for data storage. In a typical DHL system, however, magnetic fringing would not reduce the portion of the disk useable for data storage because the head is already positioned on a ramp beyond the outer diameter of the disk.

try to find a *broader*, extrinsic definition. For example, Seagate invokes a different patent, filed at a different time by a different inventor, assigned to a different entity (Cornice), as evidence of how the disputed terms should be construed. However, merely because Seagate can find someone who uses the term differently than the patent itself is of no moment. Indeed, the very exercise of "claim construction" is premised on the recognition that a term can have multiple meanings. Even assuming, *arguendo*, that Seagate's construction is the "ordinary" meaning of the term, it still could not supplant the patentee's own explicit definition. As the Federal Circuit has explained:

> [A] definition of a claim term in the specification will prevail over a term's ordinary meaning if the patentee has acted as his own lexicographer and clearly set forth a different definition.... Because [the patentee] expressly acted as [his] own lexicographer by providing a definition of [the disputed term] in the specification, the definition in the specification controls the meaning of [that term], regardless of any potential conflict with the term's ordinary meaning as reflected in technical dictionaries.

*3M Innovative Properties Company v. Avery Dennison Corp.*, 350 F.3d 1365, 1371-74 (Fed. Cir. 2003), *cert. denied* 124 S.Ct. 2877 (2004). Hence, whether Seagate can find some extrinsic evidence (a dictionary, an unrelated patent, lawyer argument, Cornice document, or anything else) is not relevant when construing this claim. Having selected a particular definition and called it out in the specification, the patentee clearly informed those skilled in the art the meaning that should be ascribed the terms "park" and "parking" when reading and applying the '159 patent. *See also Cultor Corp. v. AE Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) ("Having explicitly defined this term ['water-soluble polydextrose'] as limited to that prepared with a citric acid catalyst, this effected a disclaimer of the other prior art acids."). Seagate must now live with the definition it originally chose.

**C.    Cornice's Constructions are Consistent with the Understanding of One of Ordinary Skill in the Art**

Finally, one of ordinary skill in the art in the November 1988 timeframe would understand the terms "park" and "parking" as used in the claims of the '159 patent to be consistent with Cornice's proposed constructions. See Exh. B, Rebuttal Expert Report of James H. Morehouse, Ph.D.

Regarding the Noninfringement of the '159 Patent ("Morehouse '159 Rebuttal") at pages 30-34; Exh. A,

Morehouse '159 Invalidity Report at ¶ 45.

## II.    "A MAGNETIC FIELD CONTAINING MEMBER"

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "a magnetic field containing member"<br><br>[cls. 1, 5] | The phrase "a magnetic field containing member" means "a single structure that prevents magnetic fringing (*i.e.*, contains the magnetic field)." | "A member that contains a magnetic field." |

The dispute surrounding this term focuses on (1) whether "a magnetic field containing member" must restrict or confine a magnetic field (as urged by Cornice) or if it can simply be in the presence of and permeable to a magnetic field (as urged by Seagate), and (2) whether "a member" is one structure (as urged by Cornice) or can be comprised of multiple structures (as urged by Seagate).

### A.    The Specification Supports Cornice's Construction

The entire specification repeatedly emphasizes the importance of using the magnetic field containing member to prevent magnetic fringing or leakage, and notes the benefits of such a design. As early as the Abstract, the patent advises those of ordinary skill that the claimed invention is "[a] magnetic parking device for a disk drive includes a magnet and a member for containing the magnetic field produced by the magnet. The ***magnetic field containing member*** has an air gap which is substantially parallel to the magnet flux lines of the magnetic field ***so that there is no fringing of the magnetic field outside of the gap***." Exh. A-4, '159 patent, Abstract (emphasis supplied).

In describing prior art designs, the patent then criticizes designs where the magnetic field is not contained:

> Purely magnetic parking devices park the actuator by the attraction by a magnet of a magnetically permeable portion of the actuator. Such parking devices have provided direct contact between the magnetically permeable portion of the actuator and the magnet. The primary drawback of a magnetic latch of this type is that the rotational movement of the actuator is adversely affected by the attraction of the magnetically permeable portion of the actuator and the magnet, thereby creating problems with the track following and seek functions. Further, an

extremely large force is required to release the actuator from the magnet.
Exh. A-4, '159 Patent, col. 2, lns. 57-68.

