IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEAGATE TECHNOLOGY LLC,

          Plaintiff,

    v.

CORNICE, INC.

          Defendant.

C.A. No. 04-418 (SLR)

REDACTED

**PLAINTIFF SEAGATE TECHNOLOGY LLC'S OPENING BRIEF REGARDING CONSTRUCTION OF CERTAIN DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 6,744,606 AND 5,452,159**

Date: November 18, 2005

FISH & RICHARDSON P.C.
Timothy Devlin (#4241)
919 N. Market Street, Suite 1100
Wilmington, DE  19899-1114
Tel: (302) 652-5070

Roger S. Borovoy
David M. Barkan
500 Arguello Street, Suite 500
Redwood City, CA 94063-1526
Tel: (650) 839-5070

Ruffin B. Cordell
Brian R. Nester
Timothy W. Riffe
Christian A. Chu
1425 K Street NW, Suite 1100
Washington, D.C.  20005
Tel: (202) 783-5070

Edmond R. Bannon
Lewis E. Hudnell, III
Citigroup Center
153 East 53rd Street, 52nd Floor
New York, NY 10022-4611
Tel: (212) 765-5070

Attorneys for Plaintiff
SEAGATE TECHNOLOGY LLC

**TABLE OF CONTENTS**

Page

I.      NATURE AND STAGE OF THE PROCEEDINGS ............................................1

II.     SUMMARY OF THE ARGUMENT ....................................................................1

III.    LEGAL STANDARDS OF CLAIM INTERPRETATION ................................2

IV.     BACKGROUND OF GENERAL DISC DRIVE
        TECHNOLOGY .....................................................................................................4

V.      The '606 Patent ......................................................................................................4

        A.     Technology Overview of the '606 Patent ......................................................4

        B.     Construction of Disputed Terms in U.S. Patent No.
               6,744,606 ("the '606 patent") ...................................................................9

               1.     "actuator" ......................................................................................9

               2.     "single arm portion" / "single arm support
                      portion" .........................................................................................9

                      a.     "single" means single, not multiple ................................10

               3.     "single arm portion" and "single arm *support*
                      portion" use different terms and have different
                      meaning .........................................................................................14

               4.     "step portion" .................................................................................15

VI.     The '159 Patent ....................................................................................................15

        A.     Technology Overview of the '159 Patent ...................................................15

        B.     Construction of Disputed Terms in U.S. Patent No.
               5,452,159 ("the '159 patent") ...................................................................18

               1.     "a magnetic field containing member" .........................................18

               2.     "the capture member is in a non-permeated state
                      . . . and the capture member switches to a
                      permeated state" ...........................................................................20

               3.     "to park" .........................................................................................21

               4.     "an actuator for selectively positioning the
                      transducer over a path between a first position
                      and a second position" .................................................................25

i

## <u>TABLE OF CONTENTS (cont'd)</u>

<u>Page</u>

VII.    CONCLUSION......................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

ACCO Brands, Inc. v. Micro Sec. Devices, Inc.
  346 F.3d 1075 (Fed. Cir. 2003)..................................................................... 12

Beachcombers v. Wildewood Creative Prods., Inc.
  31 F.3d 1154 (Fed. Cir. 1994)....................................................................... 20

C.R. Bard, Inc. v. U.S. Surgical Corp.
  388 F.3d 858 (Fed. Cir. 2004)......................................................................... 3

CCS Fitness, Inc. v. Brunswick Corp.
  288 F.3d 1359 (Fed. Cir. 2002)..................................................................... 19

Cybor Corp. v. FAS Tech, Inc.
  138 F.3d 1448 (Fed. Cir. 1998)....................................................................... 2

Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.
  257 F.3d 1364 (Fed. Cir. 2001)..................................................................... 19

E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.
  849 F.2d 1430 (Fed. Cir. 1988)..................................................................... 24

Ekchian v. Home Depot, Inc.
  104 F.3d 1299 (Fed. Cir. 1997)..................................................................... 24

Enercon GmbH v. International Trade Com'n
  151 F.3d 1376 (Fed.Cir.1998)....................................................................... 24

Free Motion Fitness, Inc. v. Cybex Intern., Inc.
  423 F.3d 1343 (Fed. Cir. 2005)............................................................... 10, 19

Innova/Pure Water, Inc. v. Safari Water Filtration Sys. Inc.
  381 F.3d 1111 (Fed. Cir. 2004)....................................................................... 2

Innovad, Inc. v. Microsoft Corp.
  260 F.3d 1326 (Fed. Cir. 2001)............................................................... 10, 13

Johns Hopkins Univ. v. Cellpro, Inc.
  152 F.3d 1342 (Fed. Cir. 1998)..................................................................... 12

Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.
  285 F.3d 1046 (Fed. Cir. 2002)..................................................................... 13

Johnson Worldwide Assocs., Inc. v. Zebco Corp.
  175 F.3d 985 (Fed. Cir. 1999).................................................................. 2, 24

Jones v. Hardy
  727 F.2d 1524 (Fed. Cir. 1984)..................................................................... 20

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Markman v. Westview Instruments, Inc.
    52 F.3d 967 (Fed. Cir. 1995)..................................................................... 2

Netword, LLC v. Centraal Corp.
    242 F.3d 1347 (Fed. Cir. 2001)................................................................ 21

Novo Nordisc of N. Am., Inc. v. Genentech, Inc.
    77 F.3d 1364 (Fed. Cir. 1996)................................................................ 13

Omega Eng'g, Inc, v. Raytek Corp.
    334 F.3d 1314 (Fed. Cir. 2003)................................................................. 3

Phillips v. AWH Corp.
    415 F.3d.1303 (Fed. Cir. 2005)............................................................. 2, 3

Renishaw PLC v. Marposs Societa' per Azioni
    158 F.3d 1243 (Fed. Cir. 1998)................................................................ 21

RF Del., Inc. v. Pac. Keystone Techs., Inc.
    326 F.3d 1255 (Fed. Cir. 2003)................................................................ 14

Southwall Techs., Inc. v. Cardinal IG, Co.
    54 F.3d 1570 (Fed. Cir. 1995)................................................................... 3

Teleflex, Inc. v. Ficosa N. Am. Corp.
    299 F.3d 1313 (Fed. Cir. 2002)................................................................. 3

Toro Co. v. White Consol. Indus., Inc.
    199 F.3d 1295 (Fed. Cir. 1999)................................................................ 21

