IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SEAGATE TECHNOLOGY LLC, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 04-418 (SLR) |
| ) | |
| v. ) | **REDACTED VERSION** |
| ) | |
| CORNICE, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT CORNICE, INC.'S OPENING CLAIM CONSTRUCTION
BRIEF FOR U.S. PATENT NO. 5,600,506**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
  *Attorneys for Defendant and Counterclaim
  Plaintiff Cornice, Inc.*

OF COUNSEL:
Vernon Winters
Steven Carlson
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153
(212) 310-8000

Original Filing Date:  November 18, 2005

Redacted Filing Date:  November 28, 2005

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| TABLE OF CITATIONS | | IV |
| NATURE AND STAGE OF PROCEEDINGS | | 1 |
| STATEMENT OF FACTS | | 2 |
| I. TECHNICAL BACKGROUND | | 2 |
|     A. Disk Drives Require a Servo System to Read and Write Data | | 2 |
|     B. Gray Codes and Servo Bursts | | 4 |
| II. THE '506 PATENT | | 9 |
| ARGUMENT | | 11 |
| I. CLAIM CONSTRUCTION | | 11 |
|     A. "Quadrature Servo pattern," in the context of the '506 patent, means a quadrature burst pattern in which one of the four bursts must be centered in data track "0," as well as each and every data track thereafter. | | 12 |
|         1. The claimed system and method of the '506 patent requires that the "quadrature servo pattern" include a burst centered in every data track | | 12 |
|             a. Summary of the Invention | | 15 |
|             b. Detailed Description of the Invention | | 16 |
|             c. Brief Description of the Drawings | | 19 |
|     B. "A fixed reference point in said gray scale band on said disk" | | 21 |
|         1. The "fixed referenced point" must be the same for each position determination. | | 22 |
|         2. The "fixed reference point" must be located on the disk. | | 23 |
|     C. The "0.75*Z" limitation means that "the quadrature servo pattern repeats precisely three times for every four data tracks across all Z data tracks within each sector" and the "1.5*Z" limitation means that "within a gray scale band, there are precisely three consecutively addressed gray scale areas for every two data tracks across all Z data tracks within each sector." | | 24 |
|     D. The "Position Generator" limitation is subject to means-plus-function Construction | | 25 |

Table of Contents (cont'd.)                                                                                          iii.

|   |   |   |   |
|---|---|---|---|
| | E. | Claim 22 is Invalid Under 35 U.S.C. § 112, Paragraphs 1 and 2 in View of the "Coact" Limitation | 30 |
| | F. | Dependent Claims | 32 |
| | | 1. "Zones" means the specific methodology described in the '506 patent in Figs. 5 and 9 for demodulating the servo burst signals in order to generate a position signal. | 32 |
| | | 2. "Zone detector" means the series of logic elements that determine the applicable zone based on the gray code and servo bursts. | 34 |
| CONCLUSION | | | 35 |

TABLE OF CITATIONS

Page(s)

Cases

*Alloc, Inc. v. International Trade Commission*,
    342 F.3d 1361 (Fed. Cir. 2003)............................................................................ 20

*Al-Site Corp. v. VSI Intern., Inc.*,
    174 F.3d 1308, 1318 (Fed. Cir. 1999).................................................................... 26

*Apex, Inc. v. Raritan Computer, Inc.*,
    325 F.3d 1364 (Fed. Cir. 2003)............................................................................ 26

*Apple Computer v. Articulate Sys. v. Dragon Sys.*,
    234 F.3d 14, 25 (Fed. Cir. 2000)............................................................................ 22

*Aquatex Indus. v. Techniche Solutions*,
    419 F.3d 1374 (Fed. Cir. 2005)...................................................................... 13, 14

*Autogiro Co. of America v. United States*,
    384 F.2d 391 (Ct. Cl. 1967).................................................................................. 13

*Cultor Corp. v. A.E. Staley Manufacturing Co.*,
    224 F.3d 1328 (Fed. Cir. 2000)............................................................................ 21

*Digital Systems, Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002)............................................................................ 13

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir. 1996).............................................................................. 22

*Gaus v. Conair Corp.*,
    363 F.3d 1284, 1290 (Fed. Cir. 2004).................................................................. 19

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
    91 F.3d 1580 (Fed. Cir. 1996).............................................................................. 28

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241, 1253-54 (Fed. Cir. 2005) ............................................................ 29

*KCJ Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000)............................................................................ 23

*Laitram Corp. v. NEC Corp.*,
    62 F.3d 1388 (Fed. Cir. 1995).............................................................................. 28

Table of Contents (cont'd.)                                                                                          v.

