7.

data track, and thus will read equal magnitudes from burst A and burst B as it passes over each burst. This results in an A-B position signal of 0, also referred to as a "null." In position 2, the head is shifted 1/2 track to the right, and thus will read a maximum amplitude from burst A and minimum from burst B. This corresponds with the peak in the A-B signal, informing the servo system that the head is shifted over by 1/2 track to the right. In position 3, the head is shifted slightly less than 1/2 track to the left, resulting in an A-B signal that is near its maximum negative value as shown. In each case, the head will read the same Gray code value, which indicates to the servo system the approximate track location of the head. By analyzing the position signal, however, the servo system can more accurately determine where within the track the head is located.

In the 1980s, a second set of bursts (designated C/D) was added to the A/B pattern to achieve even greater positioning accuracy. The resulting pattern came to be known as a "quadrature" amplitude pattern because the A/B pair of bursts and C/D pair of bursts overlap with each other by 1/2 burst. The bursts and position signals appear as follows:

## "Quadrature" Servo Pattern



Note that, as in the two burst pattern, the A/B bursts do not overlap with each other, and the C/D bursts do not overlap with each other.  Because four bursts provide more information about where within the servo track the head is located, the quadrature amplitude pattern allows for more accurate positioning of the head as compared to a two-burst pattern.  As shown above, the use of four bursts provides for two different position signals, A-B and C-D.  These signals are then combined with the Gray code read from the disk and processed using logic to derive the precise position of the head and determine if any correction to the position is necessary.   This process is referred to as "demodulation," and requires specialized hardware and software to arrive at a numerical representation of position from the Gray code and burst information read from the disk.  The software (commonly referred to as "servo logic") is fairly complex, and relies on a variety of mathematics and logic.

The foregoing describes and depicts servo systems known in the art at the time of the '506 patent and described in the "Background of the Invention" section of the patent ('506 patent; col. 1:26-62).  For convenience, the Gray code and burst pattern of such prior art servo systems is repeated below:

| Data Track 0 | Data Track 1 | Data Track 2 | Data Track 3 | Data Track 4 | Data Track 5 | |
|---|---|---|---|---|---|---|
| A | | A | | A | | A |
| | B | | B | | B | |
| C | | C | | C | | |
| | D | | D | | D | |
| | | | | | | |
| Gray Code 0 | Gray Code 1 | Gray Code 2 | Gray Code 3 | Gray Code 4 | Gray Code 5 | |

An important feature of such known patterns was that the bursts and data tracks are aligned in a specific manner.  In particular, there is a transition from one burst to another, *i.e.*, a null, in the center of every data track.  In the example above, a null between bursts "C" and "D" is centered in

each data track, resulting in a C-D position signal of 0 when the head is centered in the data track. The presence of a null centered in each track is an advantage because it facilitates track following along the center of the track, the optimal location for the head. As Seagate's expert said, the presence of a null centered in each track also results in a burst being centered in each track due to the nature of a quadrature pattern, as shown above, where the A and B bursts are centered in alternating tracks. *See* Exh. B, Messner Tr. at 223-24.

## II.     THE '506 PATENT

Like the prior art, the '506 patent uses a quadrature amplitude pattern (referred to as a "servo band") and Gray codes (referred to as a "gray scale band") together with position demodulation logic to derive the position of the head relative to the disk surface for seek and track follow operations.

The only purported difference Seagate alleges between the prior art and the '506 patent is what Seagate's expert terms       REDACTED       *E.g.,* Messner Report, Exh. 6B at pp. 3-4.[3] This difference is illustrated by the following figure, which includes an admitted prior art quadrature pattern (the data tracks shown and labeled in blue), consistent with the discussion and drawings above. Also shown is the pattern of all claims of the '506 patent (data tracks shown in red) where the Gray code areas or servo tracks no longer correspond to the data tracks. This red pattern is the one illustrated in Fig. 8 of the '506 patent. In particular, rather than one Gray code area per data track, there are 1.5 Gray Code areas per data track. Similarly, the data tracks are 1.5 times as wide as the servo bursts. In other words, the width of the data tracks has been increased by 1/2 relative to the entire servo pattern. Stated another way, the width of the servo pattern has been "shrunk" by 1/3 relative to the width of the data tracks.

---

[3]     This description is intended solely as background information to assist the Court in connection with its resolution of claim construction disputes. Cornice does not agree that this is a difference between the prior art and the '506 patent for purposes of its invalidity defenses. Indeed, the REDACTED     Seagate refers to is actually taught by an IBM publication that predates the filing of the '506 patent by more than 5 years. *See* Exh. A-19, titled "Track Pitch Independent Servo Pattern.".



