

As can be seen, there are two C/D burst boundaries at 1/6*W and 5/6*W, which place the D burst in the center of data track 0, and an A/B burst boundary centered in data track 0 which represents the null.[4]  Thus, the Summary of the Invention of the '506 patent defines the specific relationship between the quadrature burst pattern and the data tracks upon which Cornice's claim construction is based.  It also clearly explains the reason for this precise alignment:  "to increase the accuracy of the position value determined for the transducer."

### b.    Detailed Description of the Invention

Similarly, the "Detailed Description of the Invention" discloses two "families" of embodiments of the claimed quadrature servo pattern, each including eight different burst patterns for a total of 16 different patterns, and each and every one including a burst centered in each data track.  The first family of embodiments is described beginning at col. 3, line 22 – col. 11, line 61, with reference to

---

[4]                                                                REDACTED

                                                          Exh. B, Messner Tr. at 222-23.

Figs. 3-6, and the second family beginning at col. 11, line 62 – col. 19, line 65, with reference to Figs. 7-10.  Significantly, the identical paragraph is used to describe the eight possible patterns for each family:

> The positioning measuring system is sensitive to the quadrature servo pattern used.  The positioning measuring system <u>requires</u> that one of the four servo bursts of the quadrature servo pattern used <u>must</u> be centered in data track zero.  Thus for the first set of quadrature servo patterns, quadrature servo pattern I has servo burst A centered in track 0, quadrature servo pattern II has servo burst B centered in track 0, quadrature servo pattern III has servo burst C centered in track 0 and quadrature servo pattern IV has servo burst D centered in track 0. In like manner, for the second set of quadrature servo patterns, quadrature servo pattern V has servo burst A centered in track 0, quadrature servo pattern VI has servo burst B centered in track 0, quadrature servo pattern VII has servo burst C centered in track 0 and quadrature servo pattern VIII has servo burst D centered in track 0.

'506 Patent, col. 4:11-31; col. 12:26-46 (emphasis added).   Consistent with this requirement, all 16 different quadrature servo patterns illustrated in the patent figures depict a burst centered on track 0 (highlighted in red):





FIG. 4A          FIG. 4B



FIG. 7A          FIG. 7B



U.S. Patent     Feb. 4, 1997     Sheet 8 of 11     5,600,506

### c.     Brief Description of the Drawings

Significantly, the two families of embodiments, each including eight different patterns as shown above (patterns I- VIII in each of Figs. 4(a-b) and 7(a-b), are not described as merely exemplary or preferred embodiments, but characterized as "the invention":

> FIGS. 4(a-b) is an illustration of <u>the eight quadrature servo patterns of the invention</u> and the relationship between track addresses, gray scale addresses and four zones.

> '506 Patent, col. 2:56-58 (emphasis added)

> FIGS. [7(a-b)][5] is an illustration of <u>the eight quadrature servo patterns of the invention</u> and the relationship between track addresses, gray scale addresses and eight zones.

> '506 Patent, col. 3:7-9 (emphasis added)

These characterizations of the patterns as "the invention" are especially compelling intrinsic evidence supporting Cornice's construction. *E.g.*, *Gaus v. Conair Corp.*, 363 F.3d 1284, 1290 (Fed. Cir. 2004) (use of 'according to the invention' in the specification "demonstrates that the invention itself requires" feature not explicitly recited in claim); *Watts v. XL Systems, Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2001) ("the specification actually limits the invention to structures that utilize misaligned taper angles, stating that '[t]he present invention utilizes [the varying taper angle] feature.'"); *Wang Labs, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("when the 'preferred embodiment' is described as the invention itself, the claims are not entitled to a broader scope than that embodiment.").

The inventors thus took pains to emphasize in substantial detail to those of skill in the art how each of the patterns satisfies the explicit requirement that a burst be centered in data track 0, stressing that the invention, *i.e.*, the "position measuring system" of the '506 patent "is sensitive to the quadrature pattern used." In view of this unambiguous disclosure, there is no room to argue that centering the bursts in the data tracks is merely a preferred embodiment of the '506 patent. Nowhere in the entirety of the

---

[5]     The descriptions of Figs. 7(a-b) and 8 in the Brief Description of the Drawings appear to have been switched.

'506 patent is there any suggestion that this relationship is merely optional – all 16 embodiments disclosed in the patent meet this requirement which, as the Summary of the Invention makes clear, permits the servo system "to increase the accuracy of the position value determined for the transducer." '506 patent; col. 2:19-20.

While *Phillips* reinforced the critical role of the specification in construing claim terms, prior Federal Circuit precedent similarly supports Cornice's construction given the clear mandate of the specification. For example, in *Wang Labs, Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999), the dispute was whether the term "frame" encompassed "bit-mapped" display systems as well as "character-based" systems. The court held the term limited to the latter because it was the "only system that is described and enabled" in the specification, and that even though the specification referred to bit-mapped protocols, such references "did not describe them as included in the applicant's invention, and that the specification would not be so understood by a person skilled in the field of the invention." *Id.* at 1382. Similarly, in *Watts v. XL Sys., Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000), the disputed limitation "sealingly connected" was construed to be limited to the one method described in the specification to achieve the sealing connection because the description of the invention in the specification limited the invention to structures that utilized the one method.

In *Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337 (Fed. Cir. 2001), the dispute was whether the claimed dual lumen catheter was limited to coaxial lumens. The court ruled in the affirmative, pointing to disclosure throughout the patent of only the coaxial structure, and statements in the specification indicating that all embodiments of the invention utilized this structure. *Id.* at 1342-44. Finally, in *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361 (Fed. Cir. 2003), the issue was whether the claimed invention for an interlocking floor was limited to floor panels where there is play in the joints between the panels. Relying on references to play throughout the specification, and the "inescapable conclusion that the claimed invention must include play in every embodiment," the court determined that the claims were properly limited to panels with play. *Id.* at 1370. The court rejected plaintiff's argument that it was impermissibly limiting the invention to the only

disclosed embodiment: "[W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims." *Id.* (*citing Scimed*, 242 F.3d at 1345).

Similarly, the applicants' directive that the invention "requires" that a burst "must" be centered in data track 0, coupled with the description of this feature in the Summary of the Invention as well as throughout the patent and in all 16 embodiments "of the invention," leads to the inescapable conclusion that one of skill in the art would understand that the claims were limited to systems that include this relationship. The description in the specification cannot be characterized as merely preferred or exemplary; it is explicit direction that is tantamount to a disclaimer of servo systems that do not meet the required alignment of servo bursts and data tracks. *E.g.*, *Cultor Corp. v. A.E. Staley Manufacturing Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) (statements in specification limiting claim claimed process to specific catalyst "effected a disclaimer of the other prior art acids.")

REDACTED

Exh. A at 41-44.

Seagate's construction should thus be rejected because it ignores the clear disclosure of the specification that restricts the type of quadrature pattern useable in the claimed system and method.

**B.     "A fixed reference point in said gray scale band on said disk"**

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "A fixed reference point in said gray scale band on said disk" (Claim 1);<br><br>"A fixed reference point in said gray scale band on the surface of said disk" (Claim 22);<br><br>"Fixed reference point located in said gray scale band" (Claim 33) | A reference point located on the disk that is the same for every position calculation | Any point of the gray scale area provides a fixed reference point. |

The term "fixed reference point" in the asserted claims should be construed as a **reference point located on the surface of the disk that is the same for every position calculation.** The dispute between the parties on this term is that Seagate contends that the "fixed reference point" can vary with each position calculation, and need not be on the disk. Seagate's proposed construction should be rejected because it contradicts the plain language of the claims and the patent's specification.

### 1. The "fixed referenced point" must be the same for each position determination.

The "fixed reference point" must be fixed for each position determination, as dictated by the unambiguous words of the claim itself:

> "a position generator for generating. . .a signal indicating a position of said transducer relative to a **fixed reference poin**t in said gray scale band on said disk."

Seagate's claim construction contradicts this claim requirement in asserting that "any point in the gray scale area provides a fixed reference point," suggesting that the reference point need not be the same for each position determination. This construction reads out the requirement of each and every claim that the reference point be "fixed" in the claimed system and method. However, it is well-established that every limitation in a claim is significant, and thus cannot be rendered mere surplusage. *Apple Computer v. Articulate Sys. v. Dragon Sys.*, 234 F.3d 14, 25 (Fed. Cir. 2000) ("[We] . . .simply cannot read the qualifier 'help' out of the definition of 'help' access window."); *Lantech v. Keip Mach. Co.,* 32 F.3d 542, 546 (1994) ("All limitations in a claim must be considered meaningful."). Seagate could have omitted the term "fixed" from the limitation "fixed reference point," but having included it, Seagate must "live with the language it chose." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582-83 (Fed. Cir. 1996).

Under Seagate's proposed construction, the term "fixed" has no meaning. In this regard, every point in the gray scale band on the surface of the disk necessarily is a "reference point" and has a "fixed" *location*, because the Gray code areas are permanently recorded on the disk in fixed locations. Thus, the only interpretation that gives meaning to the term "fixed" as a modifier to "reference point" in

the claims is to construe it as referring to the *specific* reference point on the surface of the disk used to provide the location from which the position of the transducer is measured for each position determination. In other words, "fixed" in the context of the '506 patent claims must be construed to mean that the signal generated by the "position generator" that indicates the transducer's position always provides the position relative to the *same* reference point in the gray scale band. *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1358 (Fed. Cir. 2000) (improper to interpret "uniform airflow . . . over substantially the entire plan surface area" to require only temporal uniformity, because to do so would render spatial limitation "meaningless"); *see also Merck & Co. v. Teva Pharms USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (interpretations of claims rendering claim terms superfluous is generally disfavored).

The specification of the '506 patent confirms this construction. In particular, the Summary of the Invention provides that the position of the transducer is measured "from the center of gray scale area addressed zero." '506 patent, col. 2:12-15; *see also* col. 6:20-23 (position signal "is indicative of the transducer with reference to the center of gray scale area 0."); col. 14:31-33 (same). There is no discussion in the '506 patent of the "reference point" varying from one position measurement to the next, which would be within the scope of Seagate's broad construction.

## 2.  The "fixed reference point" must be located on the disk

It is also unclear from Seagate's construction of "fixed reference point" ("any point of the gray scale area") whether the reference point must be on the disk. However, that the "fixed reference point" must be located on the disk surface follows from the clear language of the claims themselves. *See Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms"). In particular, all of the claims require that the gray scale band be recorded on the disk, and that the "fixed reference point" be in the gray scale band. Therefore, the fixed reference point must necessarily be on the disk. Second, claims 1 and 33 state explicitly (in the preamble) that the

24.

"fixed reference point" must be on a disk. Although language in a preamble is not necessarily a limitation, it can be used to give context to the claim and in these instances reinforces the limitations appearing in the body of the claim. *See, e.g., Metabolite*, 370 F.3d at 1362 ("A preamble may provide context for claim construction….").

REDACTED

Exh. A at 39-40.

C.    The "0.75*Z" limitation means that "the quadrature servo pattern repeats <u>precisely</u> three times for every four data tracks across all Z data tracks within each sector" and the "1.5*Z" limitation means that "within a gray scale band, there are <u>precisely</u> three consecutively addressed gray scale areas for every two data tracks across all Z data tracks within each sector."

| Claim Language | Cornice's Construction | Seagate's Construction |
|---|---|---|
| "A Quadrature Servo Pattern Repeated 0.75*Z times" '506 Patent, cls. **1, 22**.<br><br>"0.75*Z   Quadrature   Servo Patterns" '506 Patent, cl. **33** | "0.75*Z" means the quadrature servo pattern repeats precisely three times for every four data tracks across all Z data tracks within each sector | "0.75*Z" means the quadrature pattern repeats three times for every four data tracks across all Z data tracks within each sector |
| "1.5*Z Consecutively Addressed Gray Scale Areas" '506 Patent, all claims. | "1.5*Z" means within a gray scale band, there are precisely three consecutively addressed gray scale areas for every two data tracks across all Z data tracks within each sector | "1.5*Z" means within a gray scale band, there are three consecutively addressed gray scale areas for every two data tracks across all Z data tracks within each sector |

The parties are largely in agreement as to the construction of this limitation, and differ only over Cornice's use of the modifier "precisely" to describe the numerical relationship between the quadrature burst patterns and gray scale areas to the data tracks. This term is necessary and helpful to the trier of fact to clarify that, in each case, the claims cover one and only one precise numerical relationship, and do not recite a range or approximate value, matters that Seagate does not appear to dispute. Similarly, the specification discusses only this single relationship. The reason the '506 patent is so specific is that, as discussed above, expanding the data tracks relative to the servo pattern by exactly 1/2

permits the pattern to maintain a burst centered in each track, and thus a null centered in each track, as in the prior art. Deviating even slightly from this precise relationship will cause the bursts to no longer be centered in the data tracks.

The "precisely" modifier proposed by Cornice conveys this unique attribute of the '506 patent, and helps to clarify that the patent contemplates not even the slightest deviation from the numerical relationships of the claims. Without the "precisely" modifier, the proposed construction is potentially ambiguous on this point and could be understood as not limited to the specific numerical relationships.

D.    The "Position Generator" limitation is subject to means-plus-function Construction

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "a position generator for generating from said quadrature servo pattern and an address of a gray scale area read by a transducer in said disk drive system a signal indicating a position of said transducer relative to a fixed reference point in said gray scale band on said disk" (Claim 1) | This claim limitation is subject to means-plus-function analysis under 35 U.S.C. Sec. 112, Par. 6.<br><br>The function of the "position generator" is to "generat[e] from said quadrature servo pattern and an address of a gray scale area read by a transducer in said disk drive system a signal indicating a position of said transducer relative to a fixed reference point in said gray scale band on said disk" as recited in the claim. The corresponding structure is described below. | Electronics and/or processor that provide a position signal. |

The limitation "position generator" in claim 1 of the '506 patent is subject to means-plus-function construction under 35 U.S.C. Sec. 112, ¶ 6. The function of the "position generator" is to "generat[e] from said quadrature servo pattern and an address of a gray scale area read by a transducer in said disk drive system a signal indicating a position of said transducer relative to a fixed reference point in said gray scale band on said disk." The corresponding structure consists of the elements of Figure 1 including the disk 8, the head 11, the actuator 13, the positioner 12, the gray code detector 15, the servo

burst detector 16, the timing controller 18, the displacement generator 17, the zone detector 19, the gray

scale generator 20, the displacement selector 21, the offset selector 22 and the adder 23, programmed to

perform the algorithms set forth in figures 5 or 9 (depending upon the embodiment implemented). '506

Patent, col. 6:30-7:18 (describing structure of position generator). Alternatively, a microprocessor, RAM

and ROM programmed to perform the algorithms set forth in figures 5 and 9 could be used in lieu of

displacement generator 17, zone detector 19, gray scale generator 20, displacement selector 21, offset

selector 22 and adder 23, as described at col. 19, lines 22-27 of the '506 patent.

Seagate disputes that this limitation is subject to means-plus-function analysis, and

proposes a construction ("electronics and/or processor") which is so broad as to effectively cover any

means for "providing a position signal."

Ordinarily, a claim term not drafted in "means plus function" form is not subject to

construction under 35 U.S.C. § 112, ¶6. However, this presumption is overcome where the claim element

"invokes purely functional terms, without the additional recital of specific structure or material for

performing the function." *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999); *Mas-*

*Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213-14 (Fed. Cir. 1998) (presumption that section 112,

¶ 6 does not apply can be overcome if the claim "does not provide any structure," because a claim

"cannot be construed so broadly to cover every conceivable way or means to perform the [claimed]

function.").

In the "position generator" limitation above, the language following "position generator

for. . ." is clearly purely functional, and recites no structure for performing the recited function. Thus, the

analysis turns on whether the term "position generator" itself recites sufficient structure to avoid treatment

under § 112, ¶ 6. *Apex, Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371-72 (Fed. Cir. 2003). This

inquiry entails consideration of whether the term "has a reasonably well understood meaning in the art,

keeping in mind that a claim term need not call to mind a single well-defined structure to fall within the

ambit of § 112, ¶ 6." *Id.* at 1372; *see also Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d

1354, 1359-60 (Fed. Cir. 2004) (claim terms are subject to means-plus-function analysis when they are not "used in common parlance or by persons of skill in the pertinent art to designate structure").

The term "position generator" is a coined term and is used in the '506 patent merely as a label in lieu of "means" in an apparent effort to avoid means-plus-function treatment. Significantly, both named inventors of the '506 patent conceded that the term "position generator" has no generally understood meaning in the art.[6] Indeed, when asked whether the term had a specific meaning in the field, principal named inventor

REDACTED

Exh. C, Baum. Tr. at 56-57.

REDACTED

*Id.* .at 56-58.

Moreover, neither Seagate nor its expert has come forth with a single technical dictionary, treatise, patent, or other reference source to establish any reasonably well understood meaning in the art, and Cornice is not aware of any accepted meaning of "position generator" in the field.

REDACTED                                                    Exh. B, Messner

Tr. at 9.

REDACTED

Exh. D ITC Messner Tr. at 73-74.

*Id.* Furthermore, the term is not clearly defined in the '506 patent, but is used to describe the various hardware elements (including that shown in Figs. 6A and 6B (first embodiment) and Figs. 10A and 10B (second embodiment)) that receive and process the signal received from the head or transducer

---

[6]

REDACTED    Exh. C 12/10/04 Baum Deposition at 57.
Exh. E 1/13/04 Touchton Depo at 157-58.

11, and process the data in accordance with specified logic (shown in Fig. 5 (first embodiment) and Fig. 9 (second embodiment)).

The Federal Circuit's decision in *Mas-Hamilton* is instructional. There, the patent was directed to a high-security electronic lock, and the claim limitation at issue was similar to the "position generator" limitation at issue:

> *a substantially non-resilient lever moving element* for moving the lever from its disengaged position for engaging the protrusion of the lever with the cam surface on the cam wheel so that the rotation of the cam wheel thereafter in the given direction changes the locking mechanism from the locked condition to the unlocked condition;. . . .

156 F.3d at 1213 (emphasis in original). Although not drafted in "means for . . ." format, the court observed that the claim limitation "does not provide any structure" and "is drafted as a function to be performed rather than definite structure or materials." *Id.* Even though "[m]any devices take their names from the functions they perform," the court determined that because "lever moving element" had no generally understood structural meaning in the art, it was not such a device. *Id.* at 1213-14 (*citing Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996)). Thus, the court concluded that because the claimed "lever moving element" is "described in terms of its function not its mechanical structure," construing it without reference to the specification would encompass any device than can cause a lever to move. *Id.* at 1214.; *see also Toro Co. v. Deere & Co.,* 355 F.3d 1313, 1325 (Fed. Cir. 2004) ("control mechanism" "does not provide sufficient structural description," and is subject to means-plus-function analysis).

Further support for construing "position generator" in accordance with § 112, ¶ 6 can be found in the claims that depend from claim 1. *See Laitram Corp. v. NEC Corp.*, 62 F.3d 1388, 1392 (Fed. Cir. 1995) ("Although each claim is an independent invention, dependent claims can aid in interpreting the scope of claims from which they depend."). In particular, dependent claim 9 (which depends from claim 1 through claim 8) recites that "the position generator further comprises first means . . . second means . . . and third means." This is further evidence of the inventors' intent that "position generator" be treated as a mean-plus-function limitation.

Having determined that "position generator" is subject to means-plus-function construction, it is necessary to apply the law of section 112, paragraph 6. As the Federal Circuit has explained, the construction of means-plus-function claim limitations is a two-step process. First, the Court must identify the specific function recited in the claim. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Second, the Court must identify the corresponding structure described in the patent's written description necessary to perform that function. *Id.* To accomplish the claimed function of "generating from said quadrature servo pattern and an address of a gray scale area read by a transducer . . a signal indicating the position of said transducer," requires the various structure shown in Fig. 1, including the disk 8, the head 11, the actuator 13, the positioner 12, the gray code detector 15, the servo burst detector 16, the timing controller 18, the displacement generator 17, the zone detector 19, the gray scale generator 20, the displacement selector 21, the offset selector 22 and the adder 23. As described in the specification, all of these structures are necessary to generate the position information. *E.g.,* '506 Patent, col . 3:26-37; col. 6:30-9:29; col. 11: 11-22. Alternatively, the specification indicates that a microprocessor, RAM and ROM could be used in lieu of displacement generator 17, zone detector 19, gray scale generator 20, displacement selector 21, offset selector 22 and adder 23, as described at col. 19, lines 22-27 of the '506 patent. '506 Patent, col. 19:22-41.

Moreover, it is well-established that when the corresponding structure of a means-plus-function claim limitation includes computer or microprocessor elements, the limitation is construed to include the specific program or algorithm that controls the operation of the device. *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253-54 (Fed. Cir. 2005) ("the corresponding structure for the 'time domain processing means' is a microprocessor programmed to carry out a two-step algorithm in which the processor calculates generally nondiscrete estimates and then selects the discrete value closest to each estimate."); *WMS Gaming, Inc. v. Intern. Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ( "In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."). The various

hardware elements (or the microprocessor in the alternate embodiment) must be programmed with the algorithm of Fig. 5 or 9 in order to perform the claimed function of generating the position of the transducer. Thus, the corresponding structure for the "position generator" element must be construed as including the specific algorithms of Figs. 5 or 9 of the '506 Patent, depending upon the specific embodiment implemented.

REDACTED

Exh. A at 44-46.

### E.    Claim 22 is Invalid Under 35 U.S.C. § 112, Paragraphs 1 and 2 in View of the "Coact" Limitation

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "Said servo band and said gray scale band **coact** to define radial positions on said magnetic disk from a fixed reference point in said gray scale band on the surface of said disk." (Claim 22) | Claim 22 is invalid under 35 U.S.C. § 112, Paragraphs 1 and 2 | "Ordinary meaning" |

Claim 22 reads as follows:

> 22. A magnetic disk for use in a sector servo disk drive system, said disk having a plurality of sectors located on a surface of said magnetic disk, each sector having Z data tracks located between an inner diameter and an outer diameter on said magnetic disk, a servo band recorded across all said Z data tracks and a gray scale band recorded across all said Z data tracks, said servo band comprising a quadrature servo pattern repeated 0.75*Z times, said gray scale band comprises 1.5*Z consecutively addressed gray scale areas where said servo band and said gray scale band coact to define radial positions on said magnetic disk from a fixed reference point in said gray scale band on the surface of said disk.

The dispute concerning claim 22 stems primarily from what it lacks. In particular, in contrast to the other independent claims which, consistent with the purpose of the invention and the entire written description, are directed to "a system for measuring the distance of a transducer from a reference point on a disk" (claim 1) and a "method for generating a radial position signal that is indicative of the position of a transducer from a fixed reference point located on the surface of a disk" (claim 33), claim 22

recites only a "magnetic disk for use in a sector servo disk drive system." And while it claims the same precise numerical relationships between the servo patterns and gray scale band as the other claims, claim 22 omits the "position generator" and "transducer" and concludes with the awkward language: "where said servo band and said gray scale band coact to define radial positions on said magnetic disk from a fixed reference point in said gray scale band on the surface of said disk."

Seagate's position is that this language should simply be accorded its "ordinary meaning," which is unstated by Seagate and does not assist the trier of fact in understanding the scope of the claim. However, when considered in the context of the intrinsic record, claim 22 is invalid as a matter of law under paragraphs 1 and 2 of section 112. In particular, the '506 patent does not describe or enable a system of such broad scope, where the servo band and gray scale band "coact to define radial positions" in the absence of a transducer and "position generator," which violates paragraph 1. By omitting the transducer and position generator from claim 22, and generically reciting the ability of the servo band and gray scale band to "coact to define radial positions," the applicants claimed far beyond that which is described and enabled in the '506 patent specification, rendering the claim invalid under section 112, paragraph 1.

In addition, because the entirety of the specification makes clear that *both* the disk with its specialized patterns and the "position generator" specially configured to read and process those patterns are interdependent "elements" of the combination invention of the '506 patent, claim 22 does not comply with paragraph 2's requirement that the claims cover what the applicants "regard as [their] invention."

Cornice has thus moved for summary judgment of invalidity of claim 22 on these grounds, and its arguments in this regard are more fully set forth in Cornice's Memorandum in Support of its Motion for Partial Summary Judgment Regarding the Invalidity of U.S. Patent No. 5,600,506, filed today..

**F.    Dependent Claims**

1.    **"Zones" means the specific methodology described in the '506 patent in Figs. 5 and 9 for demodulating the servo burst signals in order to generate a position signal.**

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "The system of claim 1 wherein said position generator segments each said gray scale area into two zones" (Claim 8); "Segmenting each said gray scale area into two zones" (Claim 36) | The specific methodology described in the '506 patent in Figs. 5 and 9 for demodulating the servo burst signals in order to generate accurate position information. | "Zones" 0, 1, 2, and 3 are logical zones generated by the position generator logic. |

"Zones" as used in the in the '506 patent is a conceptual term used to describe a function of the claimed "position generator." In particular, it refers to the **specific methodology described in the '506 patent in Figs. 5 and 9 for demodulating the servo burst signals in order to generate a position signal.** The dispute between the parties concerning this limitation is based on Seagate's failure to provide a complete construction. Seagate's construction is simply that the "zones" claimed in the '506 patent are "logical zones generated by the position generator logic." But this construction is unhelpful in that it provides no explanation of what a "logical zone" is, a term not even found in the '506 patent. There is no dispute that the term "zones" lacks a plain and ordinary meaning in the context of the '506 patent, and that the specification must be consulted to understand what a "zone" refers to. As it stands, Seagate's construction is circular and does not inform this Court's inquiry.

Technical and ordinary dictionary definitions are not helpful in understanding the meaning of "zones" as used in the claims.                    REDACTED

Thus, the term can be construed only by reference to its usage in the specification. *See Phillips*, 415 F.3d at 1315 (noting that the specification "is the single best guide to the meaning of a disputed term"); *Liquid Dynamics Corp. v. Vaughan Co., Inc.,* 355 F.3d 1361, 1367 (Fed. Cir. 2004) ("We look to the written description for

guidance when the claim language itself lacks sufficient clarity to ascertain the scope of the claims."); *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1370 (Fed. Cir. 2003) ("A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document."); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The specification may assist is resolving ambiguity where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone.").

The specification makes clear that a "zone" is a conceptual term coined in the patent itself and used to describe the specific principles and methodology employed by the '506 patent for demodulating the servo burst signals in order to generate a position signal. In particular, the '506 patent describes "zones" as follows:

> The system employs the concept of zones where each gray scale area is divided into two zones. . . .An even addressed gray scale area is divided into zones 1 and 0 and an odd addressed gray scale area is divided into zones 2 and 3. . . As can be seen from FIG. 3, the center of each zone corresponds to a boundary between two servo bursts of the quadrature servo pattern. For example in data track 4, the center of zone 1 corresponds to the boundary between bursts C and D, the center of zone 0 corresponds to the boundary between bursts B and A and the center of zone 2 corresponds to the boundary between bursts D and C.
>
> ....
>
> A displacement signal having a value indicative of the displacement from the center of a zone for the transducer is obtained from the difference in the magnitude read for the two servo bursts whose boundary is centered in that zone. By adding the displacement signal to the center signal, a position signal is obtained having a value in gray scale units indicative of the position of the transducer with reference to the center of gray scale area 0.

Col. 5:22-6:23. In addition, Figs. 5 and 9 illustrate how the position generator logic uses the "zones" to determine the position of the transducer, as discussed in detail in the specification at col. 7, line 44 – col. 9, line 24 (Fig. 5) and col. 15, line 1 – col. 16, line 41 (Fig. 9).

Furthermore, claim 8 clearly requires a specific implementation of "zones," *i.e.*, "an even [gray code address] is divided into zone 1 and zone 0" and an "odd [gray code address] is divided into

zones 2 and zone 3 and where a center in each of said zones 0, 1, 2, and 3 is located at a boundary between two of said four bursts in said quadrature servo pattern." *See* Claim 8.  Seagate completely ignores this claim language in offering its overly broad claim construction, which it applies to the *entirety* of claim 8.

**2.    "Zone detector" means the series of logic elements that determine the applicable zone based on the gray code and servo bursts.**

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "Zone Detector for generating a zone signal" (Claim 11) | "Zone detector" means the series of logic elements that determine the applicable zone based on the gray code and servo bursts. | The "zone detector" includes electronics and/or a microprocessor that provides a zone signal. |

The term "zone detector" in the asserted claims means **the series of logic elements that determine the applicable zone based on the gray code and servo bursts**.  In contrast, Seagate's construction is that the "zone detector" merely "includes electronics and/or a microprocessor that provides a zone signal."  As with "zone," the term "zone detector" lacks a plain and ordinary meaning in the context of the asserted claims, and thus, the specification must be consulted to ascertain its meaning.  Again, Seagate's construction is overly broad, inconsistent with the specification of the '506 patent, and does not inform this Court's inquiry.

The phrase "zone detector" has no generally understood meaning in the art.  And while "detector" has some understood meaning in the art, one must make reference to the specification to understand what it means in the context of "detecting" zones.  *See Teleflex*, 299 F.3d at 1325.  A review of the specification reveals that the logical elements of a "zone detector" are indicated by reference numeral 19 in FIG. 6A, which are programmed to perform the logic of FIG. 5, from step 502 through 508.  Col. 9:41-43.  The function of the zone detector is to "determine[] the applicable zone" based on the gray code and servo bursts.  Col. 9:41-43.

Seagate construes "zone detector" to "include electronics and/or a microprocessor that provides a zone signal.".  First, this construction is circular and uninformative because Seagate has not provided a construction of "zones" as discussed above.  Second, the specification of the '506 patent clearly indicates that a "zone detector" and a microprocessor are mutually exclusive design choices.  The specification states that:

> Fig. 2 is another embodiment of the invention where zone gray scale generator [sic] 20, displacement generator 17, zone detector 19, offset selector 22 and displacement selector 21 and adder 23 are replaced by microprocessor 50.

Col. 19:22-26 (emphasis added).  Thus, it is improper for Seagate to construe the limitation to encompass a microprocessor where the specification expressly states that a microprocessor may be used in lieu of the zone detector.  *See Scimed Life Sys.*, 242 F.3d at 1341 ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent…").

## CONCLUSION

For the foregoing reasons, the Court should adopt Cornice's proposed constructions for the claim terms in dispute.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Julia Heaney*
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jheaney@mnat.com
*Attorneys for Defendant and Counterclaim Plaintiff Cornice, Inc.*

OF COUNSEL

Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153
(212) 310-8000

Original Filing Date:  November 18, 2005

Redacted Filing Date:  November 28, 2005

## CERTIFICATE OF SERVICE

I, Julia Heaney, hereby certify that on November 28, 2005, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

William J. Marsden, Jr., Esquire
Fish & Richardson, P.C.

and that I caused copies to be served upon the following in the manner indicated:

### BY HAND

William J. Marsden, Jr., Esquire
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
Wilmington, DE  19801

### BY FEDERAL EXPRESS

Ruffin B. Cordell, Esquire
Fish & Richardson, P.C.
1425 K Street, NW, Suite 1100
Washington, DC  20005

/s/ *Julia Heaney*
Julia Heaney (#3052)
MORRIS, NICHOLS, ARSHT & TUNNELL
jheaney@mnat.com
  *Attorneys for Defendant and*
  *Counterclaim Plaintiff Cornice, Inc.*