IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEAGATE TECHNOLOGY LLC,

   Plaintiff,

  v.

CORNICE, INC.

   Defendant.

C.A. No. 04-418 (SLR)

**REDACTED**

---

**PLAINTIFF SEAGATE TECHNOLOGY LLC'S BRIEF
IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION
REGARDING U.S. PATENT NO. 5,600,506**

Dated: November 28, 2005
  *Redacted Date*

Timothy Devlin (#4241)
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

Roger S. Borovoy
David M. Barkan
Shelley K. Mack
500 Arguello Street
Redwood City, CA 94063-1526

Ruffin B. Cordell
Brian R. Nester (#3581)
Timothy W. Riffe
Christian A. Chu
1425 K Street NW, Suite 1100
Washington, D.C. 20005

Edmond R. Bannon
Lewis Hudnell III
Citigroup Center
153 East 53rd Street, 52nd Floor
New York, NY 10022-4611

Attorneys for Plaintiff
SEAGATE TECHNOLOGY LLC

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ...........................................1

II.   SUMMARY OF ARGUMENT ........................................................................1

III.  FACTS ........................................................................................................3

    A.    The '506 Patent Relates to the "Servo Pattern" and
         Related Features of a Disk Drive System ...................................................3

    B.    The Servo Pattern and System of the '506 Patent.....................................7

    C.    The Gray Code and Quadrature Pattern of the '506
         Patent.........................................................................................................11

    D.    The '506 Patent Position Signal Logic ....................................................15

IV.   DISCUSSION ...............................................................................................16

    A.    Legal Standards Regarding Claim Construction.......................................16

    B.    Claim Construction of Servo Pattern Claims 1-4, 22-26,
         and 33-35 ...................................................................................................16

         1.    The Term "quadrature servo pattern" Should Be
             Construed Consistent with Its Undisputed
             Ordinary Meaning to One of Ordinary Skill in
             the Art (claims 1, 2, 22, 23, 33, 34, 37) ............................16

         2.    The Phrases "Quadrature Servo Pattern repeated
             0.75*Z times" and "0.75*Z quadrature servo
             patterns" Should Be Construed in Accordance
             with Their Plain and Ordinary Meaning and the
             Intrinsic Record (claims 1, 22, and 33)...........................20

         3.    The Phrase "gray scale band comprises 1.5*Z
             consecutively addressed gray scale areas" Should
             Be Construed in Accordance with Ratio
             Described in the Specification (claims 1, 22, and
             33) .....................................................................................24

         4.    The Term "position generator" Should Be
             Construed According to Its Ordinary Meaning
             and Is Not a Means Plus Function Clause ...................25

         5.    The Term "fixed reference point in said gray
             scale band on said disk" Should Be Construed
             According to Its Ordinary Meaning.............................27

i

## TABLE OF CONTENTS (cont'd)

**Page**

6.    The Term "width W" Should Be Construed To Mean The Track Pitch (i.e., the radial distance between the center line of two adjacent data tracks). (claims 4 and 25)...........................................28

7.    Gray Scale "Width" Should Be Construed To Mean "An Area That Includes Portions Of The Blank Area Existing Between Gray Scale Areas On A Disk Surface, So That The 'Width' Refers To The Width Of Gray Scale Areas When Such Areas Are Drawn Abutting Each Other. (claims 4, 25, and 35) ...........................................30

C.    Claim Construction of Position Logic Claims 8-14 and 36-40 .......................................................................30

1.    The Term "Zones" Should Be Construed To Mean "Logical Zones Generated By The Position Generator Logic". (claims 8, 9, 11, 36, 38) ...........................................................................30

2.    The Term "Zone Detector" Should Be Construed To Mean "Electronic And/Or A Microprocessor That Provides A Zone Signal." (claim 11)..................................32

V.    CONCLUSION.................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amgen Inc. v. Hoecht Marion Roussel, Inc.,*
    314 F.3d 1313 (Fed. Cir. 2003)..................................................................28

*Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.,*
    246 F.3d 1336 (Fed. Cir. 2001)..................................................................29

*Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.,*
    285 F.3d 1046 (Fed. Cir. 2002)............................................................18, 32

*Johnson Worldwide Associates, Inc. v. Zebco Corp.,*
    175 F.3d 985 (Fed. Cir. 1999)..............................................................23, 25

*CCS Fitness, Inc. v. Brunswick Corporation,*
    288 F.3d 1359 (Fed. Cir. 2002)..................................................................27

*SRI International v. Matsuchita Electric Corp.,*
    775 F.2d 1107 (Fed. Cir. 1985)..................................................................28

*Superguide Corp. v. Direct TV Enterprises, Inc.,*
    358 F.3d 870 (Fed. Cir. 2004)..............................................................18, 21

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,*
    279 F.3d 1357 (Fed. Cir. 2002)..................................................................29

## STATUTES

35 U.S.C. 112, ¶ 6..............................................................................3, 27, 28

## I.    NATURE AND STAGE OF THE PROCEEDINGS

In this patent infringement case, Plaintiff Seagate Technology LLC ("Seagate") asserts seven patents against Defendant Cornice, Inc. ("Cornice"). Fact and expert discovery have closed, and the parties have exchanged expert reports. Pursuant to the Court's Scheduling Order [D.I. 36-1], Seagate files this brief regarding claim construction of one of the patents in suit, U.S. Patent No. 5,600,506 (the "'506 patent").

## II.    SUMMARY OF ARGUMENT

The '506 patent relates to certain features of a disk drive that, alone or in combination with other components, position a "transducer" or "head" over the surface of the disk to read and write data. This positioning system – referred to as the "servo" system – is crucial, because it allows the drive to accurately write information onto the disk and retrieve that same information later. The servo system uses information written on the disk to guide the transducer to a desired "data track" and maintains position near the center of that data track, much like drivers use lane markers on the road to move between lanes and maintain position within a lane.

One common component of a servo system is a magnetic pattern of information written onto the disk, referred to as the "servo pattern." The servo pattern is analogous to a ruler for measuring position on the disk surface. In disk drives of the type described and claimed by the '506 patent, these "rulers" are arranged like spokes on a wheel around the disk, to provide "snapshots" of positioning information as the disk rotates.

The servo system also includes a microprocessor or electronics to interpret signals from the servo pattern, including a preferred "logic" for interpreting that information. Because the pattern of the '506 patent was new, the preferred logic for interpreting information from the pattern was likewise new. The '506 patent describes and claims each of these inventive aspects of the servo pattern and logic, individually and in combination.

As Seagate will demonstrate at trial, Cornice utilizes the servo pattern described and claimed in the '506 patent, as well as its fundamental logic. When the claims are properly construed, infringement is clear. Indeed, some of the accused Cornice products are virtual copies of a preferred embodiment described in the patent.

There are four claim construction issues that involve elements of the independent claims. In each case, Seagate has proposed a construction consistent with the patent claims and specification, and consistent with the understanding of one of ordinary skill in the art. Cornice has proposed claim constructions that, in its view, avoid infringement of the '506 patent. These four litigation-crafted constructions, however, are inconsistent with the understanding of one of ordinary skill in the art and the intrinsic record.

One recited element in dispute is called a "quadrature servo pattern." It is not disputed that Seagate's proposed construction of this term is consistent with the understanding of one of ordinary skill in the art. ███████████████████

███████████████████████████████████████████████

███████████████████████████ Cornice's proposed construction abandons this ordinary meaning, and seeks to improperly narrow the element by reading in limitations from the specification.

A second set of elements in dispute relate to relative proportions of the servo pattern and the "data tracks" in which user data is stored. The claims recite certain numerical relationships between these two separate components. Seagate's construction reflects these numerical relationships, as understood by one of ordinary skill in the art. Cornice's proposed construction is in fact identical to Seagate's construction except that Cornice seeks to add the word "precisely" to the claims. No such word appears in the claims, nor is there any basis to narrow the claims beyond the numerical relationships recited.

A third element in dispute is a "position generator." As the '506 patent specification establishes, this element can include electronics or a microprocessor that

2

provide a position signal (i.e., a signal that tells other components of the servo system where the head is located). This is the plain language of the claim. Cornice proposes to construe "position generator" as a means-plus-function limitation under 35 U.S.C. 112, ¶ 6, despite the fact that the claim does not recite the word "means." Through its proposed construction, Cornice seeks to read into claim 1 no less than a dozen limitations from the Figures and specification, many of which are recited in dependent claims.

A fourth disputed element is a "fixed reference point" on the surface of the disk. Seagate properly contends that this element needs no construction; its meaning is clear from one of ordinary skill in the art. It simply means that distance can be measured from a given point, just like distance on a ruler can be measured from the edge of the ruler or from the one-inch mark. Cornice seeks to inject a limitation that the fixed reference point "is the same for every position calculation." This construction would conflict with basic structure of servo patterns, because position is measured according to each individual "spoke" around the disk.

As set forth more fully below, in each of these instances and in the parties' other disputes, Seagate's proposed construction is consistent with the intrinsic record and the understanding of one of ordinary skill in the art. In contrast, Cornice seeks to improperly narrow the claims in a manner that would purportedly benefit Cornice in litigation. Seagate's proposed claim construction should be adopted.

## III.    FACTS

### A.    The '506 Patent Relates to the "Servo Pattern" and Related Features of a Disk Drive System

The '506 patent relates to various components of the "servo system" of a disk drive. To read and write information on a hard disk, tiny read and write heads are carried just above the surface of the spinning disk. The heads are mounted on a pivoting "actuator" arm that allows movement back and forth across the entire radius of the disk, much like the pivoting arm on a phonograph player allows the needle to move across the

3

radius of a spinning record. [Ex.11, Messner Expert Rpt., ¶ 47.] The servo system helps
to position the heads over the disk, so that data can be accurately written and retrieved.
[Id., ¶¶ 50-51.] These components are pictured in the Figure below:



In a hard disk drive, information is stored within "data tracks" on the surface of
the disk. These data tracks are arranged in concentric rings on the surface. [Id., ¶ 48.]
To continue the phonograph analogy, a "data track" can be considered analogous to the
groove on a phonograph. While the phonograph groove is a single continuous spiral,
however, each data track on a hard disk forms its own circle. A typical Seagate disc
drive will contain over a hundred thousand data tracks per radial inch. A schematic view
(with much wider data tracks) is shown in the Figure below:



4

While the data tracks subdivide the disk surface into concentric circles, the disk may also be further divided into pie-shaped "sectors." Each sector includes a thin "servo wedge" that extends generally radially across the disk, roughly like spokes on a wheel. [Id., ¶ 49.] Each servo wedge includes a servo pattern and other information within the wedge. [Id., ¶ 51.] The servo pattern acts as a ruler for measuring radial position on the disk (i.e., how far inside or outside the transducer is). The areas between the servo wedges are available for writing and reading user data, such as documents, pictures, and music. [Id., ¶ 51.]

Systems of this type, in which the servo wedges divide the disk into sectors, are referred to as "sector servo" systems. A sector servo system is shown schematically below, with the servo wedges highlighted in yellow and the data tracks in green:



Servo wedge
Data tracks

As noted above, one part of the servo wedge is the "servo pattern." Servo patterns can including a number of different components that help to define position on the surface of the disk. One component provides a "coarse" or "integer" position, and another provides a "fine" or "fractional" position. [Id., ¶¶ 52 and 58.] Using the ruler analogy, the first component works like the "inch" marks on a ruler. By themselves, inch

marks on a ruler measure distance in integer units one through twelve along the length of the ruler. The ruler can also include fractional marks – quarter-inch, eighth-inch, etc., which provide "fractional" information within each inch. Together these marks define distance along the ruler.

Similarly, the integer and fractional components of a servo pattern can accurately define distance along a radius of the disk. These integer and fractional components of a servo pattern do not look like the simple hatched marks on a ruler. Instead they can be arranged in complex shapes and "bursts" that are read magnetically by the head to provide accurate information regarding position. [Id., ¶¶ 52 and 58.] As further discussed below, the '506 patent describes and claims certain combinations and arrangements of these complex shapes.

When the disc drive is in operation, the head or transducer reads the servo pattern, and the drive uses magnetic signals from the servo pattern to determine the current position of the head over the disk surface. [Id., ¶¶ 50 and 59.] In particular, servo information is used by the drive to perform two basic operations: (1) a "seek" operation in which the head is moved from one data track to another; and (2) a "track follow" operation, in which the head remains centered on a desired data track.

As the disk spins, each servo wedge passes the transducer, which obtains a "snapshot" of the servo pattern. This snapshot is evaluated to determine the transducer's position and to control the actuator arm to maintain the transducer at the desired position. Very loosely, this process is akin to driving along a highway with your eyes closed most of the time, but opening them very briefly every few seconds to adjust your position in the lane.

One problem with prior art servo systems and patterns is that they were not optimized for use with a type of read head known as a "magneto-resistance" or "MR" head. MR heads were originally developed by IBM in the 1970's. [Ex. 12, Messner Rebuttal Expert Rpt., ¶ 49.] While useful for reading data, MR heads presented problems

6

for prior art servo patterns for a number of reasons. [Id., ¶ 50.] These issues could create errors when determining position relative to the disk, which in turn caused errors in reading and writing data on the disk. [Id., ¶¶ 50-51.]

### B.    The Servo Pattern and System of the '506 Patent

The '506 patent provided a new type of servo pattern for use with a hard disk drive, as well as a related system and method. The '506 patent was filed May 10, 1995, and is entitled "Apparatus and Method for Determining the Position of a Transducer Relative to a Disk Surface in a Disk Drive System." It lists Michael Baum and James Touchton as the inventors. The '506 patent claims were allowed on the first Office Action. [Ex. 2.][1] The claims were never rejected during prosecution.

Certain claims of the '506 patent relates to the servo pattern itself. [Ex. 1, '506 patent claim 22, at 22:55-67.] Certain other claims relate to the servo pattern in combination with a microprocessor or electronics that determine position. [Id. at claim 1, 20:7-22.] Still other claims recite features of the preferred "logic" of the '506 patent, which can be used by the microprocessor to determine the position of the transducer. [Id. at claim 8, 20:59-65.] Together, the servo pattern, processor and logic provide information to the servo system, allowing accurate positioning of the transducer over a desired "data track" on the surface of the spinning disk.

As noted above, servo patterns typically include both an "integer" component and "fractional" component, both of which extend radially along the disk within one of the servo wedge "spokes." The integer position is typically written in binary form that can be read by the transducer and interpreted by the microprocessor. Many types of binary codes can fulfill this function. [Ex. 8, Dennison Depo. at 42:14-43:14 ███████████████

███████████████████████████████████████████████████

███████████████████████████████████ ]

---

[1] Exhibits cited in this Brief refer to Exhibits attached to the co-filed Declaration of Timothy Devlin In Support of Seagate's Proposed Claim Construction Regarding U.S. Patent No. 5,600,506.

In the '506 patent, the integer position is encoded in a binary format known as a "gray code." [Ex. 1, 506 patent, at 2:5-6.] A gray code is one of the many ways to write integers in a binary form, and each "area" of the gray code represents a single integer. For reference, an exemplary gray code is shown in the Figure below:

## Track ID Gray Code Pattern

| Track numbers | Pattern | Code bits |
|---|---|---|
| 0 | | 000 |
| 1 | | 100 |
| 2 | | 110 |
| 3 | | 010 |
| 4 | | 011 |
| 5 | | 111 |
| 6 | | 101 |
| 7 | | 001 |

This Figure shows only the gray code (not the overall servo pattern) and other schematic information about how a gray code works. The center column shows how the actual gray code magnetic patterns would be arranged on the disk. In the Figure, the gray code "areas" run vertically from the top of the page to the bottom. Each single gray code "area" is bounded by the horizontal lines in the center column (which are only shown for reference – they would not actually appear on the disk surface). Within each gray code area, the magnetic "marks" and "spaces" represent binary "code bits" that a computer system can interpret to represent an integer number. An image of a portion of a gray code taken with a magnetic force microscope is shown below. The gray code appears on the right-hand side of the solid vertical line:

8



Gray code

████████████████████████████

██████████████████████████. What is at issue here

is the proportion of gray code areas compared to the number of data tracks. The '506

patent provides a novel arrangement of gray codes and data tracks, and the parties dispute

whether a word should be imported into the claim in describing this arrangement. This

issue is further discussed below in the next section, but for clarity we first introduce the

"fractional" component of the novel servo pattern of the '506 patent.

   As mentioned previously, additional "fractional" information is required to fine-

tune the position of the head more accurately than the "integer" information allows. This

fine-tuning is necessary because a head must remain substantially centered on the data

track to minimize reading and writing errors. Frequently this fine-tuning is achieved

using a series of magnetic marks called "bursts," which are laid down in a particular

"burst pattern" along the servo wedge. At the time of the '506 patent invention, there

were many known burst patterns, including patterns such as a "quadrature" pattern, "null"

pattern and "phase" pattern, among others.

   The invention of the '506 patent utilizes a "quadrature burst pattern" to provide

"fractional" position information. A schematic Figure of an exemplary quadrature burst

pattern is provided on the following page, with an accompanying description.

Quadrature Pattern

In the Figure above, the data tracks extend vertically, and the servo wedge extends horizontally (for example, at the "three o'clock" position on the disk). The quadrature burst pattern – the only component of the servo wedge shown – also runs horizontally. A quadrature pattern includes a series of four "bursts" in alternating pairs. That is, two bursts (usually designated A and B) form an alternating pair extending radially along the servo wedge. This can be seen in the Figure above; bursts A and B alternate as they move left-to-right across the page. The other two bursts (usually designated C and D) form a second alternating pair extending along the servo wedge. This alternating relationship between bursts C and D is also shown above.

In a quadrature pattern, the transition point between one of the alternating pairs (e.g., the point at which burst A ends and burst B begins) occurs at the midpoint of a burst of the other pair (e.g., at the midpoint of burst C or at the midpoint of burst D). The Figure above shows this "quadrature" relationship. The first transition between burst A and burst B occurs that the midpoint of burst D, while the second transition from B back to A occurs at the midpoint of burst C. This relationship between the A-B pair and C-D pair is sometimes referred to as being "90 degrees out of phase." [Ex. 11, Messner

10

Expert Rpt., ¶ 52.]  As shown below, ███████████████████████

███████████████████████. [Ex.7, Dennison ITC Dep. Tr., at 28:7-29:11.]

The '506 patent specification describes that the gray scale and quadrature pattern

together act as a ruler on the surface of the d disk:

> The combination of the recorded servo band employing one of the quadrature servo patterns and gray scale band of sequentially addressed gray scale areas essentially provides a ruler that can be used to measure the radial position of the transducer from a reference point on the surface of the disk.

[Id. at 11:23-27.]

### C.    The Gray Code and Quadrature Pattern of the '506 Patent

One claim construction issue here relates to the claim limitations that define

proportions between the gray code and quadrature pattern compared to the data tracks.

The proportions themselves are not directly at issue, but rather how to describe them.

Cornice seeks to import the word "precisely" into the construction of these phrases,

despite the fact that no claim recites the word "precisely" or any similar word.

As background, in the prior art gray codes were essentially a way to provide an

identification number for each data track, so that there was one gray code "area"

corresponding to each data track.  This provides a 1:1 ratio between gray code areas and

data tracks.  An example of this "track identification" arrangement is provided in the

representative Figure below, which shows one gray code area (center column) for each

data track (left-hand column):

## Track ID Gray Code Pattern

| Track numbers | Pattern | Code bits |
|---|---|---|
| 0 | | 000 |
| 1 | | 100 |
| 2 | | 110 |
| 3 | | 010 |
| 4 | | 011 |
| 5 | | 111 |
| 6 | | 101 |
| 7 | | 001 |

In contrast to this prior art arrangement, in the novel servo pattern of the '506 patent the gray code areas are no longer provided in a 1:1 relationship with the data tracks. The inventors of the '506 patent abandoned the traditional usage of the gray code as a data track identification ("track ID") number. Instead, the gray code is a separate band in the servo pattern in which the gray code areas are provided in a different proportional relationship to the data tracks. As a result, each gray code area no longer represents a data track ID. The '506 patent refers to the gray code as a "gray scale," reflecting this difference from the prior art. [Ex. 1, '506 patent, 20:12.]

In the embodiments described and literally claimed in the '506 patent, each gray code area or "gray scale area" is sized so that its width is two-thirds the width of a data track, rather than the same width as a data track. [Id. at 4:51-53.] This provides three gray scale areas per two data tracks.

Similarly, the A, B, C and D bursts of the quadrature burst pattern are sized so that each individual burst is two thirds the width of a data track, rather than a full data track wide as commonly found in the prior art. [Id. at 4:35-37, Figs. 3, 4A, 4B, 7A, 7B and 8.] This results in a quadrature burst pattern repeating three times every four data tracks, instead of two times every four data tracks as was common. [Id. at 4:38-40, Figs. 3, 4A, 4B, 7A, 7B and 8.]

12

These relationships between the data tracks, gray scale, and quadrature servo bursts are shown for an exemplary pattern in Figure 3 of the '506 patent, part of which is reproduced below:

| | TRACK 0 | TRACK 1 | TRACK 2 | TRACK 3 | TRACK 4 | TRACK 5 | TRACK 6 |
|---|---|---|---|---|---|---|---|
| SERVO A | A | A | A | A | A | | |
| SERVO B | B | B | B | B | B | | B |
| SERVO C | C | C | C | C | C | | |
| SERVO D | D | D | D | D | D | | |
| GRAY SCALE | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| ZONE | 1 | 0 | 2 | 3 | 1 | 0 | 2 | 3 | 1 | 0 | 2 | 3 | 1 | 0 | 2 | 3 | 1 | 0 | 2 | 3 | 1 |

This Figure shows a schematic portion of a disk in which the data tracks are running vertically, and the servo band is running horizontally. Thus the gray scale and quadrature burst pattern also run horizontally. For clarity, a series of blue lines has been laid over the gray scale, and a series of red lines has been laid over the quadrature burst pattern. As can be seen, each pair of blue lines encompasses three consecutive gray scale areas (0-1-2), (3-4-5), etc. Each pair of blue lines also encompasses two data tracks (1-2), (3-4), (5-6), etc. Thus within each set of blue lines there are three gray scale areas and two data tracks. Because the servo wedge crosses all data tracks, this 3:2 ratio will also be maintained across all data tracks.

Likewise, the red lines show the proportions of the quadrature burst pattern and data tracks. Between the pair of red lines, there are three A bursts, three B bursts, three C bursts, and three D bursts (two whole D bursts and two halves). The red lines also

13

encompass four full data tracks, beginning in the center of track 0 and extending to the center of track 4. Thus there are three repetitions of the quadrature servo pattern every four data tracks. Again, because the servo wedge extends through all data tracks, this 3:4 ratio will be maintained across all the data tracks. The '506 patent shows a number of preferred embodiments of the arrangement of the data tracks, gray scale and quadrature servo bursts. [See id. at Figs 3, 4A, 4B, 7A, 7B and 8.]

The '506 patent claims describe these proportions using algebraic relationships. Specifically, the claims define the number of data tracks on the disk as "Z." The servo band and gray scale band are "recorded across all said Z data tracks." The literally-recited servo pattern includes "1.5*Z" gray scale areas. This equation flows directly from the ratio of three gray scale areas per two data tracks. The 3 gray scale areas divided by 2 data tracks means 1.5 gray scale areas per data track. Likewise, the literally-recited quadrature burst pattern repeats "0.75*Z times," which is the mathematical relationship provided by the ratio of three pattern repetitions every four data tracks. The 3 repetitions divided by 4 data tracks means .75 pattern repetitions per data track

The parties do not dispute the basic construction of these algebraic relationships within the claim. Both parties' constructions reflect the 3/2 and 3/4 proportions in the same manner. With respect to the gray scale, for example, both parties propose that the literal meaning of 1.5*Z includes "three consecutively addressed gray scale areas for every two data tracks across all Z data tracks within each sector." [Joint Claim Construction Statement, p. 5.]

The dispute arises because Cornice seeks to inject an additional term, "precisely," into the construction. The word "precisely" appears nowhere in the '506 patent claims. Indeed, it appears nowhere at all in the '506 patent. Claim 22, which relates to the servo pattern, demonstrates this point (subdivided into paragraphs for clarity):

A magnetic disk for use in a sector servo disk drive system,

14

said disk having a plurality of sectors located on a surface of said magnetic disk, each sector having Z data tracks located between an inner diameter and an outer diameter on said magnetic disk,

a servo band recorded across all said Z data tracks and a gray scale band recorded across all said Z data tracks, said servo band comprising a quadrature servo pattern repeated 0.75*Z times, said gray scale band comprises 1.5*Z consecutively addressed gray scale areas,

where said servo band and said gray scale band coact to define radial positions on said magnetic disk from a fixed reference point in said gray scale band on the surface of said disk.

[Id. at 22:55-67.]

As can be seen, claim 22 does not use the word "precisely" or any other qualifier to limit the claimed relationships. The claim simply recites a gray scale and quadrature burst pattern in certain proportions compared to the data tracks. The claims were also allowed on the first Office Action [Ex. 2], so the Applicants never made any arguments or amendments that could be interpreted as narrowing the claims.

### D.    The '506 Patent Position Signal Logic

The '506 patent further discloses electronics and/or a microprocessor and associated signal processing logic that utilize the quadrature burst and gray scale information to generate a position signal. [Id. at 3:33-37, Figs. 1, 2, 5, 6A, and 6B.] In some claims, these features are not recited. Claim 22 above, for example, recites only a disk having the novel servo pattern of the '506 patent. Claim 1 also recites a disk, and further recites a "position generator," i.e. a microprocessor and/or electronics, that generates a position signal. [Id. at 20:17-22.] Additional dependent claims recite specific aspects of the logic that can be used by the microprocessor to determine position. [See, e.g., id. at claim 8, 20:59-65.]

In the preferred form of logic recited in various dependent claims, the '506 patent divides each gray scale area into logical "zones" that are used in the generation of a position signal. [Id. at 5:22-36.] The zones are employed during signal processing to help determine an offset and/or fractional position information, as well as to perform

15

error correction.  [Id. at 5:32-6:23, 9:42-11:52, Figs 1, 2, 5, 6A and 6B.]  Both 4-zone embodiment and 8-zone embodiments are described.

The patent further describes the electronics and logic that may be used for position generation.  [See id. at Figs. 6A and 6B.]  In certain embodiments, the logic is implemented using hard-wired circuitry.  In other embodiments, a microprocessor running appropriate software executes the logic to generate a position signal.  [Id. at 19:22-41.]  As noted within the patent, it was within the knowledge of skill in the art at the time of the invention to program microprocessors to perform such logical functions. [Id. at 19:32-41.]

## IV.    DISCUSSION

### A.    Legal Standards Regarding Claim Construction

Seagate incorporates by reference the legal section set forth in its claim construction brief regarding U.S. Patents Nos. 5,452,159 and 6,744,606, filed concurrently.

### B.    Claim Construction of Servo Pattern Claims 1-4, 22-26, and 33-35

#### 1.    The Term "quadrature servo pattern" Should Be Construed Consistent with Its Undisputed Ordinary Meaning to One of Ordinary Skill in the Art (claims 1, 2, 22, 23, 33, 34, 37)

The term "quadrature servo pattern" should be construed consistent with its ordinary meaning: "a servo pattern with four bursts, where a transition between one pair of alternating bursts occurs at the center of one of a second pair of alternating bursts (also known as being 90 degrees out of phase)."

Cornice's own expert Mr. Ronald Dennison 

16



[Ex. 7, Dennison ITC Dep. Tr., at 28:7-29:11.][2]

. [Ex. 3, U.S. Patent No. 5,050,016, at 9:23-24 and Fig. 6; Ex. 4, U.S. Patent No. 5,381,281, at 14:1-4 and Fig. 8; Ex. 5, U.S. Patent No. 5,274,510, at Fig. 5; Ex. 5, U.S. Patent No. 4,590,526, at Fig. 2.] The '506 patent includes no express definition of a quadrature pattern that could somehow be construed as giving an alternative meaning to the phrase. Accordingly, there is no dispute that Seagate's proposed construction reflects the plain and ordinary meaning of the term.

. [Ex. 7, Dennison ITC Depo., 129:6-131:7.]

Cornice proposes an unduly narrow construction of "quadrature servo pattern" that would require "a quadrature burst pattern in which one of four bursts must be centered in data track '0,' as well as each and every data track thereafter. [Joint Claim Construction Statement, at p. 4] This narrow construction conflicts with the ordinary

meaning of the term "quadrature pattern" as understood by a person of ordinary skill in

the art, ████████████.

Cornice's construction is also unsupported by the intrinsic record. None of the

evidence that Cornice cites demonstrates an intent on the part of the inventors to deviate

from the ordinary meaning of the claim term "quadrature servo pattern." Rather, this

evidence demonstrates Cornice's attempt to impermissibly read limitations from the

preferred embodiments into the claims. See, e.g., Johnson & Johnston Associates Inc. v.

R.E. Service Co., Inc., 285 F.3d 1046, 1052 (Fed. Cir. 2002) (" the claims, not the

specification, provide the measure of the patentee's right to exclude"); Superguide Corp.

v. Direct TV Enters., Inc., 358 F.3d 870, 875 (Fed. Cir. 2004).

First, Cornice relies on the following passage from the specification to support its

contention that the claim term "quadrature servo pattern" should be construed to require

that a burst be centered on data track 0:

> The positioning measuring system is sensitive to the quadrature servo
> pattern used. The positioning measuring system requires that one of the
> four servo bursts of the quadrature servo pattern used must be centered in
> data track zero.

[Ex. 1, '506 patent, at 4:11-15 and 12:26-30.]

Cornice's reliance on this passage is misplaced. This passage states that the

described embodiments of the preferred "*positioning measuring system*" require one of

the four servo bursts to be centered in data track zero. It does not state that the phrase

"quadrature servo pattern" alone requires that one of the four bursts be centered in data

track 0. Just because the quadrature servo pattern used in conjunction with the preferred

embodiments of the positioning measuring system requires one of the four bursts to be

---

[2] Unless otherwise noted, all emphasis in this Brief has been added.

18

centered in data track 0 does not mean the inventors of the '506 patent intended to deviate from the ordinary meaning of the term "quadrature servo pattern" within the patent as a whole.  The position generator logic on which Cornice seeks to rely is not even recited in claims 1-4, 22-26, and 33-35.

Indeed, the '506 patent claims themselves contain no such limitation.  If the inventors had intended to limit the claims to a quadrature servo pattern with one of the four bursts centered in data track 0, they would have done so.  Likewise, Cornice can point to nothing in the prosecution history that restricts the claims to such a narrow scope.  Cornice can not now read limitations from the specification into the claims that the inventors expressly left out.  See, e.g., Superguide v. Direct TV, 358 F.3d 870, 875.

Similarly, the fact that the quadrature servo patterns described and illustrated in the '506 patent depict a burst centered on data track 0 is immaterial.  Each of these quadrature servo patterns is merely an embodiment of the claimed "quadrature servo pattern" and is not a claim limitation in and of itself.  Indeed, the specification states that Figure 4 depicts "eight servo patterns that **can** be used in the invention is shown," not that must be used.  [Ex. 1, '506 patent, at 3:58-59.]

Finally, ███████████████████████████████████████

████████████████████████████████████████████████

██████████.  [See, e.g., Ex.9, Dennison Expert Rpt., at 43-44.]  The claimed ratios of "a quadrature servo pattern repeated .75*Z times" and a "gray scale band comprises 1.5*Z consecutively addressed gray scale areas," however, have nothing to do with whether the "quadrature servo pattern" has a burst centered in data track 0.  As noted above, there is no such limitation in the claims.

For these reasons, the term "quadrature servo pattern" should be construed consistent with its undisputed ordinary meaning as understood by those of ordinary skill in the art, and not be unduly limited as proposed by Cornice.

> **2.  The Phrases "Quadrature Servo Pattern repeated 0.75*Z times" and "0.75*Z quadrature servo patterns" Should Be Construed in Accordance with Their Plain and Ordinary Meaning and the Intrinsic Record (claims 1, 22, and 33)**

As properly construed, the phrases "a quadrature servo pattern repeated 0.75*Z times" (claims 1 and 22) and "0.75*Z quadrature servo patterns" (claim 33) mean that "the quadrature servo pattern repeats three times for every four data tracks across all Z data tracks within each sector." Seagate's construction is entirely consistent with the plain and ordinary meaning of the claim language and the intrinsic record in this case. In fact, Cornice does not even dispute any of the language Seagate proposes for its construction. The sole dispute between the parties concerns Cornice's insistence that the word "precisely" be included in the construction such that it requires "the quadrature servo pattern repeats *precisely* three times for every four data tracks across all Z data tracks within each sector." [Joint Claim Construction Statement, at pp. 4-5.]

Cornice seeks to include an extra term within the claims that is simply not present. It is not supported by the intrinsic record, and is inconsistent with the plain and ordinary meaning of the claim language as understood by one of ordinary skill in the art. Cornice's reasons for including the term "precisely" in the construction are both pretextual and self-serving and have no merit. For all these reasons, the Court should adopt Seagate's proposed claim construction.

Seagate's construction follows directly from the specification. Indeed, the specification unambiguously states that the claimed "quadrature servo pattern" is repeated three time for every four data tracks:

> As can be seen from FIG. 3, a quadrature servo pattern has an overall width of 1.5*W and is ***repeated three times across four data tracks 0, 1, 2 and 3***. In so doing portions of the A, B, C, and are distributed differently in each of the four data track. It should be noted that the distribution of the A, B, C, and D burst for a given data track will be repeated every fourth data track.

[Ex. 1, '506 patent, at 4:38-44, Figs. 3, 4A, 4B, 7A, 7B and 8.]

The specification does not state that any relationship must be "precisely" present. In fact, the word "precisely" does not appear at all in the '506 patent. All the specification requires is that the proportions be satisfied across a subset of Z data tracks. Stated differently, for any subset of data tracks across all Z data tracks, the 3:4 relationship between quadrature pattern and data tracks will be met.

This is what the inventors of the '506 patent conveyed in the Figures of the '506 patent. [Id. at Figs. 3 and 8.] For example, Figure 3 of the '506 patent only uses seven data tracks to illustrate that the claimed quadrature servo pattern repeats three times for every four data tracks across all Z data tracks within each sector. The relevant portion of Figure 3 is reproduced below with the red and blue lines overlaid:



As noted above, there are three repetitions of the quadrature servo pattern and four data tracks between the red lines. The servo band extends through all of the data tracks, so this 3 to 4, or 3:4, ratio will be maintained across all Z data tracks within each sector. This 3:4 ratio across all the Z data tracks is consistent with the algebraic relationship "0.75*Z" recited in the claims. This relationship is set forth in Seagate's proposed construction. Cornice's attempt to inject an additional limitation is improper. "General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." Johnson Worldwide Associates, Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999) (citations omitted).

Cornice may argue that with the term "precisely" in the construction that the term ".75*Z" requires that there be a precise numerical relationship between the number of data tracks and the number of quadrature servo patterns. Under this purported construction of the claims, if the disk surface has 100,000 data tracks, there must be "precisely" 75,000 quadrature servo patterns. Indeed, ███████████████████ ██████████████████████. [See Ex. 9, Dennison Expert Rpt. at 40.] This

22

interpretation, however, is inconsistent with the intrinsic record and the understanding of one of ordinary skill in the art.

A precise numerical relationship as proposed by Cornice would not make practical sense to one of ordinary skill in the art. There are hundreds of thousands of data tracks on the surface of a typical disk. No person of ordinary skill in the servo engineering art would ever consider taking the time to undertake the fruitless exercise of counting them, especially when the relationship between data tracks and quadrature burst patterns can be determined from a small subset of the total number data tracks.

Indeed, the '506 patent specification recognizes this. Rather than depicting many thousands of data tracks in the Figures of the '506 patent, the inventors chose only to depict a limited number data tracks and corresponding quadrature servo patterns. This relatively small picture is sufficient to define the relationship between the two. ████

████████████████████████████████████████████

██████████. [See, e.g., Ex. 14, at 000006.] ████████████████████████

████████████████████████████████████. [Ex.3, U.S. Patent No. 5,050,016, at Fig. 6; Ex.4, U.S. Patent No. 5,381,281, at Fig. 8; Ex. 5 ,U.S. Patent No. 5,274,510, at Fig. 5; Ex. 6, U.S. Patent No. 4,590,526, at Fig. 2.] Nothing in the intrinsic record or knowledge of one of ordinary skill supports Cornice's insertion of an additional word into the claims.

Seagate and Cornice agree on much of the construction for these phrases. The only difference is an additional word in Cornice's construction that has no connection to the claim. For all these reasons, Seagate's construction (i.e., the "joint" portion of both parties' constructions) should be adopted.

   **3.**    **The Phrase "gray scale band comprises 1.5\*Z consecutively addressed gray scale areas" Should Be Construed in Accordance with Ratio Described in the Specification (claims 1, 22, and 33)**

As with the above limitation, the only dispute here relates to Cornice's attempt to insert the word "precisely" into the claims. Cornice's attempt should be rejected. The limitation "gray scale band comprises 1.5\*Z consecutively addressed gray scale areas" should properly be construed to mean that "within a gray scale band there are three consecutively addresses gray scale areas for every two data tracks across all Z data tracks within each sector."

The claims do not recite the word "precisely" with respect to this limitation. The word "precisely" occurs nowhere in the claims or anywhere else in the intrinsic record. The patent specification makes clear that these limitations can be understood looking at only a limited range of servo pattern and data tracks. Figure 3 from the specification, shown above, confirms this very point. As outlined by the overlaid blue lines, Figure 3 shows three gray code areas for every two data tracks. This 3:2 relationship conforms to the algebraic equation 1.5\*Z, and is the same relationship set forth in Seagate's proposed construction.

As with the "0.75\*Z" limitation, Cornice does not dispute *any* of Seagate's proposed language for the "1.5\*Z" limitation. The only dispute between the parties is that Cornice insists upon including the word "precisely" in the construction. Again, Cornice's attempt to insert an additional word into the claims is inconsistent with the language of the '506 patent claims and specification, as well as the understanding of one of ordinary skill in the art. Johnson Worldwide v. Zebco, 175 F.3d 985, 989.

To the extent Cornice seeks to argue that every data track and every gray code area must be counted to show infringement, these assertions make no sense in light of the '506 patent Figures or the understanding of one of ordinary skill in the art. ███████████ ████████████████████████████████, [see, e.g., Ex. 9, Dennison Expert Rpt., at 41], and it should be rejected.

Because there is no support for Cornice's inclusion of the word "precisely," Seagate's proposed construction (i.e., the "joint" portion of both parties' constructions) should be adopted.

> **4.    The Term "position generator" Should Be Construed According to Its Ordinary Meaning and Is Not a Means Plus Function Clause**

The parties agree the claimed "position generator" is used to generate a position signal, but otherwise disagree as to the proper construction. The claimed "position generator" should be construed according to its ordinary meaning: "electronics and/or processor that provides a position signal."

Seagate's proposed construction is consistent with the plain and ordinary meaning of the claim term "position generator" and its usage in the '506 patent. ███████████ █████████████████████████. [See, e.g., Ex. 11, Messner ITC Dep. Tr., at 75:1-9.] Seagate's proposed construction is consistent with the specification itself, which describes the position generator in broad terms:

> [T]he position generator generates for the transducer a digital position signal from the received values of the magnitude sampled from the four servo bursts [the quadrature pattern] and the address of the gray scale area.

[Ex. 1, '506 patent, 6:30-34.]

The specification provides a similarly broad description of an embodiment of the position generator that includes a microprocessor:

25

> *It is well within the skill of an art for programming microprocessors in the microprocessor program language associated with that microprocessor to provide a program which is stored preferably in the ROM 51 to generate the position value of the transducer* from the four displacement value N, N', Q, and Q" derived from the digital values of the four servo burst of the quadrature servo pattern and from the digital (encoded or not encoded) gray scale address read GS read by transducer 11.

[Id. at 19:34-41.]

Cornice maintains, however, that the claim limitation "position generator" should be construed as a means plus function limitation under 35 U.S.C. § 112(6) and therefore should be limited to the structures disclosed in the specification and their equivalents. [Joint Claim Construction Statement at 5-6.] Using this "means" argument, Cornice seeks to sweep in to the construction of "position generator" at least a dozen separate limitations. [Id. at 5-6.]

Cornice's proposed construction is incorrect for a number of reasons. First, claim 1 does not use the words "means" to introduce the recited position generator. As such, there is a presumption that 35 U.S.C. § 112(6) does not apply. See CCS Fitness, Inc. v. Brunswick Corporation, 288 F.3d 1359, 1369 (Fed. Cir. 2002). Neither Cornice nor its expert has presented any legitimate basis for overcoming this presumption.

Second, Cornice's argument rests on the assertion that the term "position generator" does not imply any structure, but this is not the case. A person of ordinary skill in the servo engineering field would understand the claimed "position generator" to recite structure, namely the electronics and/or processor that provides a position signal. [See Ex. 12, Messner Expert Rpt.., ¶ 85; Exhibit 5.]

Third, the dependent claims recite many of the very limitations that Cornice seeks to inject into the "position generator" limitation. Under the principle of claim differentiation, the "position generator" element should obtain a broader meaning than

simply these three elements combined. The independent claim should not be read to have the same scope as its dependent claim. "[W]hen a patent claim 'does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.'" Amgen Inc. v. Hoecht Marion Roussel, Inc., 314 F.3d 1313, 1326 (Fed. Cir. 2003) (quoting SRI Int'l v. Matsuchita Elec. Corp., 775 F.2d 1107, 1122 (Fed. Cir. 1985)).

For these reasons, Cornice's means plus function analysis under 35 U.S.C. § 112(6) should be rejected, and the term "position generator" should be construed under its plain meaning as set forth above.

### 5. The Term "fixed reference point in said gray scale band on said disk" Should Be Construed According to Its Ordinary Meaning

The claim limitation "fixed reference point" is recited in independent claims 1, 22, and 33. Seagate properly contends that this element needs no construction; its meaning is clear from one of ordinary skill in the art. It simply means that distance can be measured from a given point, just like distance on a ruler can be measured from the edge of the ruler or from the one-inch mark.

Cornice seeks to inject a limitation that the fixed reference point "is the same for every position calculation." This construction would conflict with very language of the '506 patent claims, as well as the basic structure of servo patterns, because position is measured according to each individual "spoke" around the disk. [See Ex. 1, '506 patent, Fig. 1.] This concept is reflected in claim 1 of the '506 patent, which recites a gray scale and quadrature servo pattern within "each sector" of the disk. [Id. at 20:11-15.]

Accordingly, each "fixed reference point" of claim 1 relates to the particular "sector" that is being described by the claim. Because there are multiple sectors, there

can be multiple fixed reference points.  The claim language is consistent with this

interpretation, because the term "a" fixed reference point can allow for "one or more"

such reference points.  See Tate Access Floors, Inc. v. Interface Architectural Resources,

Inc., 279 F.3d 1357, 1370 (Fed. Cir. 2002) ("It is well settled that the term 'a' or 'an'

ordinarily means 'one or more.'");  Crystal Semiconductor Corp. v. TriTech

Microelectronics International, Inc., 246 F.3d 1336, 1347, 1350-51 (Fed. Cir. 2001)

("This court has consistently emphasized that the indefinite articles 'a' or 'an,' when used

in a patent claim, mean 'one or more' in claims containing open-ended transitional

phrases such as 'comprising.'")

Cornice's construction would limit the "fixed reference point" to a ***single position***

on a disk, and conceivably to the exact same position from disk to disk.  This

construction is expressly contradicted by the claim language and applicable case law.  It

is also contradicted by the very structure of a sector servo system, in which the gray scale

and quadrature servo pattern of the '506 patent provide information regarding the ***radial***

position of the transducer over the disk.  Measuring a radial position by calculating

distance from a reference point on the far side of the disk makes no sense.

Cornice's construction should be rejected, and the term "fixed reference point"

should obtain its ordinary meaning.

### 6.    The Term "width W" Should Be Construed To Mean The Track Pitch (i.e., the radial distance between the center line of two adjacent data tracks). (claims 4 and 25)

Claims 4 and 25 each recite that "each data track has a width W" and that "each

gray scale area has a width of 2/3*W."  This term should be construed to confirm the

meaning of "width W" within the context of the '506 patent.

28

The term "width W," as properly construed in this context, means the track pitch, or the radial distance between the center line of two adjacent data tracks. This construction is consistent with the plain and ordinary meaning of the width W of a data track as understood by those of ordinary skill in the art. For example,



[Ex.15, Carlson Del. Dep Tr., at 317:13-17.]

This construction should be confirmed so that the term "data track" refers to the entire width taken up by each data track. On an actual disk, there is a small gap in which no data is written. This small gap is included within a "data track" when they are drawn for purposes of showing the various components of a servo system. Looking at Figure 3 of the patent, for example, it can be seen that the data tracks abut each other without any gap shown. Because of the small gap that occurs in practice, this edge-to-edge width of a data track, called the "track pitch," is typically defined as the distance between the centerlines of two adjacent data tracks. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and exactly the definition proposed by Seagate.

Cornice has proposed no opposing construction. Because Seagate's construction is consistent with the plain and ordinary meaning of the term "width W" as understood by one of ordinary skill in the art, Seagate's construction should be adopted.

7.    **Gray Scale "Width" Should Be Construed To Mean "An Area That Includes Portions Of The Blank Area Existing Between Gray Scale Areas On A Disk Surface, So That The 'Width' Refers To The Width Of Gray Scale Areas When Such Areas Are Drawn Abutting Each Other. (claims 4, 25, and 35)**

In the same manner, gray scale "width" should be construed to mean "an area that includes portions of the blank area existing between gray scale areas on a disk surface, so that the 'width' refers to the width of gray scale areas when such areas are drawn abutting each other." This definition is needed for clarity in the same way "width W" clarifies the width of a data track. The '506 patent specification explicitly recognizes the small gap that occurs in practice between gray scale areas, and defines gray scale area width to include the blank areas existing between gray scale areas on a disk surface:

> The gray scale band comprises a plurality of sequential gray scale areas where the width of each gray scale area is 2/3*W. *For simplicity the gray code areas are shown to abut the previous and next gray scale area between adjacent gray scale areas. Each gray scale area is defined to include the recorded gray scale address and a portion of the two blank areas bordering a gray scale area.*

[Ex.1, '506 patent, at 4:51-58.]

Cornice does not offer a construction of the term gray scale width and therefore presumably does not dispute these clear teachings of the specification. Accordingly, Seagate's construction should be adopted.

C.    **Claim Construction of Position Logic Claims 8-14 and 36-40**

1.    **The Term "Zones" Should Be Construed To Mean "Logical Zones Generated By The Position Generator Logic". (claims 8, 9, 11, 36, 38)**

Claim 8 recites that each gray scale area is divided into a pair of "zones," wherein the center of each zone is located at a boundary between two of the four bursts in the quadrature pattern. The '506 patent makes clear that these "zones" are the possible outcomes of logic trees described in the '506 patent. Accordingly, the term "zones" should be construed to mean "logical zones generated by the position generation logic."

30

It is clear from the '506 patent that the "zones" are logical constructs used to designate portions of each gray scale area:

> The system employs the *concept* of zones where each gray scale area is divided into two zones. When two zones are referred to with respect to a gray scale area, the first mentioned zone will be the zone to the left of the center of the gray scale area and the second mentioned zone will be to the right of the center of the gray code area. An even addressed gray scale area is divided into zones 1 and 0 and an odd addressed gray scale area is divided into zones 2 and 3. *The relationship between the zones and the gray scale areas is illustrated in FIGS. 3 and 4.*

[Ex.1, '506 patent, at 5:22-31]. Figures 3, 4A, 4B, 7A, 7B, and 8 all illustrate the relationship between the "zones" and the gray scale area illustrated in those figures.

Cornice's proposed construction of "zones" is not supported by the intrinsic record and is overly restrictive. Cornice contends that the term is used in the '506 patent to refer to the specific logic described in the '506 patent in Figures 5 and 9 for "demodulating" the signals from the quadrature burst pattern. This construction, however, makes no sense. At no point in the '506 patent is the term "zone" used to refer to a specific demodulation logic. In fact, the first three steps of the methodology described in Figures 5 and 9 of the '506 patent do not even employ "zones." [Ex.1, '506 patent, at 7:51-55, 8:47-50, 9:3-7, 9:53-56].

Moreover, Figures 5 and 9 show only the preferred methodology associated with the particular quadrature burst patterns shown in Figures 3 and 8, respectively. [Ex. 1, '506 patent, at 7:49-57 and 15:1-9.] There is no basis to read this preferred embodiment into the claims, and Cornice's attempt is improper. "After all, the claims, not the specification, provide the measure of the patentee's right to exclude." Johnson & Johnston Associates v. R.E. Service, 285 F.3d 1046, 1052.

Cornice's attempt to limit the concept of "zones" to the preferred embodiment described in the '506 patent specification should be rejected.

2.    **The Term "Zone Detector" Should Be Construed To Mean "Electronic And/Or A Microprocessor That Provides A Zone Signal." (claim 11)**

Claim 11 further describes the "second means" of claim 8, and recites a "zone detector for generating a zone signal." Cornice apparently disputes Seagate's construction of "zone detector," although Cornice does not appear to rely on its proposed construction for any contention of non-infringement.

The term "zone detector" should be construed to mean "electronics and/or a microprocessor that provides a zone signal." These electronics and/or microprocessor would select a zone as a function of the recited information. This is consistent the meaning of "zone detector" as set forth in the '506 patent. "Zone detector 19 determines the applicable zone . . . ." [Ex. 1, '506 patent, 9:41-42.]

Cornice's construction is overly narrow and redundant, in that it attempts to read the information used by the zone detector – already recited in the claim – into the language of "zone detector" itself. ███████████████████████████████
█████████████████████████████████." [See, e.g., Ex. 10, Dennison Rebuttal Exp. Rpt., at 47-48.] This argument misconstrues the patent specification, which indicates that the electronic version of the zone detector "of the first and second embodiments discussed above" is replaced by a microprocessor. [Ex. 1, '506 patent at 19:25-26.] This statement demonstrates that the zone detector function can be incorporated into a microprocessor, contrary to Cornice's narrow construction.

V.    **CONCLUSION**

For all of the reasons set for the above, Seagate respectfully requests that this Court adopt its proposed claim constructions in their entirety.

30255472.doc

Dated:  November 18, 2005                    FISH & RICHARDSON P.C.
          November 28, 2005
          *Redacted date*


By:    */s/ Timothy Devlin*
         Timothy Devlin (#4241)
         919 N. Market Street, Suite 1100
         Wilmington, DE  19899-1114

         Roger S. Borovoy
         David M. Barkan
         D. Austin Horowitz
         500 Arguello Street
         Redwood City, CA 94063-1526

         Ruffin B. Cordell
         Brian R. Nester
         Joseph V. Colaianni
         Rama G. Elluru (Admitted only in Texas)
         Timothy W. Riffe
         Rudhir B. Patel (Admitted only in New York)

         1425 K Street NW, Suite 1100
         Washington, D.C.  20005

         Attorneys for Plaintiff
         SEAGATE TECHNOLOGY LLC

33

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2005, I electronically filed the redacted

version of **PLAINTIFF SEAGATE TECHNOLOGY LLC'S BRIEF IN SUPPORT**

**OF ITS PROPOSED CLAIM CONSTRUCTION REGARDING U.S. PATENT NO.**

**5,600,506** with the Clerk of Court using CM/ECF which will send notification of such

filing(s) to the following:

Jack B. Blumenfeld, Esquire             Attorneys for Defendant
MORRIS NICHOLS ARSHT &                  Cornice, Inc.
TUNNELL
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347

I hereby certify that on November 28, 2005, I have mailed by Federal Express

Service, the document(s) to the following non-registered participants:

Mathew D. Powers                        Attorneys for Defendant
Jason D. Kipnis                         Cornice, Inc.
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065

Russell Wheatley                        Attorneys for Defendant
WEIL, GOTSHAL & MANGES LLP              Cornice, Inc.
700 Louisiana, Suite 1600
Houston, TX  77002

Alan J. Weinschel                       Attorneys for Defendant
David C. Radulescu                      Cornice, Inc.
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153

                                        _____/s/ Timothy Devlin_____
                                        Timothy Devlin

1