*See* Ex. A-tab 23 ['090 Patent] Fig. 2 (partial view with red labels added on right-hand side to show layer structure described at col. 3:7-41).

To further illustrate, the following picture shows the layer structure disclosed by the "Conner-Seagate Article" which Seagate's expert concedes discloses the claimed subject matter of the '754 Patent unless its construction of the term "seedlayer" is adopted:

| |
|---|
| **200 Angstrom protective C** |
| **300 Angstrom CoCrPtTa layer** |
| **1000 Angstrom chromium layer** |
| **chromium layer** |
| **glass substrate** |

*See* Ex. A-tab 20 [Conner-Seagate Article] at pp. 3963-3964 (figure based on layer structure described in the experimental and results section for Samples B and G).

**ARGUMENT**

### I.     LEGAL STANDARDS

Recently, the Court of Appeals for the Federal Circuit issued its landmark *en banc* decision on the proper methodology to be followed in resolving claim construction disputes. *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. July 12, 2005) (en banc). In *Phillips*, the Federal Circuit reconciled a split of authority in prior decisions by confirming that the claims, specification, and prosecution history are the principal sources for claim construction. *Id.* at 1312-19. The decision rejected the alternative approach of *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) and its progeny, which viewed the abstract, "ordinary meaning" of a claim term based on dictionary definitions as the starting point for claim construction, and required an "explicit definition" or "words or

expressions of manifest exclusion or resticition" in the intrinsic record to deviate from such "ordinary meaning." *Id.* at 1319-24.

Based on the specification's primary importance, "the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id.* at 1316 (quoting *Renishaw* 158 F.3d at 1250). Therefore, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* Indeed, the Federal Circuit has held that "[t]he claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose." *Netword, LLC v. Central Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

*Phillips* thus reiterated the well-established principle, which had been cast aside by *Texas Digital*, that "the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* at 1321 (quoting *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)); *see also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent docments.").

The Federal Circuit has continued to emphasize the primacy of the written description, and the context it provides for claim construction, in its evolving post-*Phillips* case law. *Aquatex Indus. v. Techniche Solutions*, 419 F.3d 1374 (Fed. Cir. Aug 19, 2005); *Nystrom v. Trex Co.*, 424 F.3d 1136 (Fed. Cir. 2005). For example, the Federal Circuit in *Aquatex* refused to construe a claim more broadly than the invention described in the specification and other intrinsic evidence. *Aquatex*, 419 F.3d at 1381-82. ("Here, the context of the specification makes clear that the patentee did not intend the term fiberfill to encompass natural materials.").

Similarly, the Federal Circuit in *Nystrom*, discussed later in greater detail, held that the plaintiff was "not entitled to a claim construction divorced from the context of the written description and prosecution history" and construed the claim term at issue consistently with its use in these intrinsic sources. *Nystrom*, 2005 WL 2218632, at *8. Furthermore, the *Nystrom* court relied on *Phillips* in holding that the plaintiff's argument – that there was no disavowal of scope in the written description or prosecution history to justify the court's construction – was "misplaced":

> What *Phillips* now counsels is that in the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public—i.e., those of ordinary skill in the art—that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source. *Id.*

The prosecution history is likewise relevant to claim construction. *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1273-74 (Fed. Cir. 2001) (affirming the district court's construction limiting the claim to three possible modes, and commenting that the prosecution history supports this interpretation because the patentees "described the 'exemplary ADSL/AVR embodiment' that operated in 'one of three' modes"). By contrast, extrinsic evidence such as expert testimony and dictionary definitions is typically less relevant. *Phillips* at 1314 (Extrinsic evidence is "less significant" and generally "less reliable" than intrinsic evidence.). And although extrinsic evidence may be helpful to claim interpretation, "it is unlikely to be a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## II.     "ALLOY"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "alloy"<br><br>[cls. 1, 6, 13] | The term "alloy" means "a metal mixture composed of two or more elements." | An "alloy" is **homogeneous** mixture or solid solution of two or more elements (usually metals), the **atoms of one replacing or occupying interstitial positions between the atoms of the other**. |

The parties dispute the meaning of the claim term "alloy," which limits every claim of the '754 Patent. Seagate proposes that an "alloy" encompasses only "homogeneous" mixtures (having atoms of one element "replac[e] or occupy[] interstitial positions" between atoms of the other element). Cornice proposes that the term "alloy" means "a metal mixture composed of two or more elements" (i.e., encompasses both homogeneous and non-homogeneous mixtures[5]).

If "alloy" is construed as Cornice proposes, Seagate's expert concedes that the "Okumura References" discussed above disclose the claimed subject matter of the '754 Patent. This explains why Seagate's proposed construction includes the homogeneous/interstitial limitation not found in the plain and ordinary meaning of the term "alloy" (as discussed further below).

### A.    The Term "Alloy" Is Used In The Specification To Describe Both Homogeneous And Non-Homogeneous Mixtures.

The specification uses the term "alloy" in at least three places where it describes non-homogeneous mixtures in a manner that is inconsistent with Seagate's proposed construction. Accordingly, the specification uses the term "alloy" to describe homogenous and non-homogenous mixtures (as proposed by Cornice). This is consistent with the plain and ordinary meaning of the term "alloy."[6]

_____

[5]    Seagate's use of the term "homogeneous" presumably refers to the common use of the term to mean "of uniform structure or composition throughout." *See* Ex. E [Merriam-Webster's Collegiate Dictionary, 11th ed., 2003] at p. 595.

[6]    *See, e.g.,* the following dictionary definitions defining "alloy" in a manner consistent with Cornice's proposed construction:

- "Name given to metal mixtures composed of several elements." Ex. A-tab 39 [International Disk Drive Equipment and Materials Association ("IDEMA") Glossary of Disk/Substrate Terms].

- "A material consisting of two or more metals (e.g. brass is an alloy of copper and zinc) or a metal and a nonmetal (e.g. steel is alloy of iron and carbon, sometimes with other metals

(continued . . .)

First, in the '754 provisional application, incorporated-by-reference into the specification of the '754 Patent at col. 1: 6-10, the Applicants used the term "alloy" to refer to non-homogeneous mixtures. For example, the '754 provisional application refers to $Cr-Ta_2O_5$ as an "alloy." *See* Ex. A-tab 15 ['754 Prosecution History] at 0114 ("The underlayer referred here can be single-layer  Cr, Cr-alloy (such as CrV, CrTi, CrTiB, $Cr-Ta_2O_5$, ...").   Seagate's  own  expert  admits  that

**REDACTED**

*See* Ex. F [10/19/05 Laughlin

Depo.] at 68:10-71:8

**REDACTED**

Accordingly, in order to have a claim construction that is consistent with the specification, the Court must construe the term "alloy" to include both homogeneous and non-homogeneous mixtures.

Second, when referring to the possible compositions of the "underlayer," the '754 specification refers to both homogeneous and non-homogenous mixtures as "alloys." *See* Ex. A-tab D ['754 Patent] at 6:53-56 ("The underlayer employed . . . can comprise Cr, a Cr alloy, such as CrV, CrTi, CrTiB or $Cr-Ta_2O_5$."). Seagate's own expert admits that           **REDACTED**

*See* Ex. F [10/19/05 Laughlin Depo.] at 59:23-61:3

**REDACTED**

_____

(. . . continued)

included).  Alloys may be compounds, *solid solutions, or mixtures of the components."  Ex. A-tab 41 [A Dictionary of Chemistry, Third Edition, dated 1996].

- "A metal product containing two or more elements as a solid solution, as an intermetallic compound, or as a mixture of metallic phases."  Ex. G [McGraw-Hill Dictionary of Scientific and Technical Terms].

- "[A] substance composed of two or more metals, or of a metal or metals with a nonmetal, intimately  mixed,  as  by  fusion  or  electrodeposition."   Ex.  A-tab  40  [Random  House Webster's College Dictionary, dated 1992].

REDACTED

and 62:17-

62:19                                        REDACTED

Third, the specification refers to another non-homogenous (or two-phase) mixture when

the specification refers to the use of an aluminum "alloy" for the substrate. *See* Ex. A-tab D ['754 Patent]

at 10:23-26 ("The substrates employed in the present invention can advantageously comprise any of

various substrates conventionally employed in the manufacture of magnetic recording media, including

Al alloy substrates...."). Aluminum alloy substrates are commonly made from a non-homogeneous alloy,

having tiny bits of aluminum-iron compounds interspersed through a primary body of aluminum. *See* Ex.

A at pp. 39-42.[8]

### III.    "SEEDLAYER"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "seedlayer"<br><br>[cls. 1, 13] | The term "seedlayer" means "a film layer that is between the substrate and the underlayer and **in direct contact with the substrate**." | A "seedlayer" is a film layer between the substrate and the underlayer, that **acts to control the crystallographic orientation of subsequent layers**. |

The parties dispute the meaning of the term "seedlayer," which is a limitation existing in

every claim of the '754 Patent. There are two distinct disputes over the construction of the term

"seedlayer." The first dispute is whether the term "seedlayer" should include Seagate's extra functional

---

[7]    Dr. Laughlin uses                     REDACTED

       [04/01/05 Laughlin Depo.] at 113:3-114:1                                    *See* Ex. H

                                             REDACTED

[8]    One of ordinary skill in the art also agrees with Cornice's proposed construction. *See* Ex. A at
       pp. 39-42.

limitation (i.e., whether the seedlayer limitation by definition "acts to control the crystallographic orientation of subsequent layers"). The second dispute is whether the "seedlayer" must be in "direct contact with the substrate" consistent with the positions taken during prosecution of the '754 Patent. The Court should adopt Cornice's construction because Cornice's construction is required by the use of the term in the specification and the prosecution history.

> **A.    Cornice's Proposed Construction Must Be Adopted Because The Prosecution History Is Clear That The "Seedlayer" Must Be Directly On Top Of The Substrate.**

The term "seedlayer" in the '754 Patent refers only to a layer in direct contact with the substrate. During prosecution, the Applicants specifically distinguished their claimed invention from prior art designs on the basis that the Applicants' seedlayer was deposited directly on top of the substrate. In light of this disclaimer in the prosecution history, the Court should rule that the patent is limited to seedlayers that are deposited directly on a substrate.

During prosecution, the examiner rejected the pending claims in light of U.S Patent No. 5,302,434 to Doerner, et al. Doerner's patent disclosed a magnetic medium with an aluminum substrate (61) having the following layers formed sequentially thereon: a nickel-phosphorus layer (62), a nickel-oxide layer (64), a chromium or chromium vanadium underlayer (66), a cobalt alloy magnetic layer, and a carbon protective overcoat:

