*See* Ex. A-tab 16 [U.S. Patent No. 5,302,434] at Figure 5 and 4:3-39. The Applicants specifically amended their claims to circumvent Doerner's layer structure by arguing that the "seedlayer" was the amorphous nickel phosphorous layer, labeled 62 above (i.e., the layer directly on the substrate 61):

> **At any rate, in order to expedite prosecution, independent claims 1 and 14 have been amended by reciting that the magnetic recording media contains a chromium or chromium alloy seedlayer**, as in original claims 2 and 15. It is not apparent and the PTO has not identified wherein Doerner et al. disclose or suggest a magnetic recording medium having a chromium or chromium alloy seedlayer as in the claimed invention. *In re Rijchaert, supra; Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co., supra.* Indeed, it should be apparent that **the seedlayer employed by Doerner et al. comprises amorphous nickel phosphorous.** There is a significant difference between amorphous nickel phosphorous and polycrystalline chromium or chromium alloy as in the claimed invention.

Ex. A-tab 15 ['754 Prosecution History] at 0072-0073 (Amendment) (emphasis supplied). By saying that Doerner's seedlayer was the nickel phosphorous layer 62 (and not the chromium layer 66 or nickel oxide layer 64 above the nickel phosphorous layer 62), the Applicants were able to obtain their patent. Seagate cannot now insist on a broader definition that would encompass Doerner's chromium or nickel oxide layers, having surrendered this claim scope during prosecution. *See Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1368 (Fed. Cir. 2001) ("[A]ll express representations made by or on behalf of the Applicant to the examiner to induce a patent grant limit the interpretation of the claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.") (citations omitted).

The Applicant's use of a narrow construction for the term "seedlayer" (as referring to only a layer in direct contact with the substrate) was repeated a second time in an attempt to distinguish the claims from another prior art reference. There, the examiner rejected the pending claims in light of U.S Patent No. 5,866,277 to Chen, et al. Chen's patent disclosed a magnetic medium with a glass substrate having a "seed layer" of nickel-phosphorus that was "partially oxidized throughout" and having a chromium layer on top of the nickel-phosphorous layer. *See* Ex. A-tab 17 [U.S. Patent No. 5,866,277] at 4:22-5:1. The Applicants specifically amended their claims to circumvent Chen's layer structure by

arguing that the "seedlayer" was the amorphous nickel-phosphorous layer (i.e., the layer directly on the substrate):

> Moreover, independent claims 1 and 14 have been amended to clarify that the magnetic recording medium comprises a chromium or chromium alloy seedlayer. This feature is neither disclosed nor suggested by **Chen et al. who in fact require an amorphous nickel phosphorous seedlayer**. There is a significant difference between an amorphous nickel phosphorous seedlayer and a crystalline chromium or chromium alloy seedlayer.

Ex. A-tab 15 ['754 Prosecution History] at 0072-0073 (Amendment) (emphasis supplied). Only by saying that Chen's seedlayer was the nickel-phosphorous layer (and <u>not</u> the chromium layer above the nickel-phosphorous layer) were the Applicants able to obtain their patent. Seagate cannot now insist on a broader definition that would encompass Chen's chromium layer, having surrendered this claim scope during prosecution. See *Ecolab,* 264 F.3d at 1368 (Fed. Cir. 2001).

> **B.      Cornice's Proposed Construction Must Be Adopted Because The '754 Specification Consistently Uses The Term "Seedlayer" In A Positional Manner, Not A Functional Manner.**

Several prior art references, including the Conner-Seagate Article discussed above, disclose the precise layer structure claimed in the '754 patent. Seagate attempts to distinguish these references on the basis that although the precise layer structure is disclosed, the references do not affirmatively state that the chromium seedlayer controls the crystallographic orientation of subsequent layers, and thus do not satisfy the extra limitation Seagate is attempting to insert into the construction of "seedlayer." However, Seagate has fabricated this requirement out of thin air. Although a "seedlayer" may have an influence on the structure of layers deposited on it, this is not a definitional requirement of the term.

The '754 Patent uses the term "seedlayer" to refer to the layer deposited directly on the substrate. Although many different layers can potentially influence the structure of later-deposited layers, the patent does not define the term "seedlayer" by this purported function. To the contrary, the patent

introduces the term "seedlayer" in a positional sense. The patent illustrates the seedlayer as being

deposited on top of the substrate, and below the underlayer and the magnetic layer:



**FIG. 5**

Ex. A-tab D ['754 Patent] at Figure 5.

   The patent describes that embodiments of the claimed invention "include deposition of a

relatively thin seedlayer, such as a seedlayer having a thickness of about 5Å to about 40Å." *Id.* at 6:25-

27. The patent further describes that "[t]he seedlayer employed in the present invention can be sputter-

deposited and can comprise various materials, such as Cr, a Cr alloy, *e.g.,* CrV, CrTi or CrTiB." *Id.* at

6:47-49. The patent also states that "the seedlayer is formed such that it contains grains lying in a plane

which are randomly oriented." *Id.* at 5:54-55. These descriptions of the seedlayer discuss its position and

composition, and do not purport to define the seedlayer in terms of any particular function.

   Of course it is true that the seedlayer is included in the claimed invention for a reason.

The patent says that after the seedlayer is deposited, then it can be chemically manipulated so that it can

influence the structure of subsequently deposited layers. However, the patent is clear that the seedlayer is

already a "seedlayer" when it is deposited on the substrate, *even before it has been chemically altered to*

*perform the function of influencing later-deposited layers*:

> In accordance with embodiments of the present invention, a desirably high [signal-to-noise-ratio] is achieved by the strategic formation of a seedlayer on the substrate prior to deposition of the underlayer and magnetic layer.
>
> ....
>
> Embodiments of the present invention comprise heating the deposited seedlayer in a vacuum containing very small, *i.e.*, residual amounts of oxygen, to form an oxidized surface layer, typically having a thickness of up to about 20Å and containing up to about 1 at. % oxygen, typically at a temperature of about 150º C. to about 250º C. Such heat treatment in the presence of residual oxygen has been found effective in modifying the surface morphology of the seedlayer for inducing substantial directional magnetic isotropy in the subsequently deposited magnetic layer.

Ex. A-tab D ['754 Patent] at 6:6-9; 6:33-42. Again, the patent states that a deposited seedlayer can then be altered in order that it can have the effect of influencing the growth of later-deposited layers: "After treatment of the seedlayer to modify the surface morphology for optimum magnetic directional isotropy, an underlayer, magnetic layer, carbon-protective overcoat and lubricant topcoat are sequentially deposited." *See Id.* at 6:49-53. Therefore the patent uses the term "seedlayer" to describe that layer both before and after it is modified to perform the function of influencing subsequent layers. Clearly then, chemically modifying the seedlayer to have crystalline-influencing properties is an ***optional*** alteration, not a definitional requirement: "It was found that the crystalline orientation and surface morphology of the seedlayer ***can be*** suitably optimized for inducing nucleation and growth of the underlayer and a magnetic layer resulting not only in increased SNR and high Hc, but also substantial directional magnetic isotropy." *Id.* at 6:28-33 (emphasis supplied).[9]

Moreover, the specification provides additional discussion of seedlayers in the prior art, including a MgO (magnesium oxide) layer in a prior art reference. The patent refers to this MgO layer as a "seedlayer" even though the patent states that this layer does not control the crystallographic orientation

---

[9]    Similarly, the patent states: "It was found that the seedlayer ***can be*** treated, after deposition, to adjust its crystalline orientation and surface morphology to induce the nucleation and growth of the underlayer and the magnetic layer such that the magnetic layer exhibits substantial directional magnetic isotropy." Ex. A-tab D ['754 Patent] at 6:14-18 (emphasis supplied).

of the subsequent underlayer and magnetic layers. *See* Ex. A-tab D ['754 Patent] at 3:29-32 ("[T]here is no (1120) CoCrPt//(200)NiAl epitaxial relationship found in the films with MgO seedlayers and NiAl underlayers."). Thus, the term "seedlayer" as used in the '754 specification does not necessarily refer to a layer that controls the crystallographic orientation of subsequent layers, contradicting Seagate's proposed construction.

It is well established that it is improper to make an objective of an invention stated in the specification (*i.e.*, the objective of the seedlayer controlling the crystallographic orientation) a limitation unless the specification suggests that the invention must only be used in a manner consistent with this objective. *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301-02 (Fed. Cir. 2003) (holding that a statement in the specification should not constitute a limitation on the scope of the invention the court stated: "The objective described is merely one of several objectives that can be achieved through the use of the invention; the written description does not suggest that the invention must be used only in a manner to attain that objective."). As in *Brookhill*, the '754 specification describes several other objectives of the purported invention. As just one example, another object of the purported invention is to achieve a magnetic recording medium that is "characterized by the absence of any substantial superlinear noise." Ex. A-tab D ['754 Patent] at 4:7-10. Moreover, the specification only states that the seedlayer "can be" chemically modified to facilitate preferred crystalline growth, not that this is a requirement. Thus, since the specification does not suggest that "controlling" the crystallographic orientation of subsequent layers is a necessary objective of the invention, and indeed uses the term "seedlayer" to describe layers lacking that functionality, it is inappropriate to read this limitation into the claims.

### C. Seagate's Insertion Of A Functional Limitation Is Inconsistent With The Use Of Term "Seedlayer" In The Prosecution History.

The prosecution history of the '754 Patent is replete with references to "seedlayers." Not once did the Applicants use the term in a functional sense (i.e., requiring that the seedlayer "acts to

control the crystallographic orientation of subsequent layers"), as Seagate is attempting to do now. Consistent with the specification, during prosecution the Applicants also used the term "seedlayer" to describe layers that did not "control the crystallographic orientation of subsequent layers."

For example, when attempting to overcome the examiner's rejection based on U.S. Patent No. 5,302,434 (to Doerner et al.), the Applicants identified the nickel phosphorus layer as the "seedlayer":

> Indeed, it should be apparent that the seedlayer employed by Doerner et al. comprises amorphous nickel phosphorus. There is a significant difference between amorphous nickel phosphorous and polycrystalline chromium or chromium alloy as in the claimed invention.

Ex. A-tab 15 ['754 Prosecution History] at 0072-0073 (Amendment). Even Seagate's own expert

REDACTED

*See* Ex. F [10/19/05 Laughlin Depo.] at 5:16-15

REDACTED

24:16-19

*see also* Ex. H [04/01/05 Laughlin Depo.] at 306:17- 308:2.

The Applicants went on to emphasize that there was no evidence the *seedlayer* in Doerner had any influence on the orientation of subsequent layers. This is in direct conflict with the position Seagate is taking in this litigation, which would be to say that Doerner doesn't even *have* a seedlayer because it lacks this property:

> There is no apparent basis of record upon which to predicate the determination that the magnetic recording medium disclosed by Doerner et al. necessarily contains a magnetic layer exhibiting substantially directional magnetic isotropy. **It should be noted that substantially directional magnetic isotropy does not occur by happenstance.** Rather the materials must be purposely selected and the deposition conditions purposely controlled to achieve that objective. **Again, Doerner et al. are conspicuously mute as to substantial directional magnetic isotropy, let alone the deposition of an underlayer and magnetic layer that do not exhibit any dominant crystallographic orientation.**

Ex. A-tab 15 ['754 Prosecution History] at 0072 (Amendment). This usage of the term is repeated throughout the prosecution history.[10] Accordingly, it is simply beyond dispute that during prosecution the Applicants used the term "seedlayer" consistent with Cornice's proposed construction, and completely inconsistent with Seagate's proposed construction which would inject the additional requirement that a seedlayer by definition must "control" the crystalline orientation of subsequent layers.

For the foregoing reasons, the Court should construe the term "seedlayer" to mean: "a film layer that is between the substrate and the underlayer and in direct contact with the substrate."[11]

## IV.     "SUBSTANTIALLY DIRECTIONAL MAGNETIC ISOTROPY"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "substantially directional magnetic isotropy"<br><br>[cls. 1, 13] | "A longitudinal magnetic media has 'substantially directional magnetic isotropy' when it has substantially equal values of magnetic properties, regardless of whether the property measurement occurs in the circumferential or radial direction, and **it has a magnetic layer that has no dominant crystallographic orientation**." | A longitudinal magnetic media has "substantial directional magnetic isotropy" when it has substantially equal values of **one or more properties** (e.g. Hc, Mrt and S*) of a thin film, regardless of whether the property measurement occurs in the circumferential or radial direction. |

Another dispute involves the limitation "substantially directional magnetic isotropy," which is a limitation present in every asserted claim of the '754 Patent. As with the term "seedlayer," there are two different disputes over the construction of the term   The first is whether the term requires

---

[10]     *E.g.*, Exh. A-tab 15 ['754 prosecution history] at 0076, where applicants refer to the amorphous nickel phosphorus layer of the Chen reference (which Seagate's own expert admits does not control subsequent layers) as a "seedlayer." *See* Ex. G [04/01/05 Laughlin Depo.] at 306:17-308:2     **REDACTED**

     *see also* Ex. F [10/19/05 Laughlin Depo.] at 5:16-15:15 and 24:16-19.

[11]     One of ordinary skill in the art also agrees with Cornice's proposed construction. *See* Ex. A at pp. 35-38.

"substantially equal values of magnetic properties" (as Cornice proposes), or whether the term can be construed as "substantially equal values of one or more properties" (as Seagate proposes). The second dispute is whether the limitation requires that the magnetic layer have a particular crystallographic makeup (i.e., "no dominant crystallographic orientation") as discussed in the specification and prosecution history. Cornice will demonstrate that the intrinsic evidence supports its position with respect to both of these areas of dispute.

As discussed above, the Federal Circuit's recent decision in *Phillips*, discussed *supra*, makes clear that the "ordinary meaning" of "substantially directional magnetic isotropy" must be ascertained with reference to the specification of the '754 Patent. 415 F.3d at 1321. Subsequent cases also emphasize the importance of implicit definitions taken from a patent specification, such as *Nystrom v. Trex, Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) ("*Nystrom II*").

Using this same rationale, as discussed below, the specification and the prosecution history of the '754 Patent makes clear that the purported invention "requires" that the magnetic properties (plural), and not just one magnetic property, be equal in the circumferential and radial directions and that the media has a magnetic layer that has "no dominant crystallographic orientation," as urged by Cornice.

A.    **The '754 Patent Discusses The Magnetic *Properties* Required For "Substantially Directional Magnetic Isotropy."**

The parties dispute whether the term "substantially directional magnetic isotropy" is to be construed as "substantially equal values of magnetic properties" (as Cornice proposes), or whether the term should be construed as "substantially equal values of one or more properties" (as Seagate proposes). Under Seagate's construction a disk can have "substantially directional magnetic isotropy" if only a single magnetic property is substantially equal in the circumferential and radial directions. In other words, under Seagate's construction, a disk can exhibit "substantially directional magnetic isotropy" even if the vast bulk of magnetic properties are very anisotropic. Seagate's construction is inconsistent with the

patent, because the patent explains the term "substantially directional magnetic isotropy" by referring to magnetic proper*ies* (in the plural):

> Magnetic recording media in accordance with embodiments of the present invention exhibit **substantial directional magnetic isotropy, *e.g.*, magnetic properties with an orientation ratio of less than about 1.1, including an orientation ratio of about 1.0**, improved overwrite characteristics, significantly reduced magnetic property modulation and are characterized by the absence of any substantial nonlinear noise behavior at high recording densities.

*See* Ex. A-tab D ['754 Patent] at 10:8-16 (emphasis added).   The patent again refers to magnetic proper*ies* (in the plural) as having an orientation ratio less than about 1.1:

> The inventive magnetic recording media have magnetic proper*ies* with an orientation ratio (OR) less than about 1.1, e.g., about 1.0.

*See id.* at 7:4-6 (emphasis supplied); *see also id.* at 5:58-61.   Thus, the patent clearly states that the phrase "substantial directional magnetic isotropy" refers to a plurality of magnetic properties.   Seagate is simply wrong to suggest that having a single substantially isotropic property is sufficient to make the disk substantially directionally magnetically isotropic.

> **B.    Requiring Only One Magnetic Property As Urged By Seagate Is Contradicted By Seagate's Own Expert And By Other Extrinsic Evidence.**

Seagate's contention that only one property is needed to determine whether a media exhibits "substantially directional magnetic isotropy" is contradicted by the extrinsic evidence.   Seagate's own expert, Dr. David Laughlin,

**REDACTED**

*See* Ex. G [4/1/05 Laughlin Depo.] at 225:6-12.

Moreover, Seagate's own inventor, Qixu Chen,

**REDACTED**

*See* Ex. A-tab 44 [12/17/04 Chen Depo.] at 113:18-114:9.

Furthermore, people of ordinary skill in the art use more than one magnetic property when determining magnetic isotropy.  For example, an independent third party (Komag) stated in a prior art patent that three magnetic parameters (coercivity ($H_c$), coercive squareness ($S^*$), and magnetic remanence ($M_{rt}$)) are considered in determining whether a disc is isotropic:

> Most media made today are "oriented," *i.e.*, Hc, Mrt and S* are higher in the circumferential direction than in the radial direction, as opposed to "isotropic" media which have the same Hc, Mrt, and S* in all in-plane directions.

*See* Ex. A-tab 25 [U.S. Patent No. 6,156,404] at 2:3-6.

Thus,

**REDACTED**

Seagate's litigation position is out on a limb, and should be rejected.  Accordingly, the Court should adopt Cornice's construction that "substantially directional magnetic isotropy" requires that a media have "substantially equal values of magnetic properties."

**C.    The "Substantially Directional Magnetic Isotropy" Limitation, Read In Light Of The Specification, Requires That The Magnetic Layer Must Have "No Dominant Crystallographic Orientation."**

As stated above, the parties are in agreement that the claim term "substantially directional magnetic isotropy" is specific to the '754 Patent, and does not have an ordinary meaning in the art. Accordingly, the only source of guidance as to the meaning of this term is the patent specification. *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("As we held in *J.T.*

*Eaton*, absent such an accepted meaning, we construe a claim term only as broadly as provided for by the patent itself."). The parties dispute whether "substantially directional magnetic isotropy" requires that the magnetic layer have "no dominant crystallographic orientation," as indicated in the patent itself and urged by Cornice, or whether no such requirement exists, as urged by Seagate.

By urging silence on the issue, Seagate advocates a construction of "substantially directional magnetic isotropy" that permits the magnetic layer to either <u>have</u>, or <u>not have</u> a dominant crystallographic orientation. However, Seagate's proposed construction is contradicted by the specification which only discloses the purported invention as having "no dominant crystallographic orientation." Seagate's proposed construction of "substantially directional magnetic isotropy" would include exactly what the '754 Patent teaches is the "conventional practice" and is *not* the subject of the '754 Patent. The following passage from the Description of the Invention section is the first time in which "substantially directional magnetic isotropy" is described or defined:

> **Conventional practices** seek to control material selection and deposition conditions to obtain an underlayer exhibiting a (200)-**dominant crystallographic orientation** to induce a (1120)-**dominant crystallographic orientation** in the magnetic layer deposited and epitaxially grown thereon. However, in accordance with embodiments of the present invention, a seedlayer is employed, and the materials are selected and the deposition conditions controlled so that the subsequently deposited underlayer and **magnetic layer do not exhibit any dominant crystallographic orientation**. Thus, in accordance with embodiments of the present invention, the underlayer does not exhibit a (110)- or (200)-dominant crystallographic orientation and the magnetic layer does not exhibit a (1120)-dominant crystallographic orientation. Rather, the seedlayer is formed such that it contains grains lying in a plane which are randomly orientated. **As a result, the magnetic layer exhibits substantial directional magnetic isotropy**.

Ex. A-tab D ['754 Patent] at 5:46-57(emphasis supplied). Thus the '754 Patent teaches that certain specific crystallographic orientations are "conventional," and that in order to have "substantially directional magnetic isotropy" the magnetic layer cannot form in these conventional crystallographic orientations. Also, in "embodiments of the present invention" the magnetic layer "do[es] not exhibit any dominant crystallographic orientation," and as a "result, the magnetic layer exhibits substantially

directional magnetic isotropy." *See also id.* at 10:8-22 (confirming that in the "present invention" the "magnetic layer, similarly, does not exhibit any dominant crystallographic orientation").

      **D.**      **The Applicants' Statements During Prosecution Confirm That The "Substantially Directional Magnetic Isotropy" Limitation Requires That The Magnetic Layer Have No Dominant Crystallographic Orientation.**

      The prosecution history is emphatic that the claim term "substantial directional magnetic isotropy" depends on having a magnetic layer with no dominant crystallographic orientation. In trying to distinguish a prior art reference (U.S. Patent No. 5,302,434 to Doerner et al.), the Applicants underscored that having "substantial directional magnetic isotropy" requires a random crystallographic orientation in the magnetic layer (*i.e.*, having no dominant crystallographic orientation):

> **"It should be noted that substantially directional magnetic isotropy does not occur by happenstance**. Rather the materials must be purposely selected and the deposition conditions purposely controlled to achieve that objective. Again, Doerner et al. are conspicuously mute as to **substantial directional magnetic isotropy**, let alone the deposition of an underlayer and **magnetic layer that do not exhibit any dominant crystallographic orientation**.

Ex. A-tab 15 ['754 Prosecution History] at 0072 (Amendment) (emphasis supplied). Since Doerner is not "conspicuously mute" on magnetic properties, the Applicants' statements must be interpreted as requiring that "substantially directional magnetic isotropy" refers to something more than just the magnetic properties. *See* Ex. A-tab 16 [U.S. Patent 5,302,434 to Doerner et al.] at 5:23-31 ("These scratches can result in magnetic anisotropy with enhanced coercivity and squareness along [t]he scratch direction. Since the residual scratches are not aligned parallel to the recording track direction, the anisotropy produces undesirable signal amplitude modulation. The formation of the NiO film on the NiP coating significantly reduces this modulation by altering the crystallographic orientation of the underlayer and magnetic layer"). The prosecution history is clear that in order to exhibit "substantially directional magnetic isotropy" a media must not "exhibit any dominant crystallographic orientation."

Furthermore, in attempting to avoid the examiner's rejection in light of another prior art patent (U.S. Patent No. 5,866,227 to Chen), the Applicants used the term "substantially directional magnetic isotropy" as a description of crystallographic orientation. According to the Applicants, the Chen patent did not disclose "substantially directional magnetic isotropy" because the crystals in the Chen patent did have a dominant crystallographic orientation:

> Specifically, each of independent claims 1 and 14 requires a magnetic layer exhibiting substantially directional magnetic isotropy. These features are neither disclosed nor suggested by Chen et al. In fact, as set forth in the paragraph bridging columns 3 and 4 of Chen et al., the underlayer exhibits a (200)-dominant crystallographic orientation and the magnetic layer exhibits a (1120)-dominant crystallographic orientation. Clearly, Chen et al. neither disclose nor suggest a magnetic recording medium or method of manufacturing a magnetic recording medium wherein the magnetic layer exhibits substantially directional magnetic isotropy.

Ex. A-tab 15 ['754 Prosecution History] at 0076 (Amendment).

Thus, in the prosecution history, the Applicants made clear that "substantial directional magnetic isotropy" requires that the layer "does not exhibit any dominant crystallographic orientation." Because the term "substantial directional magnetic isotropy" lacks any ordinary meaning in the art, these structural requirements set forth in the patent and prosecution history are properly part of the definition of the claim term, because the term is otherwise meaningless. *See, e.g., Irdeto*, 383 F.3d at 1300.[12]

## V. "RANDOMLY ORIENTED GRAINS" AND "GRAINS [LYING IN A PLANE] ARE RANDOMLY ORIENTED"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "randomly oriented grains" [cl. 10] "grains [lying in a plane] are | "A longitudinal magnetic media has 'randomly oriented grains' or 'grains [lying in a plane] are randomly oriented' when the magnetic c-axis of the grains are | The claim phrases should receive their ordinary meaning, without additional limitations:<br>• "randomly oriented grains" means "randomly oriented |

---

[12]    One of ordinary skill in the art also agrees with Cornice's proposed construction. *See* Ex. A at pp. 42-46.

| randomly oriented" [cl. 13] | randomly oriented in all three dimensions." | grains"<br>• "grains lying in a plane are randomly oriented" means "grains lying in a plane are randomly oriented" |
| --- | --- | --- |

Cornice agrees with Seagate that the terms "randomly oriented grains" and "grains [lying in a plane] are randomly oriented" should be given their "ordinary meaning." As explained below, it is clear that the ordinary meaning of these terms as used in the '754 Patent is consistent with Cornice's proposed construction. However, Seagate is presumably claiming that the "ordinary meaning" of these terms is that grains have c-axes randomly oriented only in the plane of the film (otherwise Seagate would not be contesting Cornice's proposed claim construction). As explained below, this is not the ordinary meaning of the terms as they are used in the '754 Patent.

The terms "randomly oriented grains" and "grains [lying in a plane] are randomly oriented" limit claims 10, 12 and 13 of the '754 Patent. Cornice's claim construction should be adopted because the meaning of these terms to the ordinary artisan after reading the entire patent is consistent with Cornice's proposed construction.

> **A.    The Ordinary Meaning Of "Randomly Oriented Grains" And "Grains [Lying In A Plane] Are Randomly Oriented" Limitations, Read In Light Of The Specification, Must Be Construed To Require Random Orientation In All Three Dimensions.**

*Phillips* made clear that "the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." 415 F.3d at 1321. Seagate is presumably taking the position that "randomly oriented grains" or "grains [lying in a plane] are randomly oriented" means grains that are only randomly oriented in two dimensions. This position adds an "only in two-dimension" limitation to the terms. This position has no support, and it is fact contradicted, by the use of the terms in the '754 specification.

The '754 specification only uses the term "random" twice, both in reference to grain orientation. The first time the term is used is in the Disclosure of the Invention section, which states

"depositing a seedlayer on a non-magnetic substrate, wherein grains lying in a plane are randomly orientated." Ex. A-tab D ['754 Patent] at 4:37-38. There is nothing in this section of the specification that limits the random orientation of the grains to only two-dimensions.

The second time the term "random" is used in the '754 specification is in the Description of the Invention section, which states, "[t]hus in accordance with embodiments of the present invention, the underlayer does not exhibit a (110)- or (200)-dominant crystallographic orientation and the magnetic layer does not exhibit a (1120)-dominant crystallographic orientation. Rather, the seedlayer is formed such that it contains grains lying in a plane which are randomly orientated." Ex. A-tab D ['754 Patent] at 5:49-55. Again there is nothing in this section of the specification that limits the random orientation of the grains to only two-dimensions. Further, the above quotation is juxtaposing, via the word "rather," a media that has certain dominant crystallographic orientations with a media that has a seedlayer with grains that are "randomly orientated." The logical conclusion is that a media with randomly oriented grains would have no dominant crystallographic orientation.

Seagate's position is also contradicted by extrinsic evidence. Presumably, Seagate is limiting "random" to mean "random in two-dimensions" but does not include "random in three-dimensions." This additional limitation is contradicted by the plain and ordinary meaning of random which is well summarized by Webster's Dictionary: "random: [] lacking a definite plan, purpose or pattern." *See* Ex. E [Excerpt from Merriam-Webster's Collegiate Dictionary, 11th ed.] at 1029.[13] Using this simple dictionary definition, it is clear that there is no inherent limitation on the word "random" and

---

[13]    *Phillips* confirmed that it is still appropriate for the Court to use dictionaries in assisting the Court's claim construction as long as dictionary definitions are not given the same weight as the intrinsic evidence. 415 F. 3d at 1322 ("we do not intend to preclude the appropriate use of dictionaries").

in fact any construction of the word "random" that allows for some sort of pattern would contradict the plain meaning of the term. [14]

## VI.     "HAVING MAGNETIC PROPERTIES WITH AN ORIENTATION RATIO OF ABOUT 1.0"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "having magnetic properties with an orientation ratio of about 1.0" [cl. 10] | The term "magnetic properties" as used in the phrase "having magnetic properties with an orientation ratio of about 1.0" means "at least two magnetic properties."<br><br>The term "orientation ratio of about 1.0" as used in the phrase "having magnetic properties with an orientation ratio of about 1.0" means "an **orientation ratio number that would round to 1.0**." | "Having magnetic properties with **one or more orientation ratios** of about 1.0." |

The term "having magnetic properties with an orientation ratio of about 1.0" limits dependant claim 12 of the '754 Patent. There appears to be two disputes in regard to this limitation: 1) whether "magnetic properties" refers to just one magnetic property and thus reads out the plurality of the term, and 2) whether "about 1.0" can include numbers above 1.1. The Court should adopt Cornice's construction because it required by the use of the term "having magnetic properties with an orientation ratio of about 1.0" in the specification.

### A.     The '754 Claim Language And Specification Require That "Magnetic Properties" Means At Least Two Magnetic Properties.

A plain reading of the term "magnetic properties" found in claim 12, in light of the specification, clearly means at least two magnetic properties. First, "magnetic properties" is a plural term and therefore must refer to more than one magnetic property. *See e.g., Leggett & Platt, Inc. v. Hickory*

---

[14]     One of ordinary skill in the art agrees with Cornice's proposed construction. *See* Ex. A at pp. 47-49.

*Springs Mfg. Co.*, 285 F.3d 1353, 1357 (Fed. Cir. 2002) ("At the outset, the claim recites 'wires' in the plural, thus requiring more than one welded "support wire."). Second, the specification only refers to "magnetic properties" when it refers to multiple magnetic properties. In fact the specification partially defined "magnetic properties" by citing to at least three possible magnetic properties. *See* Ex. A-tab D ['754 Patent] at 10:4-5 ("magnetic properties, i.e., Hc, S* and SNR"). Further, the specification consistently uses the term "magnetic properties" when it is referring to more than one magnetic property. *See e.g.*, Ex. A-tab D ['754 Patent] at 9:36-61 ("It should be apparent from Table II that the orientation ratio of the magnetic properties of Sample B . . ." where Table II cites three magnetic properties (Hr, Mr, and S*). Accordingly, the Court should construe the "magnetic properties" term as used in the phrase "having magnetic properties with an orientation ratio of about 1.0" as meaning "at least two magnetic properties."

**B.    The '754 Specification As Read By One Of Ordinary Skill In The Art Requires That "About 1.0" Means A Number That Would Round To 1.0.**

It is clear that "about 1.0" at least means "less than about 1.1." This is made clear by the specification which defines the term "about 1.0" as being less than about 1.1. *See* Ex. A-tab D ['754 Patent] at 7:3-5 ("The inventive magnetic recording media have magnetic properties with an orientation ratio (OR) less than about 1.1, e.g., about 1.0."). Further, one of ordinary skill would understand the words "about 1.0" to be referring to a number that would round to 1.0 and would not round up to 1.1 (and thus be excluded from the definition of "about 1.0" provided by the '754 specification). [15]

## CONCLUSION

For the foregoing reasons, Cornice respectfully requests that its proposed claim construction be adopted by the Court.

---

[15]    One of ordinary skill in the art also agrees with Cornice's proposed construction. *See* Ex. A at pp. 46-47.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ Julia Heaney

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market St., P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jheaney@mnat.com
  *Attorneys for Defendant and Counterclaim Plaintiff*
  *Cornice, Inc.*

OF COUNSEL:

Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Original Filing Date: November 18, 2005

Redacted Filing Date: November 28, 2005
#494740

## <u>CERTIFICATE OF SERVICE</u>

I, Julia Heaney, hereby certify that on November 28, 2005, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> William J. Marsden, Jr., Esquire
> Fish & Richardson, P.C.

and that I caused copies to be served upon the following in the manner indicated:

### <u>BY HAND</u>

> William J. Marsden, Jr., Esquire
> Fish & Richardson, P.C.
> 919 N. Market Street, Suite 1100
> Wilmington, DE  19801

### <u>BY FEDERAL EXPRESS</u>

> Ruffin B. Cordell, Esquire
> Fish & Richardson, P.C.
> 1425 K Street, NW, Suite 1100
> Washington, DC  20005

> */s/ Julia Heaney*
> Julia Heaney (#3052)
> MORRIS, NICHOLS, ARSHT & TUNNELL
> jheaney@mnat.com
>   *Attorneys for Defendant and*
>   *Counterclaim Plaintiff Cornice, Inc.*