IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEAGATE TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-418-SLR |
| | ) | |
| CORNICE, INC. | ) | **REDACTED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CORNICE INC.'S ANSWERING BRIEF IN RESPONSE TO SEAGATE'S OPENING CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NO. 6,146,754

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market St.
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com
    *Attorneys for Defendant and Counterclaim Plaintiff Cornice, Inc.*

OF COUNSEL:

Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
**Redacted Filing Date: December 22, 2005**
Original Filing Date: December 16, 2005

i.

TABLE OF CONTENTS

Page

TABLE OF CITATIONS                                                    iii

NATURE AND STAGE OF THE PROCEEDING                                    1

SUMMARY OF ARGUMENT                                                   1

STATEMENT OF FACTS                                                   2

ARGUMENT                                                            2

I.   "ALLOY"                                                         2

     A.   Because The Term "Alloy" Is Used In The Specification To
          Refer To Two-Phase Mixtures, Seagate's Proposed Construction
          Is Inconsistent With The Specification.                    3

     B.   The Prior Art Cited In The '754 Patent Supports Cornice's, Not
          Seagate's, Proposed Construction Of The Term "Alloy."       3

II.  "SEEDLAYER"                                                      5

     A.   Contrary To Seagate's Representation, There Is No "Ordinary
          Meaning" Of The Term "Seedlayer" That Includes Function As
          Well As Position.                                          5

     B.   The Use Of The Term "Seedlayer" In The Specification Is
          Inconsistent With Seagate's Proposed Construction.          6

     C.   The Prior Art Cited In The '754 Patent Does Not Support
          Seagate's Proposed Construction Of The Term "Seedlayer."    8

     D.   Seagate's Proposed Construction Of The Term "Seedlayer" Has
          Ignored The Prosecution Of The '754 Patent.                10

III. "SUBSTANTIALLY DIRECTIONAL MAGNETIC ISOTROPY"                   11

     A.   Seagate's Discussion Of A "Numerical Ceiling" Is Irrelevant To
          Claim Construction.                                        11

     B.   Seagate Mischaracterizes The Dispute Regarding The Use Of
          The Term "Magnetic Properties" In The Specification.        12

     C.   Seagate's Claim Differentiation Argument Is Factually Incorrect
          And Irrelevant, Because Cornice's Proposed Construction Of
          "Substantially Directional Magnetic Isotropy" Does Not Render
          Claim 11 Superfluous.                                      13

     D.   The Parties Agree That The Term "Substantially Directional

ii.

TABLE OF CONTENTS (continued)

Page

Magnetic Isotropy" Does not Have An Ordinary Meaning
Outside The '754 Patent.                                              13

IV.    "RANDOMLY ORIENTED GRAINS" AND "GRAINS [LYING IN A
       PLANE] ARE RANDOMLY ORIENTED"                                  15

V.     "HAVING MAGNETIC PROPERTIES WITH AN ORIENTATION
       RATIO OF ABOUT 1.0"                                            16

       A.    Seagate Mischaracterizes The Dispute Regarding "Magnetic
             Properties."                                             17

       B.    Cornice's Construction Of "About 1.0" Does Not Exclude The
             "Preferred Embodiment."                                  17

VI.    "SUBSTRATE"                                                    18

CONCLUSION                                                            19

iii.

TABLE OF CITATIONS

Page(s)

Cases

*Autogiro Co. of America v. United States,*
    384 F.2d 391 (Ct. Cl. 1967)       3

*Comark Communications, Inc., v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998)       13

*Goldenberg v. Cytogen, Inc.,*
    373 F.3d 1158 (Fed. Cir. 2004)       14

*J.T. Eaton & Co., Inc. v. Atl. Paste & Glue Co.,*
    106 F.3d 1563 (Fed. Cir. 1997)       14

*Network Commerce, Inc. v. Microsoft Corp.,*
    422 F.3d 1353 (Fed. Cir. 2005)       14

*On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GMBH,*
    386 F.3d 1133 (Fed. Cir. 2004)       14

*Seachange Intern., Inc. v. C-Cor Inc.,*
    413 F.3d 1361 (Fed. Cir. 2005)       13

*United States Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997)       15

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)       3

1.

## NATURE AND STAGE OF THE PROCEEDING

Seagate Technology LLC ("Seagate") brought this action against Cornice, Inc. ("Cornice") for infringement of seven patents on June 22, 2004. The parties have exchanged opening claim construction briefs. Cornice provides this Response to Seagate's opening brief regarding the construction of disputed claim terms appearing in U.S. Patent No. 6,246,754 ("the '754 Patent").[1]

## SUMMARY OF ARGUMENT

Seagate's Brief relies on a series of mischaracterizations of both the record and Cornice's positions in an attempt to defend its untenable claim construction positions. For example, Seagate's "Summary of the Argument" section attempts to paint Cornice as a technologically inferior competitor. Seagate claims that "Cornice makes no attempt to truly innovate," and that "Cornice opted not to innovate." D.I 146 at 1.                    REDACTED

REDACTED

REDACTED                    REDACTED

In order to bolster its weak positions, Seagate also attempts to merge issues of claim construction with issues of fact that should be decided by a jury. For example, in the "Summary of the Argument" section Seagate discusses just one claim term, "substrate," even though, as discussed below,

---

[1]    References to Exhibits A-H are to those attached to Cornice's Opening Claim Construction Brief for the '754 Patent (D.I. 178). Exhibits I-P are attached herewith.

2.

discussion of this claim term is irrelevant in the claim construction context because the parties agree on

the appropriate construction.

## STATEMENT OF FACTS

Relevant facts are included in the Argument section.

## ARGUMENT

### I.    "ALLOY"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "alloy" | The term "alloy" means "a metal mixture composed of two or more elements." | An "alloy" is homogeneous mixture or solid solution of two or more elements (usually metals), the atoms of one replacing or occupying interstitial positions between the atoms of the other. |

Seagate attempts to construe the term "alloy" to be a "homogeneous mixture or solid

solution of two or more elements (usually metals), the atoms of one replacing or occupying interstitial

positions between the atoms of the other." According to Seagate, this long-winded definition can be

boiled down (in the "chromium alloy" context) to "a single-phase solid solution of chromium and other

element(s) (usually metals)."[2]  D.I. 146, Seagate's Claim Construction Brief Regarding U.S. Patent No.

6,146,754 at 14.  It does not matter whether the long or short version of Seagate's construction is

considered—both must be rejected because they contradict the specification and the prosecution history.

---

[2]    Seagate discusses both the term "alloy" and the term "chromium alloy" in its Opening Brief.  Because
"alloy" is the term the parties agreed should be construed (see the Joint Claim Construction Statement
D.I. 143 at 10), Cornice focuses its analysis on the term "alloy," as the Scheduling Order requires.

3.

**A.    Because The Term "Alloy" Is Used In The Specification To Refer To Two-Phase Mixtures, Seagate's Proposed Construction Is Inconsistent With The Specification.**

Seagate argues that "a review of the specification indicates that the patent <u>only</u> used 'alloy' and 'chromium alloy' to refer to <u>single</u>-phase mixtures in which atoms of one element substitutes for atoms of another." D.I. 146 at 16 (emphasis added). This statement is incorrect. As explained in Cornice's Opening Brief (D.I. 178), Seagate's own expert has            REDACTED

            REDACTED                            REDACTED

                                                                    The fact that Seagate's construction of the term "alloy" contradicts how that term is used in the '754 specification stands unrefuted. Using the framework set-out by the *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) decision, which reiterated the importance of the specification in any claim construction analysis, Seagate's proposed construction of the term "alloy" must be rejected for that reason alone. Indeed, the *en banc Phillips* court revitalized long-standing precedent that the specification "is the single best guide to the meaning of a disputed term" (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)) and provides "a concordance for the claims." (*citing Autogiro Co. of America v. United States*, 384 F.2d 391, 397-98 (Ct. Cl. 1967)). 415 F.3d at 1315.

Seagate's citation to sections of the specification that refer to single-phase mixtures as "alloys" does not save Seagate's construction. By referring to both single-phase and multi-phase mixtures as "alloys" the specification makes clear that the term was used in its plain and ordinary way. *See* dictionary definitions set forth in D.I. 178, Cornice's Opening Brief at pp. 13-14 (footnote 6).

**B.    The Prior Art Cited In The '754 Patent Supports Cornice's, Not Seagate's, Proposed Construction Of The Term "Alloy."**

The second basis for Seagate's construction of the term "alloy" relies on an erroneous characterization of the prior art cited in the '754 Patent and during prosecution of the '754 Patent. Seagate argues that "none of the references considered during prosecution . . . use any 'chromium alloy' other than a single-phase substitution mixture." D.I. 146 at 18. Seagate is again incorrect. For example,

4.

U.S. Patent No. 5,456,978, cited in the '754 Patent as prior art (D.I. 146, Ex. 1 ['754 Patent] at 3:41) and thus part of the intrinsic record of the patent, describes an amorphous layer as being a "chromium alloy":

> The targets in station 34 are preferably pure chromium targets, or *chromium alloys* containing a sufficient amount of a second non-magnetic metal, *e.g.*, W, Si, Zr, Al, Mn, Nb, Hf, V, Y, B, Ta, Mo, Ag, B, Gd, or Ti, to produce an *amorphous Cr*/second metal sputtered layer.

Ex. L [Pat. No. 5,456,978] at 5:59-64 (emphasis added).  As Seagate's own expert    REDACTED
REDACTED

REDACTED                  Accordingly, Seagate's argument that "none of the [cited prior art] references" refer to a "chromium alloy" as being anything other than a single-phase substitution mixture is incorrect.  Further, there are at least two other references cited during prosecution that use the term "alloy" when referring to substrates made from a two-phase mixture, namely an "aluminum alloy." *See* D.I. 178, Ex. A-16 ['434 Patent] at 4:8-10 ("AlMg is typically 5586 aluminum alloy"); Ex. A-17 ['227 Patent] at 1:47-50 ("aluminum-magnesium (Al-Mg) alloy").  As explained in Cornice's Opening Claim Construction Brief, substrates composed of "aluminum alloys" are typically two-phase mixtures. D.I 178 at 15.  Thus, these two references contradict Seagate's proposed construction of the term "alloy."

In summary, Seagate's sole basis for claiming that the "prosecution history" supports its proposed construction is a cite to a single prior art reference (while mischaracterizing the content of the remaining references).  According to Seagate, this one reference uses the term "alloy" to refer to only single-phase mixtures.  As explained above, however, there are at least three other prior art references cited in the specification or during prosecution that describe two-phase mixtures as "alloys."  Thus, contrary to Seagate's representation in its brief, the prior art included in the intrinsic record refers to both single-phase and two-phase mixtures as "alloys."[3]

---

[3]    Aside from what is discussed above, Seagate makes two other significant mischaracterizations with regard to the term "alloy."  First, Seagate claims that "a bag of copper marbles mixed with iron nuggets would be a 'metal mixture composed of two or more elements.'"  D.I. 146 at 16.  This is a mischaracterization of Cornice's proposed construction.  Further, Seagate's analogy of copper marbles and iron nuggets is not helpful because anyone with skill in the art knows that magnetic
(continued . . .)

## II.    "SEEDLAYER"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "seedlayer" | The term "seedlayer" means "a film layer that is between the substrate and the underlayer and in direct contact with the substrate." | A "seedlayer" is a film layer between the substrate and the underlayer, that acts to control the crystallographic orientation of subsequent layers. |

The parties agree that unlike the term "substantially directional magnetic isotropy" (discussed in Section III below), the term "seedlayer" is a term used by persons of skill in the relevant art. The parties disagree as to how the term "seedlayer" should be construed in the context of the '754 Patent (particularly in light of statements made during prosecution to distinguish the prior art).  Seagate's proposed construction requires that a "seedlayer" "acts to control the crystallographic orientation of subsequent layers."  Seagate's proposed construction should be rejected because it is based on further mischaracterizations of the specification and prior art articles cited in the '754 Patent, and, more importantly, completely ignores how the term was used during prosecution to distinguish the prior art.

### A.    Contrary To Seagate's Representation, There Is No "Ordinary Meaning" Of The Term "Seedlayer" That Includes Function As Well As Position.

Seagate states that "[t]here is no dispute here that . . . the term 'seedlayer' ordinarily encompasses both structure and function. In fact, Cornice's own expert admits it." D.I. 146 at 11.  Here

---

(. . . continued)
media is not made of marbles and nuggets.  Seagate's claim is not supported by Seagate's expert and is simply attorney argument.  Further, Seagate's statement is incorrect.  A bag of marbles and nuggets would not be a "metal mixture" as required by Cornice's proposed construction.

Second, Seagate claims that "[t]he parties do not dispute that an 'alloy' cannot be a 'compound.'" D.I. 146 at 14 (footnote 7).  As an initial matter this statement is a nearly incomprehensible double-negative, and is irrelevant to this claim construction.  Moreover, if Seagate means to claim that Cornice agrees that an alloy cannot be a "compound," then this statement is wrong.  Nothing in Cornice's proposed claim construction that an "alloy" is a "metal mixture composed of two or more elements," prevents an alloy from being a "compound."

6.

again Seagate has resorted to mischaracterizing the record, this time with respect to Dr. Coffey's

opinions.                                                         REDACTED


REDACTED


            REDACTED            Seagate selectively quotes from Dr. Coffey's Report, and in doing so

mischaracterizes his opinions.                          REDACTED
            REDACTED


**B.**    **The Use Of The Term "Seedlayer" In The Specification Is Inconsistent With Seagate's Proposed Construction.**

Seagate's Brief also mischaracterizes how the term "seedlayer" was used in the '754

specification. For example, Seagate states that the "patent repeatedly indicates that a seedlayer performs

a specific function in the magnetic medium," *i.e.,* controlling the crystallographic orientation. D.I. 146 at

11. As support for this proposition Seagate cites the following passage from the '754 Patent:

> In accordance with embodiments of the present invention, a desirably high SNR is achieved by the strategic formation of a seedlayer on the substrate prior to deposition of the underlayer and magnetic layer. After considerable experimentation and investigation, it was found that the nucleation, growth and crystallographic orientation of the magnetic layer can be suitably **controlled** by the proper selection of seedlayer and underlayer materials and, significantly, by suitable methodology.

*Id.* at 11-12 (emphasis in Seagate's Brief, not '754 Patent). Seagate claims that this passage proves that

the "seedlayer" controls the crystallographic orientation of the magnetic layer. *Id.* at 12-13. Seagate's

reading of this passage, however, ignores what it actually says. The above passage shows that the '754

Patent considered a number of factors to be important in controlling the crystallographic orientation of the

magnetic layer including "selection of . . . underlayer materials and, significantly, [] suitable

methodology." By ignoring the other factors that are important in controlling the crystallographic

orientation, Seagate has completely mischaracterized the teachings of the '754 Patent. The following is

the same passage quoted above, but with different emphasis supplied to show that "control" of the crystallographic orientation of the magnetic layer "can be" due to three factors:

> In accordance with embodiments of the present invention, a desirably high SNR is achieved by the strategic formation of a seedlayer on the substrate prior to deposition of the underlayer and magnetic layer. After considerable experimentation and investigation, it was found that the nucleation, growth and crystallographic orientation of the magnetic layer <u>can be suitably controlled</u> by the proper selection of <u>seedlayer</u> and <u>underlayer</u> materials and, <u>significantly, by suitable methodology.</u>

This passage clearly shows that there "can be" three factors that control the crystallographic orientation of the magnetic layer but does not state that any one "must" control such orientation. Seagate's claim that this paragraph supports its construction that the "seedlayer" must control the crystallographic orientation of the magnetic layer mischaracterizes the plain language of the '754 specification.

Seagate goes on to claim that the "seedlayer achieves this function by affecting the underlayer's grains and thus inducing (or precluding) particular crystallographic orientations in the magnetic layer's grains." D.I. 146 at 12. As support for this proposition, Seagate cites the following passage from the '754 Patent:

> It was found that the seedlayer can be treated, after deposition, to adjust its crystalline orientation and surface morphology <u>to induce</u> the nucleation and growth of the underlayer and the magnetic layer <u>such that</u> the magnetic layer exhibits substantial directional magnetic isotropy.

*Id.* at 12 (emphasis added by Seagate). Here again, a careful reading of the above passage shows that Seagate's construction of the term "seedlayer" is inherently flawed. The above passage states that the "seedlayer can be treated, after deposition." This statement shows that a layer is a "seedlayer" even before treatment, *i.e.*, before it is capable of performing the very function required by Seagate's claim construction. Further, the above passage shows that it is the treatment to the seedlayer (and not the seedlayer itself) that induces the nucleation and growth of the underlayer and the magnetic layer. This is inconsistent with Seagate's construction that requires that the "seedlayer" "acts to control the crystallographic orientation of subsequent layers."

Finally, Seagate mischaracterizes the specification by stating: "In a preferred embodiment of the patent, the seedlayer performs its function by precluding the formation of a (110) or

(200) dominant orientation in the underlayer, and thus preventing the development of a (11$\underline{2}$0) orientation in the magnetic layer." *Id.* This statement is incorrect for at least two reasons.

First, Seagate claims that a magnetic layer without a (11$\underline{2}$0) orientation is "a preferred embodiment." As explained in Cornice's Opening Brief (D.I. 178), a media with "no dominant crystallographic orientation" (which by definition has no dominant (11$\underline{2}$0) orientation) is not a "preferred" embodiment, but instead is the only embodiment disclosed in the '754 Patent.[4]

Second, Seagate's statement that "the seedlayer performs its function" is incorrect, if by "its function" Seagate means the function of "controlling" crystallography (as required by Seagate's proposed construction). Seagate is correct that a "seedlayer" <u>can</u> perform some function(s); however, as used in the specification and particularly during prosecution there is no requirement a "seedlayer" perform any particular function—especially the very specific function of "controlling" the crystallography. As explained above, it is not the "seedlayer" alone, but the "seedlayer" along with other factors like deposition conditions and "suitable methodology" that "controls" the crystallographic orientation.

### C. The Prior Art Cited In The '754 Patent Does Not Support Seagate's Proposed Construction Of The Term "Seedlayer."

Seagate claims that "two papers cited on the face of the patent define 'seedlayer' based on the layer's position <u>and</u> function." D.I. 146 at 13. Seagate again has mischaracterized the record, because neither article supports a construction of "seedlayer" that requires a certain functionality. Seagate contends that the following quote from the first paper supports its proposed construction, but a close reading of this passage shows that it does not:

> A seed layer (sometimes called a precoating) is a thin-film layer that is deposited between the substrate and the underlayer. Seed layers are used for (1) the facilitation of infrared heating of glass substrates, (2) the modification of the topography of the disk substrates

---

[4]    This is just one of a number of reasons why the term "substantially directional magnetic isotropy" must be construed as having "no dominant crystallographic orientation." *See* Section III *infra*.

for tribological purpose, and (3) inducing preferred crystallographic texture to underlayers.

D.I. 146 at 13 (Seagate's emphasis removed).  This passage does not support Seagate's proposed construction for at least three reasons.

First, the very **first sentence** of this passage, which says what a seedlayer "is," only mentions the position of the "seedlayer" and states nothing about the functionality of the layer. This is in direct conflict with Seagate's proposed requirement that a "seedlayer" "control" the crystallographic orientation of other layers.

Second, the only other sentence of this passage sets out **three** possible uses for a "seedlayer."  The fact that the sentence lists three different uses shows that Seagate's proposed construction is flawed because its construction allows for only one specific use ("control" of subsequent layers).  Seagate's Brief gives no explanation why Seagate ignores two of the three cited uses for a "seedlayer" in its proposed claim construction.  Further, this sentence only lists possible uses for a "seedlayer," and does not have any language that indicates that a layer is only a "seedlayer" when it is used in one of the three listed ways.

Third, the fact that the article states that a "seedlayer" can in some instances "induc[e] preferred crystallographic texture to underlayers," does not support Seagate's proposed construction. This is because Seagate's proposed construction requires "control" of not just the underlayer, but of "subsequent layers."  In the context of the '754 Patent, "subsequent layers" must include at least the underlayer and the magnetic layers, not just the underlayer.

Seagate also argues that the following quote from the second paper supports its proposed construction, but again, a close reading of this passage shows that it does not:

Our terminology for the different layers is shown in Fig. 1. We have named the layers in reference either to their positions with respect to the magnetic layer (the underlayer lies *under* the magnetic layer and the intermediate layer lies *between* the underlayer and the magnetic layer) or with a name that describes its function (the seedlayer *seeds* the nucleation of a particular crystallographic texture of the underlayer).

D.I. 146 at 14 (underlines added by Seagate, italics in original article). This passage does not support Seagate's proposed construction for at least two reasons.

First, as with the previous passage, this passage only refers to the underlayer and not more broadly to the "subsequent layers" as is required by Seagate's proposed construction. The above passage states that there are at least two layers above the "seedlayer." By stating that the "seedlayer" only "seeds the nucleation of a particular crystallographic texture of the **underlayer**," and not the magnetic layer, the passage's use of the term "seedlayer" conflicts with Seagate's proposed construction.

Second, this passage refers to "seed[ing] the nucleation of a particular crystallographic texture." Seagate offers no support, aside from attorney conjecture, as to why the terms "seed" and "control" are somehow synonymous. The terms "seed" and "control" are not the same, and for this additional reason this passage contradicts Seagate's proposed construction. In fact, as explained in Cornice's Opening Brief (D.I. 178), the '754 Patent is focused on obtaining a media with "no dominant crystallographic orientation." Thus, to construe a "seedlayer" as requiring that it "control" the crystallographic orientation of a subsequent layer that has "no dominant crystallographic" orientation is again inconsistent with the specification.

### D.    Seagate's Proposed Construction Of The Term "Seedlayer" Has Ignored The Prosecution Of The '754 Patent.

As explained in Cornice's Opening Brief (D.I. 178), the Applicants of the '754 Patent used the term "seedlayer" during prosecution in a manner that required a "seedlayer" to be "in direct contact with the substrate." As *Phillips* made clear, the "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the inventions and whether the inventor limited the invention in the course of prosecution." 415 F.3d at 1317. Further, *Phillips* explained that prosecution history "consists of the complete record of proceeding before the PTO." *Id*. Seagate's only alleged support from the prosecution history comes from the prior art that is cited in the patent. Seagate's Brief and its proposed construction completely ignores the prosecution (*i.e.,* the actual back and forth between the Applicants and the Examiner) of the '754 Patent.

### III.    "SUBSTANTIALLY DIRECTIONAL MAGNETIC ISOTROPY"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "substantially directional magnetic isotropy" | A longitudinal magnetic media has "substantially directional magnetic isotropy" when it has substantially equal values of magnetic properties, regardless of whether the property measurement occurs in the circumferential or radial direction, and it has a magnetic layer that has no dominant crystallographic orientation. | A longitudinal magnetic media has "substantially directional magnetic isotropy" when it has substantially equal values of one or more properties (*e.g.* Hc, Mrt and S*) of a thin film, regardless of whether the property measurement occurs in the circumferential or radial direction. |

The parties' dispute regarding the scope of the phrase "substantially directional magnetic isotropy" can be boiled down to two issues. First, can a media that exhibits "substantially directional magnetic isotropy" have preferred crystallographic orientations (as Seagate asserts), or must the magnetic media have "no dominant crystallographic orientation" (as Cornice asserts)? Second, in determining whether a media exhibits "substantially directional magnetic isotropy" should the jury be instructed that it can consider a single magnetic property of the accused media, while ignoring all other magnetic properties (as Seagate's construction would allow), or should the jury decide (as a factual matter), whether a particular media has "substantially equal values of magnetic properties" based on all evidence presented (as Cornice's construction would allow)? As explained in Cornice's Opening Brief (D.I. 178), Seagate's proposed constructions are not warranted and are inconsistent with the specification and prosecution history. This helps explain why Seagate's Brief does not cite to a <u>single</u> opinion from its own Expert Report in support of its proposed construction. The following responds to those aspects of Seagate's arguments not explicitly addressed in Cornice's Opening Brief.

### A.    Seagate's Discussion Of A "Numerical Ceiling" Is Irrelevant To Claim Construction.

Seagate spends a full two pages in its Opening Claim Construction Brief discussing Dr. Coffey's noninfringement analysis and Dr. Coffey's opinion regarding the limits of "substantially

12.

directional magnetic isotropy." D.I. 146 at 18-20. While Cornice agrees with Dr. Coffey's opinion that the scope of "substantially directional magnetic isotropy" should be limited by what is disclosed by the '754 Patent, this issue has nothing to do with Cornice's proposed claim construction of the term "substantially directional magnetic isotropy." Instead, this is a fact issue to be decided by a jury after the Court construes the claims. Accordingly, Seagate's discussion starting on page 18 and ending on page 20 should be ignored because it is irrelevant to the claim construction aspect of the two-step process for determining infringement. It should also be ignored because Seagate's disagreement with Dr. Coffey's opinions are not backed up by Seagate's expert.

B.     **Seagate Mischaracterizes The Dispute Regarding The Use Of The Term "Magnetic Properties" In The Specification.**

Seagate claims that "the parties generally agree that the skilled artisan may consider more than one orientation ratio of a medium's magnetic properties . . . to make this determination." D.I. 146 at 21. Once again Seagate has mischaracterized the parties' positions. It is contradictory for Seagate to claim that it agrees that a "skilled artisan may consider more than one orientation ratio" when its claim construction allows a jury to consider only one orientation ratio (and effectively ignore all others) in determining infringement. There is no question that if this case went to a jury, and there were two orientation ratios that were extremely high and one that was on the lower side, Seagate would argue that its claim construction of "one or more" means that only the lower orientation ratio needs to be considered and all others can be ignored (based on Seagate's proposed construction).

This dispute should focus on common sense. The following analogies illustrate the logical flaws with Seagate's proposed construction: Using Seagate's logic, an office building would be found to be "substantially empty" if no one is in the first floor lobby, even if all other floors were full of people. This results from a construction that simply requires "one or more properties (*i.e.*, lobby occupancy)" to be considered in the analysis (as Seagate's construction allows). Similarly, using Seagate's logic, a particular office in the building would be found to be "substantially clean" if the desk in that office were clean, even if all the floors and bookcase tops were filthy. This results from a

13.

construction that simply requires "one or more properties (*i.e.*, cleanliness of the various parts of an office)" to be considered in the analysis.

    C.    **Seagate's Claim Differentiation Argument Is Factually Incorrect And Irrelevant, Because Cornice's Proposed Construction Of "Substantially Directional Magnetic Isotropy" Does Not Render Claim 11 Superfluous.**

    Seagate claims that "Cornice's limitation contradicts and renders dependent claim 11 superfluous." D.I. 146 at page 24. Seagate is wrong. If "substantially directional magnetic isotropy" is construed to require a magnetic layer with "no dominant crystallographic orientation" then claim 11 would still be limited by the underlayer limitation set forth in that claim (*i.e.*, the "underlayer does not exhibit a (200)-dominant crystallographic orientation").

    The doctrine of claim differentiation recognizes that there is "a presumption that each claim in a patent has a different scope." *See Comark Communications, Inc., v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). However, the presumption is relatively weak, and can be rebutted. *See Seachange Intern., Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) ("the doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history"). Here the doctrine does not apply here, because dependant claim 11 adds an additional limitation to claim 1 by adding the limitation that "the underlayer does not exhibit a (200)-dominant crystallographic orientation." In addition, as explained in Cornice's Opening Brief [D.I. 178 at 26-29], the '754 Patent does not disclose a single embodiment of how to achieve a magnetic layer that has anything but "no dominant crystallographic orientation" in the context of the claimed subject matter. Accordingly, claim differentiation does not support Seagate's expansive construction. *Id.*

    D.    **The Parties Agree That The Term "Substantially Directional Magnetic Isotropy" Does not Have An Ordinary Meaning Outside The '754 Patent.**

    There is no dispute that the term "substantially directional magnetic isotropy" does not have an ordinary meaning outside the '754 Patent.        REDACTED

14.

REDACTED

REDACTED

REDACTED

REDACTED                                                    Nonetheless,

Seagate proposes a construction that ignores the specification and relies heavily on attorney characterizations not backed-up by its own expert. Given that Seagate concedes the term "substantially directional magnetic isotropy" has no accepted meaning other than that given to it by the specification, Seagate's proposed construction is especially erroneous. *See, e.g., Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) ("The parties agree that the term 'marker substance' has no accepted meaning to one of ordinary skill in the art . . . . Accordingly, we construe it only as broadly as is provided for by the patent itself"); *J.T. Eaton & Co., v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1568 (Fed. Cir. 1997) ("[meaning for] term with no previous meaning to those of ordinary skill in the art . . . must be found somewhere in the patent"); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1359-60 (Fed. Cir. 2005) (construing coined term "download component" based on description of specific attributes in specification); *On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GMBH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) ("Because the phrase 'substantially spherical . . . having a cylindrical component added thereto' has no precise and generally understood meaning in the art as applied to

15.

reflective surfaces, we look to the intrinsic evidence, in this case the specification, for guidance as to the meaning of that language as used in the patent.").

## IV.    "RANDOMLY ORIENTED GRAINS" AND "GRAINS [LYING IN A PLANE] ARE RANDOMLY ORIENTED"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "randomly oriented grains"<br><br>"grains [lying in a plane] are randomly oriented" | A longitudinal magnetic media has "randomly oriented grains" or "grains [lying in a plane] are randomly oriented" when the magnetic c-axis of the grains are randomly oriented in all three dimensions. | The claim phrases should receive their ordinary meaning, without additional limitations:<br>• "randomly oriented grains" means "randomly oriented grains"<br>• "grains lying in a plane are randomly oriented" means "grains lying in a plane are randomly oriented" |

Seagate proposes that the Court not provide any constructions for the above phrases. This is because Seagate has no "infringement" arguments if "random" is properly construed to mean random in "all three dimensions" (as Cornice proposes), as opposed to random in "two and only two dimensions" (as Seagate's expert has testified). Seagate has no basis, and does not provide any evidence in its brief, for its claim that "random" should be limited to "random in only two-dimensions."[5] If the Court does not provide a construction for the terms, then Seagate is expected to argue at trial that "random" actually means "random in only two-dimensions." Under these circumstances, the "randomly oriented" terms should be construed by the Court. *See United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain").

---

[5]    Seagate also claims that Cornice's "proposed construction is of recent vintage." D.I. 146 at 28. This is incorrect. Seagate has known that it is Cornice's position that the '754 Patent refers to a media that has no dominant crystallographic orientation (and thus has grains randomly oriented in three dimensions) since at least early 2005 in connection with the parties' previous ITC litigation.

16.

As explained in Cornice's Opening Brief (D.I. 178), the "randomly oriented" limitations should be construed as requiring random orientation in three dimensions. Seagate's arguments regarding the magnetic c-axis are irrelevant and off point. First, Seagate does not provide any support for its statement that "chromium-based crystals do not have a magnetic c-axis." D.I. 146 at 29. Accordingly, Seagate's entire argument is based on attorney argument. Second, Seagate's "magnetic c-axis" argument does not address the more relevant limitation of Cornice's proposed construction—that "randomly oriented" grains must be randomly oriented in "all three dimensions."

## V.     "HAVING MAGNETIC PROPERTIES WITH AN ORIENTATION RATIO OF ABOUT 1.0"

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "having magnetic properties with an orientation ratio of about 1.0" | The term "magnetic properties" as used in the phrase "having magnetic properties with an orientation ratio of about 1.0" means "at least two magnetic properties."<br><br>The term "orientation ratio of about 1.0" as used in the phrase "having magnetic properties with an orientation ratio of about 1.0" means "an orientation ratio number that would round to 1.0." | "Having magnetic properties with one or more orientation ratios of about 1.0." |

There are two distinct disputes regarding the term having "magnetic properties with an orientation ratio of about 1.0." The first dispute is whether the term "magnetic properties" can refer to one magnetic property (as Seagate proposes). The second dispute is whether the jury should be given some guidance as to what "about 1.0" means in the context of orientation ratios for magnetic recording media.

**A.    Seagate Mischaracterizes The Dispute Regarding "Magnetic Properties."**

Seagate claims that the dispute regarding the term "magnetic properties" found in claim 12 is essentially the same as the dispute over the term "substantially directional magnetic isotropy." Seagate again has mischaracterized Cornice's position and the record. In reality these are two completely separate and different disputes. The dispute over "substantially directional magnetic isotropy" is what does the term refer to in the '754 Patent and how should the jury be instructed as to its scope. In contrast, the dispute over "magnetic properties" is whether a plural term can mean just one. While there is overlap in the evidence and arguments between the two terms, the dispute is distinct and should be considered separately.

As explained in Cornice's Opening Brief (D.I. 178), the term "magnetic properties" is plural and therefore must mean "at least two magnetic properties." In an attempt to avoid the obvious conclusion that a plural term must refer to at least two things, Seagate argues that "magnetic properties" has two different meanings. For example, Seagate claims that the two properties that the term "magnetic properties" refers to could be Hc and Mr, alternatively "magnetic properties" could refer to Hc measured in the circumferential direction and Hc measured in the radial direction. Seagate's position holds no water. Here again, an analogy is helpful. A well known property is density. The density of a rock can be measured at the top and it can be measured at the bottom. No one, however, would claim that density is actually two properties. Instead, the single property of density has been measured at two different locations.

**B.    Cornice's Construction Of "About 1.0" Does Not Exclude The "Preferred Embodiment."**

Seagate claims that Cornice's proposed construction would exclude the "preferred embodiment" of the '754 Patent found in Table II. *See* D.I. 146 at 28. Seagate again misses the point. Table II provides the only experimental example found in the '754 Patent, but nowhere in the '754 Patent is Table II described as the "preferred embodiment." There are other non-experimental examples found

18.

in the '754 Patent that could be considered as being covered by the claimed subject matter. For instance, the '754 Patent states, "inventive magnetic recording media have magnetic properties, with an orientation ratio (OR) less than about 1.1, *e.g.*, about 1.0." D.I. 146, Ex. 1 ['754 Patent] at 7:4-6. Cornice's construction of "about 1.0" would not exclude this example. Accordingly, Seagate's argument that Cornice's proposed construction of "about 1.0" excludes the "preferred embodiment" is factually incorrect.

VI.    **"SUBSTRATE"**

| Claim Term | Cornice's Proposed Construction | Seagate's Proposed Construction |
|------------|--------------------------------|--------------------------------|
| "substrate" | The supporting material on which the thin films are deposited. | The "substrate" is the supporting material on which the thin films are deposited. |

The parties agree on the construction of the term "substrate." Nonetheless, Seagate spends about four pages of its Opening Brief discussing the application of the parties' agreed upon construction. Again, Seagate is confusing issues of claim construction with the second step of any infringement analysis (*i.e.*, whether the claims describe the accused products). Cornice disagrees with Seagate's positions and Seagate's mischaracterizations of Cornice's positions. Cornice will reserve its response to Seagate's arguments for the proper time, however, because Seagate's discussion is irrelevant and should be ignored in the claim construction context.[6]

---

[6]    Seagate's "Note" found in the Joint Claim Construction Statement that "Seagate disagrees with Cornice's implicit exclusion of coating layers on substrate bases" is likewise irrelevant. *See* D.I. 143 at 12. The parties have agreed how the term "substrate" should be construed.

19.

## CONCLUSION

For the foregoing reasons, Cornice respectfully requests that its proposed claim construction be adopted by the Court.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ Julia Heaney
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jheaney@mnat.com
*Attorneys for Defendant and Counterclaim
Plaintiff Cornice, Inc.*

OF COUNSEL:

Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

December 16, 2005
498277

I

THIS EXHIBIT HAS BEEN REDACTED

J

**THIS EXHIBIT HAS BEEN REDACTED**

K

**THIS EXHIBIT HAS BEEN REDACTED**

L

US005456978A

# United States Patent [19]

## Lal et al.

[11] Patent Number: 5,456,978

[45] Date of Patent: Oct. 10, 1995

[54] THIN-FILM RECORDING MEDIUM WITH THIN METAL SUBLAYER

[75] Inventors: Brij B. Lal, San Jose; Tadashi Shinohara, Fremont, both of Calif.

[73] Assignee: HMT Technology Corporation, Fremont, Calif.

[21] Appl. No.: 101,230

[22] Filed: Aug. 3, 1993

[51] Int. Cl.$^6$ .................. B32B 5/16; G11B 5/66; B05D 5/12; C23C 14/00

[52] U.S. Cl. .................. 428/332; 428/336; 428/408; 428/666; 428/667; 428/693; 428/698; 428/694 T; 428/694 TS; 428/694 TP; 428/694 TC; 428/701; 428/702; 428/65.5; 204/192.1; 204/192.2; 427/127; 427/128; 427/130; 427/131; 427/132

[58] Field of Search .................. 428/900, 64, 65, 428/694 T, 694 TS, 694 TP, 611, 694 TC, 666, 667, 693, 698, 332, 336, 408, 701, 702; 204/192.1, 192.2; 427/127, 128, 130, 131, 132

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,833,020 | 5/1989 | Shiroishi et al. | 428/336 |
| 5,082,747 | 1/1992 | Hedgcoth | 428/611 |
| 5,122,423 | 6/1992 | Hase et al. | 428/694 |
| 5,316,631 | 5/1994 | Ando | 204/192.2 |
| 5,316,844 | 5/1994 | Suzuki | 428/323 |
| 5,344,706 | 9/1994 | Lambeth | 428/336 |

FOREIGN PATENT DOCUMENTS

92102454  6/1990  Japan .

OTHER PUBLICATIONS

Fisher, R. D., et al., "Magnetic Properties and Longitudinal Recording Performance of Corrosion-Resistant Alloy Films," *IEEE Trans. Mag.* 22: 352–354 (1986).

Futamoto, M., et al., "Investigation of 2 Gb/in² Magnetic Recording at a Track Density of 17 kTPI," *IEEE Trans.*

*Mag.* 27(6): 5280–5285 (1991).

Howard, J. K., "Thin films for magnetic recording technology: A review," *J. Vac. Sci. Technol. A* 4(1): 1–13 (1986).

Hughes, G. F., "Magnetization reversal in cobalt–phosphorus films," *J. Appl. Phys.* 54(9): 5306–5313 (1983).

Johnson, K. E., et al., "Dependence of Magnetic Media Noise on Ultra–Thin Cr Underlayer Thickness," *IEEE Trans. Mag.* 28(5): 3099–3101 (1992).

Johnson, K. E., et al., "The effect of Cr underlayer thickness on magnetic and structural properties of CoPtCr thin films," *J. Appl. Phys.* 67(9): 4686–4688 (1990).

Kitada, M., and N. Shimizu, "Magnetic properties of sputtered Co–Pt thin films," *J. Appl. Phys.* 54(12): 7089–7094 (1983).

Kogure, T., and S. Katayama, "High-coercivity magnetic hard disks using glass substrates," *J. Appl. Phys.* 67(9): 4701–4703 (1990).

Lal, B. B., et al., "A New Series of Quaternary Co-Alloys for High Density Rigid-disk Applications," *IEEE Trans. Mag.* 27(6): 4739–4741 (1991).

Miura, S., et al., "Noise and Bit Jitter Performance of CoNiPt Thin Film Longitudinal Recording Media and its Effect on Recording Performance," *IEEE Trans. Mag.* 24(6): 2718–2720 (1988).

Sanders, I. L., et al., "Magnetic and Recording Characteristics of Very Thin Metal-Film Media," *IEEE Trans. Mag.* 25(5): 3869–3871 (1989).

Shiroishi, Y., et al., "Read and Write Characteristics of Co–Alloy/Cr Thin Films for Longitudinal Recording," *IEEE Trans. Mag.* 24(6): 2730–2732 (1988).

Yogi, T., et al., "Dependence of Magnetics, Microstructures and Recording Properties on Underlayer Thickness in CoNiCr/Cr Media," *IEEE Trans. Mag.* 24(6): 2727–2729 (1988).

*Primary Examiner*—L. Kiliman

*Attorney, Agent, or Firm*—Peter J. Dehlinger; Judy M. Mohr

[57] ABSTRACT

A magnetic thin-film medium formed on a non-metallic substrate and having reduced noise characteristics, by virtue of a 5–50 Å, sputtered Cr-containing sublayer interposed between the substrate and a chromium underlayer. Also disclosed is a method of preparing the low-noise medium.

8 Claims, 5 Drawing Sheets





## Fig. 1



## Fig. 2



**Fig. 3**

**Fig. 4**



Fig. 5A



Fig. 5B



Fig. 6



Fig. 7



**Fig. 8**



**Fig. 9**

5,456,978

1

## THIN-FILM RECORDING MEDIUM WITH THIN METAL SUBLAYER

### FIELD OF THE INVENTION

The present invention relates to a thin-film magnetic recording medium and to a method of producing the same.

### REFERENCES

Fisher, R. D., et al., IEEE Trans. on Magn., 22:352 (1986).
Howard, J. K., J Vac Sci Technol, A4(1):1 (1986).
Hughes, G. F., J Appl Phys, 54:5306 (1983).
Johnson, K. E., et al., J. Appl Phys, 67:4686 (1990) .
Johnson, K. E. , et al., IEEE Trans. on Magn, 28(5):3100 (1992).
Kitaka, M., et al., J Appl Phys, 54(12):7089 (1983).
Lal, B. B., et al., IEEE Trans Mag, 27(6):4739 (1991).
Miura, S., et al., IEEE Trans on Magn, 24(6):2718 (1988).
Sanders, I. L., et al., IEEE Trans on Magn, 25(5):3869 (1989) .
Shiroishi, Y., et al., IEEE Trans on Magn, 24:2730 (1988).
Yogi, T., et al., IEEE Trans on Magn, 24(6):2727 (1988).

### BACKGROUND OF THE INVENTION

Thin-film hard disc magnetic media are widely used in read/write memory devices in computers. Increasingly, there is an effort in the thin-film medium industry to achieve higher recording density (Howard). Among the magnetic properties which are important to a high recording density are:

(1) Coercivity, defined as the magnetic field required to reduce the remanence magnetic flux to 0, i.e., the field required to erase a stored bit of information. Higher coercivity in a medium allows adjacent recorded bits to be placed more closely together without mutual cancellation. Thus, higher coercivity is associated with higher information storage density.

(2) HF signal amplitude, which provides a measure of the signal amplitude recorded at a selected high frequency, typically, between about 4–8 MHz. Signal amplitude depends in part on the magnetic M, of the medium, the higher the $M_r$, the greater the HF signal amplitude.

(3) Resolution, which provides a measure of the response of a read/write system. Resolution is typically expressed as a ratio (in percent) between the read voltages at HF and LF, where F is as above.

(4) Signal-to-noise ratio (SNR) which defines the ratio of signal amplitude, or peak-to-peak amplitude of a single pulse, as a function of recording frequency, to recording noise at that frequency. A HIGH SNR ratios, due to signal amplitude and/or low noise, are necessary for high density recording.

(5) The isolated readback pulsewidth, PW-50, measured at 50% of base to peak amplitude, indicates the degree of signal distortion at a given readback frequency due to overlap between adjacent signals. ideally, for high density recording, PW-50 should be reduced.

Thin-film media are typically prepared by sputtering an underlayer, such as a chromium underlayer, onto the substrate surface, then sputtering a cobalt-based magnetic thin film over the underlayer. A protective, lubricating carbon

2

overcoat may be applied over the thin-film layer by sputtering.

The requirements for lower fly heights and higher recording densities have placed severe requirements on the substrate. Al/NiP substrates of thicknesses below 35 mils have shown significant problems in maintaining good fly characteristics below 4 microinches. As the thickness of the Al/NiP substrate is reduced, these substrates have also shown a greater susceptibility to handling damage.

Nonmetallic substrates, such as canasite™ (glass-ceramic) or glass substrates, have smoother surfaces and higher flexural strength. As a result, they are capable of providing superior fly properties and are potential replacements for Al/NiP substrates. Unfortunately, longitudinal magnetic media deposited on canasite™ substrates have generally exhibited lower outputs, higher noise and increased bit-shifts over comparable media deposited on Al/NiP substrates.

### SUMMARY OF THE INVENTION

The present invention includes, in one aspect, an improvement in a magnetic film recording medium of the type having (a) a disc-like non-metallic substrate, (b) a sputtered Cr underlayer having a thickness between about 200–3,000 Å, and a predominantly (200) crystallographic orientation, (c) a sputtered magnetic thin-film layer having a thickness between about 150–800 Å, and (d) a sputtered carbon overcoat. The improvement, which is effective to reduce the noise of the medium by at least about 25%, comprises a sputtered Cr-containing sublayer formed directly on the substrate, between the substrate and underlayer, and characterized by:

(i) a thickness of between 5 and 80 Å, and

(ii) a crystalline structure, characterized by the presence of a predominantly Cr (110) x-ray diffraction line.

In one general embodiment, the sublayer contains oxygen, nitrogen, or carbon in an amount sufficient to produce the desired Cr crystalline structure. In a preferred embodiment, the sublayer contains oxygen in an amount sufficient to produce the Cr (110) crystalline structure, and the sublayer thickness is between about 5–80 Å, preferably 5–15 Å.

In another aspect, the invention includes an improvement in a sputtering method for producing a magnetic thin-film recording medium by successively sputtering onto a disc-like non-metallic substrate, (a) a sputtered Cr underlayer having a thickness between about 200–3,000 Å, and a predominantly (200) crystallographic orientation, (b) a sputtered magnetic thin-film layer having a thickness between about 150–800 Å, and (c) a sputtered carbon overcoat.

The improvement, which is effective to reduce the noise of the medium by at least about 25%, comprises forming directly on the substrate, between the substrate and underlayer, a sputtered Cr-containing sublayer under conditions effective to produce sublayer characteristics of:

(i) a thickness of between 5 and 80 Å, and

(ii) a crystalline structure, characterized by the presence of a predominantly Cr (110) x-ray diffraction line.

In one preferred embodiment, the forming includes sputtering a Cr sublayer onto the substrate, to a selected thickness of between 5–80 Å, and allowing the substrate to become partially oxidized before sputtering the Cr underlayer over the sublayer.

The sputtering is preferably carried out to form a sublayer thickness between about 5–20 Å, the sublayer is deposited

5,456,978

3

at a sputtering pressure between about 2–10 mBar, and the substrate is heated to above about 150° C. prior to sputtering.

These and other objects and features of the invention will be more fully appreciated when the following detailed description of the invention is read in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a sectional view of a thin-film media formed in accordance with the invention;

FIG. 2 is a schematic illustration of a portion of a sputtering apparatus used in forming the disc of the invention;

FIG. 3 is a plot of substrate coercivity as a function of sublayer deposition temperature in a thin-film medium having a 20 Å Cr sublayer;

FIG. 4 shows plots of coercivity as a function of sublayer sputtering pressure in media having Cr sublayer thicknesses of 10 Å (solid rectangles) and 50 Å ("+" symbols);

FIG. 5A shows plots of media noise as a function of recording linear density for media having no Cr underlayer (solid rectangles) and Cr sublayer thicknesses of 10 Å (vertical tick), 20 Å ("–" symbols), 30 Å (open rectangles), 40 Å ("X" symbols) , and 50 Å (solid triangles);

FIG. 5B shows plots of media noise as a function of recording linear density for media having Cr sublayer thicknesses of 10 Å (solid rectangles), 50 Å (vertical tick), 100 Å (stars symbols), 200 Å (open rectangles), and 300 Å ("X" symbols);

FIG. 6 shows the plots of signal to noise ratio as a function of recording linear density for media having Cr sublayer thicknesses of 10 Å (solid rectangles), 50 Å (vertical tick), 100 Å (stars symbols), 200 Å (open rectangles), and 300 Å ("X" symbols);

FIG. 7 shows a plot of HF signal amplitude as a function of Cr sublayer thickness in a thin-film medium;

FIG. 8 shows a plot of resolution ( % ) as a function of Cr sublayer thickness in a thin-film medium; and

FIG. 9 shows a plot of PW-50 as a function of Cr sublayer thickness in a thin-film medium.

## DETAILED DESCRIPTION OF THE DRAWINGS

### I. Thin-Film Medium

FIG. 1 shows in cross section view, a fragmentary portion of a thin-film medium or disc 10 formed in accordance with one embodiment of the invention. The disc generally includes a rigid, non-magnetic substrate 12, and forming successive thin-film layers over the substrate, an amorphous, Cr-containing sublayer 14, a crystalline underlayer 16, a magnetic thin-film layer 18, and a protective carbon overcoat 20. It will be appreciated that the disc is symmetrical with respect to its upper and lower surfaces, the lower portion of the disc not being shown in the figure.

The non-metallic substrate may be either a glass, glass-ceramic, or ceramic substrate. An example of a glass-ceramic substrate is a canasite™ substrate. Such substrates are formed initially as an amorphous glass, then heated under conditions which produce a crystalline, ceramic phase. A ceramic substrate may be formed conventionally by sintering alumina particles, then coating the ceramic with a glass surface coating. Such substrates, which are commercially available, have a thickness of about 1.27 mm for a 95

4

mm disc, and conventional testing is done at ID/OD values of about 0.8 inch and 1.78 inch, respectively.

One method for texturing a glass substrate is described in parent U.S. patent application for "Glass Substrate with Controlled Low-Friction Surface," Ser. No. 475,715, filed Feb. 6, 1990, which is incorporated by reference herein. Alternatively, the glass or ceramic substrate may be micro-roughened by known mechanical texturing methods. In still another embodiment, a disk substrate having a desired surface texturing may be obtained from commercial sources. One such commercial substrate is a canasite™ ceramic substrate available from Corning Glass (Corning, N.Y.). The substrate is available in conventional as well as non-standard thicknesses, and has a micro-roughened surface having a density of zero crossings of about 70/mm, and a peak-to-valley depth of between about 10-30 nm.

Two conventional size substrates have outer diameters of 130 and 95 mm (5.1 and 3.74 inches), with corresponding inner diameters of 40 and 25 mm (1.57 and 0.98 inches), respectively. The discs used for the preferred embodiment have a thickness of 0.472 inches and outer diameters of 1.888 inches. The inner and outer edges of the disc which define these diameters are indicated at 22, 24, respectively, in FIG. 1.

Sublayer 12 provides a Cr-containing metal surface for desired underlayer crystal orientation on the substrate, when the underlayer material is sputtered over the sublayer. According to one important consideration, the sputtered Cr-containing sublayer has a crystalline structure, characterized by the presence of a predominantly Cr (110) x-ray diffraction line. Conventional surface x-ray diffraction methods can be used to show the presence of a Cr (110) crystal orientation in the sublayer.

The Cr (110) crystal orientation of the sublayer can be achieved in a variety of ways. In one general embodiment, the sublayer contains a sufficient amount of a nonmetal, preferably oxygen, carbon, or nitrogen, to effectively prevent 200-oriented crystal growth. The amount of oxygen, carbon, or nitrogen required is typically between 5–30 atom percent. As will be seen below, the non-metal element may be introduced into the sputtered underlayer by a combination of (i) allowing a Cr-sputtered sublayer to undergo oxidation prior to forming the underlayer, and/or (ii) conducting the sputtering steps in the presence of oxygen, nitrogen, and/or a carbon containing gas, such as methane.

Alternatively, the Cr-containing sublayer may be a Cr-metal alloy, such as Cr in combination with Tl, Mo, Zr, Hf, Si, Nb, Al, Y, V, Mn, Ag, B, Gd, where the non-Cr metal is present in an amount sufficient to produce the desired Cr (110) crystal orientation in the sputtered sublayer. The non-Cr metal is typically included in the Cr-containing target used for sputtering, as described below.

According to another important consideration, the sublayer is formed to a thickness of between 5–80 Å, preferably 5–50 Å, and more preferably between about 5–15 Å. The preferred sublayer thickness improves HF signal amplitude, resolution, and PW-50 characteristics of the medium, as seen in Section III below. The preferred sublayer thickness also allows for higher coercivity under increased-pressure sputtering conditions, as will be seen in Section II below.

The crystalline underlayer is preferably a sputtered Cr underlayer having a thickness between about 200–3,000 Å, and a predominantly (200) crystallographic orientation, as determined by conventional x-ray surface diffraction techniques.

Magnetic thin-film layer 18 is formed by sputtering onto

5,456,978

5

the underlayer, a target alloy composed of a Co-based alloy such as a Co/Cr or Co/Ni binary alloy, or a Co/Cr or Co/Ni based alloy, i.e., an alloy in which the binary elements constitute about 80 atomic percent or more of the alloy. Exemplary alloys include Co/Cr/Ta, Co/Ni/Pt or Co/Ni/Cr ternary alloy, or a Co/Cr/Ta/Pt or Co/Ni/Cr/Pt quaternary alloy. One preferred magnetic thin film alloy is composed of 60–90 percent Co, 2–15 atom percent Cr, and 10–30 atom percent Ni. The elemental compositions of one exemplary magnetic thin-film alloy, identified herein as TMM #71, is 67 atom percent Co, 8 atom percent Cr, and 25 atom percent Ni. The thin-film layer has preferred thickness between about 100–800 Å, preferably 300–500 Å.

Alternatively, the thin-film magnetic layer may be a multilayer structure composed of two or more magnetic thin-film sublayers, each separated by a thin isolation layer, such as a 2–50 Å Cr isolation layer.

Carbon overcoat 20 in the thin-film medium is preferably a carbon layer formed by sputtering carbon onto the magnetic layer, under conditions in which the carbon is in a predominantly diamond-like structure. The overcoat thickness is preferably between about 100 and 400 Å.

More generally, the invention includes an improved thin-film recording medium of the type having (a) a disc-like non-metallic substrate, (b) a sputtered Cr underlayer having a thickness between about 200–3,000 Å, and a dominant (200) crystallographic orientation, (c) a sputtered magnetic thin-film layer having a thickness between about 150–800 Å, and (d) a sputtered carbon overcoat. The improvement, which is effective to reduce the noise of the medium by at least about 25%, comprises a sputtered Cr-containing sublayer formed directly on the substrate, between the substrate and underlayer, and characterized by:

(i) a thickness of between 5 and 80 Å, and

(ii) an amorphous crystalline structure, as characterized by the presence of a predominantly Cr (110) x-ray diffraction line.

II. Method of Reducing Medium Noise

FIG. 2 shows, in schematic view, a portion of a sputtering apparatus 26 which is used, in the method of the invention, for producing the thin-film medium described in Section 1. The method will be described with reference to forming the medium illustrated in FIG. 1.

Apparatus 26 includes a vacuum chamber 28 having at least four stations at which sputtering or heating operations occur. A heating station (not shown) at the upstream end of the chamber has a plurality of infrared lights which are arrayed for heating both sides of a substrate, such as substrate 30, carried through the station in the chamber on an disc holder or pallet 32.

Just downstream of the heating station is a first sputtering station 34 at which the sublayer is formed on a substrate, in a manner to be described. The station includes a pair of targets, such as targets 36, 38, effective to sputter chromium onto opposite sides of a substrate, such as substrate 30. The targets in station 34 are preferably pure chromium targets, or chromium alloys containing a sufficient amount of a second non-magnetic metal, e.g., W, Si, Zr, Al, Mn, Nb, Hf, V, Y, B, Ta, Mo, Ag, B, Gd, or Ti, to produce an amorphous Cr/second metal sputtered layer. The percent of second metal is typically 2–30 atom percent in the target.

When the sublayer is a sputtered Cr/C (carbide) or Cr/N (nitride) layer, the first sputtering station may contain a

6

mixture of Ar and either a carbon-containing gas, such as $CH_4$, or $N_2$. Typically, the chamber would contain 10–70 mole percent non-Ar gas, at a total gas pressure of between about 2–20 mBar. Alternatively, the target itself may contain carbon in the form of graphite, or be formed of CrC or CrO.

In one preferred embodiment, the same Cr target is used for forming both the sublayer and Cr underlayer. As will be described below, the Cr-containing sublayer in this embodiment is a partially oxidized Cr sublayer produced by (i) sputtering a 5–80 Å Cr sublayer, and (ii) removing the substrate from the sputtering station, to allow oxidation of the sublayer to occur. The substrate with oxidized sublayer coating is then introduced into the Cr target station again, to form the Cr underlayer.

A second sputtering station (not shown) downstream of chamber 28 is designed for sputtering a magnetic film onto the underlayer. The station includes a pair of sputtering targets for sputtering the magnetic film alloy onto the substrate, after formation of the underlayer on the substrate. As indicated above, the targets in this station are formed of a Co/Cr- or Co/Ni-based alloy, and preferably one containing 60–90 percent Co, 2–20 atom percent Cr, and 10–30 atom percent Ni. The alloy is formed and shaped for use as a sputtering target by conventional metallurgical methods.

The carbon overcoat in the medium is produced by sputtering from a graphite target in a final sputtering station (not shown) in the apparatus.

The basic sputtering apparatus is preferably a commercial system, such as in available from Varian-INTEVAC (Santa Clara, Calif.), Circuits Processing Apparatus (Fremont, Calif.), ULVAC (Japan), Leybold Heraeus (Germany), VACTEC (Boulder, Colo.), or Materials Research Corporation (Albany, N.Y.). These systems are double-sided, in-line, high-throughput machines having two interlocking systems, for loading and unloading.

In operation, the sputtering chamber is evacuated to pressure of about $10^{-7}$ Torr, and argon gas is introduced into the chamber to a final sputtering pressure of 2–20 mTorr (2 to 25 mBar). A preferred argon gas pressure is 5 mTorr.

The substrate is heated in the heating station to a selected temperature before advancing into the two sputtering chambers. The heating conditions in the apparatus are preferably adjusted to achieve a preferred substrate temperature of between about 100° C. and 400° C., although temperatures below 100° may also be employed.

FIG. 3 shows the effect of substrate temperature during Cr sublayer deposition (20 Å sublayer thickness) on the coercivity of a thin-film medium completed by (i) depositing a 1200 Å sputtered Cr underlayer over the sublayer, and (ii) depositing a 350 Å magnetic thin-film layer over the underlayer. The coercivity (in Oe) was measured from vibrating sample magnetometer (VSM) curves conventionally. The thin-film magnetic layer in the media is formed of the above TMM #71 Co/Ni/Cr alloy. As seen, a relatively small increase in coercivity (about 4% increase) is seen at the highest substrate temperature compared with 100° C.

The sputter pressure during sublayer formation may also be adjusted to optimize coercivity in the medium. FIG. 4 shows the effect of sputtering pressure on coercivity in media formed with a Cr sublayer having thicknesses of either 10 Å (solid rectangles) or 50 Å ("+" symbols). As seen, at the lower sublayer thickness, coercivity was about 4–5 percent at higher at 10 mBar than at 3 mBar.

The sputtered sublayer is formed under sputtering conditions effective to produce a 5–50 Å layer. The pressure/coercivity effect noted above provides one advantage of a

5,456,978

7

sublayer in the lower thickness range, e.g., 5–50 Å. As will be seen in Section III below, optimal HF signal amplitude, resolution, and PW-50 properties are also achieved at this lower thickness range.

After sublayer formation, the substrate is moved to a Cr sputtering station for formation of the Cr underlayer. In the case where the sublayer itself is formed in this station, the substrate is positioned outside the station between sublayer and underlayer deposition, to allow partial oxidation of the sublayer before underlayer formation.

The coated substrate is preferably also reheated before underlayer formation, to a preferred temperature of between 250°–400° C. The thin Cr sublayer functions here to increase the rate of heating, in part by providing an internal heat-reflecting surface which reduce heat loss from the non-metallic substrate. The ability to achieve higher and more stable substrate temperature during underlayer formation is another advantage of the invention. In addition, the sublayer allows a DC voltage bias to be applied to the substrate during underlayer formation.

The Cr underlayer is formed by conventional sputtering, achieving a dominant (200) crystal orientation required for high coercivity in the medium. The sputtering is carried out to produce a 200–3,000 Å underlayer; and preferably 800–3,000 Å. The sputtering rate from the Cr target is preferably adjusted to achieve a deposition rate of about 40 Å/sec.

After formation of the underlayer, the substrate is moved downstream on a disc holder into the second sputtering chamber, where the magnetic layer is sputtered onto the underlayer. The magnetic thin film is sputtered onto the underlayer under known conditions, such as described in the co-owned U.S. Pat. No. 4,816,127. The pressure and substrate temperature conditions are similar to those described above. The thickness of the magnetic layer is preferably between about 100–800 Å, and more preferably 300–500 Å.

After formation of the magnetic thin film, the substrate is carried on the disc holder toward a third sputtering station (not shown) at which a carbon overcoat is applied according to conventional sputtering methods.

It will be appreciated that a variety of sputtering techniques may be employed to produce an amorphous, Cr-containing substrate in a thin-film medium of the type described. More generally, this aspect of the invention includes an improved method for forming a magnetic thin-film recording medium by successively sputtering onto a disc-like non-metallic substrate, (a) a sputtered Cr underlayer having a thickness between about 200–3,000 Å, (b) a sputtered magnetic thin-film layer having a thickness between about 100–800 Å, and (c) a sputtered carbon overcoat. The improvement, which is effective to reduce the noise of the medium by at least about 25%, comprises sputtering between the substrate and underlayer, a Cr-containing sublayer having a thickness of between 5 and 80 Å.

### III. Media Properties

Bulk magnetic properties were determined by vibrating sample magnetometry (VSM) conventionally. Magnetic recording testing was carried out on a Guzik Model RWA 501, using a thin-film inductive reading and recording head with a gap length of 0.38 microns, a gap width of 7.25 microns, and a flying height of 2.5 μin. The head inductance was 1.1 μHenry and resistance, 30 ohms. Recording current was 25–30 mAmps for saturation. The AC-SNR was measured at linear densities between 30 and 100 kiloflux change/inch (KFCI).

8

In the studies reported below, media were prepared as follows: A canasite substrate (48 mm) was heated to 300° C. and a sputtered Cr sublayer having a selected thickness was formed. The coated substrate was moved from the sputtering station, heated to 300° C., and positioned again in the Cr sputtering station, this time to form a 1200 Å underlayer. A TMM #71 magnetic thin-film layer was the sputtered on the disc, followed by a 200 Å carbon overcoat. The medium was coated with a standard lubricant.

FIG. 5A shows the effect of sublayer thickness on media noise, measured at linear recording densities of 30, 40, 60, 80, and 100 kiloflux change per inch (KFCI). According to an important feature of the invention, the presence of a 10–50 Å sublayer reduced media noise by 30% or more at each recording density.

The media noise plots shown in FIG. 5B, for sublayer thicknesses between 10 and 300 Å, do not show any systematic effect of sublayer thickness on noise. Nor was a systematic thickness effect on SNR observed for the same sublayer thicknesses (FIG. 6).

The effect of sublayer thickness on the ID parametrics, and media coercivity, are given in Table 1 below.

TABLE 1

| Expt # | BH-Hc (Oe) | Cr-Sub. Thick-ness | HF (uv) | ID:R = 0.466" (HF: 4.331 Mhz) Res. (%) | O/W (-dB) | PW-50 (ns) | BS (ns) |
|---|---|---|---|---|---|---|---|
| | | | Cr-Sublayer Thickness Effect: | | | | |
| #F | 1679 | 0Å | 210 | 93.8 | 34.2 | 115.8 | 26.4 |
| #D-6 | 1669 | 10Å | 233 | 96.8 | 34.2 | 112.6 | 18.8 |
| #D-10 | 1691 | 50Å | 229 | 96.8 | 33.9 | 113.4 | 19.6 |
| #A-2 | 1684 | 100Å | 230 | 95.1 | 33.8 | 114.2 | 20.1 |
| #A-3 | 1744 | 200Å | 224 | 94.5 | 33.8 | 112.1 | 20.4 |
| #A-4 | 1742 | 300Å | 222 | 94.4 | 33.6 | 114.5 | 19.9 |

As seen, HF signal amplitude, resolution, and PW-50 all have a pronounced sublayer-thickness effect. FIG. 7 shows the effect of sublayer thickness on HF signal amplitude. A peak at 10 Å is seen, with a gradual decrease in signal amplitude with increasing sublayer thickness. Similarly, for media resolution, a peak between 10–50 Å was observed, with a gradual decrease at greater sublayer thicknesses (FIG. 8). PW- 50 values are plotted in FIG. 9, showing optimal pulse width values at 10 Å sublayer thickness.

Although the invention has been described with respect to particular embodiments, it will be apparent to those skilled in the art that various changes and modifications can be made without departing from the invention.

It is claimed:

1. In a magnetic film recording medium having (a) a non-metallic substrate, (b) a sputtered Cr underlayer having a thickness between about 200–3,000 Å, and a (200) crystallographic orientation, (c) a sputtered magnetic thin-film layer having a thickness between about 100–800 Å, and (d) a sputtered carbon overcoat, an improvement effective to reduce the noise of the medium by at least about 25%, comprising

a sputtered Cr sublayer also containing oxygen, nitrogen, or carbon, and formed directly on said substrate, between said substrate and underlayer, and having:

(i) a thickness of between 5 and 50 Å, and

(ii) a crystalline structure, characterized by a Cr (110) crystallographic orientation as determined by x-ray diffraction.

2. The medium of claim 1, wherein the sublayer is 5–15

5,456,978

9

Å in thickness and contains oxygen.

3. In a method for forming a magnetic thin-film recording medium by successively sputtering onto a non-metallic substrate, (a) a Cr underlayer having a thickness between about 200–3,000 Å, and a (200) crystallographic orientation, (b) a magnetic thin-film layer having a thickness between about 150–800 Å, and (c) a carbon overcoat, an improvement effective to reduce the noise of the medium by at least about 25%, comprising

forming directly on said substrate between said substrate and underlayer, a sputtered Cr sublayer also containing oxygen, nitrogen, or carbon, sputtered under conditions effective to produce sublayer characteristics of:

(i) a thickness of between 5 and 50 Å, and

(ii) a crystalline structure, characterized by a Cr (110) crystallographic orientation as determined by x-ray diffraction.

4. The method of claim 3, wherein said forming includes

10

sputtering in a Sputtering station a Cr sublayer onto the substrate, to a selected thickness of between 5–50 Å, and removing the substrate from the sputtering station to allow oxidation of the sublayer before sputtering the Cr underlayer over the sublayer.

5. The method of claim 3, wherein a D.C. bias is applied to the substrate after said forming, and during sputtering of said underlayer.

6. The method of claim 4, wherein said sputtering is effective to form a sublayer thickness between about 5–20 Å.

7. The method of claim the 5, wherein the sublayer is deposited at a sputtering pressure between about 2–30 mBar.

8. The method of claim 6, wherein said forming includes heating the substrate to above about 150° C. prior to said sputtering.

* * * * *

M

**THIS EXHIBIT HAS BEEN REDACTED**

N

**THIS EXHIBIT HAS BEEN REDACTED**

O

# THIS EXHIBIT HAS BEEN REDACTED

P

# THIS EXHIBIT HAS BEEN REDACTED

## CERTIFICATE OF SERVICE

I, Julia Heaney, hereby certify that on December 22, 2005, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

William J. Marsden, Jr., Esquire
Fish & Richardson, P.C.

and that I caused copies to be served upon the following in the manner indicated:

**BY HAND:**

William J. Marsden, Jr., Esquire
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
Wilmington, DE 19801

**BY FEDERAL EXPRESS:**
Ruffin B. Cordell, Esquire
Fish & Richardson, P.C.
1425 K Street, NW, Suite 1100
Washington, DC 20005

/s/ Julia Heaney
Julia Heaney (#3052)
MORRIS, NICHOLS, ARSHT & TUNNELL
jheaney@mnat.com
  *Attorneys for Defendant and*
  *Counterclaim Plaintiff Cornice, Inc.*