IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEAGATE TECHNOLOGY LLC,      )
                             )
            Plaintiff,       )
                             )
      v.                     )      Civil Action No. 04-418-SLR
                             )
CORNICE, INC.                )      **REDACTED**
                             )
            Defendant.       )
                             )

**CORNICE INC.'S ANSWERING BRIEF IN RESPONSE TO SEAGATE'S
OPENING CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT 5,600,506**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market St.
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com
   *Attorneys for Defendant and Counterclaim Plaintiff
   Cornice, Inc.*

OF COUNSEL:

Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
**Redacted Filing Date: December 22, 2005**
Original Filing Date: December 16, 2005

i.

<u>TABLE OF CONTENTS</u>

|  |  | <u>Page</u> |
|---|---|---|
| TABLE OF CITATIONS |  | ii |
| NATURE AND STAGE OF PROCEEDINGS |  | 1 |
| SUMMARY OF ARGUMENT |  | 1 |
| STATEMENT OF FACTS |  | 3 |
| ARGUMENT |  | 3 |
| A. | "Quadrature Servo Pattern" | 3 |
| B. | "A fixed reference point in said gray scale band on said disk" | 7 |
| C. | The "0.75*Z" and "1.5*Z" limitations | 10 |
| D. | "Position Generator" | 12 |
| E. | Dependent Claims | 14 |
| 1. | "Zones" | 14 |
| 2. | "Zone detector" | 15 |
| 3. | Data track "width 'w'" and gray scale area "width" | 16 |
| CONCLUSION |  | 18 |

ii.

## TABLE OF CITATIONS

Page(s)

Cases

*Abtox, Inc. v. Exitron Corp.,*
    122 F.3d 1019 (Fed. Cir. 1997)      9

*Applera Corp. v. Micromass UK, Ltd.,*
    186 F. Supp. 2d 487 (D. Del. 2002)      17

*ASM America ,Inc. v. Genus, Inc.,*
    260 F. Supp. 2d 827 (2002)      17

*Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
    424 F.3d 1293 (Fed. Cir. 2005)      2, 13

*Embrex, Inc., v. Serv. Eng'g Corp.,*
    216 F.3d 1343 (Fed. Cir. 2000)      2, 11

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.,*
    279 F.3d 1022 (Fed. Cir. 2002)      18

*Gaus v. Conair Corp.,*
    363 F.3d 1284 (Fed. Cir. 2004)      7

*Goldenberg v. Cytogen, Inc.,*
    373 F.3d 1158 (Fed. Cir. 2004)      15, 16

*Insituform Techs., Inc. v. Cat Contracting, Inc.,*
    99 F.3d 1098 (Fed. Cir. 1996)      9

*J.T. Eaton & Co., v. Atl. Paste & Glue Co.,*
    106 F.3d 1563 (Fed. Cir. 1997)      15, 16

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.,*
    7 F.3d 1571 (Fed. Cir. 1993)      9

*Network Commerce, Inc. v. Microsoft Corp.,*
    422 F.3d 1353 (Fed. Cir. 2005)      14, 16

*Nike Inc. v. Wolverine World Wide, Inc.,*
    43 F.3d 644 (Fed. Cir. 1994)      18

*Nystrom v. Trex Co., Inc.,*
    424 F.3d 1136 (Fed. Cir. 2005)      13

*On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GMBH,*
    386 F.3d 1133 (Fed. Cir. 2004)      14, 16

iii.

*Pause Technology LLC v. Tivo Inc.,*
    419 F.3d 1326 (Fed. Cir. 2005) ... 11

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ... passim

*Process Control Corp. v. Hydreclaim Corp.,*
    190 F.3d 1350 (Fed. Cir. 1999) ... 17

*Quantum Corp. v. Rodime, PLC,*
    65 F.3d 1577 (Fed. Cir. 1995) ... 17

*Terlep v. Brinkmann Corp.,*
    418 F.3d 1379 (Fed. Cir. 2005) ... 11, 14

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997) ... 3, 17

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ... 1, 5, 17

*Vivid Tech., Inc. v. Am. Science & Eng'g, Inc.,*
    200 F.3d 795 (Fed. Cir. 1999) ... 16

*Wang Labs, Inc. v. America Online, Inc.,*
    197 F.3d 1377 (Fed. Cir. 1999) ... 7

*Watts v. XL Systems, Inc.,*
    232 F.3d 877 (Fed. Cir. 2001) ... 7

1.

## NATURE AND STAGE OF PROCEEDINGS

Seagate Technology L.L.C. ("Seagate") brought this action against Cornice, Inc. ("Cornice") for infringement of seven patents on June 22, 2004. The parties have exchanged their opening claim construction briefs. Cornice provides this Response to Seagate's opening brief regarding the construction of claim terms appearing in U.S. Patent No. 5,600,506 ("the '506 patent").[1]

## SUMMARY OF ARGUMENT

Seagate's Brief in Support of Its Proposed Claim Construction Regarding U.S. Patent No. 5,600,506 ("Seagate Opening '506 CC Brief") relies on unsupported attorney argument, misstatements of the law, and conclusory opinions of its paid expert in a failed effort to bolster the overly broad constructions it must advocate to sustain its infringement argument. Significantly, Seagate fails to address virtually the entire specification of the '506 patent, something it cannot do in the wake of the recent *Phillips* decision where the Federal Circuit reiterated that the specification "is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320-21 (Fed. Cir. 2005) (*en banc*) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

For example, with regard to the important term "quadrature servo pattern," Seagate attempts to justify its disregard for the unambiguous teachings of the patent's specification on the basis that the "'506 patent includes no express definition of a quadrature pattern that could somehow be construed as giving an alternate meaning to the phrase." However, *Phillips* made clear that requiring any definition of claim language to be "express" is "inconsistent" with Federal Circuit precedent. *Phillips*, 415 F.3d at 1320-21. Seagate cannot reasonably dispute that the entirety of the patent mandates that the purported invention of the '506 patent utilize a quadrature pattern where one of the four bursts is centered in each of the data tracks.

---

[1]     References to Exhibits A-E are to those attached to Cornice's Opening Claim Construction Brief for the '506 Patent (D.I. 185). Exhibits F-H are attached herewith.

2.

Concerning the term "fixed reference point," Seagate misconstrues Cornice's proposed construction, which requires only that the same reference point *in the gray scale band, i.e.,* the same radial position, be used for each position calculation on a given disk, *not that the same, single physical point on the disk be used,* or that every disk use the same fixed reference point. In any event, Seagate offers no justification for its attempt to read "fixed" out of the term "fixed reference point."

Seagate's objection to use of the term "precisely" to describe the numerical values that define the relationship between the servo information and data tracks ignores a central purpose of claim construction – to assist the factfinder in understanding the scope of the claims. *Embrex, Inc., v. Serv. Eng'g Corp.,* 216 F.3d 1343, 1347 (Fed. Cir. 2000). Seagate does not dispute that one and only one precise numerical value is disclosed and claimed with respect to each of the relationships between the data tracks and the gray scale band (1.5*Z), and the data tracks and the quadrature servo pattern (0.75*Z), and that these numerical relationships must be maintained across *all* the data tracks on the disk. Its only conceivable reason for objecting to the use of the term "precisely" is the hope that the jury will fail to appreciate that the patent does not allow for any deviation from these specific relationships.

With regard to the term "position generator for generating . . . a signal," which Cornice contends is subject to means-plus-function construction, Seagate does not dispute that the limitation is described solely in functional terms. Seagate's position that the term nonetheless sufficiently describes structure to avoid treatment under §112, ¶6 is belied by the inventors and supported only by Seagate's paid expert, who has never even worked in the disk drive industry. In addition, Seagate's unsupported contention that claim differentiation somehow weighs against means-plus-function treatment contradicts Federal Circuit precedent, which holds that the statutory restrictions on claim scope of §112, ¶6 trump any contrary construction that may obtain from the comparatively weak judicial doctrine of claim differentiation. *E.g., Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1304 (Fed. Cir. 2005).

Seagate's proposed constructions for "zone" and "zone detector" are not helpful to the jury and ignore the fact that these terms are not used in the '506 patent consistent with their plain English

3.

meanings.    Finally, Seagate's proposed constructions for "width W" and gray scale "width" are unnecessary and contradicted by the intrinsic record.    Nothing in the patent explicitly or implicitly suggests these terms should be accorded anything but their ordinary English language meanings, which will be readily apparent to the jury.    Further elaboration of these ordinary English terms is unnecessary and unwarranted.    *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction "is not an obligatory exercise in redundancy.").

## STATEMENT OF FACTS

The relevant facts are included in the Argument section.

## ARGUMENT

Cornice's legal argument and evidence in support of its proposed constructions for the disputed terms of the asserted claims of the '506 patent are set forth in its Opening Claim Construction Brief for the '506 Patent ("Cornice's Opening '506 CC Brief").    In the sections below Cornice briefly responds to the arguments in Seagate's Opening Claim Construction Brief for the '506 Patent.

A.    "Quadrature Servo Pattern"

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "Quadrature Servo Pattern" | A quadrature burst pattern in which one of the four bursts must be centered in data track "0," as well as each and every data track thereafter. | A servo pattern with four bursts, where a transition between one pair of alternating bursts occurs at the center of one of second pair of alternating bursts. |

As discussed in Cornice's Opening '506 CC Brief, the term "quadrature servo pattern" appears in all claims and should be construed as a quadrature burst pattern in which one of the four bursts is centered in data track "0" as well as each and every data track thereafter.    Significantly, at pp. 9-10 of its Opening '506 CC Brief, Seagate illustrates and describes what it characterizes to be an "exemplary quadrature burst pattern" that, like the quadrature pattern shown in Cornice's Opening '506 CC Brief at pp. 5, 7, and 8 and throughout the '506 patent, includes a burst centered in each data track.    Seagate

4.

nevertheless conveniently ignores this aspect of the quadrature pattern, and seeks an overbroad construction that covers *any* alignment between the bursts and data tracks, which contradicts the entirety of the patent's specification. Seagate's failure to confront the intrinsic evidence, or even acknowledge the impact of the Federal Circuit's *en banc* decision in the *Phillips* case, serve only to confirm that Cornice's proposed construction should be adopted.

It is also telling that Seagate seeks to construe "quadrature servo pattern" based solely on abstract extrinsic evidence of an alleged "ordinary meaning" divorced from the patent itself. *E.g.,* D.I. 185 (Seagate Opening '506 CC Brief) at pp. 16-17 Seagate highlights certain statements of Cornice's expert, Ronald Dennison, but disregards his unequivocal testimony as to the proper meaning of "quadrature servo pattern" *in the context of the '506 patent,* which is undeniably the proper analysis under *Phillips.* "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips,* 415 F.3d at 1321.                REDACTED

REDACTED

REDACTED   · *See* D.I. 185 at 16-17; Exh. 7 at 28-29. Considered in context, as mandated by *Phillips,* the term is limited to patterns with a specific alignment to the data tracks, as Mr. Dennison made clear. Seagate's attempt to take Mr. Dennison's testimony out of context should be rejected. *See Phillips,* 415 F.3d at 1319 (extrinsic evidence "is unlikely to result in a reliable claim scope unless considered in the context of the intrinsic evidence.").

Seagate also cites to other patents—all four of which are also extrinsic evidence—that it claims "likewise reflect this ordinary meaning of quadrature servo pattern." However, two of the patents it cites (D.I. 185 Exhs. 5 and 6, U.S. Patent Nos. 5,274,510 and 4,590,526) actually show burst patterns with a burst centered in each data track, consistent with Cornice's proposed construction. For example, a simplified and annotated version of Figure 5 from the '510 patent is shown below, with Q bursts (red) centered in red data tracks, and P bursts (blue) centered in blue data tracks, illustrating that Cornice's proposed construction is entirely consistent with references that Seagate contends show the "ordinary meaning" of "quadrature servo pattern":

FIG. 5



Similarly, U.S. Patent No. 4,590,526 discloses that there is a "null" at every data track center. D.I. 185, Exh. 6 at col. 6:25-36. As described in Cornice's Opening '506 CC Brief— REDACTED

REDACTED         —this mandates that a burst is centered in every data track. D.I. 183 (Cornice Opening '506 CC Brief) at pp. 8-9; Exh. B, at 223-24.

Seagate also argues that its construction must be adopted because the "'506 patent includes no express definition of a quadrature pattern that could somehow be construed as giving an alternate meaning to the phrase." D.I. 185 at p. 17. However, *Phillips* plainly rejected Seagate's reasoning: "requiring that any definition of claim language in the specification be express, is inconsistent with our rulings that the specification is 'the single best guide to the meaning of a disputed term,' and that the specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" 415 F.3d at 1320-21 (*quoting Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

In addition, Seagate admits that *every* quadrature servo pattern described and shown in the '506 patent includes a burst centered in each and every data track, and that the specification mandates the use of such an arrangement for what it characterizes as "embodiments of the preferred position measuring system." D.I. 185 at p. 18-19. Seagate nevertheless argues that Cornice's construction of "quadrature servo pattern" is "unsupported by the intrinsic record" because the limiting statements in the

specification are directed to the "preferred 'positioning measuring system'" rather than the "quadrature servo pattern" itself. D.I. 185 at pp. 18-19. Seagate's argument is nothing but a red herring.

First, the specification makes clear throughout that the purported invention of the '506 patent is in fact directed to a "positioning measuring system." *See, e.g.,* D.I. 183, Exh. A-1, ('506 Patent), Title ("Apparatus and Method for Determining the Position of a Transducer Relative to a Disk Surface in a Disk Drive System."); Abstract ("A method and system for generating a position signal indicative of the position of a transducer with reference to a fixed reference point on the surface of a disk within a disk drive system."); Summary of the Invention, col. 1:66 ("the positioning system of the invention"); Detailed Description, col. 3:22-25 ("*The present invention is* the method and apparatus for generating a position signal indicative of the location of a transducer with reference to the surface of a disk within a disk drive system.") (emphasis added). As the specification makes clear, the "quadrature servo pattern" is part and parcel of the "positioning measuring system," and cannot be considered in isolation. '506 Patent, col. 4:11-12; col. 12:26-27 ("The positioning measuring system is sensitive to the quadrature servo pattern used."). In fact, as Seagate admits, the *only* purpose of the "quadrature servo pattern" on the disk is "to provide 'fractional' position information" of the head relative to the disk surface. *E.g.,* D.I. 185 at p. 9.

Second, even if the "quadrature servo pattern" of the '506 patent were somehow considered independent of the "position measuring system," the specification makes clear that "quadrature servo pattern" should be construed as Cornice proposes. As discussed in Cornice's Opening '506 CC Brief, each and every one of the "quadrature servo patterns" disclosed in the patent requires a burst centered in each data track, and the specification makes clear that the '506 patent "requires" this feature. Moreover, contrary to Seagate's argument at page 19 of its brief, these patterns are not described as merely preferred or exemplary embodiments, but as "the invention": "FIGS. 4(a-b) is an illustration of *the eight quadrature servo patterns of the invention* and the relationship between track addresses, gray scale addresses and four zones." '506 Patent, col. 2:56-58 (emphasis added). "FIGS. [7(a-b)] is an illustration of *the eight quadrature servo patterns of the invention* and the relationship between track addresses, gray scale addresses and eight zones. '506 Patent, col. 3:7-9 (emphasis added). Seagate's

attempt to dismiss this compelling intrinsic evidence is unconvincing in view of the law. *See, e.g., Gaus v. Conair Corp.*, 363 F.3d 1284, 1290 (Fed. Cir. 2004) (use of 'according to the invention' in the specification "demonstrates that the invention itself requires" feature not explicitly recited in claim); *Watts v. XL Systems, Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2001) ("the specification actually limits the invention to structures that utilize misaligned taper angles, stating that '[t]he present invention utilizes [the varying taper angle] feature.'"); *Wang Labs, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("when the 'preferred embodiment' is described as the invention itself, the claims are not entitled to a broader scope than that embodiment.").

Finally, Seagate's argument that the claimed ratios of 0.75*Z and 1.5*Z "have nothing to do with whether the 'quadrature servo pattern' has a burst centered in data track 0" (D. I. 185 at p. 19) is contradicted by its own expert.  These ratios were not chosen randomly, but are the only ones that maintain a burst centered in each data track,                     REDACTED

          REDACTED

The entire intrinsic record thus compels Cornice's construction.

### B.   "A fixed reference point in said gray scale band on said disk"

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "A fixed reference point in said gray scale band on said disk" (Claim 1); "A fixed reference point in said gray scale band on the surface of said disk" (Claim 22); "Fixed reference point located in said gray scale band" (Claim 33) | A reference point located on the disk that is the same for every position calculation. | Any point of the gray scale area provides a fixed reference point. |

The term "fixed reference point" in the asserted claims should be construed as a reference point located on the surface of the disk that is the same for every position calculation.  Seagate argues that

8.

Cornice's construction conflicts with the "very language of the '506 patent claims, as well as the basic structure of servo patterns, because position is measured according to each individual 'spoke' around the disk." D.I. 185 at 27. In short, Seagate misconstrues Cornice's construction to require that the same *physical* location on the disk be used for each position calculation, and that the "fixed reference point" be the same from disk to disk. *Id.* at 28. However, Cornice's construction requires only that the same reference point, *i.e., the same gray code value within the "gray scale band,"* be used for every *position calculation.* This construction follows directly from the claim language, which specifies that the "fixed reference point" is "in said gray scale band." Each gray code value is repeated in each servo sector and represents a specific radial distance from the center of the disk, but not a unique physical location on the disk surface. *See* D.I. 185 at 27-28.

The proper meaning of "fixed reference point" may be better understood with reference to the following figure:



As shown above, in the '506 patent, the position of the transducer is always measured along a radius "from the center of gray scale area addressed zero." '506 patent, col. 2:12-15; *see also* col. 6:20-23 (position signal "is indicative of the transducer with reference to the center of gray scale area 0."); col. 14:31-33 (same). For example, at position 1, the position of the head is measured from the

9.

center of gray code 0 in the servo wedge where the head is located. Similarly, at position 2, the head position is also measured with reference to gray code 0, *i.e.*, the same reference point within the gray scale band, but a different physical location on the disk because the head is within a different servo wedge at position 2. Consistent with the claim requirement that the reference point be "fixed," there is no discussion in the '506 patent of the "reference point" varying from one position measurement to the next, *i.e.*, using a different gray code value as a reference point for each position determination as Seagate contends. Dependent claims 3 and 6 confirm that only one fixed reference point is contemplated. Both specify that "*said* fixed reference point is located at a center of a gray scale area having an address of zero," indicating that the claims specify one and only one reference point.

Thus, it is Seagate that proposes a construction at odds with the claim language by arguing that "there can be multiple fixed reference points." D.I. 185 at 27-28. Seagate's contention that the claim language "a fixed reference point can allow for one or more such reference points" contradicts the claim's requirement that the reference point be "fixed." In this regard, although the term "a" is sometimes construed as one or more, where, as here, the context requires otherwise, "a" is construed as one and only one. *See Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023-24 (Fed. Cir. 1997) (construing "a chamber" to mean a "single chamber" because the claim language referred back to the "chamber" as "said chamber" and "[n]othing in the written description suggests that the claim language encompasses a device with more than one . . . chamber."); *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105-06 (Fed. Cir. 1996) (construing "a cup" to mean a "single cup" based on surrounding claim language and the specification); *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1576-77 (Fed. Cir. 1993) (construing "a terminal portion" to mean a "single terminal portion" because "there is no indication in the patent specification that the inventors here intended it to have other than its normal singular meaning.").

**C.    The "0.75*Z" and "1.5*Z" limitations**

| Claim Language | Cornice's Construction | Seagate's Construction |
| --- | --- | --- |
| "A Quadrature Servo Pattern Repeated 0.75*Z times" '506 Patent, cls. **1, 22**.<br><br>"0.75*Z Quadrature Servo Patterns" '506 Patent, cl. **33** | "0.75*Z" means the quadrature servo pattern repeats precisely three times for every four data tracks across all Z data tracks within each sector | "0.75*Z" means the quadrature pattern repeats three times for every four data tracks across all Z data tracks within each sector |
| "1.5*Z Consecutively Addressed Gray Scale Areas" '506 Patent, all claims. | "1.5*Z" means within a gray scale band, there are precisely three consecutively addressed gray scale areas for every two data tracks across all Z data tracks within each sector | "1.5*Z" means within a gray scale band, there are three consecutively addressed gray scale areas for every two data tracks across all Z data tracks within each sector |

The parties are largely in agreement as to the construction of these two limitations, and differ only over Cornice's use of the term "precisely" to describe the numerical relationships between the quadrature burst patterns and gray scale areas to the data tracks. The use of "precisely" is necessary and helpful to the trier of fact to clarify that, in each case, the claims cover one and only one precise numerical relationship, and do not recite a range or approximate value, matters which Seagate does not appear to dispute.

As an initial matter, the parties are in agreement, as reflected in their respective proposals included in the Joint Claim Construction statement, that both numerical relationships must be maintained *across all the data tracks on the disk,* as the claim language itself clearly requires ("across all said Z data tracks"). Seagate's brief also reflects this requirement of the claims:

- "Because the servo wedge crosses all data tracks, this 3:2 ratio [of gray scale areas to data tracks] *will also be maintained across all data tracks.*" D.I. 185 at p. 13 (emphasis added).

- "Again, because the servo wedge extends through all data tracks, *this 3:4 ratio [of quadrature servo patterns to data tracks] will be maintained across all the data tracks.*" *Id.* at 14 (emphasis added).

- The servo band extends through all of the data tracks, so *this 3 to 4, or 3:4, ratio [of quadrature servo patterns to data tracks] will be maintained across all Z data tracks within each sector.*" *Id.* at 22 (emphasis added).[2]

Second, Seagate does not dispute that the term "precisely" accurately describes what is claimed and disclosed in the patent, *i.e.*, it does not contend that the patent allows for variation from these ratios, or that the term "precisely" alters the claim scope, but protests only because the word does not literally appear in the claim.[3] But Seagate's argument loses sight of an important purpose of claim construction – to clarify the scope of the claims for the jury. And in clarifying claim scope it is often helpful to include language in the construction that does not appear *in haec verba* in the claim itself, provided they do not alter the scope of the claim. *Pause Technology LLC v. Tivo Inc.*, 419 F.3d 1326, 1332 (Fed. Cir. 2005) ("[I]n clarifying the meaning of claim terms, courts are free to use words that do not appear in the claim so long as 'the resulting claim interpretation . . . accord[s] with the words chosen by the patentee to stake out the boundary of the claimed property.'"); *see also Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) ("The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.") (*quoting Embrex, Inc., v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000))..

Given the complexity of the subject matter of the '506 Patent, without including the clarifying term "precisely," the jury may fail to appreciate the rigidity of the numerical relationships described and claimed, and be left with the misconception that the claims may cover slight deviations from these relationships. Cornice's proposed construction would effectively eliminate this potential for jury confusion.

---

[2]     At points in its brief, Seagate appears to argue that the numerical limitations need be met across only a "subset" of data tracks. D.I. 185 at p. 21, 23. It is unclear why Seagate takes this apparently contradictory position. That the patent illustrates only a portion of the total number of data tracks in the figures is irrelevant to claim construction.

[3]

REDACTED

12.

### D.    "Position Generator"

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "a position generator for generating from said quadrature servo pattern and an address of a gray scale area read by a transducer in said disk drive system a signal indicating a position of said transducer relative to a fixed reference point in said gray scale band on said disk" (Claim 1) | This claim limitation is subject to means-plus-function analysis under 35 U.S.C. Sec. 112, Par. 6.<br><br>The function of the "position generator" is to "generat[e] from said quadrature servo pattern and an address of a gray scale area read by a transducer in said disk drive system a signal indicating a position of said transducer relative to a fixed reference point in said gray scale band on said disk" as recited in the claim. The corresponding structure is described in Cornice's Opening '506 CC Brief. D.I. 183 at pp. 25-26. | Electronics and/or processor that provide a position signal. |

The limitation "position generator for generating from said quadrature servo pattern and an address of a gray scale area read by a transducer in said disk drive system a signal indicating a position of said transducer relative to a fixed reference point in said gray scale band on said disk" in claim 1 of the '506 patent is properly subject to means-plus-function construction under 35 U.S.C. §112, ¶6. Seagate disputes this, and proposes an overbroad construction ("electronics and/or processor") in an effort to cover *any* means for "providing a position signal."

First, Seagate points to the presumption that means-plus-function analysis does not apply based on the lack of the words "means" in the claim. Cornice fully addressed why this presumption is overcome in its Opening Brief. D.I. 183 at pp. 25-30. In this regard, Seagate does not dispute that the entirety of the "position generator" limitation is drafted in functional terms, with no recitation of structure for performing the claimed function. This undisputed fact overcomes the presumption that arises from the failure to recite "means for" in the claim. Second, Seagate argues that a "person of ordinary skill in the servo engineering field would understand the claimed 'position generator' to recite structure." D.I. 185 at

13.

p. 26.  However, in deposition                         REDACTED


                        REDACTED


                                REDACTED                         REDACTED



                                                                                Such

conclusory expert opinion is entitled to no weight.   *Phillips*, 415 F.3d at 1318 ("conclusory, unsupported

assertions by experts as to the definition of a claim term are not useful to a court.").

                                REDACTED                         REDACTED


Finally, Seagate argues that claim differentiation prevents application of §112, ¶6

because "the dependent claims recite many of the very limitations that Cornice seeks to inject into the

'position generator' limitation."  D.I. 185 at p. 26.  Seagate's argument lacks merit.  As an initial matter,

Seagate does not even articulate how Cornice's proposed construction supposedly violates the judicial

doctrine of claim differentiation.  Moreover, it is well-established that claim differentiation, which is only

a guide and not a rigid rule, cannot override the statutory provision that restricts the range of means-plus-

function claim elements.   *Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293,

1304 (Fed. Cir. 2005) (§112, ¶6 trumps the doctrine of claim differentiation) (*citing Laitram Corp. v.*

*Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed. Cir. 1991)); *see also Nystrom v. Trex Co., Inc.,* 424 F.3d 1136,

1143 (Fed. Cir. 2005) ("Different terms or phrases in separate claims may be construed to cover the same

subject matter where the written description and prosecution history indicate that such a reading of the

terms or phrases is proper.").

E.    **Dependent Claims**

1.    **"Zones"**

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "The system of claim 1 wherein said position generator segments each said gray scale area into two zones" (Claim 8); | The specific methodology described in the '506 patent in Figs. 5 and 9 for demodulating the servo burst signals in order to generate accurate position information. | "Zones" 0, 1, 2, and 3 are logical zones generated by the position generator logic. |
| "Segmenting each said gray scale area into two zones" (Claim 36) | | |

As discussed in Cornice's Opening '506 patent Markman Brief (D.I. 183), "zones" as used in the '506 patent is a term coined in the '506 patent to describe a specific function of the claimed "position generator." In particular, "zones" refers to the methodology described in the '506 patent in Figs. 5 and 9 for demodulating the servo burst signals in order to generate a position signal. Seagate's construction is that "zones" refers to "logical zones generated by the position generator logic." Notably, Seagate does not contend that "zones" is a term of art with an established meaning in the servo engineering field. But Seagate's construction is unhelpful and circular, leaving it to the jury to ascertain the meaning of "logical zone," a term not even found in the '506 patent. In these circumstances, it is essential that the construction provide meaningful guidance to the jury in understanding the scope of the claims that use the term "zones." *See Terlep*, 418 F.3d at 1382.

Cornice's proposed construction follows directly from the specification, and in fact adopts the usage of the term "zones" in the specification. Given that Seagate concedes the term has no accepted meaning in context, no other construction is proper or instructive for the jury. *See, e.g., Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1359-60 (Fed. Cir. 2005) (construing coined term "download component" based on description of specific attributes in specification); *On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GMBH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004)

15.

("Because the phrase 'substantially spherical . . . having a cylindrical component added thereto' has no precise and generally understood meaning in the art as applied to reflective surfaces, we look to the intrinsic evidence, in this case the specification, for guidance as to the meaning of that language as used in the patent."); *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) ("The parties agree that the term 'marker substance' has no accepted meaning to one of ordinary skill in the art . . . . Accordingly, we construe it only as broadly as is provided for by the patent itself"); *J.T. Eaton & Co., v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1568 (Fed. Cir. 1997) ("[meaning for] term with no previous meaning to those of ordinary skill in the art . . . must be found somewhere in the patent").

Seagate's only criticism of Cornice's construction is that it "makes no sense" because "the first three steps of the methodology described in Figures 5 and 9 of the '506 patent do not even employ 'zones.'" D.I. 185 at p. 31. Seagate's criticism is a non sequitur. The "zones" methodology for determining position described by Figures 5 and 9 requires, as a *prerequisite*, (1) the gray code number [step 1], (2) the four displacement values [step 2] and (3) identification of whether the gray code is odd or even [step 3] as shown in Figures 5 and 9. This information is used in the subsequent steps to determine which "zone" the head is in, which in turn defines unique position information for the head. *See* D.I. 183, Exh. A-1, the '506 Patent, Figures 5 and 9. In the '506 patent, the "zones" are thus integral to the position demodulation logic used to determine the position of the head relative to a fixed reference point. The term "zone" as used in the '506 patent has meaning only in the context of these figures and the corresponding text used to describe the position demodulation process.

2.     "Zone detector"

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "Zone Detector for generating a zone signal" (Claim 11) | "Zone detector" means the series of logic elements that determine the applicable zone based on the gray code and servo bursts. | The "zone detector" includes electronics and/or a microprocessor that provides a zone signal. |

16.

The term "zone detector" in the asserted claims means the series of logic elements that determine the applicable zone based on the gray code and servo bursts. In contrast, Seagate's construction is that the "zone detector" merely "includes electronics and/or a microprocessor that provides a zone signal." As with "zone," the term "zone detector" lacks meaning outside the context of the patent, and thus its construction must based on its usage in the specification. *See, e.g., Network Commerce, Inc.*, 422 F.3d at 1359-60; *On-Line Technologies, Inc.*, 386 F.3d at 1138; *Goldenberg*, 373 F.3d at 1164; *J.T. Eaton & Co., Inc.*, 106 F.3d at 1568. Again, Seagate's construction is overly broad, inconsistent with the specification of the '506 patent, and not helpful to the jury.

Seagate criticizes Cornice's construction on the basis that it "does not appear to rely on its proposed construction for any contention of non-infringement." Seagate is incorrect. REDACTED

REDACTED

REDACTED                                                           Regardless, Seagate's insinuation that the claims should be construed with reference to the accused product is soundly rejected by the case law. *E.g., Vivid Tech., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("claims are construed objectively and without reference to the accused device").

3.     <u>Data track "width 'w'" and gray scale area "width"</u>

| Claim Language | Cornice's Proposed Construction | Seagate's Proposed Construction |
|---|---|---|
| "width W" '506 Patent, cls. 4 and 25. | No construction required. | The track pitch (i.e., the radial distance between the centerline of two adjacent data tracks). |
| gray scale "width" '506 Patent, cls. 4, 25, and 35. | No construction required. | An area that includes portions of the blank area existing between gray scale areas on a disk surface, so that the "width" refers to the width of gray scale areas when such areas are drawn abutting each other. |

Seagate proposes constructions for data track "width 'w'" and gray scale area "width," which appear in dependent claims 4, 25 ("each data track has a width W"), and 34 ("W is the width of a data track") and 4, 25 ("each said gray scale area has a width of 2/3*W"), and 35 ("each gray scale area has a width of 2/3*W"), respectively. However, construing these terms would be an exercise in redundancy—the meaning of "width" is readily apparent on its face. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also ASM America ,Inc. v. Genus, Inc.*, 260 F. Supp. 2d 827, 850 (2002) ("The Court agrees with ASM that there is no better way to define 'generally circular' than to simply say 'generally circular.'"); *Applera Corp. v. Micromass UK, Ltd.*, 186 F. Supp. 2d 487, 508 (D. Del. 2002) ("The court . . .believes the proper construction of rod to be self-evident.").

Moreover, Seagate admits at page 29 of its brief that the specification of the patent does not even support its construction. Indeed, Seagate correctly notes that the width "w" of the data tracks is shown in Figure 3 of the patent, where each track is adjacent to the next and has a defined width as is readily apparent. Seagate then inexplicably argues that because, "[o]n an actual disk, there is a small gap in which no data is written," the term "width" should be redefined as "track pitch," a term nowhere found in the '506 patent. D.I. 185 at 29. Of course, the inventors could have claimed "track pitch" rather than "width," but chose not to. The court should reject Seagate's blatant attempt to rewrite the claim for purposes of litigation. *Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("[W]e do not permit courts to redraft claims."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'") (*quoting Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)); *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995) ("[I]t is well settled that no matter how great the temptation of fairness or policy making , courts do not

18.

redraft claims."); *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647 (Fed. Cir. 1994) (noting that under the guise of claim construction, a patentee "cannot, in effect, rewrite its patent claims to suit its needs in this litigation.").

Seagate seeks to justify its rewriting of the claim through the testimony of Cornice employee Mr. Lance Carlson, a clear violation of the principles of claim construction laid down in the *Phillips* decision. *Phillips*, 415 F.3d at 1319 (extrinsic evidence cannot be used to "change the meaning of claims" derived from the intrinsic record).

REDACTED

REDACTED                                          REDACTED

For the same reasons, Seagate's proposed construction of gray scale area "width" should also be rejected. As the claims themselves make clear, the term "width" is used to describe both the "width" of the data tracks and the "width" of the gray scale areas, and should be understood to refer to the same dimension in both cases. *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) ("[A] word or phrase used consistently throughout a claim should be interpreted consistently."); *Rexnord Corp.*, 274 F.3d at 1342 ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent."). Moreover, the portion of the specification relied upon by Seagate at p. 30 of its brief is simply a definition of "gray scale *area*," not the "width" of the gray scale area ("Each gray scale area is defined to include the recorded gray scale address and a portion of the two blank areas bordering a gray scale area."). It does not justify Seagate's convoluted construction ("an area that includes portions of the blank area existing between gray scale areas on a disk surface, so that the 'width' refers to the width of the gray scale areas when such areas are drawn abutting each other") which would serve only to confuse the jury.

## CONCLUSION

For the foregoing reasons and those in its opening brief, the Court should adopt Cornice's proposed constructions for the claim terms in dispute.

19.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ Julia Heaney (#3052)
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com
*Attorneys for Defendant and Counterclaim Plaintiff
Cornice, Inc.*

OF COUNSEL:
Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
Arlene Hahn
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

December 16, 2005
498180

Exhibit F

**THIS EXHIBIT HAS BEEN REDACTED**

# Exhibit G

**THIS EXHIBIT HAS BEEN REDACTED**

Exhibit H

THIS EXHIBIT HAS BEEN REDACTED

## CERTIFICATE OF SERVICE

I, Julia Heaney, hereby certify that on December 22, 2005, I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> William J. Marsden, Jr., Esquire
> Fish & Richardson, P.C.

and that I caused copies to be served upon the following in the manner indicated:

**BY HAND:**

William J. Marsden, Jr., Esquire
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
Wilmington, DE  19801

**BY FEDERAL EXPRESS:**
Ruffin B. Cordell, Esquire
Fish & Richardson, P.C.
1425 K Street, NW, Suite 1100
Washington, DC  20005

/s/ Julia Heaney
Julia Heaney (#3052)
MORRIS, NICHOLS, ARSHT & TUNNELL
jheaney@mnat.com
*Attorneys for Defendant and*
*Counterclaim Plaintiff Cornice, Inc.*