230

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEAGATE TECHNOLOGY LLC,

Plaintiff,

v.

CORNICE, INC.

Defendant.

C.A. No. 04-418 (SLR)

REDACTED

**PLAINTIFF SEAGATE'S RESPONSIVE BRIEF TO DEFENDANT CORNICE'S
OPENING CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NO. 5,600,506**

Dated: December 16, 2005

FISH & RICHARDSON P.C.
Timothy Devlin (#4241)
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

David M. Barkan
D. Austin Horowitz
500 Arguello Street
Redwood City, CA 94063-1526

Ruffin B. Cordell
Brian R. Nester
Timothy W. Riffe
Christian A. Chu
1425 K Street NW, Suite 1100
Washington, D.C. 20005

Edmond R. Bannon
Lewis E. Hudnell, III
Citigroup Center
153 E. 53rd St 52nd Floor
New York, New York 10022

Attorneys for Plaintiff
SEAGATE TECHNOLOGY LLC

# TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................1

II.   SUMMARY OF THE ARGUMENT ...............................................................1

III.  STATEMENT OF FACTS ............................................................................1

    A.  Inventive Combination of the '506 Patent.............................................1

    B.  Servo Wedges and Servo Writing.......................................................2

    C.  The Quadrature Servo Pattern Limitation Is Defined
        Consistent with Its Ordinary Meaning.................................................3

    D.  Cornice Misstates the Advantages of the '506 Patent ...........................5

IV.   ARGUMENT ..............................................................................................5

    A.  "Quadrature Servo Pattern" ...............................................................5

        1.  Cornice's Proposed Construction Is Inconsistent
            with Both the Ordinary Meaning and '506 Patent
            Claims .........................................................................................5

        2.  Cornice's Construction of "quadrature servo
            pattern" Impermissibly Reads Preferred
            Embodiments Onto the Claims ......................................................7

            a.  Case Law Supports the Ordinary
                Meaning and Prohibits Reading
                Limitations into the Claims.........................................7

            b.  Summary of the invention.............................................10

            c.  Detailed Description of the Invention............................11

            d.  Brief Description of the Drawings..................................12

        3.  The Cases Cited by Cornice Are Distinguishable
            and Do Not Support Cornice's Position..........................................12

    B.  "Fixed Reference Point" ...................................................................14

        1.  Cornice's Proposed Construction Is Improperly
            Narrow .......................................................................................14

        2.  Seagate's Construction Does Not Allow for
            Points Not on the Disk to Act as Fixed Reference
            Points.........................................................................................15

i

## TABLE OF CONTENTS (cont'd)

| | | Page |
|---|---|---|

C.  The "0.75*Z" and "0.5*Z" limitations ....................................................15

D.  "Position Generator".............................................................................16

    1.  Cornice Has Failed to Present Sufficient
Evidence that the Term "position generator"
Should Be Construed as a Means-Plus-Function
Limitation..........................................................................................16

E.  Claim 22................................................................................................17

F.  "Zones" ................................................................................................18

G.  "Zone Detector"....................................................................................19

V.  CONCLUSION................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Apex Inc. v. Raritan Computer, Inc.,*
   325 F.3d 1364 (Fed. Cir. 2003) .................................................................17, 18

*Karlin Technology, Inc. v. Surgical Dynamics, Inc.,*
   177 F.3d 968 (Fed.Cir.1999)...................................................................10, 11

*Medrad, Inc. v. MRI Devices Corp.,*
   401 F.3d 1313 (Fed. Cir. 2005)........................................................................6

*Personalized Media Communication, LLC v. International Trade Commission,*
   161 F.3d 696 (Fed. Cir. 1999).......................................................................18

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005)......................................................6, 8, 9, 12

*Praxair, Inc. v. ATMI, Inc.,*
   2005 WL. 2989767 (D. Del 2005)..........................................10, 15, 16, 19, 20

### STATUTES

35 U.S.C. § 112(6) ........................................................................................17, 18

## I.    NATURE AND STAGE OF THE PROCEEDINGS

In this patent infringement case, Plaintiff Seagate Technology, LLC ("Seagate") files this responsive brief to Cornice's opening claim construction brief on U.S. Patent No. 5,600,506 ("the '506 patent").

## II.    SUMMARY OF THE ARGUMENT

In construing the disputed terms of the '506 patent, Seagate has proposed constructions consistent with the patent claims and specification, and consistent with the understanding of a person of ordinary skill in the art. Conversely, Cornice advocates improperly narrow constructions that would purportedly benefit Cornice in this litigation and that, in its view, avoid infringement of the '506 patent. For example, much of Cornice's Motion for Summary Judgment of Noninfringement of the '506 patent depends on its construction of the term "quadrature servo pattern," and not the actual features of its accused products. The motivation behind Cornice's overly restrictive construction is apparent – when the claims are properly construed, infringement is clear. Indeed, some of the accused Cornice products are virtual copies of a preferred embodiment described in the '506 patent.

Each of Cornice's litigation-crafted constructions, however, is inconsistent with the understanding of one of ordinary skill in the art and the intrinsic record. As discussed below, Cornice repeatedly violates fundamental tenets of claim construction: limitations from preferred embodiments should not be read into the claims; limitations recited in dependent claims should not be read into independent claims. Cornice relies on irrelevant facts and law to support its narrow constructions, and its attempts to improperly limit the claims should be rejected.

## III.    STATEMENT OF FACTS

### A.    Inventive Combination of the '506 Patent

Cornice's Opening Brief suggests that the only purported difference between the prior art and the '506 patent is the disassociation of gray scale areas from data tracks. [See

1

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

D.I. 183 at 9.] Cornice's characterization of the inventive aspects of the '506 patent, however, is plainly incorrect. The disassociation of gray scale areas and data tracks is just one of the inventive features taught and claimed by the '506 patent.

In contrast to Cornice's arguments, the independent claims recite a novel combination of features not found in the prior art. ███████████████████████



██████ [Ex. 4 at 23:20-25:5.][1] Similarly, the position signal logic recited in dependent 8-14 and 36-40 is inventive and not disclosed by the prior art. [See, e.g., Ex. 7 at ¶ 74-82.] ████████████████████████████████████████████ [Ex. 6 at p. 107-110.] In part for these reasons, the claims of the '506 patent were allowed on the first Office Action. [Ex. 2.]

Cornice argues that the disassociation of gray scale areas and data tracks is taught by an IBM publication entitled "Track Pitch Independent Servo Pattern" (the "IBM reference"). ████████████████████████████████████████████ ██████. [Ex. 4 at 41:20-42:13.] ████████████████████. [Id. at 40:10-41:4.] These and other features distinguish the '506 patent claims from the IBM reference. ████████████████████████████████████████████ ████████████. [Id. at 23:20-25:6.] The IBM reference should not be construed to limit the claims of the '506 patent.

**B.    Servo Wedges and Servo Writing**

As explained in Seagate's Opening Brief, a typical "sector servo" disk drive system includes many thin "servo wedges" that extend generally radially from the center of the disk.

---

[1]    Exhibits cited in this Brief refer to Exhibits attached to the co-filed Declaration of Timothy Devlin In Support of Seagate's Responsive Brief to Defendant Cornice's Opening Claim Construction Brief for U.S. Patent No. 5,600,506.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

[Ex. 5 at ¶ 49.] Each of these servo wedges may be used by the disk drive system to define positions on the surface of the disk. [Id. at ¶ 50-52.] Cornice's Opening Brief is consistent in this regard. [See D.I. 183 at p. 4-6.] As discussed below, however, Cornice's construction of the term "fixed reference point" would essentially render all but one of these servo wedges useless, as it requires that the fixed reference point be the same for every position calculation.

The servo pattern is written on the disk by a device known as a servo track writer, frequently at a manufacturing facility before data is written onto the drive. [See, e.g., Ex. 8 at 19:13-24.] Because of this, a servo pattern itself is properly defined by its own characteristics, such as the positioning of bursts that comprise the servo pattern and their relationship to each other, as opposed to the particular alignment between the servo pattern and the data tracks. One of ordinary skill in the art would understand that a servo pattern has its own identity separate and independent of the data tracks. [Ex. 5 at ¶ 85, Exhibit 5.]

### C.    The Quadrature Servo Pattern Limitation Is Defined Consistent with Its Ordinary Meaning

Cornice's Opening Brief asserts that the '506 patent quadrature servo pattern has an "important" feature of providing a burst centered in each data track. [See D.I. 183 at 10-11.] Cornice argues that this feature – something only disclosed in preferred embodiments of the '506 patent – should be read into the claims.

As set forth in Seagate's Opening Brief, there is no dispute that Cornice's proposed construction is contrary to the ordinary meaning of the term "quadrature servo pattern." This ordinary meaning as understood by a person of ordinary skill in the art is a pattern of four bursts in two alternating pairs, where a transition between one pair of alternating bursts occurs at the center of one of a second pair of alternating bursts. [Ex. 5 at ¶ 85, Exhibit 5.]

 [Ex. 4 at 28:8-29:11.] There is also no dispute that

3

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

REDACTED

Cornice's products meet this limitation under its ordinary meaning. ███████████
███████████████, [Ex. 9 at 175:22-176:15; Ex. 4 at 129:5-130:14.]

In support of its narrow construction, Cornice attempts to point to language in the '506 patent specification that, according to Cornice, limits the claimed "quadrature servo pattern." This language, however, merely describes preferred embodiments of the quadrature servo pattern or describes features that are utilized with a preferred form of the position generating logic. [Ex. 1 at 4:12-15 ("The *position generating system* requires that one of the four servo bursts of the quadrature servo pattern used must be centered in data track 0.")]

Contrary to Cornice's argument, the '506 patent expressly defines the characteristics of a quadrature servo pattern. The patent definition involves only the four servo "bursts" and their relationship to one another:

> Each quadrature pattern in the first set *is characterized by* an A burst which initiates at the mid point of the D burst of the preceding quadrature servo pattern, a B burst initiating at the point of termination of the A burst, a C burst initiating at the mid point of the A burst and a D burst initiating at the point of termination of the C burst and terminating at the mid point of the A burst of the following quadrature servo pattern. . . . Each quadrature servo pattern of the second set *is characterized by* an A burst which initiates at the mid point of the C burst of the preceding quadrature servo pattern, a B burst initiating at the point of termination of the A burst, a D burst initiating at the mid point of the A burst and a C burst initiating at the point of termination of the D burst and terminating at the mid point of the A burst of the following quadrature servo pattern.[2]

[Ex. 1 at 3:61-4:10.]

These characterizations correspond precisely with the undisputed ordinary meaning of "quadrature servo pattern." They each describe two alternating pairs of bursts, the pairs being staggered so that the transition between one pair of bursts occurs at the center of another bursts, as shown in Figure 4. [Ex. 1 at 3:58; Fig 4.] Thus the patent specification

---

[2] Unless otherwise noted, emphasis in this brief has been added. With respect to quoted language from the '506 patent, certain typographical error in the patent text were corrected by Certificates of Correction, and quotations here reflect such corrections.

4

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

and ordinary meaning both support Seagate's construction, and contradict Cornice's proposed construction.

### D.    Cornice Misstates the Advantages of the '506 Patent

Cornice also seeks to rely on purported advantages set forth in the '506 patent, but Cornice's description of the asserted advantages is directly contradicted by the patent itself. Cornice's proposed construction requires that the quadrature servo pattern have a burst centered within each data track, providing a "null" at the center of each data track. According to Cornice, this optimizes track following along the centerline of a data track, which Cornice suggests is an asserted advantage of the '506 patent.

On the contrary, the '506 patent expressly identifies the advantage that track following can occur along the entire width of the data track, not just at the track center:

> Another advantage of the present invention is that the position signal may be used during a track following operation such that the track following operation may be used *over the entire width of a data track.*

[Ex. 1 at 2:25-29.] Thus, the "null" feature on which Cornice seeks to rely is not "important" to the invention, as Cornice suggests. Any purported distinction Cornice seeks to draw regarding the ability to follow a data track along its entire width does not exist.

## IV.    ARGUMENT

### A.    "Quadrature Servo Pattern"

#### 1.    Cornice's Proposed Construction Is Inconsistent with Both the Ordinary Meaning and '506 Patent Claims

Cornice's construction of the claim term "quadrature servo pattern" has been crafted to avoid infringement, and it is clear that Cornice's proposed construction is divorced from the ordinary meaning of the term.

Cornice's construction seeks to read in the limitation "in which one of the four bursts must be centered in data track '0'" from the preferred embodiment of the positioning

5

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

measuring system disclosed in the '506 patent.[3] This is plainly inconsistent with the undisputed, ordinary meaning of the claim term "quadrature servo pattern." [Ex. 4 at 28:8-29:11.] Cornice cannot ignore this ordinary meaning. As the Federal Circuit stated in Phillips, "the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability *if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms*." Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc).

This understanding may be obtained from admissions by a party's own expert. See Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1318 (Fed. Cir. 2005). ████████████



████████████████████████████████████████ [Ex. 4 at 28:7-29:11.] This testimony confirms Seagate's proposed construction.

Cornice's construction also attempts to define a quadrature servo pattern in terms the alignment data tracks, but it is clear from the claims of the '506 patent that the quadrature servo pattern and the data tracks are two completely different features. Claim 1 separately recites "Z data tracks" and a "servo band," which comprises the quadrature servo pattern. [Ex. 1 at 20:12-14.]

This distinction between data tracks and servo tracks makes sense. ████████████

---

[3] Cornice's construction recites a "quadrature burst pattern." The parties have used this term and the term "quadrature servo pattern" interchangeably. Additionally Cornice's brief recites a "quadrature amplitude pattern" in referring to the quadrature servo pattern of the '506 patent. [See D.I. at 7.] For the purposes of this Response, Seagate assumes that Cornice intends the term "quadrature amplitude pattern" to mean "quadrature servo pattern."

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

REDACTED



[Ex. 10 at 284:3-11.]

Under Cornice's construction, however, a disk could never have a quadrature servo pattern unless the disk also had data tracks recorded on it. This construction makes no sense in light of the patent claims and the understanding of one of ordinary skill in the art. Because Cornice's construction is illogical and because it deviates from the undisputed ordinary meaning of the term "quadrature servo pattern," it should be rejected.

> ### 2. Cornice's Construction of "quadrature servo pattern" Impermissibly Reads Preferred Embodiments Into the Claims

Cornice's attempts to rely on the patent specification are likewise misplaced. In fact, the specification makes clear that the "quadrature servo pattern" limitation should obtain its ordinary meaning. As an initial matter, Cornice's Opening Brief attempts to confuse the issue between the parties. Seagate's construction does not require that the limitation "quadrature servo pattern" be construed to cover *any* alignment between the bursts and the data tracks. Rather, Seagate's construction *is* the ordinary and customary meaning of the claim term as understood by a person of ordinary skill in the art: a servo pattern with four bursts, where a transition between one pair of alternating bursts occurs at the center of one of a second pair of alternating bursts. ███████████████████████████████ ██████ [Ex. 10 at 28:7-29:11.]

> ### a. Case Law Supports the Ordinary Meaning and Prohibits Reading Limitations Into the Claims

Because Seagate's construction reflects the ordinary meaning, it establishes the baseline for claim construction. See Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) ("The inquiry into how a person of ordinary skill in the art understands a

7

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

claim term provides an objective baseline from which to begin claim interpretation."). In reality, the sole dispute between the parties is whether Cornice should be permitted to read limitations from the preferred embodiments into the claims. Because this practice is improper, Cornice's construction must be rejected.

The Federal Circuit recently reminded litigants in Phillips of the "danger of reading limitations from the specification into the claim," a reminder that Cornice ignores. Phillips, 415 F.3d at 1323. Instead, the entire premise of Cornice's argument is that the "quadrature servo pattern" limitation should be limited to the specific embodiments disclosed in the '506 patent. This is exactly the type of claim construction analysis Phillips warns against: "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." Id. at 1423.

Nevertheless, Cornice contends that all 16 embodiments of the quadrature servo pattern disclosed in the specification include a burst centered in data track 0, and that the claimed "quadrature servo pattern" should be so limited. Phillips flatly rejects this notion. "In particular, *we have expressly rejected the contention* that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." Id. at 1423. Phillips confirms the long-standing principle that it is improper to read limitations from preferred embodiments from the specification into the claims. Id. at 1423 ("We also acknowledge that the purpose underlying the Texas Digital line of cases--to avoid the danger of reading limitations from the specification into the claim--is sound.")

Cases following Phillips have adhered to this principle. For example, in JVW Enterprises, Inc. v. Interact Accessories, Inc., defendant Interact argued that its accused video game controllers were "monolithic" controllers and not an "accessory designed to aid a video game player." 424 F. 3d 1324, 1335 (Fed. Cir 2005). Interact also argued that a "video game controller" should be construed as a "self-contained device intended to be used by itself for playing a video game without any additional accessory." Id. at 1335. The Federal Circuit

8

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

rejected Interact's argument, stating that it would require the Court to limit the claim to the specific embodiment disclosed in the specification, which would be improper:

> *We do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment,* unless the specification makes clear that "the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive."

Id. at 1335 (citing Phillips, 415 F.3d at 1323).

Similarly, this Court has recently rejected an attempt by a defendant to read limitations from preferred embodiments into the claims, just as Cornice is attempting to do here. In Praxair, Inc. v. ATMI, Inc., this Court considered defendant's construction of the claim limitation "an outlet port for releasing pressurized gas from the container." 2005 WL 2989767 (D. Del. 2005). The defendant argued that the "outlet port" must be in a valve assembly as opposed to the container. While this Court acknowledged that such an arrangement was shown in the Figures, it was just one embodiment of the invention. Accordingly, this Court declined to read limitations from preferred embodiments into the claims. "Claims of a patent may only be limited to a preferred embodiment by the express declaration of the patentee." Praxair, Inc. v. ATMI, Inc., 2005 WL 2989767, at *2 (D. Del. 2005) (citing Karlin Technology, Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 973 (Fed. Cir. 1999)).

In that same case, the Court also considered another limitation related to a "restrictor" of the gas flow path, which the defendant sought to define in terms of preferred embodiments. Id. at * 2. This Court stated in no uncertain terms that it "will not read limitations of the preferred embodiments into the claims." Id. (citing Playtex Products, Inc. v. Procter & Gamble Co., 400 F.3d 901, 908 (Fed. Cir. 2005)).

In the present case, Cornice attempts to lead this Court down the same path the ATMI defendant sought to take. Cornice ignores clear evidence in the specification that the claimed

9

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

"quadrature servo pattern" is consistent with the broad ordinary meaning. Cornice has not identified any express declaration limiting the term "quadrature servo pattern" to features only disclosed in preferred embodiments. Instead, as set forth below, Cornice cites numerous portions of the specification in support of its construction of "quadrature servo pattern" that relate to preferred embodiments or even to other limitations of the '506 patent.

### b.     Summary of the Invention

First, Cornice contends that "the Summary of the Invention of the '506 patent defines the specific relationship between the quadrature burst pattern and the data tracks upon which Cornice's claim construction is based." [See D.I. 183 at p. 15-16.] Cornice points to a statement in the Summary of the Invention that "[e]ach data track will have a boundary defined by two servo bursts located at 1/6*W, 1/2*W, and 5/6*W positions in a data track." [Id. at p. 15.] This discussion, however, is part of the disclosure of the "position generator" and how it utilizes the servo pattern. [Ex. 1 at 2:12-20.] It comes *after* the quadrature pattern has been introduced and described. [Id. at 1:66-2:5.]

Moreover, the particular features of the preferred quadrature pattern on which Cornice seeks to rely are not recited in the independent claims of the '506 patent, but are instead reflected in dependent claims. For example, claim 4 and several other claims require that each burst of the claimed "quadrature servo pattern" have a width of 2/3 * W, or 2/3 the width of a data track. As can be seen from the excerpt of Figure 3 in Cornice's brief, the D burst, which has boundaries at 1/6*W and 5/6*W, has the claimed width of 2/3 * W. The recitation of these features in dependent claims further establishes that Cornice's attempt to read them into the "quadrature servo pattern" limitation is improper. Karlin Technology, Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 972 (Fed. Cir. 1999). Indeed, Cornice's purported "limitation" of a burst be centered in a data track is explicitly left out of the claims.

Cornice's argument is inconsistent with the understanding of one of ordinary skill in the art. ████████████████████████████████████████████████████

10

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

REDACTED

████████████████. [Ex. 10 at 284:3-11.] Defining the term "quadrature servo pattern" in terms of its alignment with respect to the data tracks on the disk, as Cornice does, leads to the illogical conclusion that a "quadrature servo pattern" could not exist on a disk unless data tracks were also recorded on the disk. This notion is contrary to the undisputed ordinary meaning of "quadrature servo pattern," which is defined in term of the four servo bursts and their arrangement.

c.     **Detailed Description of the Invention**

Cornice also asserts that each embodiment of the quadrature servo pattern disclosed and illustrated in the specification has a burst centered in each data track. Even if the many patterns described in the '506 patent could be construed as a single embodiment, the fact that the specification only discloses one embodiment is not sufficient justification to read limitations from the preferred embodiments into the claims. See Phillips, 415 F.3d at 1323.

Cornice's continued reliance on the statement in the specification that "*the position measuring system requires* that one of the four servo bursts of the quadrature servo pattern used must be centered in data track zero" is also misplaced. [See D.I. 183 at p. 17.] This passage relates to a characteristic required by a preferred embodiment of the position measuring system, not the claimed "quadrature servo pattern." [See D.I. 185 at 18-20.] The specific features of this position measuring system are likewise recited in dependent claims. [See, e.g., Ex. 1 at claims 8-21.] They should not be imported into the independent claims. Karlin Technology, Inc., 177 F.3d at 972.

In fact, the characteristics of a quadrature servo pattern are expressly defined in the specification immediately before the passages cited by Cornice, in a manner consistent with the ordinary meaning:

> Each quadrature pattern in the first set *is characterized by* an A burst which initiates at the mid point of the D burst of the preceding quadrature servo pattern, a B burst initiating at the point of termination of the A burst, a C burst initiating at the mid point of the A burst and a D burst initiating at the

11

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

point of termination of the C burst and terminating at the mid point of the A burst of the following quadrature servo pattern.

[Ex. 1 at 3:61-4:1; see also 4:2-10, 13:7-25.]

As '506 patent makes clear, a quadrature servo pattern is properly described in terms of the relationship between the bursts (like Seagate's construction) and not in relation to the data tracks (like Cornice's construction). Cornice's attempt to read limitations of preferred embodiments of the position measuring system are improper and should be rejected.

### d.    Brief Description of the Drawings

Finally, Cornice asserts that the Brief Description of the Drawings limits the invention to the preferred embodiments [D.I. 183 at p. 19.] Cornice's argument is directly contradicted by the '506 patent itself. The introduction to the Brief Description of the Drawings states unequivocally that *"the invention will be described with respect to particular embodiments* thereof and reference will be made to the drawings, where a reference numeral refers to the same element through out the drawings." [Ex. 1 at 2:39-42.] It is clear that the inventors did not intend that the Figures or their descriptions define the invention, but rather define embodiments of the invention.

### 3.    The Cases Cited by Cornice Are Distinguishable and Do Not Support Cornice's Position

Cornice cites cases where statements in the intrinsic record characterizing "the invention" limited the claims to features disclosed in preferred embodiments. Each of these cases, however, is distinguishable from the present facts.

For example, in Gaus v. Conair Corp., the court relied on the patentee's use of the statement "according to the invention" to limit the invention to a particular feature. 363 F.3d 1284, 1290 (Fed. Cir. 2004) But this type of express declaration is not present in the '506 patent, nor has Cornice identified any such declaration.

Similarly, in Watts v. XL Systems, Inc., the court pointed to a statement in the specification that "actually limits the invention to structures that utilize misaligned taper

12

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

angles, stating that the 'present invention utilizes [the varying taper angle] feature.'" 232 F.3d 877, 883 (Fed. Cir. 2001). The Court also pointed to statements in the file history that distinguished prior art based on that feature. Neither type of statement is present in the '506 patent or its file history. In fact, the claims of the '506 patent were allowed on the first Office Action, [Ex. 2], so the Applicants never made any arguments or amendments that could be interpreted as narrowing the claims.

In Wang Labs, Inc. v. America Online, Inc., the Court declined to construe the claim term "frame" to cover embodiments that were not described or enabled in the specification. 197 F.3d 1377, 1383 (Fed. Cir. 1999). That is not the case here. The '506 patent expressly discloses and enables a quadrature servo pattern, as that the term is understood by a person of ordinary skill in the art. [Ex. 1 at 3:61-4:1, 4:2-10, 13:7-25.]

In Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc., the Court limited the asserted claims to structures with coaxial lumens because the patentee explicitly stated that the structure containing coaxial lumens is "the basic sleeve structure for *all embodiments of the present invention* contemplated and disclosed herein," and distinguished prior art on that basis. 242 F.3d 1337, 1344 (Fed. Cir. 2001). Again, no such statement is present in the intrinsic record of the '506 patent.

Finally, in Alloc, Inc. v. International Trade Commission, the Court limited a claimed invention on interlocking floor panels to embodiments where there was "play" in the joints between panels, because the "specification indicates that the invention is indeed *exclusively* directed toward flooring products including play" and because the "specification also distinguished prior art on the basis of play." 342 F.3d 1361, 1371 (Fed. Cir. 2003). The Court further found evidence that play between panels was a key feature of the claimed invention in the prosecution history of one of the patents-in-suit. Id. at 1371. None of the evidence that Cornice cites indicates that the '506 patent is directed only to quadrature servo patterns having a burst centered in each data track. Only the preferred position generator

13

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

requires this feature. [Ex. 1 at 4:11-14.] Moreover, Cornice cannot point to any statement during prosecution where the patentee distinguished prior art on this basis.

Because Cornice has not identified any express statements in the intrinsic record of the '506 patent limiting the term "quadrature servo pattern" to a preferred embodiment, Cornice's proposed construction should be rejected. Praxair, Inc., 2005 WL 2989767 at *2 ("Claims of a patent may only be limited to a preferred embodiment by the express declaration of the patentee.").

### B.    "Fixed Reference Point"

#### 1.    Cornice's Proposed Construction Is Improperly Narrow

Cornice's contends that the fixed reference point must be "the same for each position calculation" [D.I. 183 at 21], and that the term "fixed" would not otherwise have meaning in the claims. Contrary to Cornice's construction, the '506 patent claims and specification both establish that there *cannot* be a single reference point for every position calculation.

Each independent claim of the '506 patent recites multiple servo wedges. Claim 1, for example, recites "a disk surface divided into sectors." [Id. at 20:11.] Each sector includes a "servo band" including a quadrature servo pattern, and a "gray scale band." [Id. at 20:12-14.] Position is calculated using information from the "quadrature servo pattern and an address of a gray scale area." [Id. at 20:17-18.] Thus contrary to Cornice's argument, the claims clearly contemplate multiple servo bands for calculating position. This requires a reference point within each gray scale band to accurately measure radial position.

The '506 patent specification also describes multiple servo wedges. [Ex. 1 at 3:39 (describing a disk divided into "sectors").] While Cornice points to sections of the '506 patent specification that describe measuring position from the center of gray scale area zero, [id. at 23], nothing in the specification limits the disk to having a single such area. As Cornice acknowledges, there are hundreds of servo wedges on the surface of a disk, each having a gray scale area addressed zero. [Id. at 4.] Under Cornice's logic, each position

14

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

measurement must made be using a single gray scale area of a single servo wedge. If that were the case, however, there would be no need for multiple servo wedges. Even if attempted, calculating position from a single point would result in wildly varying results when position is measured from different servo wedges around the disk. Cornice's proposed construction requiring a single reference point should be rejected.

### 2. Seagate's Construction Does Not Allow for Points Not on the Disk to Act as Fixed Reference Points

Cornice also incorrectly asserts that Seagate's construction allows for points not on the disk to act as "a fixed reference point." [See D.I. 183 at 23-24.] Contrary to Cornice's argument, Seagate's construction explicitly recites that "any point of *the gray scale area* provides a fixed reference point." Because each independent claim recites that the gray scale area is recorded on the disk, the fixed reference point must also be on the disk.

According to Seagate's construction, once a fixed reference point is selected within the gray scale, position can then be measured from that point.



[Ex. 4 at 109:16-21.] As such, Cornice's assertion has no merit.

### C. The "0.75*Z" and "0.5*Z" limitations

Not only does Cornice attempt to read limitations from preferred embodiments into the claims, but regarding the ratio limitations "0.75*Z" and "0.5*Z", Cornice attempts to read words into the claims that do not appear anywhere in the '506 patent. As noted in Seagate's Opening Brief, the sole dispute between the parties relates to Cornice's insistence that the word "precisely" be inserted into the claim. [D.I. 143 at 4-5.]

The extra term "precisely" is simply not present anywhere in the '506 patent. It is not supported by the intrinsic record, and is inconsistent with the plain and ordinary meaning of the claim language as understood by one of ordinary skill in the art. As set forth in Seagate's

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Opening Brief, Cornice's self-serving reasons for inserting the term "precisely" into the claims have no merit. For these reasons, the Court should adopt Seagate's proposed claim construction (i.e., the "joint" portion of both parties' constructions).

**D.    "Position Generator"**

      **1.    Cornice Has Failed to Present Sufficient Evidence that the Term "position generator" Should Be Construed as a Means-Plus-Function Limitation**

Cornice's construction of the term "position generator" represents another attempt by Cornice to read limitations into the claims in order to avoid infringement. Indeed, by arguing that the claim term "position generator" should be construed under 35 U.S.C. § 112(6), when it presumptively should not, Cornice seeks to sweep into claim 1 at least a dozen separate limitations recited in the dependent claims.

There is no dispute the claims do *not* use the word "means" to introduce the term "position generator." Thus, Cornice bears the burden of going forward with evidence to rebut the presumption that 35 U.S.C. §112(6) does not apply. See, e.g., Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1372 (Fed. Cir. 2003). This turns on whether Cornice has presented sufficient evidence to establish that the term "position generator" fails to recite sufficient structure. Cornice has failed to make this showing.

Cornice's principal argument is that the term "position generator" does not have a generally understood meaning in the art. [See D.I. 183 at p. 26.] In support, Cornice attempts to rely on the testimony of the inventors of the '506 patent, Michael Baum and James Touchton, and Seagate's expert, Dr. William C. Messner. Cornice's arguments, however, are both legally and factually misplaced.

A claim term cannot be considered a means limitation simply because it lacks a generally understood meaning. Even assuming Cornice's factual premise on this point, the court must also consider whether the term "position generator" connotes sufficient structure to one of ordinary skill in the art. See, e.g., Apex Inc., 325 F.3d at 373 (finding that the claim

16

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

term "circuit" connotes sufficient structure to one of ordinary skill in the art); <u>Personalized Media Communication, LLC v. International Trade Commission,</u> 161 F.3d 696, 704 (Fed. Cir. 1999) (holding that the claim term "digital detector" connotes sufficient structure to one of ordinary skill in the art).

In this case, both the inventors and Seagate's expert testified that the term connotes structure.



[Ex. 11 at 57:17-58:1.]

[Ex. 12 at 157:4:21.]

[Ex. 13 at 80:10-81:9, 85:11-19.] Thus, Cornice's contention the term "position generator" does not recite sufficient structure is belied by the very evidence on which Cornice seeks to rely.

Cornice has failed to rebut the presumption that 35 U.S.C. §112(6) does not apply. Its proposed construction of the term "position generator" would read into claim 1 multiple limitations from the dependent claims, and should be rejected. <u>Karlin Technology, Inc.,</u> 177 F.3d at 972.

E.    Claim 22

Cornice has not offered a construction of claim 22 but rather has moved for summary judgment that claim 22 is invalid under 35 U.S.C. § 112. Cornice's assertions regarding the validity of claim 22 are without merit, and Seagate addresses Cornice's arguments in its Opposition to Cornice's Motion for Partial Summary Judgment Regarding the Invalidity of U.S. Patent No. 5,600,506, filed concurrently.

Cornice has not offered a construction of the phrase "said servo band and said gray scale band coact to define radial positions on said magnetic disk from a fixed reference point in said gray scale band on the surface of said disk," and does not dispute Seagate's proposed

17

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

construction. Accordingly, Seagate submits that this phrase should be construed according to its ordinary meaning, as proposed by Seagate.

### F.    "Zones"

Cornice's proposed construction of "zones" is not supported by the intrinsic record and, again, improperly imports limitations from the specification into the claims. Cornice contends that the term "zones" is used in the '506 patent to refer to the specific logic for "demodulating" the signals from the quadrature burst pattern, shown in Figures 5 and 9. This construction, however, makes no sense. Nowhere in the '506 patent is the term "zone" used to refer to any specific demodulation logic. In fact, the first three steps of the exemplary demodulation logic described in Figures 5 and 9 of the '506 patent do not even employ zones. [Ex. 1 at 7:51-55, 8:47-50, 9:3-7, 9:53-56.]

Moreover, Figures 5 and 9 show only the preferred methodology associated with only two of the quadrature burst pattern embodiments shown in Figures 3 and 8. [Ex. 1 at 7:49-57 and 15:1-9.] There is simply no basis to read this preferred embodiment into the claims, and Cornice's attempt is improper. Praxair, Inc. v. ATMI, Inc., 2005 WL 2989767, at *2.

The '506 patent claims and doctrine of claim differentiation further support Seagate's proposed construction. Many dependent claims of the patent recite various features of the preferred demodulation logic described in the '506 patent. Cornice would have every one of these limitations imported into the few dependent claims reciting "zones." This should not be permitted. Karlin Technology, Inc., 177 F.3d at 972.

Lastly, Cornice contends that claim 8 requires limiting the construction of "zones." Cornice, however, offers no explanation as to how this claim supports its construction of the term "zones." Moreover, claim 8 is entirely consistent with Seagate's construction, because claim 8 recites each of the logical zones, zones 0, 1, 2, and 3, that are generated by the position generator recited in the claim. Cornice's construction should be rejected.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER

### G.   "Zone Detector"

Cornice's reliance on preferred embodiments is even more apparent in its construction of "zone detector," which Cornice seeks to limit to the specific logical elements depicted in Figure 6A of the '506 patent. As this Court has already warned, depictions of features in a single figure of a single embodiment should not limit the claims. Praxair, Inc. v. ATMI, Inc., 2005 WL 2989767, at *2. Because Cornice has not identified any legitimate basis for reading the specific embodiment of Figure 6A into the claims, its construction must be rejected.

Cornice has also asserted that a zone detector and a microprocessor are somehow "mutually exclusive." [See D.I. 183 at p. 35.] As noted in Seagate's Opening Brief, this argument plainly ignores the patent specification, which indicates that the electronic embodiment of the zone detector (i.e., hard-wired circuitry) may be "replaced by a microprocessor 50, RAM 52, and ROM 51." [Ex. 1 at 19:25-26.] This statement demonstrates that the zone detector function can be incorporated into a microprocessor, contrary to Cornice's narrow construction.

### V.   CONCLUSION

For the reasons set forth above and in Seagate's Opening Brief, Seagate's proposed claim constructions should be adopted.


Dated:  December 16, 2005                    FISH & RICHARDSON P.C.

                                   By:  /s/ Timothy Devlin
                                        Timothy Devlin (#4241)
                                        919 N. Market Street, Suite 1100
                                        Wilmington, DE  19899-1114
                                        Tel: (302) 652-5070

                                   Attorney for Plaintiff
                                   SEAGATE TECHNOLOGY LLC

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO
PROTECTIVE ORDER