# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEAGATE TECHNOLOGY LLC,      )
                                  )
               Plaintiff,      )
                                  )
       v.                     )      C.A. No. 04-418 (SLR)
                                  )
CORNICE, INC.,                )
                                  )
            Defendant.   )

## DEFENDANT CORNICE, INC.'S
## SECOND SET OF INTERROGATORIES TO PLAINTIFF

      Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Cornice,

Inc. ("Cornice"), by and through its undersigned counsel, hereby requests that plaintiff Seagate

Technology LLC ("Seagate") separately answer each interrogatory set forth below in accordance

with the Definitions and Instructions contained herein, and serve such answers on Defendant's

counsel, Morris, Nichols, Arsht & Tunnell, 1201 N. Market Street, P.O. Box 1347, Wilmington,

Delaware 19899, within thirty (30) days of service hereof. These interrogatories are continuing

in nature, and pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, plaintiff is hereby

requested to supplement its answer to each and every interrogatory whenever it learns that the

response is in some material respect incomplete or incorrect.

## DEFINITIONS AND INSTRUCTIONS

      A.    The Definitions and Instructions set forth in Cornice's First Set of Interrogatories
to Plaintiff are incorporated by reference as though fully set forth herein.

## INTERROGATORIES

### INTERROGATORY NO. 18:

For each of the patents-in-suit, explain in detail all facts and circumstances supporting, contradicting, or otherwise relating to Seagate's calculation of damages allegedly resulting from Cornice's alleged infringement thereof, including, but not limited to:

(a)    each category of damages alleged, including without limitation, for each such category, a computation of damages alleged (in type and dollar amount), the method(s) and calculation(s) used for such computation of damages, all individuals with knowledge of the bases for each such computation, and the location and custodian of documents relevant to the computation of each category of damages alleged;

(b)    to the extent that Seagate contends it is entitled to a reasonable royalty, an identification of each of the fifteen "Georgia-Pacific" factors that Seagate is relying on in support of a reasonable royalty, Seagate's basis for relying on that factor, all facts supporting or contradicting Seagate's alleged reasonable royalty rate, all individuals with knowledge of facts relating to how such factor(s) relate(s) to the calculation of a reasonable royalty for the patents-in-suit, and the location and custodian of documents relating to the computation of a reasonable royalty for the patents-in-suit. *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970); and (c) to the extent that Seagate contends it is entitled to lost profits, identification of all facts supporting or contradicting such contention; identification of all individuals with knowledge of facts relating to any profits, sales, or other revenue, including licensing revenue, actual or projected, that Seagate allegedly lost as a result of Cornice's alleged infringement, and the location and custodian of documents relating to any such alleged lost profits.

2

**INTERROGATORY NO. 19:**

Explain in detail all facts and circumstances supporting, contradicting, or otherwise relating to any assertion by Seagate that Cornice's alleged infringement of any claim of any patent-in-suit has been deliberate or willful, that damages if any should be enhanced pursuant to 35 U.S.C. § 284, or that Seagate is entitled to its attorneys fees pursuant to § 285.

**INTERROGATORY NO. 20:**

State the date on which Seagate contends that Cornice's alleged infringement of the patents-in-suit began and the date on which Seagate first became aware of such alleged infringement, and explain in detail why Seagate did not commence this action against Cornice between the date Seagate became so aware and June 2004.

**INTERROGATORY NO. 21:**

Identify all individuals with knowledge of or involvement in the financial and/or accounting aspects of Seagate's business as it relates to Seagate Products during the period from 1980 through the present, including but not limited to those with knowledge or involvement relating to each of the following, and the location and custodian of documents related to each of the following:

  (a) all sales or revenues (including any deductions) for Seagate Products;

  (b) all costs related to Seagate Products, including overhead costs, which include but are not limited to administrative, marketing, selling, labor and research and development expenses, and all fixed, variable, and semi-variable costs;

  (c) all prices of Seagate Products, including price lists and pricing strategies;

  (d) all profits on Seagate Products;

  (e) marginal costs, per program, related to Seagate Products;

3

(f)    trend(s) in sales, market share, costs, profits or prices;

(g)    actual or potential customers of Seagate Products;

(h)    development or strategic plans, budgets, forecasts, and projections, including policy and marketing decisions and negotiations;

(i)    past and present market shares, and definition of the relevant market;

(j)    customer lists;

(k)    product development costs, including marketing costs, selling, general and administrative (SG&A) expenses, engineering expenses, and general allocation expenses;

(l)    past and present demand;

(m)    establishment or setting of prices for Seagate Products;

(n)    gross margin, and the methods for calculating gross margin;

and, for each such individual, describe in detail his or her knowledge and/or involvement in the aforementioned activities.

**INTERROGATORY NO. 22:**

Identify all individuals with knowledge of non-infringing alternatives to the Seagate Products or the Patents-in-Suit, including any potential design-around of the Patents-in-Suit, and/or any actual or estimated costs of developing and/or implementing each such alternative or design-around.

**INTERROGATORY NO. 23:**

Identify all individuals with knowledge of or involvement with Seagate's actual or potential customers with respect to the Seagate Products for the period of 1980 through the present and, for each such individual, describe in detail his or her knowledge and/or involvement in the aforementioned activities.

4

**INTERROGATORY NO. 24:**

Identify each person currently or formerly employed by, retained or otherwise associated with Seagate having first-hand knowledge of any discussions, negotiations, proposals, offers, or other communications concerning any actual or potential fees, royalty rates or other payments during the period of 1980 through the present  for (i) any patent or other intellectual property rights pertaining to any Seagate Product, or (ii) any Seagate Product, and, for each such person, identify the following:

        (a)    the patent(s) and/or other intellectual patent rights involved;

        (b)    the assignee and/or owner of the rights set forth in (a);

        (c)    the products and/or services for which payment was to be made; and

        (d)    each person involved in such discussions, negotiations or other communications on behalf of the assignee and/or owner set forth in (b).

**INTERROGATORY NO. 25:**

Identify all fact and expert witnesses Seagate expects to call at any hearing or at trial in this case, and all individuals from whom Seagate will or expects to submit an expert declaration or expert report.

**INTERROGATORY NO. 26:**

Identify all individuals with knowledge of or involvement with Seagate's business plans, forecasts, market analyses, marketing plans, sales plans, operating plans, or sales or market projections relating to Seagate Products and, for each such individual, describe in detail his or her knowledge and/or involvement.

**INTERROGATORY NO. 27:**

Identify any communications between Seagate and any third party, including but not

5

limited to the U.S. Internal Revenue Service, referring or relating to any royalties, royalty rates, fees, or valuations of any of Seagate's intangible property (either between Seagate and third parties or between and among Seagate's affiliated corporate entities), including but not limited to patents, inventions, formulas, processes, designs, patterns, trademarks, trade names, trade dress, licenses, methods, programs, systems, procedures, customer lists, and technical data.

## INTERROGATORY NO. 28:

Identify any transfer pricing studies or similar analyses prepared for Seagate for purposes of any tax adjustments pursuant to Section 6662(e)(3) of the U.S. Internal Revenue Code, the regulations issued thereunder, or determining if transactions reflected on the U.S. income tax return of Seagate, including without limitation any subsidiary of Seagate, complied with the requirements of Section 482 of the U.S. Internal Revenue Code.

## INTERROGATORY NO. 29:

Identify all communications between Seagate and any third party, including but not limited to the U.S. Internal Revenue Service, referring or relating to Income Tax Regs. Sections 1.482-4 and/or 1.482-7 (or predecessor regulations).

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
*Attorneys for Defendant and Counterclaim Plaintiff
Cornice, Inc.*

6

OF COUNSEL:

Vernon Winters
Steven Carlson
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Russell Wheatley
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77001
(713) 546-5000

Alan J. Weinschel
David C. Radulescu
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

465347

7

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the foregoing were caused to be served on May 13, 2005, upon the following counsel of record in the manner indicated:

**BY HAND DELIVERY**

William J. Marsden, Jr., Esquire
Fish & Richardson, P.C.
919 N. Market Street
Suite 1100
Wilmington, DE 19801

**BY FEDERAL EXPRESS**

Roger S. Borovoy, Esquire
Fish & Richardson, P.C.
500 Arguello Street
Redwood City, CA 94063-1526

Ruffin B. Cordell, Esquire
Fish & Richardson, P.C.
1425 K Street, NW
Suite 1100
Washington, DC 20005

Edmond Bannon
Fish & Richardson
Citigroup Center
153 East 53rd St.
New York, NY  10022

Julia Heaney

# Exhibit 10

# Sealed Document

# EXHIBIT 11

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4   SEAGATE TECHNOLOGY LLC,          :          CIVIL ACTION
                                      :
5               Plaintiff            :
                                      :
6          vs.                       :
                                      :
7   CORNICE, INC.,                    :
                                      :
8               Defendant            :          NO. 04-418 (SLR)

9                        - - -

10                              Wilmington, Delaware
                                Tuesday, June 28, 2005
11                              4:43 o'clock, p.m.

12                        - - -

13  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

14                        - - -

15  APPEARANCES:

16          FISH & RICHARDSON P.C.
            BY:  TIMOTHY DEVLIN, ESQ
17

18                  -and-

19
            FISH & RICHARDSON P.C.
20          BY:  BRIAN R. NESTER, ESQ.
                 (Washington, D.C.)
21
                        Counsel for Plaintiff
22

23                              Valerie J. Gunning
                                Official Court Reporter
24

25

2

```
 1    APPEARANCES (Continued):

 2
              MORRIS, NICHOLS, ARSHT & TUNNELL
 3            BY:  JACK B. BLUMENFELD, ESQ. and
                   JULIA HEANEY, ESQ.
 4

 5                      -and-

 6
              WEIL, GOTSHAL & MANGES LLP
 7            BY:  DAVID RADULESCU, ESQ. and
                   MICHAEL ZUPPO, ESQ.
 8                 (New York, New York)

 9                 Counsel for Defendant

10                      - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1

2                    P R O C E E D I N G S

3

4            (Proceedings commenced in the courtroom,

5    beginning at 4:43 p.m.)

6

7            THE COURT:  I take it you're here because

8    there are things for us to discuss, so I will let you

9    tell me what they are.

10           MR. DEVLIN:  Good afternoon, your Honor.

11   Tim Devlin, of Fish & Richardson, for Seagate.

12           With me I have Brian Nester from our D.C.

13   office.  He'll be arguing primarily on behalf of Seagate.

14           THE COURT:  All right.  Thank you.

15           MR. NESTER:  Good afternoon, your Honor.

16   I'd like to start out with a little bit of background,

17   so the Court can appreciate where the parties are and

18   how much work we've actually done at this point.

19           As you may recall, we had a sister litigation

20   in the ITC that settled on April 29th.  In that ITC

21   litigation, the parties took significant discovery on

22   many of the issues that will be relevant here.  You

23   know, Cornice issued 144 Interrogatories there that we

24   responded to, and including the experts, we took over 40

25   depositions.  But like I said, the ITC case settled on

4

1  April 29th and that moved us into this stage, the

2  Delaware action and, as the scheduling order sits now,

3  discovery closes on June 30th.

4            Despite all the discovery that took place

5  in the ITC, there's still a fair amount of discovery

6  that needs to take place in Delaware, related to damages:

7  Cornice's counterclaims, of which there are three or

8  four, as well as design changes that they've made to

9  their products.

10           And also relevant to this conference is on

11 the 20th, there is a new counterclaim added to this case.

12 It was their breach of contract counterclaim.

13           So let me tell you the status of discovery

14 right now.  Like I said, the parties have been working

15 hard on discovery.  Last week and this week, we got a

16 total of 24 depositions that are taking place, including

17 third-party depositions.  Documents are being produced

18 on a rolling basis.  We received documents yesterday

19 from Cornice.  And as well, we received supplements

20 today on Interrogatories from Cornice.  We've also

21 received some third-party discovery, documents relating --

22 number one, they're documents Cornice produced.  They

23 relate directly to damages that we didn't receive from

24 Cornice.  They deal with market reports, market share,

25 competitors, valuation of Cornice.

5

1          So there's a significant amount of discovery

2     going on.  I'm not saying that Seagate has completed all

3     of its discovery, but there is a fair amount of discovery

4     that needs to still take place and ultimately we're going

5     to ask that discovery be extended to August 12th.

6               So that's point number one.

7               There are three issues for which we're going

8     to seek a motion to compel on, your Honor.  The first is

9     an order compelling Cornice to produce products that it

10    has already marketed to its customers.  There are three

11    of them.  Two of them are different versions of products

12    it has already agreed to produce.  The fourth is a

13    product that it has sold and has some sort of an

14    agreement with Samsung to sell.  I call those sort of

15    new products, although they're not that new.

16              The second category that we're going to

17    move for, to compel on, is a 30(b)(6) witness.  Cornice

18    flat-out refuses to provide any 30(b)(6) witness in

19    this case, so we're going to ask that the Court order

20    them to do that.

21              And then the last thing that we're going

22    to move on, your Honor, is there are a number of

23    individuals that we have noticed up as 30(b)(1) witnesses

24    and those have been scheduled so as to limit them to

25    about two to three hours apiece.  Some of the witnesses,

6

1   it's fine, but some of the witnesses we will need more

2   time, so we're going to ask that we have at least seven

3   hours available, as the rules provide.

4           With that, I would like to move into the

5   specifics on the new products that we think discovery

6   should be produced on, and if the Court recalls, on May

7   11th, Seagate moved for all R&D discovery relating to

8   the technologies at issue as a result of the patents in

9   this case.  We did not -- the Court granted only that

10  we get discovery on products that Cornice has marketed,

11  quote unquote.

12          And the status of discovery now is that

13  Cornice has agreed to produce on three products, your

14  Honor -- or I should say four.  It's the 1.0 gig, the

15  1.5 gig, the 2.0 gig and the 3.0 gig drive.  Of those

16  four products, only one is a current manufacturer.  It's

17  the 3.0.  The 1.0, 1.5 and 2.0 lines have all been

18  discontinued in favor of the 3.0 gig line.

19          At this point, if we try to go beyond those,

20  the 3.0 product, at deposition we get instructions not

21  to answer, so we -- if we ask Interrogatories beyond

22  products other than 3.0, we get no answer.

23          We can't even get documents relating to the

24  status of these products.  So it is a complete block on

25  anything, any information relating to a product beyond

1   the 3.0.

2           Now, despite that, there are, as a result

3   of depositions last week, we learned of two variations of

4   the 3.0 which they agreed to produce to us.  One is

5   called the Thin Wind.  It's the 3.0 drive that's in a

6   smaller package.  It's thinner, and thus the name Thin

7   Wind.  This product has been sold to Samsung.

8           The next product is called the Compact Flash

9   product.  This product is in mass production sometime

10  this week according to Mr. McNeill, an employee at

11  Cornice.  This is another 3.0 product.  We thought we

12  were getting discovery on the 3.0.  We're not getting

13  discovery on this and so we seek a motion on the Compact

14  Flash.

15          And then there is a third group of products.

16  It's the 4.0 gig product.  That product, they have agreed

17  to sell 1,000 units a week to Phillips.  At this point,

18  Phillips, based on testimony that we do have, should

19  have samples in its hand, according to Cornice's

20  witnesses, so they have been provided a sample to test

21  and use and to -- it's basically an offer for sale, it's

22  a demonstration.  And there's some sort of commitment

23  for a thousand products a week on that 4.0.

24          There is a third piece of discovery relating

25  to this that we're after.  There is an article in the

8

1    register that discloses, that Cornice sent some sort of

2    a mailing, an announcement to its customers at the

3    settlement of the ITC, announcing new products, so it

4    would be higher-capacity products and what's called

5    smaller form factors.  It's just the drive shrunk down

6    a bit.

7         So we are after that announcement, and

8    depending on what's in there, we think that there are

9    likely other products that Cornice has marketed to its

10   customers.  But, again, most of that discovery has been

11   entirely blocked.

12        So for that reason, your Honor, we are seeking

13   an order to compel on the Thin Wind 3.0 product, the

14   Compact Flash product, the 4.0 product as well as this

15   announcement that we believe Cornice has issued to its

16   customers.

17        THE COURT:  All right.  Let me hear from

18   Cornice on that issue.

19        MR. BLUMENFELD:  Your Honor, Jack Blumenfeld,

20   for Cornice.

21        Before I address that issue specifically, can

22   I set the framework a little bit because I think it is

23   important where we are and why we're going where we are

24   going, and if I could just take a couple minutes to do

25   that, I would appreciate that.

9

1          And I would like to, if I could, I would like

2     to just hand up a couple of charts that I would like to

3     refer to (handing documents to the Court).

4          Thank you.

5          MR. NESTER:  If we can get copies...

6          (Mr. Blumenfeld handed documents to Mr.

7     Nester.)

8          MR. BLUMENFELD:  Your Honor, when we were here

9     in May, we had a request for an extension of discovery, at

10    that time 30 days, and it all had to do with getting into

11    this 4.0, this supposed new product.  And that was the

12    second time we were asked for an extension.  Today we're

13    being asked for 43 days I guess it comes to.

14          But what has happened here, and seems to us

15    to be fairly orchestrated, because your Honor set a

16    schedule and I guess I will refer to the chart that goes

17    from September '04 to June '05, your Honor, one of the

18    two charts I handed you.

19          Your Honor set a schedule in September where

20    document production on certain issues was to be completed

21    by last November and document production on other issues

22    was to be completed by this January.  And what happened

23    was that, as shown on this first chart, in October, we

24    got a set of document requests.  It was on commercial

25    issues.  And then we got virtually nothing more until

10

1    the day we were here, on May 11th.

2              That was Seagate's decision not to serve any

3    discovery within the schedule that your Honor set.

4    Things were going on in the ITC, for sure, but in this

5    court, they elected to do nothing.  They let the document

6    completion dates go by.  And then, all of a sudden, we

7    get to May 11th, and since May 11th, in the six weeks

8    since then, we've been served with 26 Interrogatories,

9    356 document requests, ten requests for admission.  A

10   30(b)(6), which is one of the issues that Mr. Nester is

11   going to raise, has 193 categories, and I'm glad we're

12   going to get to that because I would like to discuss

13   that.  Sixteen individual depositions of people on the

14   Cornice side, and then ten subpoenas to third parties

15   for both documents and witnesses.

16             And if you look at the second chart, the

17   one that shows May and June, having done nothing from

18   October to May 11th, the second chart shows the activity

19   that Seagate has engaged in since May 11th, when we were

20   last here.

21             And that is not an accident.  What they

22   are trying to do here is get this schedule stretched

23   because they want to bring it out, get the discovery

24   cut off because they're trying to stretch the schedule

25   so that when we come out with new products, they'll be

1    captured in this case.

2            Now, the other side of the issue here, and

3    we've been trying to respond to this and we've produced,

4    for example, 14 of the 16 witnesses that they've noticed.

5    But we can't deal with 356 document requests six months

6    after document production is supposed to be completed

7    and ten third-party subpoenas, and on the other side we

8    served seven notices of deposition on May 27th.  We have

9    not gotten a single one of those witnesses yet.  We have

10   not even gotten a single date for those witnesses.

11           And so what Seagate is doing is, on their

12   side, they're serving a tremendous amount of discovery

13   on us and then, when we serve discovery, which I think

14   has been much more modest than what they've served,

15   they're just not producing witnesses, and then they come

16   into court and say we need six more weeks, your Honor.

17           So that's kind of where we are.  We have the

18   same thing on other 30(b)(6) topics.  We have the same

19   thing on Interrogatories, and maybe I will get to that

20   later, depending on what happens.

21           But this is what has happened over the last

22   six weeks, and I think the reason this has happened is

23   because Seagate didn't get the extension they wanted on

24   May 11th, so we're back again, trying to get it.

25           Now I'm not going to address the 3.0 issues

12

1  because my understanding of the two 3.0 products is that

2  they're, for purposes of this patent case, they are not

3  different than the other 3.0 products.  I don't think

4  that's going to be an issue.

5         The 4.0, the product is not a product yet.

6  It's under research and development.  It's still being

7  designed.  There is nothing that's completed.  There's

8  nothing that has been sold.  There's nothing that has

9  been finalized.  There's nothing that has been placed

10  with customers.  It's just not a product.  And we have

11  a discovery cutoff two days from now and what they are

12  trying to do is stretch the schedule to the middle of

13  August with the thought that maybe by then it will be

14  a product and then they can add it to the case.  And

15  if that happens, then I suppose we're going to be back

16  saying now we need another round of discovery on

17  damages, on infringement, whatever else.

18         And, you know, as far as we're concerned on

19  that, they just have no evidence that the 4.0 is a

20  product.  They raised this based on the same things

21  they're talking about in the ITC twice and twice the

22  ITC turned them down.  But they have no evidence.  If

23  it was a product that was on the market, they would have

24  it.  They would have it off of our website.  They would

25  have the product.  It isn't there.

13

 1          And I guess, in our view, it is just we're

 2     at a point where enough is enough.  We've had an ITC

 3     proceeding, as they said, 40 depositions.  They are

 4     getting depositions in this case.  They've got 80,000

 5     pages of documents.  There are still some depositions

 6     to be taken for sure.  This is a pretty telling point.

 7     But when we had some leftover depositions after June

 8     30th and we said, Okay, we'll agree, let's get the

 9     document production to the extent it hasn't been done.

10     Let's get it done.  We'll agree that we can complete

11     these depositions after June 30th, but only if you'll

12     agree that that is not going to extend the overall

13     schedule, and they said no.  We'll only agree to do

14     depositions after June 30th if you'll agree that that

15     extends the overdrawn schedule.

16          And it is just part of their plan here to

17     keep this thing so complicated and serve so much

18     discovery that the schedule has to get extended with the

19     hope of bringing in the new product.

20          And we've had ten months of discovery already.

21     They've had about 40 depositions, 35, 40.  And in our

22     view, this just has to come to an end.

23          THE COURT:  All right.

24          MR. NESTER:  Your Honor, we absolutely have

25     evidence that the 4.0 has been provided to customers to

14

1    the best that we can have evidence.  It's interesting

2    that they complain that we don't.

3            THE COURT:  Well, but the bottom line is,

4    if it's not being marketed as a commercial product, I

5    thought I had already ruled that it was not part of this

6    case.  Therefore, the argument you are making is, once

7    again, trying to push my ruling and change it.  I am not

8    changing it.  It is not on the market.  It is not for

9    sale on the market.

10            MR. NESTER:  Your Honor, if I can just

11    revisit this issue, the point is that they will

12    absolutely give us no discovery on the agreements that

13    they have with Samsung on this product.  Their 30(b)(6)

14    witness testified that they are going to be supplying

15    1,000 units a week of the 4.0 to -- I'm sorry -- I

16    misspoke -- to Phillips, not Samsung.  Their 30(b)(6)

17    witness also testified that this product would be a

18    complete product that would be handed over to Phillips

19    in June, in June.  So that's before the June 30th date.

20            So this business is not a business where

21    you're going to see a press release or a -- well, I will

22    take that back.

23            THE COURT:  I will tell you what.  I,

24    frankly -- your word, their word.  If you want to give

25    me the deposition excerpts, I will take a look at it.

1    But just because I'm not letting this discovery go

2    forward in this case does not mean you can't bring

3    another suit at sometime in the future on the 4.0.

4              All I'm trying to do is close the record so

5    we can bring whatever you have.  Whatever the basis was

6    for your bringing this suit in the first instance, we

7    can bring it to a close and get it resolved.

8              MR. NESTER:  I understand that, your Honor.

9    And we would like to do that efficiently.  And we think

10   that a lot of the technology that's used in the 3.0 is

11   ported over and carried right into the 4.0, so there

12   would not be a lot of discovery in addition.

13             But I do have --

14             THE COURT:  That isn't the point.  The point

15   is I made a ruling.  The question is whether you are

16   doing what lawyers always do, which is butt their head

17   against the line that I've ruled on and make me go back

18   and make the same decisions over and over again or

19   whether, in fact, there's a good-faith basis for

20   thinking there product is going to be marketed before

21   discovery ends.

22             MR. NESTER:  Okay.  I would like to submit

23   the testimony and I would like to submit a couple

24   e-mails that we have on this issue and I would request

25   the opportunity to submit a brief on that.

16

1              THE COURT:  No.  I don't need a brief.

2              MR. NESTER:  Okay.

3              THE COURT:  What I need is the factual basis

4    for your rearguing an issue.

5              MR. NESTER:  All right.  So I would like to

6    give you the whole deposition and point to the transcript.

7              THE COURT:  Well, I want the deposition

8    highlighted.  I don't want to read the whole deposition.

9              MR. NESTER:  Okay.

10             THE COURT:  Not tonight.  Tomorrow, whenever

11   you want to, you need to give me the deposition with the

12   portions highlighted and if Cornice wants to highlight

13   other parts of the deposition thanking the other way,

14   then I'm happy to review that as well.

15             MR. NESTER:  Okay, your Honor.  Thank you.

16             THE COURT:  All right.

17             MR. BLUMENFELD:  Your Honor, we may want to

18   put in a declaration.  The whole deposition was taken in

19   the ITC in March, so it's not exactly up-to-date

20   information, but we will see what they submit and we

21   can respond to it.

22             THE COURT:  So this is something everyone

23   knew about in March?

24             MR. RADULESCU:  Yes, your Honor.  This is

25   the same motion that was made in March once.  Motion

17

1    denied.  The Court allowed a 30(b)(6) deposition into

2    the schedule.  They refiled the motion based on this

3    whole deposition and there again the Court denied the

4    motion.  At this point you can appreciate that a

5    deposition in March projecting where a product or

6    project will be in June or July or August is getting

7    fairly complicated.

8              THE COURT:  All right.  But perhaps I need

9    counsel for Cornice to answer the question raised by

10   counsel for Seagate, and that is if this is not the

11   kind of business like a medical device business where

12   new products come into the market with great fanfare,

13   but some other way, how is it that a third party is

14   supposed to know whether a product is, quote unquote, on

15   the market?

16             MR. RADULESCU:  This is an industry where

17   products come in with great fanfare.  These are

18   commercial consumer electronic products, such as mini

19   I pods, such as, you know, micro desktop hard drives.

20   So there is fanfare and there has been none of that

21   here because the product is still in design and

22   development.

23             MR. NESTER:  Your Honor, they don't sell

24   I pods.  They don't sell M P-3 players.  They sell into

25   those applications.

18

1          I agree, the I pod is press-released with

2     great fanfare, but the little components inside the I pod

3     are not.

4          MR. RADULESCU:  I guess my response would be

5     that, you know, we must allow them to file whatever paper

6     they want to file citing to a deposition transcript from

7     March, we want to have the ability to respond to that

8     transcript with the actual schedule for the product

9     they now want to sweep into this litigation.

10          And the point is that your Honor has ruled

11     that if it's not on the market and available to test

12     for infringement, it's sort of hard to even take

13     discovery on it.

14          THE COURT:  All right.

15          MR. RADULESCU:  And, you know, in terms of

16     a response to that type of motion by Seagate, we would

17     like to establish they are just factually wrong as to

18     where this potential product is in the pipeline.

19          THE COURT:  First of all, we're not doing

20     motions.  The reason I have you here, we're engaged in

21     a discussion.

22          Second of all, how is it, we have a March

23     deposition.  You want to counter with the actual

24     schedule.  How is it that Seagate can test the actual

25     schedule?  I mean, that's what I'm trying to figure out.

19

1          MR. RADULESCU:  They can take a deposition.

2    We don't have a problem with producing, as we did in the

3    ITC, a witness to testify as to the schedule of this

4    project and we did that in the ITC.

5          THE COURT:  All right.

6          MR. RADULESCU:  We don't have a problem.  My

7    problem is if you are relying on old testimony that's

8    trying to project out six months, as you can appreciate,

9    the schedule has to be updated.

10         THE COURT:  All right.

11         MR. RADULESCU:  It's has to reflect where we

12   actually are in the development.

13         THE COURT:  Then it seems to me rather than

14   my reviewing anything, Cornice needs to produce a

15   witness talking about the schedule for the 4.0.

16         MR. RADULESCU:  That's fine.

17         THE COURT:  So that Seagate can take the

18   deposition.

19         All right.  So that's the first issue.

20   Let's go on to 30(b)(6) and the 193 categories for the

21   30(b)(6).

22         MR. NESTER:  I will give you the background

23   on that, your Honor.  The 30(b)(6) was served, I believe,

24   the 12th.  It was right after the discovery conference.

25         It is a list -- if you will recall, Cornice

1    would not agree that the written discovery in the ITC

2    could just be ported over into the Delaware action.

3    They told us, go ahead and reissue what you did in the

4    ITC and we'll respond.

5              So we did that.  And we issued the notice.

6    And recognizing that there were only 45 days approximately

7    in discovery left, we went from sort of the broad

8    categories to make sure we covered everything to very

9    specific categories to help them figure out exactly what

10   it was we were looking for.  And we have been willing

11   since day one, since that notice has issued, to sit down

12   and work out with them what topics we want.  Instead, we

13   get, well, it's a lot.  We'll think about it.  And then

14   yesterday I just get a flat-out, we object.  We're not

15   going to produce anyone.  It's the end of discovery.

16   You're going to get no 30(b)(6).

17              And, you know, that's not fair.  There are

18   a number of individuals that we deposed individually

19   that they could identify for topics and they wouldn't

20   do that.  They would not set anyone up as their

21   30(b)(6) witness.

22              I'm willing to work with them on narrowing.

23   I don't want to retake discovery taken in the ITC.  I

24   only want to take issues in this case.  So we think that

25   we ought to have a 30(b)(6) witness from them.

21

1            We're willing to work with them on that.

2            THE COURT:  All right.  And why is it -- I

3    mean, why is it that the discovery taken in the ITC case

4    shouldn't be used here?

5            MR. BLUMENFELD:  It can be used here.  One

6    of the things I told you last time we were here was that

7    the documents produced there could be used and the

8    depositions could be used, and that has never been an

9    issue.

10           THE COURT:  All right.  I must have

11   misunderstood what was happening, then.

12           The point of the 30(b)(6) witness is to do

13   what?  I mean, I thought you said it had something to

14   do with the fact that the ITC discovery couldn't be used.

15           MR. NESTER:  Yes.  That's right.

16           So they have not wholesale agreed that the

17   30(b)(6) testimony could be used as 30(b)(6) testimony

18   in the ITC, and as far as the written discovery, such

19   as 30(b)(6) notices, such as Interrogatories, such as

20   document requests, they would not agree that the ITC

21   discovery could carry forward, the written discovery

22   could carry forward into Delaware, for whatever reason.

23   We were trying to get that.  Instead, they said, just

24   reissue it.

25           So would did that and there are a number of

22

1    issues on their notice.  There are a number of issues

2    on our notice that no one seeks deposition testimony

3    on because it has been covered in the ITC, but they

4    wanted the written notice to be ported in Delaware, so

5    we did it.

6              THE COURT:  So has anyone actually looked

7    at the 193 categories to determine what's in dispute

8    and what isn't?  Have you actually sat down and talked,

9    because if you have not, I'm leaving, and you are going

10   to do that right now.  I mean, honestly, this is a waste

11   of my time.

12             MR. NESTER:  I agree, your Honor.  I tried

13   to do that for the past six weeks.

14             THE COURT:  All right.  So you'll do that

15   before you leave tonight.

16             The third category was, and I'm not sure I

17   understood this, 30(b)(1) witnesses.  I can look it up

18   in the rules because I have not heard 30(b)(1) witnesses

19   in a long time.

20             Witnesses.  What is the issue here?

21   Witnesses?

22             MR. NESTER:  Individual deponents.  Okay.

23             THE COURT:  All right.

24             MR. NESTER:  So the issue here is that we

25   issued deposition notices to individuals.  And what we

23

1   have found is that they have grouped people with like

2   topics into, say, there will be five deponents in the

3   two days and you have to do all your depositions in

4   that two-day period and that's it.

5           And let me go through and give you the

6   four different groups.  For instance, this week,

7   Wednesday and Thursday, we have five damages-related --

8   more on the marketing sales end, but we have five

9   damages related individuals.

10          We didn't take damages discovery in the ITC

11  because all you can get is an exclusion order.  There

12  may be some overlapping issues, but there are certainly

13  a lot of issues that are not overlapping.

14          So we don't intend to use seven days with

15  each witness.

16          THE COURT:  Seven hours.

17          MR. NESTER:  I'm sorry.  Seven hours.  But

18  I don't want to be cut off and say that's the end of it

19  after two days.  Essentially, two to three hours per

20  witness.  Two days for the entire --

21          THE COURT:  So why is it when the scheduling

22  order that you all agreed to says seven hours per, why

23  is it that -- and I'm talking to Cornice's attorneys --

24  why is it that you basically set your own limits?

25          MR. BLUMENFELD:  Your Honor, I guess I have

24

1  three things to say in response to that.

2          One, in the last few weeks, they have noticed

3  16 individuals from Cornice, all of whom were taken in

4  the ITC already.  So these were their second depositions.

5  Every single one has been taken before.  At least one of

6  them was taken over two days before.

7          Second, they noticed ten third parties.

8          Third, they noticed a 30(b)(6).  And we

9  had a June 30th discovery cutoff.  They would not agree

10  that they could -- that they would take these after

11  June 30th without us agreeing that the discovery period

12  would be extended.

13          You get into a little box when you are

14  trying to schedule close to 30 depositions in the last

15  couple weeks of discovery.

16          Now, the other thing I will say in our

17  defense on this is, I mentioned this before, the seven

18  individuals we noticed on May 27th, we have not gotten

19  one minute with any of them.  And so if we're going to

20  have rules here, let's have rules thanking both ways,

21  but the way we see things, they've had about 40

22  depositions.  They've had these witnesses, all of them

23  for more than a day, and at some point we just have to

24  cut this off.

25          THE COURT:  Your point is made.

1          MR. NESTER:  Okay.  And I do think that it's

2    a two-way street.  I think if they need an individual

3    for seven hours, they should get it.  And certainly we

4    have not used seven hours with everyone and we won't do

5    that.

6          As far as the third parties that they are

7    referring to, yes, we do take third-party discovery and

8    we're getting very relevant damages documents that

9    Cornice hasn't produced.  So they can complain about it,

10   but if they had produced it up front, we wouldn't have

11   had to take the discovery.

12         And we are repeating even technical

13   depositions because they are changing technology since

14   the ITC.  And they've changed media.  They've changed

15   servo pattern.  There's these new Thin Winds that we

16   didn't know about until this week.

17         And so we are being very careful and

18   selective.  We are being reasonable in discovery.

19         THE COURT:  Well, I don't know that anyone

20   is reasonable in discovery, to tell you the truth.

21         All right.  Well, first of all, fact

22   discovery is not -- well, all right.  Let me make sure,

23   with respect to the three issues presented by Seagate.

24         Number one, a 30(b)(6) witness will be

25   produced and we'll talk about when on the 4.0 product.

26

1          Number two, you all are going to stay in

2     the courtroom, even though I have a charge conference

3     soon, and work out 193 category 30(b)(6) notice, the

4     notice with 193 categories to see where the disputes are.

5          With respect to depositions, it would be

6     nice to think that I could rely on attorneys using some

7     self-restraint and some common sense and some reason.

8     I'm not confident that this is the case I can have that

9     kind of confidence in.

10          If all of these individuals have already been

11    deposed once, if not twice, then one would not expect

12    seven hours.  If you all agree to expand the June 30

13    deadline to accommodate the depositions that have been

14    noticed thus far, then that is appropriate, and that

15    happens all the time.

16          I do not believe that means without my

17    permission that any new discovery should be taken.  It

18    does not mean that the fact discovery is per se and

19    without limit extended.  So you need to work out these

20    depositions.

21          Because your first report is due August 22nd,

22    it seems to me as though you still need the depositions

23    done by July 22nd, at least to give your experts 30 days

24    to review everything.

25          So it's a matter of using some self-restraint

27

1  in order to get this done, because I am not going to

2  extend discovery wholesale.

3        If you cannot, again, while you're still in

4  the courthouse, and maybe I can put you in my jury room

5  so that you actually have a table and can work.  If you

6  can't come up with dates and come up with a schedule to

7  accommodate these folks, or at least have some grounds

8  to talk about it, then I will simply make arbitrary

9  decisions so that you all will have to live with them.

10  That's the default.  I can be arbitrary if you can't be

11  reasonable.  All right?

12        So those are the three issues on plaintiff's

13  side.

14        What other issues are there so I can get you

15  back in the jury room to start talking so I can have my

16  charge conference at some point this evening.

17        MR. BLUMENFELD:  Your Honor, given what your

18  Honor said, I'm not sure that we really need to take up

19  other things.

20        The seven individual depositions, there is

21  one issue and that is five of them, I think they're going

22  to produce.  We have not gotten dates yet.  We'd like to

23  get dates.

24        But the other two they just said they won't

25  produce.  One of them is a gentleman named William

28

1    Hudson, who's Vice President and General Counsel at
2    Seagate and who was involved in correspondence with the
3    President of Cornice, wrote a letter to him back in
4    2003, which essentially said that any company that makes
5    or sells any form of hard disk drives will be infringing
6    their patents and then there was correspondence back and
7    forth.  He was involved in other communications between
8    the companies.
9            They are taking Mr. Maginnis, our President
10   or our CEO, but they refuse to produce Mr. Hudson, who
11   is involved, on the basis that it's just harassment.
12   And we are not doing it to harass him.  We're doing it
13   because we think he has information that we want to get.
14           The same thing with their former Chief
15   Financial Officer, and I don't know if I'm pronouncing
16   it right.  Mr. Russo.  And, again, we think he has
17   information that is relevant.  They just refuse to
18   produce him.  His name is on documents that have been
19   produced that are relevant to this case.
20           So that's one issue.
21           The second one is our own 30(b)(6).  Well,
22   we've been taking 30(b)(6) on damages.  There are other
23   categories on something called Servo, which we have not
24   gotten yet, and I assume -- but on those, I assume we
25   can sit down and talk about 30(b)(6)'s.  The problem

1   we've had is we've gotten some 30(b)(6) witnesses on

2   damages last week and again today and the reports

3   we're getting, including from today, are that the

4   witnesses are saying, I didn't do anything to prepare

5   it, I didn't talk to anyone and I don't really know

6   anything about this.

7          And -- but I think that's the other side of

8   the table when we sit down and we can try to work that

9   out.

10         We got some Interrogatory Answers that we just

11   received this morning, where they answered the first two

12   and then the last 14, they said we refuse to respond

13   because by our count, you're over 50 Interrogatories.

14         And it just seems to me that for someone

15   who's serving 356 document requests and demanding 26

16   witnesses to come in and say the way we count, you're

17   over the 50 Interrogatory limit so we're not answering

18   it is really not for a case like this the appropriate

19   way to handle it.  I would hope we could get past it,

20   but that's really our other issue.

21         THE COURT:  All right.

22         MR. NESTER:  Just a little background, your

23   Honor, on these executive or seven individual notices

24   that they have deposed.

25         They did notice, they issued seven individual

30

1  notices.  There were two, some of the highest level

2  executives at Seagate.  And the reason they did that is

3  because they had this sham litigation counterclaim that

4  says the case is objectively baseless, and that there is

5  some sort of a subjective intent of bad faith.

6          They have to satisfy both of those points.

7  It's hard to believe that they really are going to carry

8  forward the counterclaim of objectively baseless.  They

9  agreed in the ITC to stop manufacturing the product that

10 we accused of infringement.

11         But moving on, we agreed to produce a number

12 of high-level executives from Seagate despite, you know,

13 our feelings about these counterclaims.

14             THE COURT:  So who is being produced?

15             MR. NESTER:  Bill Watkins, our CEO, our

16 current CEO.  Done Waite, our former CFO, Will Ruffume,

17 who is VP of Engineering, Phil Altinger, who is -- I

18 don't have his exact title, but he's a VP in Business

19 Development, and he was involved in some discussions

20 that Cornice and Seagate had regarding mergers.

21         And then there's a third person, a fifth

22 person, named Margo Lapenz, who relates to Servo.

23         The two people that we will not -- that we

24 are putting -- or drawing the line in the sand on and

25 we need an order on is Bill Hudson, who is the General

31

1    Counsel and Executive Vice President of Seagate.  As

2    you can imagine, he's a general counsel.  He did write

3    a letter to Cornice saying, We're going to monitor your

4    product.  It your typical notice-type letter.

5            But the letter speaks for itself.  Anything

6    else that they're going to ask is going to be privileged.

7    So to us, this deposition is designed to harass.  It's

8    not designed to get viable discovery.

9            The last guy, his name is Steve Luzzo.  He

10   is the Chairman of the Board.  We asked Cornice why they

11   want to depose him.  They wanted to depose him for his --

12   there's some inter-company transfer-type documents that

13   they believe has some sort of a reasonable royalty in it.

14   He does not have any understanding of those.

15           I'm willing to put up our Senior VP of Tax

16   to take his place who could talk about these tax issues,

17   who has knowledge about these tax issues.

18           But just to go after our Chairman and our

19   G.C., you know, is not geared for proper discovery in

20   our opinion, especially in light of the people that we; have

21   put up.

22           Going to the Interrogatories, yes, we did

23   object based on sub-parts.  In fact, they separately

24   numbered and lettered the sub-parts, and we answered

25   beyond 50 as well as we answered 144 of the ITC.

32

1          So at some point I'm willing to negotiate

2  with them, but at some point, the scheduling order must

3  stick, which is that we agreed to 50 in the scheduling

4  order and that's got to have some meaning.  So that is

5  the reason we objected.

6          THE COURT:  All right.  Thank you.

7          All right.  I'm not particularly convinced

8  that the General Counsel and the Chairman of the Board

9  have relevant information.

10          MR. RADULESCU:  Very briefly, for each of

11  them, there's a handful of documents relating to the

12  correspondence back and forth between Cornice and Seagate

13  pre-litigation where their General Counsel is intimately

14  involved in making these decisions from a business

15  perspective.  He's also the Secretary of the company.

16  That's with respect to the general counsel.  A number

17  of documents that he has personal knowledge regarding.

18          With respect to Luzzo, his relevance is that

19  there's a cost-sharing agreement internal at Seagate.

20  He is the signator on behalf of Seagate Technology

21  relating to a cost share agreement that involves

22  intellectual property rights.

23          So in terms of this agreement, if you are

24  looking for people that are the most knowledgeable, what

25  is our option?  If they're rejecting 30(b)(6) damages,

1   you know, witnesses, the same time we have to identify

2   individuals that we know have personal knowledge, that's

3   how he enters the picture.

4        So we're sort of caught in this Catch 22

5   where we're not getting any 30(b)(6) witnesses and so

6   we're trying to pick, and we picked seven.  There are

7   seven individuals out of the full scope of people that

8   we could have picked for these depositions.  We're

9   doing it specifically for relevant information.

10       THE COURT:  All right.  Well, I've never

11  heard of the Chairman of the Board being deposed, to

12  tell you the truth.

13       MR. RADULESCU:  I mean our Chairman is being

14  deposed.

15       THE COURT:  But he has another title?

16       MR. RADULESCU:  Pardon?

17       THE COURT:  He has another title?

18       MR. RADULESCU:  He has a title of Chairman of

19  the Board.

20       With respect to Luzzo, he is the ex-CFO.

21       THE COURT:  How many ex-CFOs are there?

22  You've named three so far.  Two, three?  I don't know.

23       Well, all right.  So the information --

24  tell me the information you want to get from these

25  witnesses and I perhaps can make a determination about

34

1   whether they are the best witness and if there's a

2   better witness, we can go with that.  If there's not,

3   then --

4            MR. RADULESCU:  The information, I can go

5   through probably half a dozen documents.  The example

6   Mr. Blumenfeld raised, when they, we would say threatened

7   us, and said no matter what type of disk drive you make,

8   you will infringe our intellectual property rights, you

9   know, what is the basis of that?  Did they have a basis?

10           Is it the case that when they sent that

11  letter, which is a threat letter, did they have a basis

12  to support those allegations?  Is the one that wrote

13  the letter?  Either they did or they didn't.

14           And with respect to understanding if they

15  had a basis for those allegations, who else are we going

16  to go to at this point?  That's an example with respect

17  to the General Counsel.

18           And, again, he's also involved with the

19  e-mails that are going back and forth.  For example,

20  with another presentation that was done to seek -- done

21  to Cornice, he was involved in the drafting of that

22  presentation.  Again, a power point presentation to

23  Cornice and there were threats in that power point

24  presentation, a threat that said even nuisance

25  litigation, Cornice, can put you out of business.

1          THE COURT:  All right.

2          MR. RADULESCU:  Again, he was involved with

3    it.  And I think we have the right to ask him what did

4    he mean, what did Seagate mean at the time of that

5    presentation to Cornice.  That's with respect to the

6    General Counsel.

7          Now, with respect to Luzzo, he is the

8    signator to this cost-sharing agreement that at this

9    point is the only individual we can identify at Seagate

10   as having knowledge regarding that cost-sharing agreement,

11   which, again, involves Seagate's intellectual property

12   rights.

13         THE COURT:  You're saying cost-sharing

14   agreement?

15         MR. RADULESCU:  Cost-sharing agreement in

16   the sense that Seagate is a Cayman Islands company.

17         THE COURT:  I wasn't sure what word you

18   were using.  Cost sharing?

19         MR. RADULESCU:  It's a cost-sharing

20   arrangement between the various Seagate entities and

21   there is a value that's apportioned to the intellectual

22   property.

23         THE COURT:  Okay.  Is there a better person

24   than Mr. Luzzo to ask about that if he's the signatory

25   on that agreement?

36

1         MR. NESTER:  There is.

2         THE COURT:  Okay.

3         MR. NESTER:  It's the person we agreed we

4    will produce.  His name is Steve Sadler.  He's a Senior

5    Vice President of Tax.

6         THE COURT:  All right.  I'm going to have

7    you take his deposition first.  If there is something

8    that he does not know, then Mr. Luzzo might, then we'll

9    take that the next step.  I will have Mr. Hudson be

10   produced, though.

11        MR. NESTER:  If I could just address that,

12   though...

13        THE COURT:  No.  I think I've made a decision.

14        MR. NESTER:  Okay.

15        THE COURT:  So I think that's fine.

16        With respect to 30(b)(6) depositions, I know

17   I've got a stack of papers in another case where I

18   promised some time to go through and see whether the

19   30(b)(6) witness was actually prepared.  If I have to do

20   that in this case, I will.  The sanction is the cost,

21   obviously, of the deposition.  Depending on how poorly

22   a witness is not prepared, it could be that there are

23   some preclusions in terms of the evidence presented.

24        So I want everyone to take this seriously.

25   And if you want to start playing that game, I will try

37

1    to play with you, but I would hope that the consequences

2    are such that you really don't want to be doing that,

3    that you will prepare your witnesses to answer the

4    questions.

5              All right.   I'm going to just check to make

6    sure that my jury room is clean, that my jury notebooks

7    are not in the room or anything, so that you can go

8    back and you can talk about finishing up this discovery,

9    narrowing perhaps the 193 categories, making sure that

10   you're all on the same page with respect to naming the

11   depositions that you have to happen and work up a

12   tentative schedule to get the depositions done before

13   your experts need to start working on their reports.

14             And when you are done, if you can't work

15   something out, then you can come back to the back of

16   the courtroom and I will meet with you when I'm done my

17   charge conference and I will make whatever decisions I

18   need to make.   But I'm not going to go through 193

19   categories to determine what is appropriate and what's

20   not.

21             MR. BLUMENFELD:   Your Honor, under 30(b)(6),

22   on the 193 categories, under 30(b)(6), this may help

23   resolve a lot of them.   There are 40 or 50 categories

24   that begin by saying Cornice's full factual and legal

25   basis for asserting that it, and then does not infringe,

38

1    the patents are invalid.

2              THE COURT:  I don't do contention depositions.

3    You all know that.  You all should know that.  No

4    contention depositions.  Those are in writing.  There's

5    no one person that should have to answer that.

6              All right.  Let me -- just stay here for a

7    minute.  Let me check to see what my situation is.

8              I was supposed to ask you all something.  We

9    are now in the wonderful word of electronic filing.  We

10   are not going to babysit lawyers in terms of what they

11   file if it's confidential or not.  You either need to

12   take your responsibility to file it under seal and then

13   file a redacted version.  On the other hand, I have a

14   hard copy of Cornice's motion for leave to file an

15   amended answer and counterclaim, stamped confidential,

16   my hard copy, but I don't think it was filed under seal.

17             So I mean it's out in the world now.  If you

18   want to change it, you need to do that.

19             This is just a note I got from my Clerk.  I

20   actually don't have any clue as to what you did.  But

21   we are not babysitting.  Once it's out, it's out.  If

22   you want me to do something about it, you have to file

23   a motion and have me do it.  All right?  Hold on.  Let's

24   get us organized.

25             (Short recess taken.)

39

```
1                              - - -

2              (Court resumed after the recess.)

3

4              THE COURT:  Maria is going to direct you to

5   the jury room.  You're either going to disappear because

6   you've managed to work out your differences or you are

7   going to go to the back.  Maria will show you how to

8   get out and I will talk to you after my charge

9   conference.

10             (Court recessed at 5:30 p.m.)

11                             - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit 12

# Sealed Document

# Exhibit 13

# Sealed Document