# Ex. 1

TO THE DECLARATION OF TIMOTHY DEVLIN
IN SUPPORT OF PLAINTIFF SEAGATE TECHNOLOGY LLC'S
RESPONSE BRIEF REGARDING CONSTRUCTION OF
DISPUTED TERMS IN U.S. PATENT NO. 5,596,461

US005596461A

# United States Patent [19]

## Stefansky

[11] Patent Number: 5,596,461

[45] Date of Patent: Jan. 21, 1997

[54] **SPACE EFFICIENT HOUSING CONFIGURATION FOR A DISK DRIVE #7**

[75] Inventor: F. Mark Stefansky, Longmont, Colo.

[73] Assignee: Seagate Technology, Inc., Scotts Valley, Calif.

[21] Appl. No.: 450,213

[22] Filed: May 25, 1995

[51] Int. Cl.[6] ........................... G11B 17/02; G11B 33/00
[52] U.S. Cl. ........................... 360/97.01; 360/98.01
[58] Field of Search ........................... 360/97.01, 98.01, 360/98.07–99.01, 99.12, 104–106, 137; 369/75.1, 258, 272, 292

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,025,335 | 6/1991 | Stefansky | 360/97.01 |
| 5,235,472 | 8/1993 | Smith | 360/60 |
| 5,396,384 | 3/1995 | Caldeira et al. | 360/98.01 |
| 5,412,522 | 5/1995 | Lockhart et al. | 360/97.01 |
| 5,414,574 | 5/1995 | Boutaghou et al. | 360/97.01 |
| 5,420,733 | 5/1995 | Knighton et al. | 360/97.01 |
| 5,488,523 | 1/1996 | Seaver et al. | 360/99.12 |

Primary Examiner—Jefferson Evans
Attorney, Agent, or Firm—Bill D. McCarthy; Edward P. Heller, III; Randall K. McCarthy

[57] **ABSTRACT**

A space efficient disk drive housing is described. The disk drive housing comprises a base member having a top, a bottom, and an outer perimeter having length and end portions of preselected dimensions and a cover element comprising a top surface and side walls depending downwardly from the top surface. The cover element has length and width dimensions corresponding to the dimensions of the length and end portions of the base member so that the cover element can be secured to the base member to form the housing. The cover element is provided with a first raised portion to provide a height dimension within the housing sufficient for topmost portions of a spindle motor and head stack assembly of a disk stack assembly of a disk drive. Remaining portions of the top surface of the cover element providing a continuous, single PCB support surface. A set of support posts is provided on the cover element of the disk drive housing. The support posts are used to mount the disk drive to a host computer. The spindle motor and head stack assembly are mounted to the base member. The removal of the support posts from the base housing element mounting the spindle motor and head stack assembly, frees up space on the base to permit greater flexibility in the placement of mechanical components of the disk drive.

**8 Claims, 3 Drawing Sheets**





FIG. 1



FIG. 2



5,596,461

1

## SPACE EFFICIENT HOUSING CONFIGURATION FOR A DISK DRIVE #7

### FIELD OF THE INVENTION

The present invention is directed to disk drives. More particularly, the present invention provides a novel mechanical architecture for a disk drive housing. According to the architecture, the housing is configured in a manner that decreases the overall dimensions of the disk drive while accommodating the mounting of mechanical and electronic components required for operation of the disk drive.

### BACKGROUND OF THE INVENTION

Disk drives are commonly used in workstations, personal computers, laptops and other computer systems to store large amounts of data in a form that can be made readily available to a user. In general, a disk drive comprises a magnetic disk that is rotated by a spindle motor. The surface of the disk is divided into a series of data tracks. The data tracks are spaced radially from one another across a band having an inner diameter and an outer diameter. Each of the data tracks extends generally circumferentially around the disk and can store data in the form of magnetic transitions within the radial extent of the track on the disk surface.

An interactive element, such as a magnetic transducer, is used to sense the magnetic transitions to read data, or to transmit an electric signal that causes a magnetic transition on the disk surface, to write data. The magnetic transducer includes a read/write gap that contains the active elements of the transducer at a position suitable for interaction with the magnetic surface of the disk.

As known in the art, the magnetic transducer is mounted by a head structure to a rotary actuator arm and is selectively positioned by the actuator arm over a preselected data track of the disk to either read data from or write data to the preselected data track of the disk, as the disk rotates below the transducer. The head structure includes a slider having an air bearing surface that causes the transducer to fly above the data tracks of the disk surface due to fluid currents caused by rotation of the disk.

In modern high capacity disk drives, the spindle motor is arranged to mount a stack of axially aligned storage disks, with the storage disks in the stack being spaced from one another. The use of multiple disks increases the total disk surface available for the storage of data. A head stack assembly comprises a stack of actuator arms, each mounting a head or a pair of heads. The stack of actuator arms is arranged adjacent the stack of storage disks with each head being positioned by the respective actuator arm over the surface of a corresponding one of the disk surfaces. The spacing between any two opposed disks of the stack is sufficient to accommodate the placement of an actuator arm between the two disks of the stack to position each of a pair of heads opposite the surface of a respective one of two opposing disks in the stack.

A complete assembly of the head stack assembly and the stack of disks is called a head disk assembly. Typically, the spindle motor and head stack assembly are mounted on a mounting surface of a base plate to form the head disk assembly. The spindle motor is mounted on the mounting surface at a location that is proximate one end of the base plate and the head stack assembly is mounted at a location proximate the other end of the base plate. A cover having a top and side portions extending downwardly from the top, is

2

received over the spindle motor and head stack assembly, and is secured to the outer perimeter of the base plate to form a housing comprising the base plate and the top and side portions of the cover. In this manner, the housing encloses the spindle motor and head stack assembly of the head disk assembly in a protected environment.

The height of the head disk assembly, from the mounting surface of the base plate to the top most storage disk of the disk stack, must have a dimension that fits within the spacing between the base plate and the top of the cover. Typically, the extremities of the height dimension of each of the spindle motor and the head stack assembly exceed the extremities of the height dimension of the stack of disks. This is because the spindle motor mounts the disk or disks and has a greater height so that it can be mounted to the base plate at one end, and receive a clamp or other mechanical element at the other end, to secure the disk or disks to the spindle motor. In addition, the actuator structure must place an actuator arm/head assembly both above the top most disk surface and below the bottom most disk surface of the stack of disks to permit the reading and writing of data from these surfaces. Thus, the extremities of the spindle motor and head stack assembly dictate the overall height of the disk drive housing. In conventional disk drive products, the spacing between the top of the cover and the base plate is maintained at a dimension suitable to fit the entire head disk assembly, over substantially the entire width and length of the disk drive housing.

A disk drive product also includes various electrical connectors to couple the disk drive to a host computer (i.e. the computer that is using the disk drive to store data). The connectors include a host connector, to form electrical paths for the transmission of commands and data between the disk drive and the host computer, and a power connector, to connect the disk drive to the power supply of the computer to energize the motors and circuits within the disk drive.

A printed circuit board (PCB) is mounted on the side of the base plate opposite to the side mounting the head disk assembly. The PCB is used to mount control electronics for controlled operation of the spindle motor and actuator arm positioning. The PCB also includes read/write channel and disk controller circuitry coupled to the read/write heads, to control the transfer of data between the data tracks of the storage disks and the host connector. In a conventional disk drive, the PCB is generally rectangular in shape and has width and length dimensions that are approximately equal to the width and length dimensions of the base plate.

Moreover, a set of support posts is arranged to extend downwardly from the base plate for use in securely mounting the disk drive within the host computer.

The total height, width and length of the connectors, base plate, PCB and cover of the disk drive must fit within a mounting space provided in the host computer. Thus, the smaller the overall dimensions of the disk drive, the less space required within the host computer to accommodate the drive. The trend in recent years has been to design and build disk drive products with high data storage capacities, but that are lightweight and compact in size to minimize the space requirements and weight addition imposed on computer systems using the disk drives for data storage.

In one recent proposal, the overall dimensions of the disk drive are reduced by providing several PCB segments and mounting the PCB segments within cutout portions formed in the disk drive housing. The PCB segment approach takes advantage of miniaturization of integrated circuits to implement PCB structures in less than the full length and width

5,596,461

3

dimensions of the disk drive. However, this arrangement incurs added power requirements for transmission of signals between PCB boundaries and does not fully realize economic use of available space.

## SUMMARY OF THE INVENTION

The present invention provides a novel mechanical architecture for a disk drive housing that is based upon an efficiency in space utilization to accommodate the mounting of mechanical and electronic components of the disk drive in a minimum amount of volume. The present invention also recognizes and utilizes advances in integrated circuit miniaturization to configure PCB and housing elements in a manner that permits physical placement of disk drive components in a reduced amount of space.

In accordance with a feature of the present invention, a first raised portion of a housing element, such as a housing cover, is dimensioned to receive the top most portions of the spindle motor and actuator assembly, and includes a region that permits the movement of the top most actuator arm relative to a top disk surface. A second raised portion of the housing element, having a height dimension that is less than the height dimension of the first raised portion, is dimensioned to receive the top most disk(s) of a stack of disks.

A single PCB is arranged and configured to generally coincide with the surface area defined by the second raised portion. The PCB is mounted to the second raised portion, surrounds the first raised portion and has a height dimension that fits within the difference in height dimensions between the first and second raised portions. Advantage is taken of the miniaturization of integrated circuits to reduce the surface area of the PCB to within the surface area of the second raised portion. The first raised portion is configured to accommodate the height dimensions of the spindle motor and head stack assembly and occupies only as much space as required for this purpose. In this manner, the present invention makes a highly effective use of available space and eliminates the need to accommodate both the height of the spindle motor and head stack assembly and the mounting of a PCB to either a full side of a base plate or to be segmented into several portions arranged in various spaced recesses cut of housing surfaces.

In accordance with another feature of the present invention, a set of support posts is provided on a cover element of the disk drive housing. The spindle motor and head stack assembly are mounted to a base plate. The removal of the support posts from the base housing element mounting the spindle motor and head stack assembly, as done in conventional disk drives, frees up space on the base to permit greater flexibility in the placement of mechanical components of the disk drive.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 a perspective, exploded view of a representative disk drive according to the present invention.

FIG. 2 is a top view of the disk drive of FIG. 1, with the cover shown as being transparent to illustrate the structural features of the present invention.

FIGS. 3 is a side cross sectional view of the disk drive of FIG. 2.

## DETAILED DESCRIPTION

Referring now to the drawings, and initially to FIG. 1, there is illustrated an exemplary disk drive housing according to the present invention designated generally by the

4

reference numeral 20. The disk drive housing 20 encloses a stack of storage disks 22a–c. Each of the storage disks 22a–c is provided with a plurality of data tracks (not shown) to store user data in the form of magnetic transitions, as is well known.

A housing comprises a cover element 24 and a base plate 26. The base plate 26 is formed to include a raised portion 28 that covers a substantial portion of the top surface area of the base plate 24. The raised portion 28 provides structural integrity and strength to the base plate 26. As clearly shown in FIG. 1, the raised portion 28 of the base plate 26 is shaped to accommodate the mounting of a head stack assembly 36, as will be described, the forming of internally threaded posts 30 to secure the cover element 24 to the base plate, and the placement of a gasket 32 to seal the housing when the cover element 24 is secured to the base plate 26.

A spindle motor 34 is mounted to the base plate 26 to support the disks 22a–c for rotation, as well known in the art. The principal components of the head stack assembly 36 comprise a stack of actuator arms 36a–d, spacers 38a,b and an electric coil element 40. Each actuator arm 36a–d is suitable to mount a head gimble assembly (not shown) for reading and writing data to and from the surfaces of the disks 22a–c, also as well known in the art. A rotatable shaft 42 is mounted to the base plate 26 and supports the actuator arms 36a–d, spacers 38a,b and electric coil element 40 in an alternating arrangement for rotation as a stack, such that the actuator arm 36a is rotatably positioned above the top surface of the disk 22a, the actuator arm 36b is spaced from the actuator arm 36a by the spacer 38a and rotatably positioned between the disks 22a and b, the actuator arm 36c is spaced from the actuator arm 36b by the electric coil element 40 and rotatably positioned between the disks 22b and c and the actuator arm 36d is spaced from the actuator arm 36c by the spacer 38b and rotatably positioned below the bottom surface of the disk 22c.

A permanent magnet 44 is secured between two mounting plates 46a,b, which are, in turn, mounted to the base plate 26, as shown in FIG. 1. An electric coil portion 40a of the electric coil element 40 is sandwiched between the mounting plates 46a,b when the electric coil element 40 is mounted on the rotatable shaft 42. In this manner, a control signal applied to the electric coil portion 40a can be used to control the radial position of the head stack, as is well known:

As shown in the exemplary embodiment of the present invention depicted in FIG. 1, the shape of the raised portion 28 in the vicinity of the head stack assembly 36 and the spindle motor 34 provides space just sufficient to receive the lower most portions of the spindle motor 34 and the rotatable shaft 42, as well as the bottom actuator arm 36d with suitable clearance for rotation through an arc sufficient to move the actuator arm 36d from an inner diameter of the bottom disk 22c to an outer diameter of the disk 22c containing data tracks.

According to the present invention, the cover element 24 is formed to include a top surface comprising a first raised portion 48 and a second raised portion 50. A side wall 51 depends downwardly for the top surface to define an enclosed space between the cover element 24 and base plate 26 when the cover element 24 is positioned on the base plate 26. The first raised portion 48 is formed to provide sufficient height, when the cover element 24 is secured to the base plate 26, to receive the topmost portions of the spindle motor 34 and head stack assembly 36 and to accommodate rotation of the top actuator arm 36a through an arc sufficient to move the actuator arm 36a from an inner diameter of the top disk

5,596,461

5

22$a$ to an outer diameter of the disk 22$a$ containing data tracks. As shown in the exemplary embodiment of the present invention depicted in FIG. 1, the shape of the raised portion 28 of the base plate 26 corresponds to the shape of the first raised portion 48 of the cover element 24 to provide a shaped region of the housing 20 with a total height dimension relative to the spindle motor 34 and head stack assembly 36, that is just sufficient for those elements.

The second raised portion 50 of the cover element 24 is shaped to provide a sufficient height dimension, when the cover element 24 is secured to the base plate 26, to receive the top disk 22$a$ and the permanent magnet 44/mounting plate 46$a,b$ assembly. As shown in FIG. 1, the raised portion 28 of the base plate 26 is formed to a shape that corresponds to the shape of the second raised portion 50 to provide a total height dimension relative to the disk stack and permanent magnet 44/mounting plate 46$a,b$ assembly that is just sufficient for those elements.

A PCB 52 is provided to mount control electronics for controlled operation of the spindle motor 34 and the electric coil portion 40$a$. The PCB 52 is also used to mount read/write channel circuitry to control the transfer of data to and from the data tracks of the storage disks 22$a–c$. The control electronics and read/write channel circuitry as well as the manner for coupling these components to one another on the PCB 52 and to the various components of the disk drive are well known in the art.

The PCB 52 is also provided with a pin connector 54. The pin connector 54 is used to couple the disk drive electronics to a host computer (i.e. the computer that is using the disk drive to store data). The pin connector 54 includes a host connector, to form electrical paths for the transmission of commands and data between the disk drive and the host computer, and a power connector, to connect the disk drive to the power supply of the computer to energize the motors and circuits within the disk drive.

The PCB 52 is shaped to generally coincide with the shape of the second raised portion 50 such that the PCB 52 can be supported on the surface of the second raised portion 50 and surround the first raised portion when the PCB 52 is mounted to the disk drive housing 20. Moreover, the overall height of the PCB 52 is dimensioned to fit within the height difference between the first and second raised portions 48, 50. In this manner, a highly efficient use of space is achieved by providing housing height dimensions that precisely coincide with the height requirements of various components of the disk drive.

A portion 56 of the top surface of the cover element 24 that is not occupied by either the first and second raised portions 48, 50 is used to receive the pin connector 54 and any connecting elements (not shown) on the PCB 52 used to couple the electronics on the PCB 52 to the head stack assembly 36. To that end, an opening 58 is formed in the portion 56 to run any wiring (not shown) that may be necessary to couple the PCB 52 to the head stack assembly 36 within the housing 20.

A set of openings 60 is formed along the outer perimeter of the cover element 24 at positions that are aligned with the internally threaded posts 30 of the base plate 26 when the cover element 24 is placed onto the base plate 26. Screws (not shown) can be used to secure the cover element 24 to the base plate 26 via the aligned opening, internally threaded post arrangement.

In accordance with another feature of the present invention, openings 62 are formed in the pin connector 54. The openings 62 are arranged to align with corresponding open-

6

ings 60 and internally threaded posts 30 of the cover element 24 and base plate 26, respectively, as shown in FIG. 1. The openings 62 permit the pin connector 54, and the attached PCB 52, to be secured to the disk drive housing 20 via screws received through the openings 60 and the corresponding openings 60, and threaded into the corresponding posts 30. In conventional disk drives, the connectors are typically mounted to the PCB, and do not have a secure mounting directly to the housing as provided by this feature of the present invention.

Pursuant to the present invention, a set of support posts 64 is formed at the outer perimeter of the cover element 24 for use in mounting the disk drive in a host computer. When installed in a host computer, the disk drive housing 20 is positioned so that the support posts 64 align with corresponding openings formed in the host computer. The support posts 64 include internally threaded openings to receive screws applied through the host computer openings. In conventional disk drives, the support posts are formed on the base plate and occupy space within the regions of the base plate where the spindle motor and head stack assembly are located. By moving the support posts 64 to the housing element (e.g. the cover element 24 in the exemplary embodiment of the present invention) opposite to the mounting element for the spindle motor and head stack assembly (e.g. the base plate 26 in the exemplary embodiment of the present invention), more space is available for mounting disk stack assembly components. The additional space availability can be used to increase flexibility in design configurations for the disk stack assembly.

FIGS. 2 and 3 provide additional views of the exemplary disk drive housing embodying an example of the present invention. It will be clear that the present invention is well adapted to carry out the objects and attain the ends and advantages mentioned as well as those inherent therein. While a presently preferred embodiment has been described for purposes of this disclosure, numerous changes may be made which will readily suggest themselves to those skilled in the art and which are encompassed in the spirit of the invention disclosed and as defined in the appended claims.

What is claimed is:

1. A disk drive housing, comprising:

   a base member having a top, a bottom, and an outer perimeter having length and end portions of preselected dimensions; and

   a cover element comprising a top surface and side walls depending downwardly from the top surface, the cover element having length and width dimensions corresponding to the dimensions of the length and end portions of the base member;

   the cover element being received onto and secured to the base member to form the housing;

   the top surface of the cover element including a first raised portion to provide a height dimension within the housing sufficient for topmost portions of a spindle motor and head stack assembly of a disk stack assembly;

   remaining portions of the top surface of the cover element being generally parallel to said first raised portion and providing a continuous, single PCB support surface.

2. The disk drive housing of claim 1 wherein the remaining portions of the top surface include a second raised portion to provide a height dimension within the housing sufficient for topmost portions of a stack of disks of the disk stack assembly, the first raised portion being higher than the second raised portion.

3. The disk drive housing of claim 2, wherein the cover element and base member further comprise aligned openings

5,596,461

7

usable to secure the cover element to the base member to form the housing, and wherein the disk drive housing further comprises a PCB including an attached connector, the connector including openings aligned with at least certain ones of the openings of the base member and cover element for mounting the connector directly to the top surface of the cover element when the openings of the base member and cover element are used to secure the base member to the cover element.

4. The disc drive housing of claim 3, wherein the PCB is mounted over at least selected portions of the second raised portion of the top surface of the cover element.

5. The disk drive housing of claim 1 wherein the first raised portion of the top surface has a preselected shape and the base member includes a raised portion defining a recess aligned with the first raised portion and having a shape corresponding to the preselected shape of the first raised portion to provide a total height dimension within the housing sufficient for the height of the spindle motor and head stack assembly of the disk stack assembly.

6. A disk drive housing, comprising:

a base member having a top, a bottom, and an outer perimeter having length and end portions of preselected dimensions; and

a cover element comprising a top surface and side walls depending downwardly from the top surface, the cover element having length and width dimensions corre-

8

sponding to the dimensions of the length and end portions of the base member;

the cover element being received onto and secured to the base member to form the housing;

the top surface of the cover element including a first raised portion having a preselected shape to provide a height dimension within the housing sufficient for topmost portions of a spindle motor and head stack assembly of a disk stack assembly, the shape of the first raised portion being just sufficient to provide adequate height for the spindle motor and head stack assembly of the disk stack assembly, remaining portions of the top surface of the cover element being generally parallel to said first raised portion and providing a continuous, single PCB support surface.

7. The disk drive housing of claim 6 wherein the base member includes a raised portion defining a recess aligned with the first raised portion and having a shape corresponding to the preselected shape of the first raised portion to provide a total height dimension within the housing just sufficient for the height of the spindle motor and head stack assembly of the disk stack assembly.

8. The disc drive housing of claim 6, wherein the cover element further includes a set of support posts usable to mount the disk drive housing in a host computer.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :   5,596,461

DATED        :   January 21, 1997

INVENTOR(S) :    F. Mark Stefansky

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

Title page, column 1, line 2, after the word DRIVE, delete "#7"

column 1, line 2, after the word DRIVE, delete "#7"

Signed and Sealed this

Thirteenth Day of May, 1997

*Attest:*

BRUCE LEHMAN

*Attesting Officer*            *Commissioner of Patents and Trademarks*

# Ex. 2

TO THE DECLARATION OF TIMOTHY DEVLIN
IN SUPPORT OF PLAINTIFF SEAGATE TECHNOLOGY LLC'S
RESPONSE BRIEF REGARDING CONSTRUCTION OF
DISPUTED TERMS IN U.S. PATENT NO. 5,596,461

CONTAINS CONFIDENTIAL BUSINESS INFORMATION

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

---

In the Matter of

**CERTAIN DISC DRIVES, COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME**

Investigation No. 337-TA-516

---

Order No. 8:      INITIAL DETERMINATION Granting Respondent's Motion for
                  Summary Determination of Noninfringement

## I.      Background

By publication of the notice of investigation in the *Federal Register* on August 5, 2004,

the Commission instituted this investigation pursuant subsection (b) of section 337 of the Tariff

Act of 1930, as amended, to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain disc drives, components thereof, or products containing same by reason of infringement of one or more of claims 1-4 of U.S. Patent No. 5,452,159, claims 1 and 5-7 of U.S. Patent No. 5,596,461, claims 1, 5-22, and 28-48 of U.S. Patent No. 5,600,506, claims 1, 6, 7, and 10-13 of U.S. Patent No. 6,146,754, claims 1-4, 15-17, and 19-22 of U.S. Patent No. 6,324,054, claims 5-7, 9, 11, 12, 14, and 15 of U.S. Patent No. 6,545,845, and claims 1, 2, 4-6, 9-15, and 17-20 of U.S. Patent No. 6,744,606. and whether an industry in the United States exists as required by subsection (a)(2) of section 337.

69 Fed. Reg. 47460 (2004)

The notice of investigation named Seagate Technology, LLC ("Seagate") as the

complainant, and Cornice, Inc. ("Cornice") as the respondent. The Commission Investigative

Staff of the Office of Unfair Import Investigations ("OUII") is also a party in this investigation.

*Id.*

On January 10, 2005, the respondent, Cornice, filed its "Motion for Summary

Determination of Noninfringement of U.S. Patent No. 5,596,461." Motion Docket No. 516-7.

Cornice argues that the accused products lack certain elements required by all the asserted '461

patent claims, and thus no infringement can be found in this investigation with respect to the

'461 patent.

On January 21, 2005, the complainant, Seagate, filed its "Opposition to Respondent

Cornice, Inc.'s Motion for Summary Determination of Noninfringement of U.S. Patent No.

5,596,461 and Counter Motion for Summary Determination of Infringement of U.S. Patent No.

5,596,461." Seagate argues that Cornice has mischaracterized the asserted claims of the '461

patent, and should in fact be found to infringe as a matter of summary determination.

On February 2, 2005, Cornice filed its Opposition to Seagate's cross-motion.

On February 2, 2005, the Commission Investigative Staff filed its Response in support of

Cornice's motion for summary determination of noninfringement, and in opposition to Seagate's

motion for summary determination of infringement. The Commission Investigative Staff does

not support Cornice's arguments in their entirety. Nevertheless, the Staff agrees that the accused

products do not contain all the elements required by the asserted claims of the '461 patent, and

thus cannot be found to infringe. *See, e.g.,* OUII Response at 2 n.1, 19.

On February 14, 2005, Seagate filed a reply to Cornice's opposition to Seagate's

cross-motion.

## II.    The Legal Standard for Summary Determination

The Commission's Rules provide that any party may move with any necessary supporting affidavits for a summary determination of all or any of the issues to be determined in an investigation. The determination sought by the moving party shall be rendered if the pleadings and any depositions, admissions on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary determination as a matter of law. A party opposing a motion for summary determination may not rest upon mere allegations or denials of the opposing party's pleading, but by affidavits, answers to interrogatories or as otherwise provided for under the Commission's Rules, must set forth specific facts showing that there is a genuine issue of fact for the evidentiary hearing. 19 C.F.R. § 210.18(a)-(o).

The substantive aspects of the Commission's Rule on summary determination are analogous to Federal Rule of Civil Procedure 56, under which summary judgment is proper if there is a showing that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The Commission's Rules provide that an order of summary determination constitutes an initial determination of the Administrative Law Judge. *See* 19 C.F.R. § 210.18(f).

## III.    Standards of Claim Construction and Infringement

Any finding of infringement or non-infringement requires a two-step analytical approach. First, the asserted claims of a patent must be construed as a matter of law to determine their proper scope. Second, a factual determination must be made as to whether the properly construed claims read on an accused device. *See Markman v. Westview Instruments, Inc.,* 52

-3-

F.3d 967, 976, 979 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996).

To construe a claim, one first looks to the claim language. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)( "The starting point for any claim construction must be the claims themselves."); *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)("The appropriate starting point . . . is always the language of the asserted claim itself." ). Then, one looks to the other intrinsic evidence, beginning with the specification and concluding with the prosecution history, if in evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part.").

If the claim language is clear on its face, then a court's consideration of other intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified. A deviation may be necessary if a patentee has chosen to be his own lexicographer, and does not use words according to their ordinary meaning. *Vitronics*, 90 F.3d at 1582. Any such special definition given to a word must be clearly defined in the specification. *Markman*, 52 F.3d at 980. A deviation may also be necessary if a patentee has "relinquished [a] potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir.), *cert. denied*, 529 U.S. 1066 (1999).

One looks "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention." Examples or embodiments appearing in the written description may not be read into a claim. *Comark*, 156 F.3d at 1186-87. Thus, care must be taken to avoid reading "limitations appearing in the specification . . . into [the]

claims." *Intervet Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989).

If the meaning of the claim limitation is apparent from the totality of the intrinsic evidence, then the claim has been construed.  If, however, a claim limitation remains unclear, one may look to extrinsic evidence to help resolve the lack of clarity.[1]  Relying on extrinsic evidence to construe a claim is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997); *Vitronics*, 90 F.3d at 1583-85 ("Such instances will rarely, if ever, occur.").

Extrinsic evidence may always be consulted, however, to assist in understanding the underlying technology. *See Pitney Bowes*, 182 F.3d at 1309 ("[C]onsultation of extrinsic evidence is particularly appropriate to ensure that [a judge's] understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art."); *Vitronics*, 90 F.3d at 1585 ("Had the district court relied on the expert testimony and other extrinsic evidence solely to help it understand the underlying technology, we could not say the district court was in error.").  Extrinsic evidence may never be used "for the purpose of varying or contradicting the terms in the claims." *Markman*, 52 F.3d at 981.

As stated in the *Markman*, opinion, "the focus in construing disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a

---

[1]Dictionaries are a form of extrinsic evidence with a special place in claim construction, and may sometimes be considered along with the intrinsic evidence. *See Vitronics*, 90 F.3d at 1584 n.6 (stating that, although technically the court is free to consult dictionaries at any time to help determine the meaning of claim terms, it may do so "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.").

5

particular term. Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." 52 F.3d at 986. *Accord Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)(The court assigns a claim term the meaning that it would be given by persons experienced in the field of the invention.). Nevertheless, it is a basic principle of claim construction that "[w]hen claims are amenable to more than one construction, they should when reasonably possible be interpreted so as to preserve their validity." *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996), *overruled on other grounds, Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir, 2000), *rev'd*, 535 U.S. 722 (2002)(*Festo I*).

Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, i.e., when "the properly construed claim reads on the accused device exactly." *Amhil Enters., Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996); *Southwall Tech. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Literal infringement must be proven by a preponderance of the evidence. *Enercon v. Int'l Trade Comm'n*, 151 F.3d 1376 (Fed. Cir. 1998).

If the accused product does not literally infringe the patent claim, infringement may be found under the doctrine of equivalents. The Supreme Court has described the "essential inquiry" of the doctrine of equivalents analysis as follows: "[D]oes the accused product or process contain elements identical or equivalent to *each* claimed element of the patented invention?" *Warner-Jenkinson Co, Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 40 (1997). Under the doctrine of equivalents, infringement may be found if the accused product or process performs substantially the same function in substantially the same way to obtain substantially the

6

same result. *Valmont,* 983 F.2d 1039, 1043 (Fed. Cir. 1993). The doctrine of equivalents does not allow claim limitations to be ignored. Evidence must be presented on a limitation-by-limitation basis, and not for the invention as a whole. *Warner-Jenkinson,* 520 U.S. at 29; *Hughes Aircraft Co. v. U.S.,* 86 F.3d 1566 (Fed. Cir. 1996). Thus, if an element is missing or not satisfied, infringement cannot be found under the doctrine of equivalents as a matter of law. *See, e.g., Wright Medical,* 122 F.3d 144, 1444 (Fed. Cir. 1997); *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.,* 16 F.3d 394, 398 (Fed. Cir. 1994); *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538-39 (Fed. Cir. 1991); *Becton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 798 (Fed. Cir. 1990).

The scope of equivalents accorded an element is limited by prosecution history either through amendments to the claims or arguments made in support of patentability during prosecution of the applications that eventually matured into the patent at issue. Thus, the patentee cannot use the doctrine of equivalents to obtain coverage of subject matter relinquished during prosecution of the application. *Festo I,* 535 U.S. at 734; *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.,* 103 F.3d 1571, 1577-1578 (Fed. Cir. 1997); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki,* 344 F.3d 1359, 1365-67 (Fed. Cir. 2003) (en banc)("*Festo II*").

However, the patentee may obtain coverage of equivalents unforeseeable at the time of the amendment and beyond a fair interpretation of what was surrendered, or for aspects of the invention that have only a peripheral relation to the reason the amendment was submitted. *Festo I,* 535 U.S. at 738; *Festo II,* 344 F.3d at 1369. In order to obtain coverage under the doctrine of equivalents, the patentee must show that at the time of the amendment one skilled in the art could

7

not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent. *Festo I*, 535 U.S. at 741.

## IV.    Discussion

### A.    Construction of the Relevant Claims and Limitations

U.S. Patent No. 5,596,461, "Space Efficient Housing Configuration for a Disk Drive #7," issued to F. Mark Stefansky on January 21, 1997, and was assigned to Seagate. The claimed "[h]ousing is configured in a manner that decreases the overall dimensions of the disk drive while accommodating the mounting of mechanical and electronic components required for operation of the disc drive." '461 Patent, col. 1, lines 8-12. The asserted claims of the '461 patent are as follows:

> 1. A disk drive housing, comprising:
>
>> a base member having a top, a bottom, and an outer perimeter having length and end portions of preselected dimensions; and
>>
>> a cover element comprising a top surface and side walls depending downwardly from the top surface, the cover element having length and width dimensions corresponding to the dimensions of the length and end portions of the base member;
>>
>> the cover element being received onto and secured to the base member to form the housing;
>>
>> the top surface of the cover element including a first raised portion to provide a height dimension within the housing sufficient for topmost portions of a spindle motor and head stack assembly of a disk stack assembly;
>>
>> remaining portions of the top surface of the cover element being generally parallel to said first raised

portion and providing a continuous, single PCB support surface.

5. The disk drive housing of claim 1 wherein the first raised portion of the top surface has a preselected shape and the base member includes a raised portion defining a recess aligned with the first raised portion and having a shape corresponding to the preselected shape of the first raised portion to provide a total height dimension within the housing sufficient for the height of the spindle motor and head stack assembly of the disk stack assembly.

6. A disk drive housing, comprising:

a base member having a top, a bottom, and an outer perimeter having length and end portions of preselected dimensions; and

a cover element comprising a top surface and side walls depending downwardly from the top surface, the cover element having length and width dimensions corresponding to the dimensions of the length and end portions of the base member;

the cover element being received onto and secured to the base member to form the housing;

the top surface of the cover element including a first raised portion having a preselected shape to provide a height dimension within the housing sufficient for topmost portions of a spindle motor and head stack assembly of a disk stack assembly, the shape of the first raised portion being just sufficient to provide adequate height for the spindle motor and head stack assembly of the disk stack assembly, remaining portions of the top surface of the cover element being generally parallel to said first raised portion and providing a continuous, single PCB support surface.

7. The disk drive housing of claim 6 wherein the base member includes a raised portion defining a recess aligned with the first raised portion and having a shape corresponding to the preselected shape of the first raised portion to provide a total height dimension within the

housing just sufficient for the height of the spindle motor and head
stack assembly of the disk stack assembly.

'461 Patent, col. 6, lines 40-59, col. 7, line 13 through col. 8, line 23.[2]

The law provides that rather than construing every claim term, a court may focus its

attention in the first instance on fewer limitations if they can dispose of the case in an expeditious

and efficient manner, thereby conserving public and private resources. *See, e.g., Ballard Med.*

*Prods. v. Allegiance Healthcare Corp.,* 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("If the district

court considers one issue to be dispositive, the court may cut to the heart of the matter and need

not exhaustively discuss all the other issues presented by the parties."); *Vivid Techs., Inc. v.*

*American Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that claim "terms need

be construed . . . only to the extent necessary to resolve the controversy"). Further, infringement

exists only if all claim limitations exist with respect to each accused product. *See, e.g., Elekta*

*Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1306 (Fed. Cir. 2000).

Consequently, if an independent claim is not infringed, the claims that depend from it cannot be

infringed. *See, e.g., Jeneric/Pentron, Inc. v. Dillon* Co., 205 F.3d 1377, 1383 (Fed. Cir. 2000);

*Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed. Cir. 1989).

While there is no dispute that the asserted claims read on a housing for a disk drive, the

proper construction of certain claim elements is controverted. In this instance the disputed

limitations,[3] which are recited by both independent claims 1 and 6, are:

---

[1]Cornice filed a copy of U.S. Patent No. 5,596,461 as Exhibit 1 to the Declaration of
Alejandra C. Montenegro in support of Cornice's motion for summary determination.

[4]Cornice states that it has addressed only certain claim limitations for the purposes of its
motion, without conceding that other claim limitations are satisfied by the accused products or
(continued...)

(1)   the "cover element" and "base member," which are discussed together in the parties' briefs;

(2)   the "head stack assembly;" and

(3)   the "continuous, single PCB support surface."

*See, e.g.,* Cornice's Motion at 1, 14-21, 27-29, 30-31; Seagate Opposition and Cross-Motion at 1-2, 10-17; 31-35, 37-44; OUII Response 8-16.

### 1.    "Cover Element" and "Base Member"

The plain language of asserted claims 1 and 6 shows, and it is undisputed, that the asserted claims of the '461 patent read on a "disk drive housing," and that the housing comprises a "base member" and a "cover element." It is further clear from the plain claim language, and uncontroverted by the parties, that the disk drive contained within the housing elements includes a "spindle motor" and a "head stack assembly" (often referred to as an "HSA"). In addition, it is uncontroverted that the disk drive housed by the claimed apparatus will make use of a printed circuit board (often referred to as a "PCB"). Further, it is uncontroverted, and the claim language plainly requires that the "top surface of the cover element" must provide "a continuous, single PCB support surface." Despite these areas of agreement among the parties, questions remain as to how the "base member" and "cover element" are defined, and in particular whether certain limitations upon the base member and cover element are required in order to find that the asserted claims are infringed.

One representation of the claimed invention is depicted in the '461 patent as Figure 1, as

---

[3](...continued)
that Seagate's proposed constructions of other claim limitations are correct. *See* Cornice's Motion at 1 n.2, 15 n.5.

11

follows:



FIG. 1

Cornice argues in its motion for summary determination and related filings that the "cover element" of the asserted claims should be construed to mean "[t]he top portion of the housing opposite the base member, which is received over the spindle motor and head stack assembly."[4] Cornice argues that "base member" should be construed to mean "[t]he bottom portion of the housing for mounting the components of the drive, e.g., the spindle motor, and head stack assembly." *See* Cornice Opposition to Seagate Cross-Motion at 3 (quoting Cornice Motion at 21). Cornice argues that its proposed interpretations are required by the plain claim language, especially when construed in light of the specification and prosecution history.

---

[4]In the embodiment detailed in the patent, the spindle motor is labeled 34 and the head stack assembly is labeled 36, consisting of a "stack of actuator arms 36a-d, spacers 38a,b and an electric coil element 40." '461 Patent. col. 4, lines 17-22 ("Detailed Description").

12

Seagate argues that Cornice impermissibly reads two limitations into the claims: (1) that the "cover" and "base" mean "top" and "bottom," respectively, and (2) that the head stack assembly and spindle must be mounted only to the base. It is argued that in the art, the "cover element" of a housing is often oriented at the bottom of a device, and that it is nowhere suggested in the patent or other intrinsic evidence that the spindle motor or head stack assembly must be mounted to the base. Seagate argues that based on the plain and ordinary meaning of the claims and in view of the intrinsic evidence, the "cover element" is properly construed as "the housing element that contains the first raised portion and remaining portions, and provides a surface over which the PCB is placed." Seagate argues that "base member" should be construed as "a housing element to which the cover element is secured and that is separate and distinct from the cover element." Seagate Opposition and Cross-Motion at 10-17.

The Commission Investigative Staff argues that Seagate essentially interprets the claim terms "base member" and "cover element" to provide no limitations in and of themselves. The Staff argues that the '461 specification, contrary to Seagate's use of the terms, refers to prior art with a "base" and a "cover," even when describing disc drives without the features such as raised portions. The Staff argues that the proper construction of the terms can be determined by examining the orientation and relative position of the components of the claimed disc drive housing, specifically as the housing is oriented in the patent's illustrations. Thus, it is argued, the cover element "fits over the top of the spindle motor and head stack assembly;" and it logically follows that the bottom of the spindle motor and HSA is mounted on the base. Indeed, it is argued that in the "Summary of the Invention," the specification explicitly states that the spindle motor and HSA are mounted to the base plate. The Staff appears to acknowledge that a base

need not necessarily be located at the lowermost side of a disc drive. Yet nonetheless, it is

argued that when a drive is so oriented, the cover element is that portion of the housing opposite

the base, and is thus on the uppermost side. OUII Response at 8-12.

It is evident from the parties' briefs that the controversy surrounding construction of the

"base member" and "cover element" limitations is indeed two-fold, i.e.: (1) whether a base must

be on the bottom (or lowermost side) of the claimed housing, and whether the "cover element"

must be uppermost or on the top; and (2) whether the "base member" is limited so that the

spindle motor and head stack assembly must be attached to it rather than to the cover.

For the reasons discussed below, the Administrative Law Judge has determined that while

the "cover element" need not in every instance be uppermost, or on the top side, of the claimed

housing, it must in all instances fit over the spindle motor and head stack assembly. Further,

when the base member is at the bottom of the device (i.e., lowermost with regard to overall

spatial orientation), the cover element will necessarily be at the top of the housing. The cover

element must have a "first raised portion" to accommodate the top of the spindle motor and HSA

assembly, as well as "remaining portions of the top surface" to support the PCB. With respect to

the "base member," the spindle motor and HSA must be mounted to it, rather than to the cover

element.

The claim language expressly provides that the top surface of the cover element must

include a "raised portion to provide a height dimension within the housing sufficient for [the]

topmost portions of the spindle motor and head stack assembly of a disk stack assembly." Thus,

as argued by the Staff and Cornice, the cover element must "fit over" or be "received over" the

spindle motor and HSA, and in order to do so (while economizing on the overall amount of space

14

used by the housing), the cover has the "raised portion" that accommodates the "topmost portions of the spindle motor and head stack assembly."

However, as pointed out by Seagate, the word "top" in the independent claims is used to refer to the top of the cover element itself (to contrast it with the interior of the element), and not necessarily to refer to the overall spatial orientation of the claimed housing. Words such as "top," and "topmost" appear in the claims to perform several functions: to refer to the relationship of the exterior of the housing to the interior; to contrast the top of the spindle motor and HSA from the rest of the assembly; and to contrast the "cover" from the "base" of the claimed housing. Yet, there are no limitations in the claims, or expressed in the specification, that specify how the disk drive housing is to be oriented in space, or to require that the claimed housing always remain in the orientation shown in the patent Figures (with the cover element depicted toward the top of the page, and the base member depicted toward the bottom of the page). Similarly, it appears that although during prosecution of the '461 patent, the applicant used the terms "top" and "bottom" to distinguish prior art, the applicant's references were to a "top surface" and the "bottom of the cover element," rather than to the overall orientation of the claimed housing in space. *See* Seagate Opposition and Cross-Motion at 17 (quoting prosecution history). Nevertheless, as argued by Seagate itself, the "base member" "is a housing element to which the cover element is secured and that is *separate and distinct* from the cover element." *Id.* (emphasis added). Thus, inasmuch as the claimed housing comprises a cover secured to a base, when the base element is low in overall spatial orientation, the cover element will be high or on top, and vice versa.

With respect to the question of mounting the spindle motor and head stack assembly, it is

15

observed that there is no express statement in the claim language that the spindle motor and HSA are mounted to the "base member." However, as detailed above, the claims require that the cover element provide a height dimension (via a "first raised portion") sufficient to accommodate the "topmost portions" of the spindle motor and HSA. Thus, clearly the spindle motor and HSA cannot be mounted to the cover. As pointed out by the Staff, inasmuch as the top of the spindle is housed under the cover, logically the other end of the assembly must be mounted to the base.[5]

Moreover, the specification summarizes the claimed invention in pertinent part:

> In accordance with another feature of the present invention, a set of support posts is provided on a cover element of the disk drive housing. *The spindle motor and head stack assembly are mounted to a base plate*. The removal of the support posts from the base housing element mounting the spindle motor and head stack assembly, as done in conventional disk drives, frees up space on the base to permit greater flexibility in the placement of mechanical components of the disk drive.

'461 Patent, col. 3, lines 44-52 ("Summary of the Invention")(emphasis added).

Thus, the specification contrasts the cover element with the base plate such that the spindle motor and HSA assembly are not mounted to the cover element in the claimed invention. Rather, they are mounted to the base plate. Indeed, as quoted above, the specification explains the necessity of mounting the spindle motor and HSA to the base rather than to the cover[6] It

---

[5] The Administrative Law Judge notes the lack of any evidence that the spindle motor and head stack assembly need not be mounted at all, or that such an assembly may be mounted at the same location as the "topmost portions" of the spindle motor, and HSA.

[6] Information relevant to the technical background of the invention, which is provided in the specification, may assist one in construing this asserted patent claims. In any event, and in contrast to the portion of the specification quoted in Seagate's reply, the portion of the specification quoted above expressly pertains to the claimed invention ("Summary of the Invention"). *See* Seagate Reply to Cornice Opposition to Cross-Motion at 4 (explaining that a

(continued...)

cannot be contested that the base plate is either part of the "base member" or indeed the base

member itself. The base plate 26 is illustrated in connection with the detailed embodiment, and

is shown to be distinct from the cover element 24. In fact, in the wording of the specification the

"housing comprises a cover element 24 and a base plate 26."[7]

Based upon the language of claims 1 and 6, which describe the limitations of the "cover

element" so as to exclude any possibility that the spindle motor and head stack assembly are

---

[6](...continued)
reference to mounting the spindle and HSA to the base is found in the "Background" portion of
the specification, and not with particular reference to the claimed invention).

[7]Base plates of the claimed invention, and as found generally in disk drives and their
housings, are discussed at several portions of the specification. In the detailed embodiment of
the specification, and as illustrated in the '461 patent Figures, the "base plate" is element 26.
The specification provides that the base plate is to be configured so as to "accommodate the
mounting of the head stack assembly." See '461 Patent, col. 4, lines 6-16. It is observed that at
least in the detailed embodiment the "base member" may consist of a plate inasmuch as the sides
of the housing structure extend from the cover element.

Further, in another portion of the specification, the base plate is discussed along with the
cover to explain how head stack assemblies are generally configured in disk drives. The
specification provides, as follows:

> A cover having a top and side portions extending downwardly from
> the top, is received over the spindle motor and head stack assembly,
> and is secured to the outer perimeter of the base plate to form a
> housing comprising the base plate and the top and side portions of the
> cover. In this manner, the housing encloses the spindle motor and
> head stack assembly of the head disk assembly in a protected
> environment.

'461 Patent, col. 1, line 66 through col. 2, line 6 (Background of the Invention).

The specification, in its general technical teachings and in its description of the detailed
(or preferred embodiment), assures that there is no way to confound a base plate with a cover
element, in general or in connection with the claimed invention. In addition, the specification
unambiguously states that in general and in the claimed invention, the spindle motor and head
stack assembly must be mounted to the base rather than to the cover. See '461 Patent, col. 3,
lines 44-52.

17

mounted to it, and based upon the general and embodiment-specific teachings of the specification

concerning the mounting of the spindle motor and head stack assembly, the Administrative Law

Judge construes the "base member" of the asserted claims to include the limitation that the

spindle motor and head stack assembly be mounted to it.  The "cover element" is construed to

exclude the mounting of the spindle motor and HSA, in favor of the express limitations of the

cover, such as accommodating the opposite or "topmost portions" of the spindle motor and HSA,

and supporting the PCB.

### 2.    "Head Stack Assembly"

Cornice argues that the claim term "head stack assembly" must be limited to "an

assembly including a stack of multiple arms and heads."  *See, e.g.*, Cornice Motion at 27-29.

Seagate argues that the HSA should be construed to mean "the stack including an

actuator, its arm, a head mounted to the arm, and its electric coil, whether including one or more

arms."  *See, e.g.*, Seagate Opposition and Cross-Motion at 31-33.

The Commission Investigative Staff argues that even if the disc drive is used for only one

disc, "there must be two actuator arms, one above the disc and one below the disc."  OUII Brief

at 14.

Independent claims 1 and 6 are directed to a structure that houses a disc drive with certain

features including, a "head stack assembly."  Some arguments have been made that the claims do

not actually read on an HSA, only to a housing with dimensions sufficient to accommodate an

HSA.  Yet, the plain claim language states that the claimed invention is for "[a] disk drive

housing," and further recites particular limitations on the disc drive that should be housed

therein.  While the applicants nowhere claim to have invented a disc drive, the '461 patent is not

18

written in abstract terms. Rather, it is written to cover a product with limitations necessitated by a real and particular type of disc drive. In the specification, there are numerous teachings and detailed illustrations concerning drive components (actuator arms, head, etc.) which show that the invention "is based upon an efficiency in space utilization to accommodate the mounting of mechanical and electronic components of the disc drive . . . and utilizes advances in integrated circuit miniaturization to configure PCB and housing elements in a manner that permits physical placement of disk drive components in a reduced amount of space." '461 Patent, col. 3, lines 7-15. Consequently, in order for a housing architecture to fall within the asserted claims, it must be used in connection with the disc drive of a type specified in the claims, i.e., a disc drive characterized by, among other things, "a spindle motor and head stack assembly."

A question is raised by the parties as to whether the head stack assembly to be housed by the claimed architecture must have more than one actuator arm, or may have only one.

The plain language of the independent claims contains the term "head stack assembly," beyond which there is no limitation on the number of actuator arms. Cornice argues that given its ordinary, dictionary definition, a "stack" of objects, including actuator arms, must refer to more than one. Seagate argues that dictionary definitions notwithstanding, in the relevant art, the term "head stack assembly" is often used to refer to an HSA which in fact has only one arm or head. Seagate also suggests that the term could refer to a single actuator arm along with other components that together constitute a "stack," "heap" or "pile," for example an actuator arm, head and electric coil forming a sort of stack or pile within the claimed housing. The Staff correctly points out that some of the art relied upon by Seagate postdates the '461 patent. Indeed, in general, the Administrative Law Judge finds the examples provided by Seagate to be of little

19

or no relevance in understanding the claim terms of the '461 patent. First and foremost, the plain claim language is properly construed in light of the entire specification.

Cornice relies in part on the fact that in the specification, the applicant states that a "head stack assembly comprises a stack of actuator arms, each mounting a head or a pair of heads." *See* '461 Patent, col. 1, lines 48-50. The specification continues to describe HSAs with multiple actuator arms. However, this portion refers to the background of the invention. While this description assists one in putting the claimed invention in its proper context, it is not clear enough so as to define the term "head stack assembly" in the particular context of the claims. *See Markman*, 52 F.3d at 980.

Nevertheless, a later portion of the specification builds upon the background of the invention and summarizes the claimed invention as follows:

> In accordance with a feature of the present invention, a first raised portion of a housing element, such as a housing cover, is dimensioned to receive the top most portions of the spindle motor and actuator assembly, and includes a region that permits the movement of the ***top most actuator arm*** relative to a top disk surface. A second raised portion of the housing element, having a height dimension that is less than the height dimension of the first raised portion, is dimensioned to receive the top most disk(s) of a stack of disks.

'461 Patent, col. 3, lines 17-25 ("Summary of the Invention").

Employing claim language in the invention summary, the specification states that the "first raised portion" must "receive the top most portions of the spindle motor and actuator assembly," and further that it must permit movement of a "top most arm." As quoted above, the invention summary contemplates the possible use of only one disk by the drive, yet that does not negate the statement that there must be a "top most arm."

20

In fact, the specification shows how the use of a single disc does not mean the use of a single actuator arm. The specification explains that in the type of disc drive used with the claimed invention, one may use a "disk or disks." '461 Patent, col. 2, lines 10-14. Nevertheless, "the actuator structure must place an actuator arm/head assembly both above the top most disk surface and below the bottom most disk surface of the stack of disks to permit the reading and writing of data from these surfaces. Thus, the extremities of the spindle motor and head stack assembly dictate the overall height of the disk drive housing." '461 Patent, col. 2, lines 16-21.

According to the specification, even though the stack may incorporate a single disk, a "head stack assembly" will have at least two actuator arms (one above and one below the disk) which must be accommodated. This height accommodation of two or more actuator arms must be done in such a way as to achieve the stated purpose of the claimed invention, which "decreases the overall dimensions of the disk drive . . . ."[8] *See* '461 Patent, col. 1, lines 6-12.

Based upon the intrinsic evidence, including claim language, the background of the claimed invention, and the detailed summary of the claimed invention in the specification, the claimed housing is limited so that it accommodates a "head stack assembly" with more than one actuator arm.

3.      **"Continuous, Single PCB Support Surface"**

Both asserted independent claims require that the "the top surface of the cover element" have "remaining portions . . . generally parallel to said first raised portion and providing a continuous, single PCB support surface." There is a dispute among the parties as to whether the

---

[8]A question could be raised as to whether the claimed space-saving invention would even be relevant to a disc drive with merely one actuator arm.

claims require a PCB board and "remaining portions" that are continuous and single, or whether the claims could be satisfied by portions of the cover element that may not be single and continuous although they support a PCB with such characteristics.

On their face, the claims appear to require a continuous, single support surface for a PCB located on the top surface of the cover element. Yet before construing this limitation in its entirety, the Administrative Law Judge would request further briefing and/or the reception of evidence at a hearing due to questions concerning the prior art and other technical matters that were raised in Seagate's briefing. In any event, it is clear from the claim language and specification that the PCB is supported on the top surface of the cover element. *See* Section IV.A.1. (construing the terms "cover element" and "base member").

**B.    Analysis of the Accused Products in View of the Claims**

The products accused of infringing the '461 patent are the Cornice 1.0, 1.5 and 2.0 Storage Elements.[9] There are some disagreements as to the proper characterization of certain design elements in the accused products. Nevertheless, there is no dispute that the accused products do not differ in any way that is material for a determination of the pending motion and cross-motion relating to alleged infringement. *See* Cornice Motion at 4-5 & n.5 (citing the complaint and Seagate's answer to Cornice Interrogatory No. 2); Seagate Opposition and Cross-Motion at 11-53 and Declaration of David B. Bogy (attached in support thereof); OUII Response at 17. Further, the parties do not dispute the composition and structure of the accused

---

[9]Seagate contends that Cornice has withheld discovery concerning its 4.0 GB product. However, as pointed out by the Commission Investigative Staff, it appears that introduction of the 4.0 product is not expected until after March 2005, and not therefore the subject of a previous order concerning the scope of discovery. *See* OUII Response at 17 n.5.

22

products relative to the '461 patent infringement question. *See* OUII Response at 17; Seagate Reply to Cornice Opposition to Seagate Cross-Motion at 3, 5; Cornice Opposition to Cross-Motion at 8.

Reproduced below is an illustration from Cornice's motion, which provides a clear and unembellished representation of several relevant features of the accused products (although Seagate would take issue with the labeling of the "cover" and "base").



### 1.    "Cover Member" and "Base Element"

In discussing the question of infringement, Seagate, as supported by its expert declaration, analyzes the accused products in terms of a "first housing element" and a "second

housing element."[10]  *See, e.g.*, Bogy Declaration, ¶¶ 5-14.  Seagate's expert declares that the

so-called first and second housing elements "function together to form a housing that protects the

components of the disc drive, such as the spindle and head stack assembly ("HSA")."  Seagate's

expert also explains that the so-called first housing element "has a top surface that includes a first

raised portion and remaining portions that support the PCB."

     The patent claims do not, of course, merely limit the claimed invention to so-called

housing elements that function together to accommodate the spindle and head stack assembly.

Nor is it unimportant, according to the claims and the specification, which part of the housing

supports the PCB.  Rather, the claims, in their plain language and for the reasons discussed in the

specification , specifically require that one element of the housing—the "cover element" – must

have a "top surface" that includes a "first raised portion to provide a height dimension within the

housing sufficient for topmost portion of a spindle motor and head stack assembly of a disk

assembly."  Further, the claims require that the "cover element," and not the base element,

provide support for the PCB.  It is uncontroverted that in the accused products, the housing

element that fits over the topmost portion of the spindle motor and so-called "head stack

assembly" is not the part of the housing with the "first raised portion."[11]  Nor does the part of the

Cornice housing that fits over the spindle motor and related assembly support the PCB.  Instead,

---

[10]While the term "housing element" is used to a limited extent (and with a different
meaning) in the '461 patent specification, the terms "housing element," and "first" or "second"
"housing element," are not terms found in the claims.

[11]The term "head stack assembly" as used in the '461 is a matter of dispute.  By using the
term in connection with this infringement analysis to refer to the Cornice actuator arm, head and
related hardware, the Administrative Law Judge does not imply that the Cornice products
necessarily satisfy the particular limitation or limitations placed upon the HSA in the asserted
claims.

in the accused products the PCB is supported outside the part of the housing located at the

opposite end of the disk drive with the "topmost portions" of the spindle motor and HSA.

Indeed, the PCB is mounted on the part of the housing under the spindle and stack assembly,

rather like the "base member" in the claimed invention.[12] Seagate's declaration also discloses

that in the accused products it is the housing under the spindle motor and HSA (rather than a

cover) which contains the raised portion to accommodate the disc drive contained within the

housing. Bogy Declaration, ¶¶ 5, 6.

Without a "cover element" that has a "first raised portion" to accommodate the topmost

portions of the spindle motor and HSA, and which also has the "remaining portions" to support

the PCB, the accused Cornice products lack the "cover element" limitation required by

independent claims 1 and 6 of the '461 patent. Similarly, the accused products also lack a "base

member" required by the claims because the part of the accused housing that supports the PCB is

opposite the part of the housing that should protect the topmost portions of the spindle motor and

head stack assembly.

Consequently, a finding of literal infringement by the accused products is precluded

inasmuch as literal infringement occurs only when "the properly construed claim reads on the

---

[12]The Administrative Law Judge refrains from referring to a "cover element" and a "base
member" in the accused products, even though it would be convenient simply to state that in the
in the accused products the PCB is mounted to the base whereas in the patent claims, the PCB is
mounted to the cover. Although such as statement would be highly illustrative of part of the
problem in finding infringement in this instance, the difficulty in using such terminology lies in
the fact that given a housing that differs greatly from that claimed by the '461 patent, it is
inaccurate to use the same terminology to refer to the accused products. If the part of the housing
located over the spindle motor and HSA does not also support the PCB – as it does not in the
accused devices – then it seems somewhat misleading to refer to it as a "cover" or "cover
element," even for purposes of illustration.

accused device exactly." *Amhil*, 81 F.3d at 1562.

Seagate argues that if literal infringement is not found, it is nonetheless entitled to a finding of infringement under the doctrine of equivalents. Seagate's arguments and analyses depend upon a determination that "interchanging the portions of the housing that Cornice calls the base member is an insubstantial difference." *See, e.g.*, Bogy Declaration, ¶ 7. Yet, as discussed above in the section on claim construction, independent claims 1 and 6 of the '461 expressly place certain limitations on the "cover element," which is defined in the claims as, among other things, "including a first raised portion to provide a height dimension within the housing sufficient for topmost portions of a spindle motor and head stack assemble." While Cornice may use a structure that meets its needs for operating and housing a disk drive in a space-saving effective manner, it has not employed a structure that functions in the same way as the patented invention. For example, Seagate has set forth no evidence that Cornice decreases the overall dimension of the housing by accommodating the top of the spindle motor and head stack assembly with a first raised portion or any equivalent structure. In fact, Seagate admits that the supposed first raised portion in the accused products is actually found at the other side of the disk drive. *See, e.g.*, Bogy Declaration, ¶¶ 9-10. Yet, the first raised portion of the asserted claims is specifically linked to accommodating the top of spindle motor and head stack assembly, and by doing so without raising the entire cover, only a first raised portion (for example the feature labeled 48 in the '461 patent Figures). The limitation at issue is not a generic limitation directed to the entire disc drive or other part of the drive. Nor does this limitation require the entire cover to be elevated. The claims require a first raised portion associated only with the top of the spindle motor and HSA.

26

Further, the teachings of the specification detail the requirement to mount the PCB on the cover rather than to use the prior art structure in which the PCB was mounted on the base or arranged between various recesses on the housing surface. *See* '461 Patent, col. 3, lines 26-43; col. 5, lines 37-56. It would, therefore, be improper even under the doctrine of equivalents to find that the "cover element" limitation is satisfied by the accused products in which the PCB is mounted on the part of the housing opposite the top of the spindle motor and head stack assembly. *See J&M Corp. v. Harley Davidson, Inc.*, 269 F.3d 1360, 1368-69 (Fed. Cir. 2001)("Structure expressly disclaimed in the specification, of course, cannot be considered an equivalent under the doctrine of equivalents.").[13]

### 2.    "Head Stack Assembly"

There is no factual dispute concerning the structure of the accused products relative to "head stack assembly" limitation of the accused asserted claims. It is undisputed that the Cornice drives have only one actuator arm. Consequently, a required limitation of the asserted claims is absent from the accused products, and infringement cannot be found.

Seagate argues that even if literal infringement is not found, it is entitled to a finding of infringement under the doctrine of equivalents. Seagate's argument is based on the position that the "infringement does not turn on whether the accused products include an HSA, only whether

---

[13]In its *J&M* opinion, the Court of Appeals for the Federal Circuit affirmed a summary determination of noninfringement involving motorcycle helmet accessories used to mount a microphone and electrical plug on a helmet. The court ruled in part that "the specification disclaims coverage of a single clamp structure as a flaw of prior art accessories. Moreover, while Applicants were aware of the possibility of placing the microphone boom and electrical plug mount on a single clamp, they dismissed such an approach and expressly described and claimed accessories in which the boom and plug were separately mounted. J & M cannot now overlook this deliberate decision and reclaim this disclaimed subject matter through the doctrine of equivalents." 269 F.3d at 1369.

their housing is designed to accommodate the HSA, and other components of the drive." Seagate

Opposition and Cross-Motion at 35. For the reasons discussed above in the section construing

this claim limitation, such a proposed interpretation was rejected in view of the '461 patent's use

of a "head stack assembly" in its claims and the express teachings of the specification that the

claimed invention is used with an actual disc drive. In addition, even if a head stack assembly

were not required for the "head stack assembly" limitation to be satisfied, the way in which the

height dimensions of the non-existent HSA would be hypothetically accommodated by the

Cornice housing bears no relation to elements required by the claims of the '461 patent. As

detailed in the previous discussion concerning the "cover element" and "base member"

limitations, the accused products lack those limitations, including a "first raised portion" in the

cover that is determined by the height of the "topmost portions of a spindle motor and head stack

assembly of a disk stack assembly." The doctrine of equivalents cannot be used to read the

asserted claims onto the accused products.

Accordingly, there is no genuine question of material fact with respect to the "head stack

assembly" limitation, and Cornice is entitled to a noninfringement finding as a matter of law. It

has not been demonstrated that Seagate is entitled to a finding of infringement.

### 3.  "Continuous, Single PCB Support Surface"

As discussed above in connection with construction of the independent claims, the

Administrative Law Judge has not fully construed the meaning of "a continuous, single PCB

support surface," although on their face the claims appear to require a continuous, single support

surface for a PCB on the top surface of the "cover element," as limited by the claims.

In any event, there appears to be no dispute that in the Cornice products, the PCB board is

28

mounted on the part of the housing opposite the topmost potions of the spindle motor and thus

not on a cover as defined by the claims. Indeed, as detailed above, the accused products do not

have a "cover element" as limited by the patent claims, and thus no infringement can be found in

this investigation with respect to the accused products.

## V.    Conclusion

For the reasons detailed above, there is no genuine issue of material fact to preclude a

finding that the accused Cornice products cannot be found to practice any asserted claim of the

'461 patent. Further, Cornice is entitled to a summary of determination of noninfringement as a

matter of law, and Seagate's cross-motion for summary determination of infringement must be

denied. In addition, even if it were found that the Cornice accused products contain the claim

limitations at issue in the motion and cross-motion, other claim limitations have not been

addressed by the parties or conceded by Cornice, and no motion has been made to address

Cornice's affirmative defenses. Thus, in no case could Seagate's cross-motion for summary

determination of infringement be granted.

Accordingly, it is the INITIAL DETERMINATION of the Administrative Law Judge that

respondent Cornice's Motion No. 516-7 is GRANTED. The accused products are found not to

infringe any claim of the '461 patent.

Seagate's cross-motion for summary determination of infringement (which apparently

lacks a docket motion number) is denied.

Although this investigation should be terminated with respect to U.S. Patent No.

5,596,461, other patents remain at issue in this investigation, and thus this investigation should

not be terminated in its entirety.

By March 24, 2005, each party shall file a statement as to whether or not it seeks to have any portion of this document deleted from the public version thereof. In addition, by the aforementioned date, any party seeking to have any portion of this document deleted from the public version must submit to this office a copy of this document with red brackets indicating any portion asserted to contain confidential business information.

Sidney Harris
Administrative Law Judge

Issued: March 7, 2005

30