IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEAGATE TECHNOLOGY LLC,

                Plaintiff,

    v.

CORNICE, INC.

                Defendant.

C.A. No. 04-418 (SLR)



**PLAINTIFF SEAGATE TECHNOLOGY LLC'S RESPONSE BRIEF
REGARDING CONSTRUCTION OF DISPUTED TERMS IN
U.S. PATENT NO. 6,146,754**

Date: December 16, 2005

FISH & RICHARDSON P.C.
Timothy Devlin (#4241)
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114
Tel: (302) 652-5070

Roger S. Borovoy
David M. Barkan
500 Arguello Street, Suite 500
Redwood City, CA 94063-1526
Tel: (650) 839-5070

Ruffin B. Cordell
Brian R. Nester
Timothy W. Riffe
Christian A. Chu
1425 K Street NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 783-5070

Edmond R. Bannon
Lewis E. Hudnell, III
Citigroup Center
153 East 53rd Street, 52nd Floor
New York, NY 10022-4611
Tel: (212) 765-5070

Attorneys for Plaintiff
SEAGATE TECHNOLOGY LLC

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDING.................................................1

II.   SUMMARY OF THE ARGUMENT ...................................................................1

III.  COUNTER-STATEMENT OF FACTS ................................................................1

IV.   ARGUMENTS.........................................................................................................3

    A.    A "seedlayer" is defined by the thin-film layer's position
      and function ..........................................................................................3

        1.    The intrinsic evidence does not support
            Cornice's insertion of its extraneous limitation
            "in direct contact with the substrate" ...........................3

            a.    The specification undermines Cornice's
                position...............................................................3

            b.    Cornice's construction is impossible to
                implement ..........................................................4

            c.    There is no clear and unmistakable
                disclaimer in the prosecution history to
                support Cornice's argument...............................4

        2.    A "seedlayer" is defined by its position between
            the substrate and underlayer and by its function
            in the medium ................................................................6

    B.    A "chromium alloy" refers to a single-phase solid
      solution of chromium and other element(s) (usually
      metals)...................................................................................................8

        1.    The specification does not support the inclusion
            of two-phase mixtures ...................................................8

        2.    The prosecution history does not justify
            Cornice's interpretation ................................................9

        3.    Aluminum alloys are not "chromium alloys" ............10

        4.    Cornice cannot rely on extrinsic dictionary
            definitions ....................................................................10

    C.    "Substantially Directional Magnetic Isotropy" should be
      construed according to precedent and the technological
      context................................................................................................11

**TABLE OF CONTENTS (cont'd)**

Page

1.   The term allows consideration of one or more
     orientation ratios ...........................................................................11

2.   "Substantially directional magnetic isotropy"
     does not require a lack of dominant
     crystallographic orientation ...........................................................12

     a.   Cornice's new limitation contradicts the
          express claim language and renders claim
          11 superfluous.................................................................12

     b.   The specification does not support this
          new limitation ................................................................13

     c.   There is no clear and unmistakable
          prosecution disclaimer ...................................................13

D.   "Having magnetic properties with an orientation ratio of
     about 1.0".............................................................................................14

     1.   The claim allows "one or more" orientation
          ratios............................................................................14

     2.   "About 1.0" does not require rounding to the
          first decimal place .........................................................14

E.   "Randomly oriented grains" and "grains ... are
     randomly oriented" ..........................................................................15

     1.   Because the chromium grains of the seedlayer do
          not have a magnetic c-axis, Cornice's
          construction cannot apply to claim 13 .........................15

     2.   There is no intrinsic support for Cornice's
          "magnetic c-axis ... oriented in all three
          dimensions" limitation ..................................................15

V.   CONCLUSION...............................................................................................16

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

<u>Brookhill-Wilk, LLC v. Intuitive Surg., Inc.,</u>
    334 F.3d 1294 (Fed. Cir. 2003)................................................................. 7

<u>Karlin Tech. Inc. v. Surgical Dynamics, Inc.,</u>
    177 F.3d 968 (Fed. Cir. 1999)................................................................. 12

<u>Mars, Inc. v. H.J. Heinz Co.,</u>
    377 F.3d 1369 (Fed. Cir. 2004)............................................................. 10

<u>Omega Eng'g, Inc. v. Raytek Corp.,</u>
    334 F.3d 1314 (Fed. Cir. 2003)......................................................... 5, 13

<u>Phillips v. AWH Corp.,</u>
    415 F.3d. 1303 (Fed. Cir. 2005) (en banc)............................................. 5

<u>SanDisk Corp. v. Memorex Prods., Inc.,</u>
    415 F.3d 1278 (Fed. Cir. 2005)...................................................... 6, 9, 14

## I.    NATURE AND STAGE OF THE PROCEEDING

Pursuant to the Court's Scheduling Order [D.I. 36-1], Plaintiff Seagate Technology LLC ("Seagate") respectfully submits this Response Brief to Cornice's Inc. ("Cornice")'s Opening Claim Construction Brief for U.S. Patent No. 6,146,754 (the "'754 patent").

## II.    SUMMARY OF THE ARGUMENT

To serve its litigation needs, Cornice used six primary tactics in its brief to twist the plain terms of the claims beyond what precedent and the intrinsic evidence permit:

- Cornice disregards the plain language of the claims, by ignoring for instance "chromium" from the term "chromium alloy."

- Cornice violates the principle of claim differentiation, requiring for example an absence of all dominant crystallographic orientations in claim 1, although dependent claim 11 already excludes a specific form of dominant crystallographic orientation.

- Cornice reads limitations into the claims from the specification, adding for instance a requirement of two or more orientation ratios to "substantially directional magnetic isotropy" by importing the alleged requirement from the specification.

- Cornice's repeated reliance on prosecution history is misplaced, being without adequate evidence to substantiate the unambiguous disavowal necessary to modify the plain meaning. Not even the statements it cherry-picked come close to showing a departure from the claims' plain meaning, or to constituting statements so clear and so unmistakable that they become a relinquishment of the claims' broad scope.

- Cornice even uses extrinsic evidence, pointing to allegedly invalidating art from its failed ITC summary judgment motion and to various statements in its expert's report. In doing so, Cornice asks the Court to disregard a settled principle: that extrinsic evidence cannot vary or contradict the claim's ordinary meaning.

- In many instances, Cornice takes complete license and rewrites the claims without offering credible supporting intrinsic or extrinsic evidence. For instance, it grafts a crystallographic requirement onto a magnetic property, and adds a magnetic c-axis to the seedlayer's non-magnetic grains. This runs afoul of yet another claim construction canon: that courts (and litigants) cannot rewrite claims.

## III.    COUNTER-STATEMENT OF FACTS

In its Statement of Facts (and peppered throughout its brief), Cornice presents a slanted view of the ITC proceeding to buttress its claim construction arguments, going so far as to include its unsuccessful ITC summary judgment motion and snippets from asserted references. [E.g., D.I. 178 at 9-10, 13.] But Cornice forgets to include inconvenient facts.

1

Indeed, it fails to note that the ITC effectively denied its motion for summary judgment of invalidity on the '754 patent. In response to the motion that Cornice filed in February of 2005, Seagate submitted a detailed opposition and expert declaration, rebutting each of Cornice's assertions and showing ample triable issues of material facts. [Ex. A (Feb. 28, 2005 Oppo. to Cornice's SJ Mtn); Ex. B (Decl of D. Laughlin re Seagate's Oppo.).][1] The independent Investigative Attorney from the ITC's Office of Unfair Import Investigations agreed with Seagate and opposed Cornice's motion. [Ex. C (ITC Docket) at 15.] As a result, Judge Harris effectively denied Cornice's motion by never issuing a ruling before trial. [See id.] Given the weaknesses in its invalidity arguments and inability to design around the '754 patent, Cornice agreed – on the eve of the ITC trial – to stop making and importing the disc drives expressly specified in Seagate's ITC Complaint. [Ex. D (May 2, 2005 Press Release).]

Knowing that it cannot prevail on summary judgment on this patent, Cornice did not move for summary judgment on the '754 patent in this action, except to assert that a third-party's license may immunize it from this patent. [D.I. 175.] Instead, Cornice tries to get through the back door what it cannot obtain directly, by mixing its invalidity contentions with its claim construction arguments. Not only is this approach improper, it is also based on whole-cloth concoctions. For instance, Cornice includes a picture from the Okumura references, boldly asserting that Seagate's expert conceded anticipation unless his construction of "alloy" were adopted. [D.I. 178 at 9-10, 13.] However, the expert never made such a concession, as shown by Cornice's failure to cite supporting evidence. [Id.] As Professor Laughlin consistently maintained in his reports and depositions, the Okumura reference cannot anticipate regardless of the construction of "chromium alloy" because the reference uses a chromium-nickel compound rather than an alloy.[2] [Ex. E (Oct. 7, 2005

---

[1] Lettered exhibits cited in this brief refer to the exhibits attached to Timothy Devlin's declaration in support of this brief, filed concurrently.
[2] A compound is a chemical union of two or more elements, resulting in new properties and characteristics. There is no such chemical union in an alloy, where the atoms are homogeneously mixed rather than being actually chemically bonded.

Rebuttal Expert Rep.) at 52-57; Ex. F (Apr. 1, 2005 D. Laughlin Depo. Tr.) at 371-382.]
Glossing over the facts because there is no support in the intrinsic evidence is one thing;
creating them to suit litigation needs is beyond the pale. The Court should reject this
improper tactic and disregard Cornice's attempt to infuse invalidity into claim construction.[3]

## IV.     ARGUMENTS

### A.     A "seedlayer" is defined by the thin-film layer's position and function

According to Cornice, any thin-film layer directly in contact with the substrate base
must be a "seedlayer." Per the same logic, any tarp, bedsheet, or piece of paper in direct
contact with a concrete floor must be a carpet, regardless of its composition or function. That
is specious. A carpet is more than what is on the floor; it must also perform some of the
functions of a carpet, such as softening footsteps or insulating bare feet from cold floors.

#### 1.     The intrinsic evidence does not support Cornice's insertion of its extraneous limitation "in direct contact with the substrate"

##### a.     The specification undermines Cornice's position

A bedsheet does not become a berber carpet because it is laid on the floor. Similarly,
not everything directly on top of the substrate automatically becomes a seedlayer. Otherwise,
the "underlayer" in Figures 1 and 2 of the '754 patent (reproduced below) would be a
"seedlayer" under Cornice's construction. ['754 patent at Figs. 1-2 (below) & 1:66-2:27.]



---

[3] If the Court consider Cornice's ITC motion and expert report, Seagate requests that due
consideration be given to its ITC opposition brief and Rebuttal Report. [Exs. A-B, E.]

Further contradicting Cornice's argument are Figures 3 and 4 of the patent. As shown in Figure 3 above, the thin-film layer directly on top of the substrate and below the underlayer is not a "seedlayer;" it is called instead a "Cr sub-underlayer." [Id. Fig. 3 & 2:28-55.] If Cornice were correct, the "sub-underlayer" would be called a "seedlayer," like the thin-film in the same location in Figure 4. [Id. Fig. 4.] What distinguishes the seedlayer of Figure 4 from the sub-underlayer of Figure 3 – in fact, what defines a seedlayer – is the function it performs in the medium. While Figure 3's sub-underlayer only affects other layers' grain size [id. at 2:45-50], the seedlayer in Figure 4 performs the function of controlling the crystallographic orientation of the subsequent layers: "an underlayer structure exhibiting a (200)-dominant crystallographic orientation was obtained by depositing a magnesium oxide (MgO) seedlayer…." [Id. at 2:59-62 (emphasis added).] Position is not enough; the "seedlayer" must also perform a function.

**b.    Cornice's construction is impossible to implement**

The incongruity in Cornice's construction is apparent when its interpretation of "substrate" (which excludes a nickel phosphorous coating on the aluminum base [see D.I. 146 at Part IV.G pp. 31-34]) is coupled with its interpretation of "seedlayer." Cornice's own expert conceded he did not know how to make a workable medium under these constructions:

**REDACTED**

[Ex. G (Apr. 4, 2005 Coffey Depo. Tr.) at 148:10-14.]

**REDACTED**

[Id. at 150:20-151:2.] An interpretation resulting in a non-working medium must be wrong.

**c.    There is no clear and unmistakable disclaimer in the prosecution history to support Cornice's argument**

Cornice relies exclusively on the prosecution history for its new "directly on top of the substrate" limitation, drawing inferences from two prior art references cited during

4

prosecution. [D.I. 178 at 16-18, 21-23.] Because the seedlayer in both references happen to

be on top of the substrate, Cornice reasons that all seedlayers must have this limitation. This

is an incorrect syllogism, as flawed as if a tourist concluded that all residents of Delaware

must be blond because the first two people he met in Delaware had blond hair.

      In addition to being flawed, Cornice's argument does not meet the strict standard

required by precedent for adding new limitations. Indeed, only a patentee's clear and

unmistakable disclaimer during prosecution can justify adding such a new limitation. Omega

Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325 (Fed. Cir. 2003) (ruling that a clear and

unmistakable disclaimer exists only if the patentee's argument is both "so clear as to show

reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of

disclaimer."); see also Phillips v. AWH Corp., 415 F.3d. 1303, 1315 (Fed. Cir. 2005) (en

banc). Cornice has not pointed to any evidence of clear and unambiguous disclaimer,

referring instead to inferences it drew from the two references. But a closer examination of

these two references undercuts these inferences. In the Doerner and Chen '227 patents, the

treated nickel-phosphorous ("NiP") "seedlayer" performed the function of "seedlayers" –

they controlled the crystallographic orientation of subsequent layers:

- The Doerner patent transformed the top surface of the NiP coating on the aluminum base into a nickel oxide ("NiO") "seedlayer" by subjecting it to high heat and partial oxidation. As a result, the NiO seedlayer "significantly reduces the modulation by altering the crystallographic orientation of the underlayer and magnetic layer." [D.I. 147 Ex.13 at 4:40-64 & 5:28-31 (emphasis added).]

- The Chen '227 patent reactively sputtered and then partially oxidized its NiP layer "to control the crystallographic orientation of a subsequently deposited underlayer." [Ex. H (Chen '227 patent) at 3:56-59 (emphasis added).]

Although these two references disclosed a seedlayer, they do not teach one of the novel

features of the '754 patent: a chromium or chromium alloy seedlayer. By pointing to the

difference in chemical composition between the prior art's NiP-based seedlayer and the

patent's chromium seedlayer, the patentee convinced the Examiner that this invention was

patentable over the Doerner and Chen '227 patent. [D.I. 179 Ex. A-tab 15 ('754 prosec.

history) at 72-73.] Thus, Cornice's prosecution history citations are not clear and unambiguous enough to be a prosecution disclaimer. SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1287-88 (Fed. Cir. 2005) (because a prosecution disclaimer must "have no reasonable interpretation other than to disavow" the term's scope, the novel limitation was improper because an alternate reading of the prosecution history was "at least reasonable").

### 2. A "seedlayer" is defined by its position between the substrate and underlayer and by its function in the medium

Despite overwhelming intrinsic evidence defining a "seedlayer" by its position and function, Cornice focuses exclusively on position [D.I. 178 at 18-21], thus ignoring:

- the term's ordinary meaning: its expert's concession that Seagate's construction encompasses the term's ordinary meaning in this field [D.I. 147 Ex. 3 at 36.];

- the specification: the written description's ample use and description of the "seedlayer" as a layer controlling the crystallographic orientation of the underlayer and magnetic layer ['754 patent at 5:45-57; 6:05-19];

- the prosecution history: scientific articles (cited in the patent's Background, cited during prosecution, and considered by the Examiner) defining "seedlayer" based on the layer's position and function [D.I. 147 Ex. 4 at 4902; Ex. 5 at 3632.]

For further discussion of this compelling evidence, Seagate respectfully refers the Court to its opening claim construction brief. [D.I. 146 at Part IV.B. pp. 10-14.]

Not only does it ignore the intrinsic evidence, but Cornice also raised three flawed arguments in its brief. First, citing to three passages in the specification, Cornice argues that the seedlayer cannot be defined by its control of crystallographic orientation, since the seedlayer supposedly acquires this property after a heat and oxidation treatment. [D.I. 178 at 19-20.] But the argument is deeply flawed; none of the three citations requires the seedlayer to undergo this treatment before it can control other layers' crystallographic orientation:

- The first passage only states that using a chromium seedlayer improves the medium's signal-to-noise ratio ['754 patent at 6:6-9], without nary a word about any treatment.

- The second passage indicates that, in a preferred embodiment, the seedlayer can receive a specific treatment to improve and optimize its ability to induce "substantial directional magnetic isotropy." [Id. at 6:28-42.] But the passage does not require the seedlayer to be "treated" to control crystallographic orientations. [Id. at 6:05-19.]

6

- As with the second passage, the third citation only mentions that the treatment <u>optimizes</u> the seedlayer's ability to induce "substantially directional magnetic isotropy." [<u>Id.</u> at 6:49-53.] Without the treatment, the seedlayer may not be optimal in inducing this magnetic property, but it can still control crystallographic orientations.

The chromium seedlayer does not need to undergo any treatment to acquire its function; the treatment only optimizes its capacity to induce the desired magnetic isotropy in the medium.[4]

Second, Cornice cannot rely on the reference to the magnesium-oxide ("MgO") seedlayer found in the prior art. [D.I. 178 at 20-21.] The patent is clear that the NiAl underlayer in Figure 4 has a (200)-dominant crystallographic orientation thanks to the MgO seedlayer. ['754 patent at 2:59-62.] Without the seedlayer, the NiAl layer would exhibit its normal (110)-dominant orientation, as it does in the medium of Figure 3. [<u>Id.</u> at 2:28-39.] The MgO changed the crystallographic orientation, consistent with a seedlayer's function.

Finally, Cornice's reliance on the prosecution history to negate the seedlayer's function misses crucial points. Indeed, two scientific articles discussed in the patent's Background and considered by the Examiner define a "seedlayer" based in part on its ability to control crystallographic orientation. [D.I. 147 Ex. 4 at 4902; Ex. 5 at 3632.][5] More importantly, if Cornice were correct that a seedlayer does not perform any function, the Examiner would not have allowed '754 patent over the medium of Figure 3 (showing a Cr sub-underlayer directly on the substrate) and the two Lal patents' media (using a chromium "sublayer" directly on their substrate). ['754 patent at Fig. 3; Exs. J-K (Lal patents).] Although they used a chromium layer on the substrate, they did not perform the seedlayer's function, and were thus not chromium "seedlayers" in the eyes of the Examiner and patentee.

---

[4] Because controlling crystallographic orientation is not a stated purpose of the patent (obtaining the advantageous substantial magnetic isotropy property is), Cornice's citation to <u>Brookhill-Wilk, LLC v. Intuitive Surg., Inc.</u>, 334 F.3d 1294 (Fed. Cir. 2003) is irrelevant.

[5] Cornice's citations to Professor Laughlin's deposition transcript are disingenuous. [D.I. 178 at 22.] Both the Doerner reference and Professor Laughlin understand that the NiP coating on the aluminum base is <u>not</u> the seedlayer; it is only <u>after</u> the NiP coating is subjected to a heating and oxidation treatment that it forms a NiO surface capable of controlling crystallographic orientations. [D.I.147 Ex.13 at 5:28-31.]

**B.    A "chromium alloy" refers to a single-phase solid solution of chromium and other element(s) (usually metals)**

With regards to this term, the parties agree on one point: a "chromium alloy" covers a single-phase substitutional – or "homogeneous" (as Cornice puts it) – mixture of chromium and other element(s). [D.I. 146 at 14-16; D.I. 178 at 13.] The dispute turns on whether the term extends to multi-phase – or "non-homogeneous" – mixtures, such as a mixture of oil and water. While Cornice believes that a person skilled in this field would use non-homogenous mixtures, its position is untenable in light of the intrinsic evidence as extensively discussed in Seagate's opening brief. [D.I. 146 at Part IV.C. pp. 14-18.]

**1.    The specification does not support the inclusion of two-phase mixtures**

Cornice argues that the term "chromium alloy" must include non-homogeneous mixtures, such as a "Cr-TaO$_2$" mixture, based solely on this statement:

> The underlayer employed in the present invention can be sputter deposited at a thickness of about 300 .ANG. to about 1500 .ANG. and can comprise Cr, a Cr alloy, such as CrV, CrTi, CrTiB or Cr-Ta$_2$O$_5$.

[D.I. 178 at 14 (quoting '754 patent at 6:53-56).] Cornice is, however, misreading the specification. Indeed, the sentence recites three possible compositions for the thin-films of the underlayer: (i) pure chromium, (ii) a chromium alloy (such as CrV, CrTi, CrTiB), and (iii) a multi-phase mixture of chromium with a metallic oxide, such as Cr-Ta$_2$O$_5$. As the patent indicates, such a multi-phase mixture may be used in multilayer underlayer stacks, "such as CrV/Cr, CrV/NiAl/Cr, or CrV/NiAl/Cr/Cr-Ta$_2$O$_5$." ['754 patent at 6:59.] But the patent does not consider this two-phase mixture a "chromium alloy," as shown by two other statements in the specification. The first statement is: "Conventional underlayers include Cr, molybdenum (Mo), tungsten (W), titanium (Ti), chromium-vanadium (CrV) as well as Cr alloyed with various substitutional elements." ['754 patent at 1:60-62 (emphasis added).] Not even mentioning Cr-Ta$_2$O$_5$, this passage indicates that chromium alloys involve homogeneous solutions by emphasizing the substitutional aspect of the chromium alloy. The

8

second statement appears just two sentences before Cornice's citation and recites the types of "chromium alloys" usable as seedlayers: "The seedlayer employed in the present invention can be sputter-deposited and can comprise various materials, such as Cr, a Cr alloy, e.g., CrV, CrTi or CrTiB." ['754 patent at 6:47-49.] Like the sentence on which Cornice relies, the second passage notes that the seedlayer may be composed of (i) pure chromium, or (2) a chromium alloy such as the homogeneous CrV, CrTi and CrTiB. Noticeably absent from the list of chromium alloys is "Cr-Ta$_2$O$_5$," confirming that it is not a "chromium alloy."

## 2. The prosecution history does not justify Cornice's interpretation

To buttress its reading, Cornice resorts to the prosecution history, especially to the text of the provisional application. [D.I. 178 at 14.] Like the patent's specification, the provisional application also states that "[t]he seedlayer referred here can be oxidized Cr, Cr-alloy (such as CrV, CrTi, CrTiB) ...." [D.I. 147 Ex. 2 at § 3.] In other words, the provisional application does not regard "Cr-Ta$_2$O$_5$" as a "chromium alloy." Ignoring this point, Cornice latches on to a typographical error on the same page, where the provisional application states that "[t]he underlayer referred here can be single-layer Cr, Cr-alloy (such as CrV, CrTi, CrTiB, Cr-Ta$_2$O$_5$, ...), NiAl, FeAl..."[6] [Id. (ellipses in original).] But the patentee could not have meant what Cornice insinuates given the later change in the text of the non-provisional application that excludes Cr-Ta$_2$O$_5$ from the list of chromium alloys. [See '754 patent at 6:53-56.] In any case, this one phrase from a part of the prosecution history does not rise to the requisite level of clear and unmistakable disclaimer, especially considering the contradictory statement regarding the seedlayer's "chromium alloys." See SanDisk, 415 F.3d at 1287-88.

---

[6] To buttress its point, Cornice misquotes Prof. Laughlin and conveniently omits the relevant transcript pages where the statement appears. [D.I. 178 at 14.] As the full transcript shows, Prof. Laughlin indicated, in response to questions related to the provisional application, that Seagate's construction of "chromium alloy" was fully consistent with the intrinsic evidence, except for the "Cr-Ta$_2$O$_5$" typographical error. [Ex. F pp. 69-72.]

9

### 3.    Aluminum alloys are not "chromium alloys"

To justify its interpretation, Cornice also points to the coated aluminum alloys in the disc's substrate. Because aluminum alloy bases are non-homogeneous, Cornice argues that chromium alloys should be too. [D.I. 178 at 15.] In doing so, Cornice is essentially using an orange to construe the word "apple." Although they are both fruits, an apple is not an orange. Likewise, the claims do not call for a seedlayer or underlayer composed of a bulk "aluminum alloy," requiring instead a "chromium alloy" seedlayer or underlayer sputtered atoms by atoms to form microscopically thin films. Because construing the term outside of its context is improper, Cornice's reliance on aluminum alloy to construe chromium alloy should be rejected. See Mars, Inc. v. H.J. Heinz Co., 377 F.3d 1369, 1374 (Fed. Cir. 2004) (construing claim term "ingredients" in light of the term "mixture" used in the same claim phrase).

### 4.    Cornice cannot rely on extrinsic dictionary definitions

Finally, the extrinsic dictionary definitions Cornice cites in footnotes are to no avail. [D.I. 178 at 13-14 n.6.]

- The IDEMA Glossary sheds no light on this claim construction dispute: whether an alloy is a single phase mixture or may also include two-phase mixtures. It merely acknowledges that "alloys" refer to "metal mixtures composed of several elements."

- The Random House Dictionary actually contradicts Cornice's interpretation, by emphasizing that an alloy is a substance "intimately mixed as by fusion or electrodeposition." The reference to "intimately mixed" and "fusion" actually excludes the possibility of "two-phase mixtures," such as oil and water.

- The Dictionary of Chemistry relates to a completely different art than material sciences, while the McGraw-Hill Dictionary attempts to cover other technical fields besides material sciences. Their definitions are thus so off mark that they even encompass "compounds," which are not – by any stretch of the imagination – "alloys."

Other dictionaries in fact support Seagate's proposed construction. [Ex. I (The Am. Heritage College Dictionary 37 (2000)) (defining alloy as a "homogeneous mixture or solid solution of two or more metals, the atoms of one replacing or occupying interstitial positions between the atoms of the other.").] Ultimately, because the intrinsic evidence is clear on the meaning of "chromium alloy," there is no need to turn to such inconsistent extrinsic evidence.

10

C.    "Substantially Directional Magnetic Isotropy" should be construed according to precedent and the technological context

1.    The term allows consideration of one or more orientation ratios

Contrary to Cornice's argument, the parties do not dispute whether "substantially directional magnetic isotropy" can be determined by considering the orientation ratios of many magnetic properties, such as coercivity, remanence, and coercive squareness. [D.I. 178 at 24-26.] Seagate agrees that the more orientation ratios of a medium's magnetic properties one considers, the more accurate the conclusion becomes. Seagate's expert and one of the inventors acknowledged this undisputed point during their respective deposition. [D.I. 179 Ex. G at 225:6-12; Ex. A-tab 44 at 113:18-114:9.] The real dispute turns, instead, on the minimum number of orientation ratios (e.g., ORs of Hc, Mr, S*) that must be considered to determine whether a medium exhibits substantial magnetic isotropy.

As a scientific matter, skilled artisans understand that, when one orientation ratio is low (i.e., more isotropic), the other ratios are likely to be low as well. As Professor Laughlin explained, "very often, when one property is isotropic, other properties are. So sometimes there is no need to measure all. So if one property is isotropic, for example, in the plane, others may be also." [D.I. 147 Ex. 9 at 223:5-20.]    **REDACTED**

. [D.I. 147 Ex. 10 at 492:9-24 ("

**REDACTED**

").] Even the extrinsic evidence Cornice cites agrees that isotropic media have "the same Hc, Mrt, and S* [measurements] in all in-plane directions." [D.I. 179 Ex. A-tab 25 at 2:6.] Thus, one orientation ratio amply suffices to determine magnetic isotropy, although using two or more orientation ratios is better.

As a legal matter, Cornice's construction ignores the intrinsic evidence and controlling precedent. As Seagate's opening brief discussed [D.I. 146 at Part IV.D.2. pp. 20-23], the intrinsic evidence fully support the "one or more orientation ratios" interpretation:

11

- The claim language – as with dependent claims 4, 10, and 19 – always uses the term as part of the larger phrase "magnetic properties with an orientation ratio" to qualify the term "substantially directional magnetic isotropy" in the broader independent claims.  By using the indefinite article "an," the claims indicate that "one or more" orientation ratios would suffice.

- In each of Cornice's citations to "magnetic properties" in the specification, the patent uses the language of the dependent claims: "magnetic properties with an orientation ratio."  [Id. at 5:57-61, 7:3-6, 10:9-16.]  One orientation ratio suffices.

- Cornice's emphasis on the plural "magnetic properties" ignores that the patent uses the term to mean either (1) a magnetic property of the medium (such as Hc or S*), or (2) a property measurement made in a certain direction (such as Hc measurement in the circumferential direction).  [Contrast '754 patent at 1:54-56 with 5:59-61 & 5:64-6:2.]  When paired with "an orientation ratio," the context of the claims and specification shows that "magnetic properties" means the latter.

Thus, science and law compel one conclusion: "one or more" is the correct interpretation.

### 2.    "Substantially directional magnetic isotropy" does not require a lack of dominant crystallographic orientation

By requiring a complete absence of dominant crystallographic orientation, Cornice is essentially changing a flat roof, in which the beams are parallel to the ground, into an impossible-to-build "roof" with beams pointed in every direction in space.  The intrinsic evidence does not support this rewriting of the claims.  [See D.I. 146 Part IV.D.3. pp. 23-26.]

### a.    Cornice's new limitation contradicts the express claim language and renders claim 11 superfluous

Notably, Cornice's brief fails to cite the claim language. [D.I. 178 at 26-29].  The reason is simple: the claims do not support this novel limitation.  After all, the disputed term expressly mentions "magnetic" – not "crystallographic" – isotropy.  More importantly, Cornice's additional limitation improperly negates dependent claim 11's express requirement that the "magnetic layer does not exhibit a (1120)-dominant crystallographic orientation;" there is no reason to insist on this lack of (1120)-dominant orientation in claim 11 if claim 1, from which claim 11 depends, already negates all dominant crystallographic orientations. See Karlin Tech. Inc. v. Surg. Dynamics, Inc., 177 F.3d 968, 971-72 (Fed. Cir. 1999) (stating that under the doctrine of claim differentiation separate claims have different scope).

12

**b.     The specification does not support this new limitation**

Without support in the claims, Cornice turned to the specification hoping to find some support. Cornice thus argues that "substantially directional magnetic isotropy" only appears in the '754 patent and therefore lacks an ordinary meaning in the art. [D.I. 178 at 26.] There is one problem however; "substantially directional magnetic isotropy" is not unique to the '754 patent, appearing for example in U.S. Patent No. 6,110,582. [D.I. 147 Ex. 11.] In fact, the '582 patent uses this term interchangeably with the phrase "substantially two dimensional directional magnetic isotropy" to describe a medium characterized by a dominant crystallographic orientation parallel to the film's plane (rather than without any dominant orientation, as Cornice suggests). [D.I. 147 Ex. 11 at 6:20-30.]

Even if Cornice could justify its resort to the specification, the two sentences it cites do not help. [D.I. 178 at 27 (citing '754 patent at 5:45-49 and 10:18-22).] To the contrary, these two sentences' context indicates that the inventors were merely attempting to differentiate the conventional contemporary practices, which sought to make longitudinal recording media by inducing a (200)-dominant orientation in the underlayer and a (11$\underline{2}$0)-dominant orientation in the magnetic layer. Although the patent's preferred embodiment innovated by avoiding this conventional practice, it is a far cry to conclude that these two sentences alone preclude <u>all</u> dominant crystallographic orientations.

**c.     There is no clear and unmistakable prosecution disclaimer**

Lacking support in the claim language or written description, Cornice then turns to the prosecution history to narrow the claims. [D.I. 178 at 28-29.] But to narrow a claim term based on a patentee's statement during prosecution, the alleged disavowal of claim scope must be both clear and unambiguous. <u>Omega Eng'g</u>, 334 F.3d at 1325. The existence of a reasonable alternative explanation precludes a finding of prosecution disclaimer. <u>See id.</u>

The two passages Cornice cites here fall far from this strict standard. As to the comments regarding the Chen '227 patent, the patentee merely echoed the specification by noting that the preferred embodiment improved over the restrictive use of (200)-dominant

13

orientation in the underlayer and (11$\underline{2}$0)-dominant orientation in the magnetic layer of conventional media at the time. [D.I. 179 Ex. A-tab 15 at 76.] Far from disclaiming all dominant crystallographic orientations, the patentee's comments simply acknowledged that the patented medium could exhibit substantial magnetic isotropy even when it incorporates other dominant crystallographic orientations parallel to the plane of the film, such as (110)-dominant orientation in the underlayer and (10$\underline{1}$0)-dominant orientation for the data storage layer. As to the statements regarding the Doerner patent [D.I. 179 Ex. A-tab 15 at 72], the patentee was simply reminding the Examiner that "substantially directional magnetic isotropy" is not an inherent property. Since the Doerner reference was silent about the claimed "substantially directional magnetic isotropy" property, the Examiner could not assume that the prior art disclosed this property. And because the Doerner patent does not provide any information about crystallographic orientation, the Examiner could not presume that it taught claim 11's lack of (11$\underline{2}$0) dominant orientation.

Because the cited prosecution comments have more than one reasonable meaning (especially one not involving the alleged disavowal), the doctrine of prosecution disclaimer cannot apply here. See Sandisk, 415 F.3d at 1287-88.

D.    "Having magnetic properties with an orientation ratio of about 1.0"

1.    The claim allows "one or more" orientation ratios

Cornice's argument on this point only repeats the contention it presented with regard to "substantially directional magnetic isotropy," by insisting that multiple orientation ratios (i.e., ORs of Hc, Mr, and S*) are necessary to determine whether a medium exhibits this advantageous magnetic property. [D.I. 178 at 32-33.] Seagate thus respectfully refers the Court to its discussion of this issue above, see supra Part III.C.1, and to its opening claim construction brief on this patent. [D.I. 146 at Part IV.D.2 at 20-23 and Part IV.E.1. at 26-27.]

2.    "About 1.0" does not require rounding to the first decimal place

Cornice's concoction of this rounding requirement is without merit. First, it has no support in the intrinsic evidence, especially not where the specification only repeats the

14

phrase "having magnetic properties with an orientation ratio of about 1.0." [D.I. 178 at 33.] Second, requiring the mathematical precision of rounding to the first decimal place conceptually contradicts and negates the broadening and non-mathematical claim term "about." Finally, this limitation reads out the preferred embodiment, whose ratios are reported to two decimal places in Table II. [D.I. 146 at Part IV.E.2. pp. 27-28.]

### E.    "Randomly oriented grains" and "grains ... are randomly oriented"

Unable to justify its eleventh-hour construction, Cornice raises the proverbial straw man by blaming Seagate. According to Cornice, "randomly oriented" require that the "magnetic c-axis of the grains are randomly oriented in all three dimensions." because Seagate tries to add a two-dimensional limitation. [D.I. 178 at 30.] That is just bizarre. Far from imposing a limitation, Seagate proposed that "the claim phrases should receive their ordinary meaning, without additional limitations." [D.I. 143 (JCCS) at p. 11.] Seagate opposes Cornice's construction because it is scientifically unsound and legally baseless.

### 1.    Because the chromium grains of the seedlayer do not have a magnetic c-axis, Cornice's construction cannot apply to claim 13

Cornice ignores the context of the claims, failing to realize that its construction cannot scientifically apply to the seedlayer grains in claim 13. In context, it is clear that the "randomly oriented grains" are those of the "chromium or chromium alloy seedlayer," and not the grains of the magnetic layer. ['754 patent at 12:18-20 ("depositing a chromium or chromium alloy seedlayer on a non-magnetic substrate, wherein the grains lying in a plane are randomly oriented; ...." (emphases added).] In contrast to the magnetic layer's cobalt alloy grains, chromium and chromium alloy grains in the seedlayer are not magnetic and therefore cannot have a magnetic c-axis. [See D.I. 146 at Part IV.F.1-2. at 29-31.]

### 2.    There is no intrinsic support for Cornice's "magnetic c-axis ... oriented in all three dimensions" limitation

Except for the straw man it raised, Cornice has not offered any basis for its limitation. [D.I. 178 at 29-32.] The claims' plain language does not require three-dimensional orientation. ['754 patent at 11:10-12:5; 12:16-25.] Nor do the two passages Cornice cited:

15

- Another aspect of the present invention is a method of manufacturing a magnetic recording medium, which method comprises: depositing a seedlayer on a non-magnetic substrate, <u>wherein grains lying in a plane are randomly orientated</u> [sic] [<u>id.</u> at 4:34-38 (emphasis added)];

- Rather, the seedlayer is formed such that it contains grains lying in a plane which are randomly orientated. [sic] [<u>Id.</u> at 5:49-57.]

[D.I. 178 at 30-31.] These quotes do not support Cornice, because the "randomly orientated" [sic] grains are in the chromium <u>seedlayer</u> and thus do not have a magnetic c-axis. Worse yet, these two specification passages only echo claim 13, stating that the grains are "lying in a plane" rather than "outside of the plane" as required for three-dimensional orientation.

The prosecution history also contradicts Cornice. The '582 patent – which "contains subject matter similar to the subject matter of" the '754 patent ['754 patent at 1:11-13] – states that all grain c-axes are oriented in the plane of the film, not in all dimensions:

> As a consequence of lattice and crystalline plane matching, the magnetic layer will grow in a close-packed hexagonal structure with a ($10\underline{1}0$) crystallographic orientation which is isotropic inside the film surface. Therefore, the grains will have a ($10\underline{1}0$) orientation but <u>substantially randomly distributed in the disc surface plane.</u> As a result, the subsequently deposited magnetic layer exhibits a close-packed hexagonal structure <u>with the magnetic easy axis, c-axis, lying in the film plane, but the axis is randomly distributed inside the film plane</u>.

[D.I. 147 Ex. 11 ('582 patent) at 6:10-16 (emphases added).] In sum, there is no intrinsic evidence supporting Cornice's novel limitation; Cornice's construction should be rejected.

## V.    CONCLUSION

For the reasons provided above, Seagate respectfully requests that the Court adopt its proposed constructions in their entirety and reject Cornice's proposal.

Dated:  December 16, 2005            FISH & RICHARDSON P.C.

By: <u>/s/ Timothy Devlin</u>
Timothy Devlin (#4241)
919 N. Market Street, Suite 1100
Wilmington, DE  19899-1114
Tel: (302) 652-5070

Attorney for Plaintiff
SEAGATE TECHNOLOGY LLC

16