In the Summary of the Invention, the patent explains how the magnet and magnetic field containing member work together to confine the magnetic field so that the actuator is not subjected to the effects of magnetic fringing, but rather is only captured when the capture member enters the "slot" in the magnetic field containing member:

> The magnetic parking means includes a magnet and a magnetic field containing member having a slot (or air gap), and captures the capture member to park the head only when the capture member enters the air gap. Exh. A-4, '159 Patent, col. 3, lns. 53-57.

After discussing the details of the design, the patent goes on to talk about the benefits of eliminating magnetic fringing (*e.g.*, "The elimination of fringing allows more of the surface of disk 34 to be utilized for data storage." Exh. A-4, '159 Patent, col. 8, lns. 43-44). Therefore a person of skill in the art, reading the specification of the '159 patent, would understand that the magnetic field containing member must restrict magnetic fringing by confining the magnetic field.

**B.     During Prosecution of the '159 Patent, Seagate Made It Clear That Containment Of The Magnetic Field Was "Crucial" To Its Invention**

During prosecution, to overcome a rejection by the Patent Office, Seagate and the patentee stated:

> As noted in Applicant's specification (p. 14, line 29 – p. 15, line 20; p. 16, lns. 2-3), *containment of the parking device's magnetic field is crucial in Applicant's device* to provide a reduced device size and more efficient use of disk storage space.

Exh. A-6, '159 file history, Amendment dated June 5, 1990 at page 17 (emphasis supplied). The portions of the specification highlighted by the patentee as being "crucial in Applicant's device" are now found at column 7, line 59 – col. 8, line 18 of the '159 patent, which state in part (emphasis supplied):

> It was discovered, by the inventor, that *a field containing member* 18 having an air gap 22 oriented in a direction substantially parallel to the magnetic flux lines 116 in *field containing member* 18 *substantially alleviates fringing (or leakage) outside of air gap* 22. As shown in Figs. 2B and 6A, the flux lines 116 of the field in field containing member 18 are substantially parallel to air gap 22. The flux lines 118 of the field which pass from the south pole of magnet 14 to field containing member

> 18 all pass between magnet 14 and field containing member 18; ***none of***
> ***the flux lines 118 extend outside of the physical boundaries of field***
> ***containing member 18***.

Thus, in describing his own invention and in trying to overcome a rejection, the patentee identified the field containing member's "containment of the … magnetic field" (a.k.a. "alleviates fringing") as a feature ***"crucial"*** to the applicant's device. Seagate's argument is thus like the argument the Federal Circuit rejected in *Omega Engineering, Inc. v. Raytek Corporation*, 334 F.3d 1314 (Fed. Cir. 2003). There, the Federal Circuit instructed that "[b]y insisting that its invention [performs a certain function], the patentee has rejected the examiner's broad statement of the claim scope and stated in a public record what his invention could not be. That statement is a deliberate surrender of claim scope, unmistakable in its effect because it is not suitable to multiple interpretations.…" *Id.* at 1323-27. Indeed, such statements made during prosecution are given effect in construing claims even when "an examiner placed no reliance on an applicant's statement." *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998). Because the construction that "most naturally aligns with the patent's description of the invention will be, in the end, the correct construction," *Renishaw*, 158 F.3d at 1248-50, Cornice's construction is correct. *See also Mercexchange, L.L.C. v. eBay, Inc.*, 401 F.3d 1323, 1337(Fed. Cir. 2005) (holding that "[t]he district court's construction is supported by the language of the specification, which states that the purpose of the patented system is 'to provide a trusted network of consignment nodes that act as brokers to provide a means to electronically present a used good or collectable to an electronic market.'").

C.    **"A Member" Should Be Construed To Mean A Single Structure, Not Multiple Discrete Pieces**

The claim language "a … member" supports Cornice's requested construction. "Member" is generally defined in the field as "a named component of a composite object." Exh. B-6, Dictionary of Computer Science, Engineering, and Technology (2001) at 302; *see also* Exh. B-6, The Concise Oxford Dictionary of Current English (1990) at 740 ("a constituent portion of a complex structure"). These definitions are consistent with the portion of Cornice's proposed construction "a single structure…". In addition, the claims themselves require that there be an "air gap ***in*** the magnetic field

containing member." Were "a … member" construed to include multiple components, any supposed air gap would not be *in* the structure, but rather *between* the distinct components. Thus, Cornice's construction maintains the internal consistency of the claims.

### D.    Seagate's Construction Is Contradicted By The Intrinsic Record

Seagate's proposed construction, not endorsed by its own expert witness,[3] is "a member that contains a magnetic field." Although this construction does little to resolve the dispute, since it merely juggles the words and replaces "containing" with "contains," clearly Seagate wishes to remove the "containment of the magnetic field" requirement that is discussed repeatedly in the specification and was described as "crucial" during prosecution of the patent. However, "to construe the claims in the manner suggested by [Seagate] would read an express limitation out of the claims. This, we will not do because '[c]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.'" *Texas Instruments Inc. v. U.S. Intern. Trade Com'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (citation omitted).

In an effort to distance itself from its own specification and the unambiguous statements appearing in the prosecution history, Seagate may argue that the doctrine of claim differentiation would favor a more liberal interpretation of the phrase, since claims 2 and/or 4 likewise address containment of the magnetic field. There are several reasons why such arguments would fail. First, it is axiomatic that "the doctrine of claim differentiation is not a hard-and-fast rule; rather, it is simply a guide to claim construction." *Kwik Products, Inc. v. National Express, Inc.*, 356 F.Supp.2d 303, 318 (S.D.N.Y. 2005). The Federal Circuit does not "blindly apply the doctrine [of claim differentiation]," even when it results in claims being construed as having the same claim scope. *Bristol-Myers Squibb Co. v. Ben Venue Labs, Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001) ("We decline to blindly apply the doctrine [of claim differentiation] in this case to supplant other canons of claim construction that compel our conclusion that

---

[3]    Dr. Bogy does not offer a construction for this term, merely stating that

Redacted

14.

independent claims 1 and 5 and that independent claims 2 and 8 have identical scope."). More particularly, where the patentee has unambiguously identified the scope of his invention (such as here, by identifying the elimination of fringing as "crucial" to his invention), the presumption of claim differentiation is easily overcome, because "the doctrine of claim differentiation does not serve to broaden claims beyond their meaning in light of the specification . . . and does not override clear statements of scope in the specification and the prosecution history." *Toro Co. v. White Consolidated Indus., Inc.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999).

Moreover, Seagate itself has not been able to articulate any difference in scope between claim 2 and claim 4, because indeed they are merely alternate ways of stating the same thing.[4] This too demonstrates that claim differentiation cannot save Seagate from its own statements made to secure allowance of the '159 patent. *Desper Products, Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1337 fn.3 (Fed. Cir. 1998) (The patentee "invokes the rule that different words should be interpreted differently, yet it concedes that in other parts of the claims different words should be interpreted the same ... [The patentee's] argument based on constructional rules therefore loses much of its force."). Therefore, Seagate's proposed construction should be rejected.

### E.      Cornice's Construction is Consistent with the Understanding of One of Ordinary Skill in the Art

Finally, one of ordinary skill in the art in the November 1988 timeframe would understand the phrase "a magnetic field containing member" as used in the claims of the '159 patent to be consistent with Cornice's proposed construction. <u>See</u> Exh. B, Morehouse '159 Rebuttal at ¶¶ 6-20; Exh. A, Morehouse '159 Invalidity Report at ¶ 45.

---

[4]      In his reports, Seagate's Dr. Bogy                              Redacted

III.   "THE CAPTURE MEMBER IS IN A NON-PERMEATED STATE … AND THE
       CAPTURE MEMBER SWITCHES TO A PERMEATED STATE"

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "the capture member is in a non-permeated state … and the capture member switches to a permeated state"<br><br>['159 Patent, cls. 1, 5.] | The phrase "the capture member is in a non-permeated state … and the capture member switches to a permeated state" means "[a] rapid change (like a switch) of the capture member from a non-permeated to a permeated state." | "'Switches' should be construed consistent with its ordinary meaning to mean 'changes,' such as the 'capture member is in a non-permeated state … and the capture member "changes" to a permeated state.'" |

        Here, the parties disagree as to whether "switches" includes any temporal requirement

such that the transition must occur quickly, or if any "change" – no matter how gradual – is still a

"switch" from one condition to another.  Indeed, Seagate's proposed construction flatly removes the

"switches" limitation and replaces it with the broader word "changes."  Guided by the principle that the

"construction that stays true to the claim language and most naturally aligns with the patent's description

of the invention will be, in the end, the correct construction," *Renishaw PLC v. Marposs Societa' per*

*Azioni*, 158 F.3d 1243, 1248-50 (Fed. Cir. 1998), Cornice will demonstrate that its construction is

appropriate.

        A.      **The Intrinsic Evidence Supports Cornice's Construction**

        The specification discloses that "as [the] capture member enters [the] air gap," it

"*switches* to a permeated state," thus "becom[ing] part of the magnetic circuit."  This is not a gradual

transition from one state to another – rather switching happens quickly because of what the patent

describes as the "black hole" effect:

        The interaction of magnetic unit 12 and capture member 100 creates a
        ***magnetic switch***.  With reference to Figs. 6A, capture member 100 is
        non-permeated when capture member 100 is outside of air gap 22.  ***As
        capture member 100 enters air gap 22 (Fig. 6B), the capture member
        switches to a permeated state***.  Capture member 100 thus becomes an
        integral part of the magnetic circuit – the flux paths 116 and 118 –
        created by magnet 14, and is pulled towards the south pole S of magnet
        14 and towards the north pole N of field containing member 18 at the
        edges of air gap 22.  ***This structure also provides the so-called "black
        hole" magnetic effect.  The result of the black hole magnetic effect is***

> *that actuator arm 50 is unaffected by magnetic unit 12 until capture*
> *member 100 enters air gap 22.*

Exh. A-4, Col. 8, lns. 11-25. This is the only portion of the specification that discusses "switches" (or some derivative thereof). The fact that the invention is described as a "magnetic switch," and that the capture member is "unaffected" until it enters the air gap further emphasize that a gradual transition would not suffice (*e.g.*, otherwise the capture member *would* be affected before entering the air gap, contrary to the teaching of the patent).[5]

### B.    Seagate's Construction Is Flawed

Seagate's proposed construction, not endorsed by its own expert witness,[6] is that "'Switches' should be construed consistent with its ordinary meaning to mean 'changes,' such that the 'capture member is in a non-permeated state ... and the capture member 'changes' to a permeated state.'" Thus Seagate's proposed construction is a verbatim copy of the language from the claims, except that it removes the specific "switches" requirement, and replaces it with the more generic, *broader* term "changes." However, it is impermissible to read this limitation out of the claims. "[T]o construe the claims in the manner suggested by [Seagate] would read an express limitation out of the claims. This, we will not do because '[c]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.'" *Texas Instruments*, 988 F.2d at 1171 (citation omitted). Therefore, Seagate cannot ignore this express limitation and Cornice's construction should be adopted.

---

[5]    A "switch" is "a device used to open, close, or divert an electric circuit ... a shift or transference, *especially if sudden or unexpected*." Exh. B-7, Webster's New World Dictionary (1984) at 1440 (emphasis supplied), and "[s]witching" is "the action of turning on and off a device," Exh. B-7, Dictionary of Advanced Manufacturing Technology (1987) at 345.

[6]    Dr. Bogy does not

Redacted

C.    **Cornice's Construction is Consistent with the Understanding of One of Ordinary Skill in the Art**

Finally, one of ordinary skill in the art in the November 1988 timeframe would understand the phrase "the capture member is in a non-permeated state ... and the capture member switches to a permeated state" as used in the claims of the '159 patent to be consistent with Cornice's proposed constructions. See Exh. B, Morehouse '159 Rebuttal at ¶¶ 21-24; Exh. A, Morehouse '159 Invalidity Report at ¶ 45.

IV.    **"AN ACTUATOR FOR SELECTIVELY POSITIONING THE TRANSDUCER OVER A PATH BETWEEN A FIRST POSITION AND A SECOND POSITION"**

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "an actuator for selectively positioning the transducer over a path between a first position and a second position with respect to the data storage medium"<br><br>['159 Patent, cl. 1.] | The phrase "an actuator for selectively positioning the transducer over a path between a first position and a second position with respect to the data storage medium" means "[a]n actuator for controllably positioning the transducer at any specific location between the first position and the second position. | The phrase "an actuator for selectively positioning the transducer over a path between a first position and a second position" means "[a]n actuator that performs the function of moving a transducer over a path between a first position and a second position." |

At issue is whether this limitation requires that the actuator can be positioned selectively at any specific location between the first and second position (as urged by Cornice), or whether the limitation merely requires that the actuator "moves" between the first and second position, regardless of – and not necessarily even aware of – its exact location (as urged by Seagate). As discussed in the technical background section, because the accused product utilizes DHL technology there is a significant portion of the path between the first and second position where the actuator cannot be positioned selectively at a particular location (*i.e.*, on the ramp, where there is no servo data from which the actuator's location can be determined). Therefore, Seagate seeks to broaden the limitation to merely require that the actuator is capable of movement across that path, regardless of its position and its inability to select that position. Seagate's attempt to broaden this limitation to ensnare the accused product should be rejected.

Cornice's proposed construction is consistent with the meaning that would be ascribed to the phrase by a person of skill in the art.  "Selective" means "carefully chosen or choosing," Exh. B-8, The Penguin Wordmaster Dictionary (1987) at 633, and "having the function or power of selecting; making a selection," Exh. B-8, The Random House Dictionary (1987).  It also means "chosen or choosing carefully," Exh. B-8, Oxford American Dictionary (1980) at 614.  Cornice's proposed construction is consistent with these definitions.

Seagate's proposed construction,         Redacted         [7] is "an actuator that performs the function of selectively moving a transducer over a path between a first position and a second position."  In other words, Seagate has replaced the specific claim requirement of "selectively positioning" with the more generic, *broader* term "moving."  Again, "to construe the claims in the manner suggested by [Seagate] would read an express limitation out of the claims.  This, we will not do because '[c]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.'"  *Texas Instruments Inc. v. U.S. Intern. Trade Com'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (citation omitted); *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1358 (Fed. Cir. 2000) (improper to interpret "uniform airflow . . . over substantially the entire plan surface area" to require only temporal uniformity, because to do so would render spatial limitation "meaningless").  Therefore, this term should be construed, as the claim language requires, to require the ability to control the *position* of the actuator at any point between the first position and the second position, not simply the ability to blindly "move" the actuator in one direction or the other as urged by Seagate.

Finally, one of ordinary skill in the art in the November 1988 timeframe would understand the phrase "an actuator for selectively positioning the transducer over a path between a first position and a second position" as used in the claims of the '159 patent to be consistent with Cornice's

---

[7]     Dr. Bogy

                         Redacted

proposed construction. <u>See</u> Exh. B, Morehouse '159 Rebuttal at ¶¶ 25-29; Exh. A, Morehouse '159

Invalidity Report at ¶ 45.

## **CONCLUSION**

For the foregoing reasons, the Court should adopt Cornice's proposed constructions for

the claim limitations of the '159 patent.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Julia Heaney (#3052)*
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jheaney@mnat.com
*Attorneys for Defendant and*
*Counterclaim Plaintiff Cornice, Inc.*

OF COUNSEL:

Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Original Filing Date: November 18, 2005

Redacted Filing Date: November 28, 2005

## CERTIFICATE OF SERVICE

I, Julia Heaney, hereby certify that on November 28, 2005, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> William J. Marsden, Jr., Esquire
> Fish & Richardson, P.C.

and that I caused copies to be served upon the following in the manner indicated:

### BY HAND

William J. Marsden, Jr., Esquire
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
Wilmington, DE 19801

### BY FEDERAL EXPRESS

Ruffin B. Cordell, Esquire
Fish & Richardson, P.C.
1425 K Street, NW, Suite 1100
Washington, DC 20005

*/s/ Julia Heaney*
Julia Heaney (#3052)
MORRIS, NICHOLS, ARSHT & TUNNELL
jheaney@mnat.com
*Attorneys for Defendant and*
*Counterclaim Plaintiff Cornice, Inc.*