Vitronics Corp. v. Conceptronic, Inc.
    90 F.3d 1576 (Fed. Cir. 1996)................................................................... 2

W.E. Hall Co., Inc. v. Atlanta Corrugating LLC
    370 F.3d 1343 (Fed. Cir. 2004)................................................................ 11

Wright Med. Tech., Inc. v. Osteonics Corp.
    122 F.3d 1440 (Fed. Cir. 1997)........................................................... 13, 15


**Other Authorities**

Compact Oxford English Dictionary (2005)............................................... 20, 25

Merriam-Webster Online Dict. (2005) ........................................................... 25

Oxford English Dictionary................................................................................ 10

The American Heritage Dictionary (2000) ..................................................... 20

iv

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>Page(s)</u>

<u>Webster's New World Dictionary</u> (1984)..........................................................................20

## I.    NATURE AND STAGE OF THE PROCEEDINGS

In this patent infringement case, Plaintiff Seagate Technology LLC ("Seagate") asserts seven patents against Defendant Cornice, Inc. ("Cornice"). Discovery is nearly complete, and the parties have exchanged expert reports. Pursuant to the Court's Scheduling Order (D.I. 36), Seagate files this brief regarding claim construction of U.S. Patent No. 6,744,606 ("the '606 patent," Ex. 1[1]) and U.S. Patent No. 5,452,159 ("the '159 patent," Ex. 2).

## II.    SUMMARY OF THE ARGUMENT

Cornice attempts to construe the '606 and '159 patents inconsistently with their claim terms, specification, and prosecution history striving to create non-infringement or invalidity contentions. There is only one claim construction dispute with respect to the '606 patent, which covers a dual-plane actuator having a single arm or single arm support portion, – the meaning of "single." Seagate construes single to mean one and only one, not multiple. At bottom, Cornice essentially construes single to allow for multiple arms or arm supports. Cornice takes this position for validity purposes. Cornice tries to mask the fact that it construes single to mean multiple by using nearly a paragraph of text to construe "single arm":

> only one arm support portion is an integral component of the actuator structure, even though the actuator can also set in motion <u>other arm supports,</u> in ways not covered by the claims, which serve other discs in a multiple-disc, <u>multiple</u>-arm drive

As detailed below, the plain meaning of single, as supported by the '606 patent specification and prosecution history make clear that single means only one, not multiple. Although the ITC's administrative law judge construed single to allow for multiple arms, the Commission reversed the judge's ultimate decision. Single arm cannot allow for multiple arm actuators.

The '159 patent relates to a magnetic latch that holds the actuator in place to prevent the head on the actuator from contacting and damaging the magnetic disc. After this suit was filed, Cornice was able to design around this patent, replacing the magnetic latch, with a mechanical

---

[1] Unless otherwise noted, Exhibits in this Brief refer to the co-filed Declaration of Timothy Devlin in Support of Plaintiff Seagate Technology LLC'S Opening Brief Regarding Construction Of Certain Disputed Claim Terms Of U.S. Patent Nos. 6,744,606 and 5,452,159

one. Regardless, Cornice requests that this Court construe a number of the '159 patent terms

narrowly, all contrived to manufacture ill-conceived non-infringement positions. Although

Cornice requests construction of many terms, its argument falls into two general attempts to

narrow the claim language to avoid infringement:

1. heads must be parked on the disc/landing zone and cannot be parked on a ramp;
   and

2. no magnetic flux can leak out of the latch

As detailed below, however, Cornice's attempt to import extraneous limitations into the

claims is unsupported by the intrinsic evidence.

## III.    LEGAL STANDARDS OF CLAIM INTERPRETATION

Courts conduct infringement analysis in two steps: first, the Court construes the asserted

claims, and then the Court compares the properly construed claims to the accused devices.

Markman v. Westview Instruments, Inc., 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), aff'd, 517

U.S. 370 (1996).  Claim interpretation is a question of law the Court must decide before

proceeding to its infringement or invalidity analysis.  Cybor Corp. v. FAS Tech, Inc., 138 F.3d

1448, 1456 (Fed. Cir. 1998) (en banc).

Claim terms are read in light of the entire intrinsic record, which includes the claim itself,

the specification, and the prosecution history of the patent.  Phillips v. AWH Corp., 415

F.3d.1303, 1313 (Fed. Cir. 2005) (en banc); see also Vitronics Corp. v. Conceptronic, Inc., 90

F.3d 1576. 1582 (Fed. Cir. 1996).  The starting point for claim construction is always the

language of the claims themselves.  Innova/Pure Water, Inc. v. Safari Water Filtration Sys. Inc.,

381 F.3d 1111, 1116 (Fed. Cir. 2004).  Words of the claims are examined in their entirety and in

the context of the surrounding language.  Vitronics, 90 F.3d at 1582.

There is a heavy presumption in favor of the ordinary meaning of claim language as

understood by one of skill in the art.  Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d

985, 989 (Fed. Cir. 1999).  The ordinary and customary meaning of a claim term may be

determined by reviewing a variety of sources, such as the claims themselves, dictionaries and

treatises, and the written description, the drawings, and the prosecution history.  Phillips, 415

F.3d at 1316-19. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313.

The presumption that a claim term carries its ordinary meaning is overcome only if "the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002).

The Court must also examine the prosecution history to determine whether the patentee has relinquished a potential claim construction during prosecution. Southwall Techs., Inc. v. Cardinal IG, Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995). For prosecution disclaimers to attach, the courts have required that "the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325 (Fed. Cir. 2003) (internal citations omitted). A disclaimer is "clear and unmistakable" if there is only one reasonable reason for the prosecution statement or amendment so that "it is not suitable to multiple interpretations." Id. at 1327-30.

While extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining 'the legally operative meaning of the claim language.'" C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004). Although extrinsic evidence may be used to assist in understanding the technology, it cannot vary or contradict the claim language, the specification or file history. Id. Moreover, "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents." Phillips, 415 F.3d at 1319 (quoting Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1578 (Fed.Cir.1995)).

## IV.    BACKGROUND OF GENERAL DISC DRIVE TECHNOLOGY

Seagate incorporates by reference the background of general disc drive technology set forth in Plaintiff Seagate Technology LLC's Technology Overview filed concurrently.

## V.    THE '606 PATENT

### A.    Technology Overview of the '606 Patent

The '606 patent relates to the field of disc drives, and more particularly to a disc drive component called an "actuator." Today, nearly every desktop computer and server contains one or more hard disc drives that serve as non-volatile, bulk storage media and as repositories for a user's documents, files and applications. From the outside, a disc drive looks like a sealed metal box (Fig. 1):





Fig. 1: Exterior of a Seagate hard-disc drive          Fig. 2: Interior of a hard-disc drive

Inside (Fig. 2), the conventional disc drive contains a number of components, including multiple discs and an actuator with multiple arms. [See Ex. 1 at 1:14-1:22.] The discs are coated with a magnetic media material to allow information storage and retrieval. [Id.] Conventionally and until recently, two, three, or more discs are placed on top of each other separated by flat ring spacers that create gaps between the discs and mounted onto a spindle through a hole in their center (Fig. 3). During operation of the drive, a special motor connected to the spindle rotates the discs at speeds of up to 15,000 revolutions per minute. [Id.]

4



Fig. 3: Side view of hard disc drive

The discs are mounted in such a way as to allow very small gaps between them, where the magnetic read/write head assembly can rapidly move back and forth over a disc. There is usually a magnetic read/write "head" that can either record information onto the disc or read information from it (Fig. 4). [Id. at 1:23-1:35.] The read/write heads are suspended over the surface of the disc by suspensions attached to the actuator (Fig. 4). [Id. at 1:26-1:32.]



Fig. 4: Side view of disc drive

The '606 patent explains that an actuator is a complex apparatus:

The actuator assembly used to move the heads from track to track has assumed many forms historically, with most disc drives of the current generation incorporating an actuator of the type referred to as a rotary voice coil actuator. A typical rotary voice coil actuator consists of a pivot shaft fixedly attached to the disc drive housing base member closely adjacent the outer diameter of the discs. The pivot shaft is mounted such that its central axis is normal to the plane of rotation of the discs. The actuator is mounted to the pivot shaft by a pivot

5

assembly, which may take the form of precision ball bearing assemblies within a bearing housing. The <u>actuator</u> supports a flat coil which is suspended in the magnetic field of an array of permanent magnets, which are fixedly mounted to the disc drive housing base member.

On the side of the actuator bearing housing opposite to the coil, the actuator assembly typically includes one or more vertically aligned, radially extending actuator head mounting <u>arms</u>, to which the head suspensions mentioned above are mounted. These <u>actuator arms</u> extend between the discs, where they support the head assemblies at their desired positions adjacent the disc surfaces.

[<u>Id.</u> at 1:37-57 (emphases added).]  As illustrated below, the actuator is the whole machinery that moves the read/write heads (Figs. 5 & 6):



Fig 5: Top view of disc drive



Fig 6: Side view of actuator assembly removed from disc drive

6

The actuator is a key part of the disc drive: its rotation moves and locates the read/write heads over the precise data tracks of the discs in a synchronized fashion (Fig. 4). [Ex. 1 at 1:36-1:47, 1:66-2:4.] Changing from track to track (where data is stored) and following a chosen data track using feedback control are operations that require active movement of the actuator. These operations must occur quickly and accurately to keep pace with the electronic transmission of information, and the speed and precision of the actuator are essential to the proper working of the disc drive. [Id. at 1:55-1:65.]

A "voice coil motor" system – operating based on the electromagnetic interaction of a metal wire coil carrying electric current in the end of the actuator and the strong permanent magnets above and below the coil – controls the movements and directions of the actuator with the necessary speed and accuracy. [Id. at 1:37-1:40.] When a current is fed to the coil, the metallic coil generates an electromagnetic field that causes the actuator to move in one direction or the other depending on whether the coil's field attracts or repels the fields of the permanent magnets. [Id. at 1:41-1:65.]

Disc drives using just a single disc only recently became technologically and commercially viable. Because of recent improvements in disc drive technology, a single disc can now store large amounts of data, which would have previously required multiple discs. [Ex. 1 at 2:16-2:23.] Moreover, disc drives are no longer employed in just personal computers or servers (i.e., enterprise applications) which demand high storage capacity. They are also now used in ever-smaller consumer products, such as set top boxes, video games, hand-held computers, and audio devices. [Id. at 2:44-2:55.]

Designing disc drives with only one disc and the reduced size required for some consumer products involved challenges not present in multi-disc applications of the past. Although the use of one disc – rather than multiple discs – can increase the efficiency of the actuator and reduce the required height of the disc drive, a single arm in the same plane as the coil (instead of multiple arms attached to the coil assembly) does not have a stiff e-block with

7

integrated arms and is susceptible to bending and vibration, leading to more errors and a higher chance of drive failure. [Id. at 2:23-2:44.] Moreover, as the disc drive housing gets smaller as demanded by the consumer electronics industry, the amount of space for the actuator decreases, although the space required for the conventional actuator assembly remains the same. [Id. at 2:55-2:61.] Unless these problems are addressed, the advantages of a single disc – such as in the use by diminutive consumer electronics, like mobile digital music playing devices – would remain elusive. [Id. at 2:45-2:54.]

The '606 patent teaches a solution that addresses the problems involved with a single arm actuator. Specifically, the '606 patent discloses a non-planar actuator where at least two parts lie in different planes. Step portion 305 is identified in Fig. 2 of the '606 patent, reproduced below (a reproduction of Figure 2 of the '606 patent) separating the planes formed by the arm portion 325 and coil support portion 335:



Fig. 2 of '606 patent

Not only is this multi-planar single-arm actuator stiffer than a planar single-arm actuator and therefore more shock resistant, it also solves height and alignment impediments for low-profile disc drives. Figure 3 of the '606 patent, reproduced below, illustrates the multi-planar aspect of the '606 patent as illustrated by the red and blue sections of the actuator in Figure 3. The height restriction of the housing (120) of the disc drive requires a minimal height for the actuator, but the proper function of the actuator requires elements like the pole pieces (350) and permanent magnets (340). As shown in Figure 3 of the '606 patent, if the entire actuator were planar (i.e., the highlighted blue plane portion was in the same plane as the red portion of the

actuator) throughout its length from the coil side (335) to the arm side (325), the arm would interfere with the disc (200), making the use of such a single-plane, single-arm actuator impractical for a small, low-height disc housing.



Fig. 3: Cross section view of the actuator in the '606 patent

However, as shown in Figure 3 above, the use of a step portion (305) allows the arm (325) to be on a different plane from the coil (335), leaving adequate room for the head to read/write the disc without touching the disc during operation.

### B.    Construction of Disputed Terms in U.S. Patent No. 6,744,606 ("the '606 patent")

#### 1.    "actuator"

Seagate and Cornice appear to agree on the construction of this claim term to mean "something that causes something else to be put into action or motion." In the context of the '606 patent, the actuator typically includes a voice coil motor, an actuator arm supporting a read/write head, and a bearing or pivot assembly about which the actuator rotates within the disc drive. [See, e.g., Ex. 1 at 1:36-50; 1:66-2:4; October 20, 2005 Depo. Tr. of James Morehouse, Ph.D. at 37:3-25 (Ex. 11).]

#### 2.    "single arm portion" / "single arm support portion"

Claims 1 and 17 recite a "single arm portion" and claim 11 recites a "single arm support portion." The term "single arm portion" means "only one, not multiple arms," and the term "single arm support portion" means an actuator with "only one, not multiple, arm support portions."

9

Cornice misconstrues these claim terms in two ways. First, Cornice construes "single" as multiple. Second, Cornice argues that different claim terms, "arm" and "arm support," have the same meaning; under Cornice's construct, "arm" and "arm support" both mean arm, reading the "support" term of claim 11 out.    [Defendant Cornice, Inc.'s List of Claim Terms For Construction (Ex. 3); August 22, 2005 Expert Report of Dr. James Morehouse Regarding Invalidity of U.S. Patent No. 6,744,606 (Ex. 4 at ¶¶ 36-40.), hereinafter August 22, 2005 Morehouse '606 Report.][2]

### a.    "single" means single, not multiple

Turning first to the text of the claims, the claim language mandates "An actuator for use in a disc drive, comprising:" a "single" arm or arm support. Because the term "single" does not have a technical meaning in the art, it therefore receives its general ordinary and accustomed meaning: "one only, not double or multiple." Oxford English Dictionary 1355 (1991) [Ex. 5.]  In other words, the term "single" arm or arm support requires "one only, not double or multiple" arms or arm support portions. See Innovad, Inc. v. Microsoft Corp., 260 F.3d 1326, 1333 (Fed. Cir. 2001) (holding that the term "single, bi-state switch," even when combined with the open transition term "comprising," precludes the use of multiple switches to perform the recited function: "Only a single switch activates the dialing function for a preprogrammed number."). Had the patentee intended single to allow multiple, one or more, he could have claimed "an" arm or arm support portion, as "an" is a term of art meaning one or more. See Free Motion Fitness, Inc. v. Cybex Intern., Inc., 423 F.3d 1343, 1350 (Fed. Cir. 2005).

The specification of the '606 patent does not depart from this ordinary meaning. The written description emphasizes that the invention taught an innovation that rendered the use of a "single arm" actuator feasible. [Ex. 1 at 2:15-2:67.]  In fact, the Detailed Description of the Invention section discloses solely actuator embodiments with a single actuator arm. [E.g., id. at

---

[2] In the August 22, 2005 Morehouse '606 Report, Cornice's expert opined that "arm portion" and "arm support portion" mean the same thing. During deposition, however, Cornice's expert admitted the terms claimed different structures. Dr. Morehouse testified that "arm portion" requires an actuator arm, and "arm support portion" invokes the portion of the actuator that supports the actuator arm.

3:59-3:62 ("The actuator 300 also has a single arm 325 which is configured to support a read/write head 310 by way of a load beam or flexure 320 at its distal end."); 5:1-5:8; 5:25-5:29.] In addition, when referring to embodiments with a "single arm" or "single arm support," the '606 patent clearly depicts the covered preferred embodiment as an actuator with "only one" arm or arm support. [E.g., Ex. 1 at 3:59-64 and 5:2-8.] Figure 2 underscores this point:



Figure 2 of the '606 patent

The specification, therefore, indicates that the claim terms "single arm" and "single arm support portion" should be read according to their plain meaning, and defined as limited only to one arm or arm support portion. See W.E. Hall Co., Inc. v. Atlanta Corrugating LLC, 370 F.3d 1343, 1350-51 (Fed. Cir. 2004) (holding that the claim term "single piece construction" did not include multiple pieces because the intrinsic evidence established no meaning other than the ordinary and accustomed meaning).

Also compelling is that the Patent Examiner defined single as only one arm:

> The following is an examiner's statement of reasons for allowance: the prior art does not show or reasonably teach/suggest to one of ordinary skill in the art to which said subject matter pertains to, to the combination of structure in an actuator assembly including a single [only one] arm which is either in a configuration of a) having a plane of the arm portion displaced from a plane defined by the coil support, or b) the plane of the arm portion is positioned a different distance from a base of the disc drive than that plane defined by the coil support.

[Ex. 6, (Feb. 20, 2004 Notice of Allowability (emphasis added, but brackets in original)).] The Examiner's reasons for allowance in this case make clear that both the patentee and the Examiner understood the claimed invention to require "only one" actuator arm, or arm support, as distinguished from multi-armed prior art actuators that the Examiner considered during

11

prosecution of the '606 patent.  See ACCO Brands, Inc. v. Micro Sec. Devices, Inc., 346 F.3d 1075, 1078-79 (Fed. Cir. 2003) (relying on an Examiner's reasons for allowance in interpreting a claim).

Despite the straight-forward ordinary meaning of the terms "single arm portion" and "single arm support portion" compelled by the intrinsic evidence and as understood by the U.S. Patent and Trademark Office, Cornice dresses up its construction as follows, but essentially asks this court to construe single as allowing for multiple: "only one arm support portion is an integral component of the actuator structure, even though the actuator can also set in motion other arm supports, in ways not covered by the claims, that serve other discs in a multiple-disc, multiple-arm drive." [Ex. 3; Ex. 4 at ¶¶ 36-40.]  Such a construction flies in the face of the intrinsic evidence and is erroneous for at least the following reasons.

First, Cornice's only basis for making the assertion that single means multiple rests on the specification's discussion that a drive can contain one or more discs, and this somehow means that the claimed "An actuator . . . comprising . . . a single arm" can include an actuator with more than a single arm or arm support.  See, e.g., Ex. 4 at ¶ 38.  While the passage Cornice relies upon does suggest that one or more discs may be employed, this passage in no way suggests that when the patentee claimed "An actuator . . . comprising . . . a single arm" he meant single to be a multi-armed actuator.  There is simply nothing in the specification that supports Cornice's argument that "single" should be construed to be multiple.  Indeed, instead of focusing on the number of discs, Cornice should consider the number of arms claimed and specifically disclosed by the '606 patent.  When referring to embodiments with a "single arm," the '606 patent clearly depicts the covered preferred embodiment as an actuator with "only one" arm.[3] [E.g., Ex. 1 at 3:59-3:64 and 5:2-5:8.]  Figure 2 underscores this point:

_____

[3] Although Cornice contends that one passage in the specification discusses an actuator with multiple discs and multiple arms, [Ex. 4 at ¶ 38], that passage is irrelevant where the claim language is clear and unequivocal that the actuator must have a "single arm."  Indeed, clear precedent requires that the construed claims must cover at least one embodiment, which in this case is Figure 2 and corresponding written description.  See Johns Hopkins Univ. v. Cellpro, Inc., 152 F.3d 1342, 1355 (Fed. Cir. 1998) ("A patent claim should be construed to encompass at least one disclosed embodiment in the written description portion of the patent



Figure 2 of the '606 patent

Cornice also puts forth that because of the transition term "comprising," the actuator can encompass other unclaimed components, including additional arms. [See, e.g., Ex. 4 at ¶ 38.] However, that reading would render the claim term "single" superfluous. See Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1444 (Fed. Cir. 1997) (rejecting claim construction that would make other terms in disputed claims mere "surplusage"). Although the transition term "comprising" permits additional components, such as the pivot shaft around which the actuator rotates, it cannot eliminate the express limitation "single" from the body of the claim. See Innovad, 260 F.3d at 1333 (holding that the term "single, bi-state switch," even when combined with the open transition term "comprising," precludes the use of multiple switches to perform the recited function: "Only a single switch activates the dialing function for a preprogrammed number.").

Lastly, and in addition to single meaning multiple construction, Cornice argues that this limitation requires an arm that is integral to the actuator. Of course, the claim no where says "integral." This is particularly true here where the PTO defined "single" to mean "only one."

---

specification."). But a claim does not need to cover every single disclosed embodiment, since a written description may contain disclosed but unclaimed subject matter. See Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc., 285 F.3d 1046, 1053-54 (Fed. Cir. 2002) (en banc) (discussing rule regarding capture of disclosed but unclaimed subject matter through the doctrine of equivalents). It is in fact well settled that a patentee may provide a broader disclosure while claiming only a particular disclosed embodiment. See Novo Nordisc of N. Am., Inc. v. Genentech, Inc., 77 F.3d 1364, 1369-70 (Fed. Cir. 1996) (construing claim as covering only one preferred embodiment despite other embodiments disclosed in the specification).

13

[Ex. 6 (Feb. 20, 2004 Notice of Allowability.] Still further, dependent claim 3 of the '606 patent

expressly claims the "integral" limitation that Cornice now seeks to import:

> 3. The actuator of claim 1, in which the coil support portion and the arm portion
> are integrally formed.

[Ex. 1 at 6:1-6:2] Importing the narrowing claim limitation of dependent claim 3 into broad

claim 1 is presumptively erroneous.   See RF Del., Inc. v. Pac. Keystone Techs., Inc., 326 F.3d

1255, 1262-64 (Fed. Cir. 2003) (holding that trial court committed reversible error by "reading

limitations of narrower or dependent claims of the [patent in suit] into a broader independent

claim").  Moreover, the patentee knew how to claim "integral" when desired, as in claim 3, and

the patentee specifically chose not to use the term "integral" in claim 1.

### 3.     "single arm portion" and "single arm _support_ portion" use different terms and have different meaning

Further, the limitation "single arm support portion" should be construed separately and

according to its ordinary meaning to mean an actuator with "only one, not multiple, arm support

portions."

Seagate's proposed construction is consistent with the plain and ordinary meaning of the

claim term "single arm support portion" and its usage in the '606 patent.  For example, in

describing a second contemplated embodiment of the invention, the inventor described the

actuator as having a "coil support portion" and a "single arm support portion" positioned at

different heights above the base.  [Ex. 1 at 5:22-28.]  In further describing this embodiment, the

inventor explained that a separate "arm portion," not the "single arm support portion" may be

configured to support a head suspension assembly.  [Id. at 5:22-34.]  Both the claims and the

written description clearly show that the "single arm portion" and "single arm support portion"

are distinct claim limitations; the "single arm portion" supporting a head suspension assembly,

and the "single arm support portion" supporting the single arm portion.

Cornice argues that the different claim terms, "arm" and "arm support," should be

construed to have the same meaning.  Under Cornice's construct, "arm" and "arm support" both

mean "arm."  Adoption of Cornice's proposed construction, however, would render the

14

limitation "support" in claim 11 meaningless, and such a construct is never appropriate.  See

Wright, 122 F.3d at 1444 (rejecting claim construction that would make other terms in disputed

claims mere "surplusage").

      **4.**     **"step portion"**

This claim term should be construed consistent with its ordinary and understood meaning

to be the "part of the actuator that distances the coil support portion and the arm portion."  This

definition is consistent with the specification that shows in Figure 2 the exemplary step portion

305, which is part of the actuator that distances the coil support portion 335 and the arm portion

325.  [See, e.g., Ex. 1 at Fig. 2; 3:65-67.]  Cornice appears to generally agree with the definition

proposed by Seagate, but adds the undue restriction that the step portion must position the arm

support and coil support portions "in distinct planes."  [Ex. 4 at ¶ 41.]

An inspection of claim 4 of the '606 patent, which introduces the "step portion"

limitation, reveals that there is nothing in the claim language that restricts the coil support and

arm portions to be positioned in distinct planes.  Indeed, all that claim 4 requires is that the step

portion lie between the coil support portion and arm portion, thereby separating the two portions

by some distance.  [See, e.g., Ex. 1, Fig. 2.]  Dr. Morehouse offers no reasons why the coil

support and arm portions must be in distinct planes, and nothing in the claims, specification, or

prosecution history limits the claim in such a manner.

**VI.**    **THE '159 PATENT**

    **A.**    **Technology Overview of the '159 Patent**

The '159 patent discloses a magnetic parking device for disc drives.  As shown in

exemplary Figure 4 below from the '159 patent, the device magnetically captures a magnetically

permeable "capture member" (shown as tab 100) on the actuator of the disc drive to retain or

position the actuator and its head in a particular position.  [Ex. 2 at 1:55-63.]



Exemplary parking device

FIG. —4

[Ex. 2, Fig. 4.]

The parking device is intended to minimize head "slap." In conventional disc drives, the head "flies" over the surface of the disc, riding on the stream of air created by the rotation of the disc. If the disc drive is subject to shock, the head could contact the disc, which if hard enough is referred to as disc "slap." When the head slaps the disc, data stored on the disc may be lost and the drive may no longer function. Disc drives in portable computers or consumer devices are particularly subject to shock because of transportation, which increases the likelihood of damage due to head slap. [Id. at 2:1-15.]

Previously, the industry implemented various types of parking, or latching, devices to avoid disc slap in the non-operating state. One example used in the prior art incorporated a latch that physically engaged the actuator arm using a spring to bias the pivoting arm into a parked position. This prior art design used a spring to park the arm and an electromagnet to release the latch during operation of the drive. [Id. at 2:15-23.] The problem with this design, however, is

that use of an electromagnet to release the latch requires the continual use of electrical power to maintain the latch in the unlatched position, which in battery-driven products, such as consumer electronic products, is highly undesirable. [Id. at 2:23-27.] In addition, the electromagnet generates undesirable heat.

Other latch designs used in the prior art include air activated parking devices (which rely on air flow generated by the rotating disc(s) to release the spring-biased latch arm), and solenoids. [Id. at 2:28-41.] Both designs have a number of undesirable attributes such as air flow interference, requisite large disc surface area, increased power consumption, and residual magnetism, in the case of the solenoid, which must be overcome by the spring-biasing force. [Id. at 2:37-56.] These prior art latches also present design, manufacturing and operational problems relating to balancing the pivoting latch arm required for proper functioning.

The '159 patent provides a parking device that magnetically captures, or parks, the actuator. The use of a magnetic field provided by a permanent magnet to park the head or actuator in a disc drive, as opposed to a mechanical latch, eliminates the need for an electromagnetic or air activated device to release the mechanical latch during operation of the disc drive. [Id. at 4:54-58.] The magnetic parking device of the '159 patent includes a magnetic unit or latch assembly. The '159 patent teaches that the dimensions and location of the latch assembly is selected so that a magnetically permeable capture member enters an air gap formed in the latch assembly when the actuator arm is rotated so that the head is located in a particular position. [Id. at 7:11-21; 1:55-63.]

As shown in Figures 6a and 6b of the '159 patent, reproduced below, the interaction of the magnetic unit/latch assembly and capture member 100 creates a magnetic switch. Figure 6a shows the capture member 100 at a first location when capture member 100 is outside of air gap 22. [Id. at 8:11-14.] As the capture member enters air gap 22, the capture member 100 becomes part of the magnetic circuit. [Id. at 8:14-21; Fig. 6b.] As the '159 patent further discloses, the magnetic force attracting capture member 100 towards magnet 14 results in a strong holding force which retains capture member 100 in air gap 22. [Id. at 8:26-33.]

17



FIG. -6A



FIG. -6B

The holding force is determined by the geometric proportions of the various elements, which include the magnetic circuit (including the latch, magnet, and capture member) and strength of the magnetic field in the air gap.  The actuator arm is released from the magnetic latch by an appropriate opposing force generated by the actuator.  Accordingly, the magnetic parking device disclosed in the '159 patent eliminates the need for a spring to bias a mechanical latch and an electromagnetic unit which continually draws current during operation of the disc drive to release a mechanical latch mechanism.  [Id. at 9:1-9.]

**B.      Construction of Disputed Terms in U.S. Patent No. 5,452,159 ("the '159 patent")**

       1.      **"a magnetic field containing member"**

Seagate construes "a magnetic field containing member" as a member that contains a magnetic field.  Cornice seeks to narrow "a magnetic field containing member" limitation by requiring that it (1) must be only a single piece and (2) must eliminate all fringing of the magnetic flux.

This claim term should be construed consistent with its ordinary meaning to mean a member that contains a magnetic field.  The claim language does not require that the "a magnetic field containing member" must be a "single structure," i.e., only a single component, as Cornice asserts.  [(Ex. 7 at ¶ 45), August 22, 2005 Expert Report of Dr. James Morehouse Regarding Invalidity of U.S. Patent No. 5,452,159.]  As an initial matter, the article "a" precedes "magnetic field containing member," not the phrase "single, unitary," and as discussed above, the Federal

18

Circuit construes "a" as one or more. <u>Free Motion Fitness, Inc. v. Cybex Intern., Inc.</u>, 423 F.3d 1343, 1350 (Fed. Cir. 2005). To suit its purposes, Cornice construed "single" as meaning multiple for the '606 patent, and here construes "a," which is a term of art meaning one or more, as meaning single. Cornice tests credibility.

Further, the Federal Circuit further holds that the ordinary meaning of "member" is not limited to a single piece or component, but instead can be a multi-component design. <u>CCS Fitness, Inc. v. Brunswick Corp.</u>, 288 F.3d 1359, 1367 (Fed. Cir. 2002) (finding that claim term "member" is not limited to a structure comprising a single component only).

Neither the specification nor the prosecution history overcomes the heavy presumption that "member" carries its ordinary meaning. <u>See</u> <u>CCS Fitness</u>, 288 F.3d at 1367. The specification never requires that a certain number of components make up the magnetic field containing member, and nowhere mentions the number of components. In addition, the drawings merely illustrate several particular embodiments of the claimed magnetic field containing member, and the inventor nowhere discussed let alone assigned any importance to the number of components comprising "a magnetic field containing member." <u>See id.</u>

Cornice further asserts that the magnetic field containing member must "prevent magnetic fringing," and "contain the magnetic field." [Ex. 7 at ¶ 45.] This argument makes little sense. First, nothing in the claim language itself could possibly lead one to conclude that the member must "eliminate magnetic fringing." Claim 1 merely requires that the magnetic parking means includes as one of its components "a magnetic field containing member," not "a magnetic field containing member <u>that eliminates all fringing (flux leakage)</u>."

Cornice's construction also improperly reads out the preferred embodiment. A claim construction that does not include an exemplary embodiment is rarely correct. <u>See</u> <u>Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.</u>, 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("Patent claim construction that excludes preferred embodiment is rarely, if ever, correct because it is unlikely that inventor would define invention in a way that excluded preferred embodiment, or that persons of skill in the field would read specification in such a way.").

19

The specification of the '159 patent specifically describes embodiments of the invention, which allow for fringing of the magnetic flux outside of the magnetic field containing member. [See, e.g., Ex. 2 at 7:32-41; Figs. 1A, 1B.]

Indeed, a claim depending from claim 1 that expressly limits claim 1 based on fringing, does not even require *elimination* of fringing. Dependent claim 2 simply requires that the "magnetic flux are substantially contained in the magnetic field containing member." [Ex. 2, claim 2 (emphasis added).] Under the doctrine of claim differentiation, Cornice's claim construction renders claim 2 entirely redundant – a presumptively erroneous and unreasonable claim construction. Beachcombers v. Wildewood Creative Prods., Inc., 31 F.3d 1154, 1162 (Fed. Cir. 1994); see also Jones v. Hardy, 727 F.2d 1524, 1528 (Fed. Cir. 1984).

### 2. "the capture member is in a non-permeated state . . . and the capture member switches to a permeated state"

The dispute over this claim limitation involves the meaning of the term "switches." Seagate asserts that "switches" should be construed consistent with its ordinary meaning as "changes," such as the "capture member is in a non-permeated state . . . and the capture member 'changes' to a permeated state." [See, e.g., Ex. 8, April 11, 2005 D. Bogy Depo. Tr. at 218:24-219:11 ("changing from one state to the other state"); Compact Oxford English Dictionary (2005) ("change in position"); The American Heritage Dictionary (2000) ("to make or undergo a shift or an exchange"); Webster's New World Dictionary (1984) ("a shift or transference").]

Cornice proposes narrowing the ordinary meaning of "switches" by requiring a "rapid change (like a switch) of the capture member from a non-permeated to a permeated state." [Ex. 7 at ¶ 45 (emphasis added).]

This construction is contrary to the plain and ordinary meaning of the claim language. First, as set forth above, the claim language nowhere requires a "rapid" switch. Cornice's sole basis for asserting that the magnetically permeable capture member must rapidly switch from a non-permeated state to a permeated state is reliance upon the definitions of an electric "switch," apparently of the type used to turn on and off household lights (excluding dimmer switches that would contradict Cornice's forced position). [Id.] But dictionary definitions for electric

20

components have no relevance here as the '159 patent addresses magnetic circuits, not electric circuits. <u>See, e.g.</u>, <u>Netword, LLC v. Centraal Corp.</u>, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose."); <u>Toro Co. v. White Consol. Indus., Inc.</u>, 199 F.3d 1295, 1299 (Fed. Cir. 1999) ("[W]ords of ordinary usage must nonetheless be construed in the context of the patent documents. Thus the court must determine how a person of experience in the field of this invention would, upon reading the patent documents, understand the words used to define the invention."); <u>Renishaw PLC v. Marposs Societa' per Azioni</u>, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("[A] common meaning, such as one expressed in a relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty.... [T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.").

Not only is Cornice's reliance on such tenuous definitions improper, but its attempt to read such limitations into the claim are nowhere supported by the specification or prosecution history. If the patentee sought to limit the claim to a rapid switch, he would have claimed "rapidly switches," not just "switches."

### 3.    "to park"

Seagate construes park as "fix the position of the actuator which supports the head(s)." Cornice, on the other hand, seeks to further limit park to require that the head(s) be placed directly on a "landing zone," i.e., on a portion of a surface of the disc.

The Court should construe park pursuant to its understood meaning in this art as "fix the position of the actuator which supports the head(s)." Seagate's expert, Dr. Bogy, will testify that this is the ordinary meaning of park. [<u>See, e.g.</u>, Ex. 2 at 1:55-63.]

The '159 specification expressly adopts the industry's common usage of the word park by defining it as follows:

> parking the heads also means parking the actuator by fixing the position of the actuator which supports the heads.

21

[Ex. 2 at 1:55-63.] Prior to this litigation, this definition is precisely how Cornice defined

"parks." In International Patent Application (PCT/US02/28987) (Ex. 9) describing the Storage

Elements at issue in this Investigation, Cornice illustrated and described how its actuator arm is

in the parked position when the head is unloaded from the disc and the heads are parked, for

example, on a ramp:

> Referring to Figures 3 and 6, attention is now directed to a highly advantageous actuator
> arm position sensor. <u>These figures illustrate actuator arm 344 in the parked position.</u>
> Consistent with terminology of the art, this position may be referred to as having the
> "heads unloaded." Conversely, the term having the "heads loaded" may refer to the
> position when the actuator arm or head/transducer arrangement is positioned for reading
> magnetic media 340.

[Ex. 9 at ¶ 108.]



Figure 3

FIGURE 6

In apparent disregard of its own description of its products, Cornice now attempts to

narrow the definition by manufacturing a distinction between "contact start stop" and "dynamic

head loading" disc drive technologies. According to Cornice, contact start stop disc drive

technology generally involves positioning the head over a non-data region of the disc to protect

the head(s), whereas dynamic head loading systems move the head(s) onto a ramp structure at

some height above the disc and usually at an outer diameter of the disc. Nowhere does the '159

patent mention or distinguish between dynamic head loading or contact start stop let alone limit the invention to one of these technologies.

Moreover, prior to the present litigation, Cornice's expert, Dr. Morehouse, understood that disc drives that employed dynamic head loading technology also "parked" the read/write transducer off the disc, i.e., on a ramp. Indeed, in at least U.S. Patent Nos. 5,379,171; 5,579,189; 5,592,349; 5,760,986; and 5,835,303, Dr. Morehouse explained and illustrated how the read/write head(s) are "parked" in a position off the disc and on a load ramp. Figure 3A and its accompanying description from U.S. Patent No. 5,379,171 exemplify Dr. Morehouse's understanding and acceptance of the ordinary meaning of "park" prior to his employment by Cornice in the present litigation:



**FIG. 3A**

In Fig. 3A, load beam 14-1 and its associated read/write transducer is illustrated in a **parked position off the disk** and in its innermost position of travel. In the hard disk drive 1 structure **dynamic head loading is utilized** and therefore when the disk drive is powered down and, i.e., not rotating, load beams 14 and 14-1 and 14-2 (not shown) one (sic) moved to the position illustrated where lift tab 17 is in a **parked position** on cam assembly 18 to prevent the read/write transducer heads from interfering with or damaging the disk surface.

[U.S. Patent No. 5,379,171 (Exhibit 10) at Fig. 3A; col. 52, lines 40-52 (emphasis added).]

Cornice next seeks to unduly limit the claim term based on the following passage from the '159 patent:

> As used in this patent, the terms "park" and "parking" refer to the maintaining the position of the head(s) over a selected portion (usually a "landing zone" at the inside or outside diameter) of the disc (or discs).

[Ex. 2 at 1:56-60.] Cornice ignores the next sentence which provides a broader use of park as:

> parking the heads also means parking the actuator by fixing the position of the actuator for which supports the heads.

[Ex. 2 at 1:60-63.] When a patent uses a term in a variety of ways, and where a broader use of the term subsumes a narrower use of the term, the broader use generally controls. See, e.g., Johnson Worldwide, 175 F.3d at 991 ("varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition"); see also Enercon GmbH v. International Trade Com'n, 151 F.3d 1376, 1385 (Fed.Cir.1998) (refusing to limit a term used "interchangeably" in the written description to only one of the uses of the term).

There is nothing in the claim language, the remaining parts of the specification, or the prosecution history to suggest that the broader use, and commonly understood meaning of the term set forth by the patentee should not control. Indeed, it is this broader use that is consistent with the claim language of claim 1. Claim 1 simply requires that the magnetic parking means "park the transducer," and not necessarily over a selected portion of the disc as suggested by Cornice. Cornice apparently seeks to improperly read limitations from the specification into the claim based on the preferred embodiment's description of parking in a "landing zone" of the disc. [See, e.g., Ex. 2 at Figs. 3 and 4.] In doing so, Cornice ignores controlling law on the issue:

> The Federal Circuit has consistently stressed, however, that references in the patent specification to a preferred embodiment are not themselves claim limitations, and it is erroneous to read a claim as limited to the preferred embodiments or to the specific examples in the specification. Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1303 (Fed. Cir. 1997). Thus, care should be taken not to incorporate extraneous limitations from the specification – especially details of the preferred embodiment – into the claims.

E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433-34 (Fed. Cir. 1988). Moreover, claim 5 unambiguously requires that the transducer is "over the landing zone" when the actuator is in the parked position. This clearly shows that the inventor recognized that

24

the term "park" had a much broader meaning and that meaning is embodied in asserted claims 1-4, which, as set forth above, simply require that the magnetic parking means "park the transducer," and not necessarily in a certain position with respect to the disc.

None of the asserted claims require the actuator to park the transducer "over a selected portion of the disc," but claim more broadly that the actuator simply "park the transducer."[4]  As discussed above, prior to this litigation, Cornice and its expert Dr. Morehouse recognized the ordinary meaning of the term "park" when they filed for patent protection on the Storage Element disc drives at issue in this case, and the disc drive products developed by Dr. Morehouse's former company.  At that time, Cornice and its expert agreed that "park" covered more than just parking the transducer over a selected portion of the disc.  Cornice's litigation-induced arguments are without merit.

### 4.    "an actuator for selectively positioning the transducer over a path between a first position and a second position"

Seagate construes the phrase "an actuator for selectively positioning the transducer over a path between a first position and a second position" to require an actuator that performs the function of selectively moving a transducer over a path between a first position and a second position.  Cornice, again seeks to limit claim 1 to parking the head over the disc, to avoid infringement, by arguing that this limitation requires that that there be <u>servo data</u> on the disc at <u>every</u> instance along the path of the first and second positions.  [Ex. 7 at ¶ 45.]

The Court should adopt Seagate's construction that the "an actuator for selectively positioning the transducer over a path between a first position and a second position" simply means that there be an actuator that performs the function of selectively moving the head over a path between a first position and a second position.  Seagate's construction is the plain and ordinary meaning, and is the only construction supported by the specification.  With respect to ordinary meaning, the claim expressly states that the actuator performs the function of selectively

---

[4] Claim 1 also requires that the magnetic parking means "captur[e]" the capture member to "park the transducer."  Cornice has not offered a construction for this term.  Seagate maintains that it should be given its plain and ordinary meaning which is to "latch/hold."  [<u>See, e.g.,</u> <u>Compact Oxford English Dict.</u> (2005); <u>Merriam-Webster Online Dict.</u> (2005).]

positioning, and makes no mention of servo code.  Further, the specification repeatedly refers to

the actuator as performing the function of selectively positioning, not the servo code.  [See, e.g.,

Ex. 2 at 3:48-50; 5:23-40; 5:52-55.]

Cornice, on the other hand, attempts to introduce restrictions into the claim language that

find no support in the claim language, specification, or prosecution history.  Contrary to the plain

language, Dr. Morehouse asserts the phrase should be construed to mean that the actuator can

"controllably position the transducer at any specific location between the first position and the

second position." [Ex. 7 at ¶ 45.]  Cornice's construction requires, so Cornice's story goes, that

there be servo data at every instance along the path between the first and second positions and

because there is no servo data off the disc, i.e., on a ramp, there is no ability to selectively

position on the ramp.  [Id.]  Thus, Cornice would have the Court rewrite the claim as follows:

> "servo data ~~actuator~~ for selectively positioning the transducer ~~over a path~~ at every
> specific location between a first position on the disc and a second position on the disc."

There is nothing in the claims, specification, or prosecution history that requires servo

data per Cornice's construction, or that such information be used to selectively position at every

instance along a path as opposed to just "between a first position and a second position."  Indeed,

servo code is no where mentioned in the '159 patent or its prosecution history, let alone in the

claims.  Cornice simply seeks an insupportable narrow construction to avoid infringement.

The claim language merely requires that an actuator be able to move the transducer

between a first position and a second position, and by doing so, will move the transducer "over a

path" between the two positions.

## VII.    CONCLUSION

For the foregoing reasons, Seagate respectfully requests that the Court adopt its proposed

constructions of the disputed claim terms as set forth herein and collected in the addendum to

this brief.

26

Dated:  November 18, 2005          FISH & RICHARDSON P.C.


By:  /s/ Timothy Devlin
     Timothy Devlin (#4241)
     919 N. Market Street, Suite 1100
     Wilmington, DE  19899-1114

     Roger S. Borovoy
     David M. Barkan
     D. Austin Horowitz
     Desa L. Burton
     500 Arguello Street
     Redwood City, CA 94063-1526

     Brian R. Nester
     Timothy W. Riffe
     Christian A. Chu
     1425 K Street NW, Suite 1100
     Washington, D.C.  20005

     Edmond Bannon
     Lewis E. Hudnell, III
     Citigroup Center – 52nd Floor
     153 East 53rd Street
     New York, NY 10022-4611

     Attorneys for Plaintiff
     SEAGATE TECHNOLOGY LLC