*Lantech v. Keip Mach. Co.,*
    32 F.3d 542 (1994)......................................................................................................... 22

*Lighting World, Inc. v. Birchwood Lighting, Inc.,*
    382 F.3d 1354 (Fed. Cir. 2004)..................................................................................... 27

*Liquid Dynamics Corp. v. Vaughan Co., Inc.,*
    355 F.3d 1361 (Fed. Cir. 2004)..................................................................................... 32

*Merck & Co. v. Teva Pharms USA, Inc.,*
    395 F.3d 1364 (Fed. Cir. 2005)................................................................................ 23, 33

*Micro Chem., Inc. v. Great Plains Chem. Co.,*
    194 F.3d 1250 (Fed. Cir. 1999)..................................................................................... 29

*Network Commerce, Inc. v. Microsoft Corp.,*
    422 F.3d 1353 (Fed. Cir. 2005)..................................................................................... 14

*Nystrom v. Trex,*
    374 F.3d 1105 (Fed. Cir. 2003)................................................................................ 14, 15

*Nystrom v. Trex, Inc.,*
    424 F.3d 1136 (Fed. Cir. 2005)..................................................................................... 14

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)............................................................................... passim

*Power Mosfet Techs., L.L.C. v. Siemens AG,*
    378 F.3d 1396 (Fed. Cir. 2004)..................................................................................... 23

*Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001)................................................................................ 20, 35

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002)................................................................................ 33, 34

*Toro Co. v. Deere & Co.,*
    355 F.3d 1313 (Fed. Cir. 2004 ...................................................................................... 28

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)....................................................................................... 13

*Wang Labs, Inc. v. America Online, Inc.,*
    197 F.3d 1377 (Fed. Cir. 1999)................................................................................ 19, 20

*Watts v. XL Systems, Inc.,*
    232 F.3d 877 (Fed. Cir. 2001)................................................................................. 19, 20

Table of Contents (cont'd.)                                                                                      vi.

*WMS Gaming, Inc. v. Intern. Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999) ............................................................................. 29


Other Authorities

§ 112, ¶ 6 ............................................................................................................... 26, 28

§ 112, ¶ 6 ................................................................................................................... 26

35 U.S.C. § 112 ......................................................................................................... 30

35 U.S.C. § 112, ¶6 ................................................................................................... 26

## NATURE AND STAGE OF PROCEEDINGS

Seagate Technology L.L.C. ("Seagate") brought this action against Cornice, Inc. ("Cornice") for infringement of seven patents on June 22, 2004. In accordance with the Scheduling Order, the parties are filing a Joint Claim Construction Statement on the seven patents-in-suit today. Cornice is submitting this Opening Claim Construction Brief in support of its constructions of certain claim terms in U.S. Patent No. 5,600,506 ("the '506 patent"), and separate claim construction briefs addressing each of the other six patents-in-suit.

Cornice is also filing today three motions for summary judgment pertaining to the '506 patent. The first is for summary judgment of non-infringement of both the '506 patent and U.S. Patent No. 6,146,754 ("the '754 Patent") based on the fact that the accused products are licensed pursuant to a cross-license agreement between Seagate and TDK Corporation (whose subsidiary manufactures Cornice's accused hard drives). The granting of this motion would alleviate the need for the Court to resolve the parties' claim construction disputes set forth below, and would dispose of these two patents in suit in their entirety. The second is for summary judgment of non-infringement of the '506 patent based on certain undisputed facts concerning the accused products that preclude infringement of all claims, properly construed as discussed herein. The third is for partial summary judgment regarding invalidity of the '506 patent, and seeks summary judgment of invalidity of claim 22, as well as judgment with respect to Seagate's allegations concerning the so-called "secondary considerations" pertaining to nonobviousness.

## SUMMARY OF ARGUMENT

U.S. Patent No. 5,600,506 is titled "Apparatus and Method for Determining the Position of a Transducer Relative to a Disk Surface in a Disk Drive System." Using terminology common in the field, the '506 patent concerns the "servo system" of a hard disk drive which precisely controls the positioning of the transducer or head using specialized magnetic patterns permanently recorded on the disk during the manufacturing process. In particular, the '506 patent pertains to a very specific

2.

relationship between these special patterns and the user data on the disk that represents, *e.g.*, files or computer programs.

Seagate's infringement allegations concerning the '506 patent depend upon abstract, purported "ordinary meaning" claim constructions divorced from the context of the claim language itself as well as the patent specification. However, the Federal Circuit's recent *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) requires adoption of Cornice's proposed constructions, which account for this critical context, particularly with regard to the term "quadrature servo pattern." This term appears in every claim and provides the basis for Cornice's Motion for Summary Judgment of Noninfringement of the '506 patent.[1]

## STATEMENT OF FACTS

### I.   TECHNICAL BACKGROUND

The '506 patent presumes some baseline knowledge concerning hard disk drives in general and servo systems in particular. The following is intended to assist the Court in its understanding of the '506 patent in connection with its consideration of the claim construction disputes. It is based on the Technical Background section of the Expert Report of Ronald W. Dennison Regarding Invalidity of U.S. Patent 5,600,506, included as Exh. A.[2]

### A.   Disk Drives Require a Servo System to Read and Write Data

Hard disk drives store data in the form of magnetic "bits" contained in a series of very closely spaced concentric tracks on the surface of the disk. To read the bits, a magnetic "head" or

---

[1]   Cornice's motion for summary judgment of noninfringement of the '506 patent also seeks partial summary judgment on independent grounds with respect to the 3.0 Gigabyte product only,
REDACTED

[2]   The '506 patent is included as exhibit 1 to the Dennison Report. Exhibit 2 to the Dennison Report includes a slide presentation on servo technology for the '506 patent presented during the ITC proceedings. For ease of reference, exhibits to the report cited herein shall be designated "Exh. A-x," where x identifies the specific exhibit to the report.

transducer is used to detect the magnetic orientation of the bits along a track. To write the data, the head is used to change the magnetic orientation in some predetermined manner. The disk rotates at several thousand revolutions per minute ("RPM"), and the head, attached to an arm that pivots to reach all the tracks on the disk, "flies" above the disk surface as it is reading or writing. On a typical disk, there are tens of thousands of data tracks—each a small fraction of the width of a human hair. Precise positioning of the head is required both to record data in known locations on the disk surface, and later to read it. This is the role of the "servo system," which has been used in hard disk drives for this purpose for decades.

Two of the most important tasks performed by the servo system are "seeking" and "track following." *See, e.g.,* '506 patent; 2:25-36 (discussing the alleged advantages of the '506 patent in connection with seek and track follow operations). Seeking is the disk drive's ability to move the head to a desired track, whereas track following is the ability to keep the head aligned with the desired track during a read or write operation. To accomplish these tasks, specialized magnetic patterns are permanently placed on the disk, intelligible only when read by the head and processed using specialized hardware and software. The patterns are included in a series of "wedges," referred to as "servo wedges," evenly spaced around the disk, as shown schematically below.

4.



A disk may contain 100 or more servo wedges. User data is stored in the areas between the servo wedges. As the disk rotates beneath the head, the head periodically reads the specialized servo data in the servo wedges. This arrangement, in which servo wedges are interspersed with user data, is referred to as "sector servo" or "embedded servo" and was in common use well prior to the '506 patent.

    B.  <u>**Gray Codes and Servo Bursts**</u>

The specialized magnetic patterns within each servo wedge include two kinds of positioning information: "Gray code" (named after the inventor), and "servo bursts." The diagram below illustrates the general arrangement of Gray codes and servo bursts within a servo wedge, as was known and in use prior to the '506 patent:



As the head flies over the servo wedge in this example, it will first encounter the area designated "Gray Code 3." Gray code is a binary code that uniquely identifies a concentric track on the disk. These tracks are referred to as "servo tracks" because they are used to provide coarse "track" information to the servo system identifying the radial position of the head relative to the disk. For example, Gray Code area/servo track 0 is near the outer diameter of the disk, and each adjacent servo track is designated with a Gray Code that increases by a single integer towards the inner diameter of the disk as shown above. Also as shown above, it can be seen that the Gray Code areas correspond to the data tracks. In other words, Gray Code area /servo track 0 also identifies data track 0, Gray Code/servo track 1 identifies data track 1, and so on. Thus, by reading the Gray Code information encoded in the servo wedges, the servo system is able to determine the servo track, and in this example the data track, over which the head is positioned.

However, it was recognized long ago that more precise positioning information was necessary in order to ensure the head remained centered over the desired track. The servo bursts are used to provide this information to the servo system. Servo bursts are generally rectangular-shaped magnetized areas within a servo wedge, arranged in a specific, repeating pattern across the tracks. Like the Gray code, servo bursts consist of magnetized bits. Unlike Gray code, however, which consists of

6.

data used to uniquely identify a track, servo bursts provide position information via the strength or amplitude of the magnetic signal detected by the head as it flies over the burst (or portion thereof). In particular, the head width is sized to be approximately the same as the width of the burst, as shown above. Thus, when the head is centered over the burst, it will read a signal of maximum amplitude from that burst. Conversely, when the head does not pass over any portion of the burst, it will read a signal of minimum amplitude from that burst.

These types of burst patterns are known as "amplitude patterns." An example of a two burst or "A/B" amplitude pattern is shown below. The difference in the magnitudes of the signals read due to the two bursts (*i.e.*, A-B), is used by the servo system to determine where within the track the head is located, *i.e.*, the location of the head relative to the center of the track. Note that the bursts are placed end-to-end, *i.e.*, with no overlap.



In the above figure, three different possible positions of the head are shown relative to the A/B bursts and the center of the middle track (labeled "Data track 2"). As can be seen, the A and B bursts straddle the center of the track. Each of the three positions of the head will result in a different value for the A-B "position signal" shown in the graph at the bottom. In position 1, the head is centered over the