To use the terminology of the '506 patent, which uses the variable "Z" to refer to the number of data tracks on the disk, there are 1.5 * Z Gray code areas on the disk of the '506 patent as opposed to Z Gray code areas on the disk of the prior art pattern. Thus, in the above figure there are 6 Gray code areas and 6 blue data tracks representing the prior art arrangement, as opposed to 4 red data tracks representing the arrangement of the '506 patent. Similarly, in the prior art pattern the complete A/B/C/D burst pattern repeats every other data track, *i.e.*, there are 1/2 as many patterns as data tracks, or 0.5 * Z repetitions of the pattern., as shown above  In contrast, in the '506 patent there are 3/4 as many patterns as data tracks, or 0.75 * Z repetitions of the pattern due to the expansion of the data tracks relative to the bursts and gray code areas, as shown above.  These precise numerical relationships – 1.5 * Z and 0.75 * Z --are included in all claims of the '506 patent.

An important feature of the pattern of the '506 Patent that derives from the expansion of the data track width by precisely 1/2 relative to the burst width is that it provides for a burst centered in each data track as in prior art patterns.  As shown above, a different one of the four bursts is centered in each red data track, beginning with burst D in data track 0.  This attribute of the '506 patent is not happenstance.  As discussed above, this alignment of the bursts to the data tracks has the advantage of placing a "null" at the center of each data track to optimize track following and seek operations.  In fact, the '506 patent expressly acknowledges that track following at data track centers is a feature of *all*

embodiments. '506 Patent, col. 19:42-46 ("For all embodiments, the position signal for the transducer may be subtracted from the data track center position value, which indicate[s] the center of the addressed data track, to obtain an error signal that can be used in a track following operation.").

## ARGUMENT

For a discussion of the legal standards for claim construction, please refer to Cornice's Opening Claim Construction Brief for U.S. Patent No. 6,146,754.

### I.     CLAIM CONSTRUCTION

REDACTED

For ease of reference, claims 1 and 22 are set forth below in their entirety with the terms in dispute highlighted:

1. A system for measuring the distance of a transducer from a reference point on a disk in a sector servo disk drive system comprising:

a disk surface divided into sectors where each sector comprises Z data tracks, a servo band and a gray scale band recorded across all said Z data tracks, said servo band comprising a **quadrature servo pattern** repeated **0.75\*Z** times, said gray scale band comprises **1.5\*Z** consecutively addressed gray scale areas; and

a **position generator** for generating from said quadrature servo pattern and an address of a gray scale area read by a transducer in said disk drive system a signal indicating a position of said transducer relative to **a fixed reference point** in said gray scale band on said disk.

22. A magnetic disk for use in a sector servo disk drive system, said disk having a plurality of sectors located on a surface of said magnetic disk,

each sector having Z data tracks located between an inner diameter and an outer diameter on said magnetic disk,

a servo band recorded across all said Z data tracks and a gray scale band recorded across all said Z data tracks, said servo band comprising a **quadrature servo pattern** repeated **0.75\*Z times**, said gray scale band comprises **1.5\*Z** consecutively addressed gray scale areas

where said servo band and said gray scale band **coact** to define radial positions on said magnetic disk from **a fixed reference point** in said gray scale band on the surface of said disk.

The disputed terms occurring in the independent claims are addressed first, followed by terms appearing only in dependent claims.

**A. "Quadrature Servo pattern," in the context of the '506 patent, means a quadrature burst pattern in which one of the four bursts must be centered in data track "0," as well as <u>each and every data track thereafter.</u>**

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "Quadrature Servo Pattern" | A quadrature burst pattern in which one of the four bursts must be centered in data track "0," as well as each and every data track thereafter. | A servo pattern with four bursts, where a transition between one pair of alternating bursts occurs at the center of one of second pair of alternating bursts. |

The term "quadrature servo pattern" appears in all claims and should be construed as a quadrature burst pattern in which one of the four bursts must be centered in data track "0" as well as each and every data track thereafter. The term appears in the limitation specifying a "servo band comprising a quadrature servo pattern repeated 0.75*Z times." The dispute between the parties is based on Seagate's construction that the term be construed to cover *any* alignment between the bursts and data tracks, which contradicts the entirety of the patent's specification.

**1. The claimed system and method of the '506 patent requires that the "quadrature servo pattern" include <u>a burst centered in every data track</u>**

As an initial matter the Federal Circuit's recent *en banc* decision in *Phillips v. AWH Corp.,* 415 F.3d 1303, 1321 (Fed. Cir. 2005) makes clear that the "ordinary meaning" of "quadrature servo pattern" must be ascertained with reference to the specification of the '506 patent. "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1321 (Fed. Cir. 2005). As discussed below, the specification of the '506 patent makes abundantly clear that the purported invention "requires" that the quadrature bursts be centered in the data tracks, consistent with prior art patterns. '506 patent, cols. 3:11-

14, 12:27-30.  There is no room to argue that this feature is merely a "preferred embodiment" of the '506 patent.

Significantly, *Phillips* laid to rest the *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) approach to claim construction that Seagate necessarily relies on to justify its refusal to give weight to this intrinsic evidence, *i.e.*, that the patent's specification plays a secondary role and can be relied upon to deviate from a so-called "ordinary meaning" of a claim term obtained from extrinsic sources only if there is an explicit definition or "words or expressions of manifest exclusion or restriction." *Phillips,* 415 F.3d at 1320.  Moreover, Seagate has offered nothing but the extrinsic opinion of its expert in support of its construction, and fails to even discuss the intrinsic record.

Indeed, the *en banc Phillips* court revitalized long-standing precedent that the specification "is the single best guide to the meaning of a disputed term" (*quoting Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)) and provides "a concordance for the claims." (*citing Autogiro Co. of America v. United States,* 384 F.2d 391, 397-98 (Ct. Cl. 1967)).  415 F.3d at 1315. In so doing, it squarely rejected the notion that "any definition of claim language in the specification be express," noting that such a rule contradicts its precedent that the specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* at 1320-21 (*quoting Vitronics,* 90 F.3d at 1582).  Reliance on abstract definitions and failure to account for the context of the patent risks improper expansion of the claims beyond the invented subject matter. *Id.* at 1321.  Thus, it is necessary to "fully appreciate how the specification implicitly limits" an abstract definition to avoid a claim construction that is "unduly expansive." *Id.*

Three Federal Circuit cases decided since the *Phillips en banc* decision illustrate its impact on construction of "quadrature servo pattern" in this case.  In *Aquatex Indus. v. Techniche Solutions,* 419 F.3d 1374 (Fed. Cir. 2005), the claim term in dispute was "fiberfill batting material." Although the specification of the patent did not indicate that the type of fiberfill used was important to the invention, and at least one technical dictionary gave two examples of natural materials, the court limited

the term to synthetic fibers, noting, *inter alia*, that all of the examples in the specification were synthetic. *Aquatex,* 419 F.3d at 1381-82.

Similarly, in *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005), which concerned a patent for a method and system for purchasing electronic information over a computer network, the court construed the disputed term "download component." In so doing, the court relied heavily on the description of the term "download file" in the patent specification, specifically the portion describing that the download file "extracts [from the download file] the executable boot program and component list." *Network Commerce,* 422 F.3d at 1360 (alteration in original). This function of the "download file" was repeated throughout the patent. *Id.* at 1360 n.9. Thus, the court concluded that "the specification indicates that [the download file] must contain at least the boot program" and construed the term "download component" as incorporating this limitation even though it was not recited in the claims. *Id.* at 1360.

Finally, perhaps the best example of the impact of *Phillips* on cases where disputed claim terms are implicitly defined in the specification is *Nystrom v. Trex, Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) ("*Nystrom II*"). The patent at issue pertained to outdoor decks, and specifically "a board for use in constructing a flooring surface for exterior use." *Id.* at 1140. In the original *Nystrom* opinion, which predated the *en banc Phillips* decision, the panel reversed the grant of summary judgment of noninfringement based on the district court's construction of "board" as limited to a "piece of elongated construction material made from wood cut from a log." *Nystrom v. Trex,* 374 F.3d 1105, 1110-1114 (Fed. Cir. 2003) ("*Nystrom I*"). The initial decision followed the *Texas Digital* dictionary-based, "ordinary meaning" approach and rejected this claim construction, citing as support dictionary definitions that did not limit the term "board" to wood, other claims that were expressly limited to wood boards (*i.e.*, claim differentiation), and the absence of a clear disclaimer of subject matter in the specification. *Id.*

In the revised opinion, the same three-judge panel reversed itself in view of the *en banc* decision in *Phillips*, noting that "it is improper to read the term ["board"] to encompass a broader definition [than the ordinary and customary meaning revealed by the context of the intrinsic record]

simply because it may be found in a dictionary, treatise, or other extrinsic source." *Nystrom II*, 424 F.3d at 1145. Thus, although acknowledging the difference in the use of claim language in different claims, and the lack of a "clear disavowal of claim scope," the court found that the context provided by the intrinsic record of the written description and prosecution history mandated the claim construction adopted by the district court. *Id.* at 1145-46.

In the case of the '506 patent, the evidence pointing to Cornice's proposed construction of "quadrature burst pattern" is even more compelling than in these cases, because the specification states in no uncertain terms that the "positioning measuring system <u>requires</u> that one of the four bursts <u>must</u> be centered in data track 0." '506 Patent, cols. 4:12-15; col. 12:27-30 (emphasis added). This requirement of the purported invention of the '506 patent is expressed throughout the written description of the patent as follows.

<b>a.     <u>Summary of the Invention</u></b>

The "Summary of the Invention" specifies this requirement as follows

> "[e]ach data track <u>will have</u> a boundary defined by two servo bursts located at 1/6*W, 1/2*W, and 5/6*W positions in a data track where W is the width of the data track. These boundaries are used to increase the accuracy of the position value determined for the transducer."

'506 Patent, col. 2:16-20 (emphasis added). Significantly, this language is not permissive, and dictates that a burst be centered on each data track. In particular, this arrangement of servo bursts and data tracks is illustrated in Figs. 3 and 8. For example, consider data track "0" in Fig. 3: